# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                           )
**PAMELA A. BROWNFIELD,**     )
                           )
    **Plaintiff,**         )
                           )
      **v.**           )    **Case No. 1:05-cv-02468-EGS**
                           )
**SHEILA M. BAIR,**[1]      )
**Chairman,**            )
**Federal Deposit Insurance Corporation,**  )
                           )
    **Defendant.**        )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT THEREOF

Defendant Sheila C. Bair, in her official capacity as Chairman of the Federal Deposit Insurance Corporation ("FDIC"), hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The bases for this motion are more fully set forth in the accompanying Memorandum in Support of Defendant's Motion for Summary Judgment.

In support of this motion, defendant refers the Court to the supporting memorandum and exhibits thereto, as well as Defendant's Statement of Material Facts as to Which There is No Genuine Issue. An order granting the relief sought is attached hereto.

---

[1] The Complaint, filed on December 20, 2005, and the Amended Complaint, filed on December 1, 2006, named as defendant Martin J. Gruenberg, in his official capacity as Acting Chairman of the FDIC. Sheila C. Bair was sworn in as Chairman of the FDIC on June 26, 2006, and in her official capacity should be substituted for Mr. Gruenberg as the defendant in this case pursuant to Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND .................................................................................2

III.    SUMMARY JUDGMENT STANDARD..................................................................7

IV.     ANALYSIS...........................................................................................................8

        A.      The Court should reject Plaintiff's attempts to seek remedies for claims
                that were not properly exhausted and/or were not adverse employment
                actions ....................................................................................................8

                1.      Plaintiff failed to exhaust her administrative remedies regarding the
                        claims that she elected to treat as "background information" only:
                        (i) her non-selection in March 2004; (ii) listing her CG-12
                        Management Analyst position as "surplus" in December 2004; and
                        (iii) her receipt of an informal counseling e-mail in January 2005 .............8

                2.      Any claims involving Plaintiff's non-selection for promotion in March
                        2004 or listing her CG-12 Management Analyst position on the
                        "surplus list" in December 2004 are time-barred due to her failure to
                        contact an EEO counselor until March of 2005........................................12

                3.      Listing Plaintiff's CG-12 position on the "surplus list" in December
                        2004 and sending her an informal counseling e-mail in January 2005
                        were not adverse employment actions ......................................................13

        B.      Plaintiff's hostile work environment claim is insufficient as a matter of law .......16

                1.      Plaintiff cannot make out a prima facie hostile work environment
                        claim under Title VII ...............................................................................16

                2.      Plaintiff's non-recognition of her hostile work environment is fatal
                        to her claim ..............................................................................................19

                3.      The discrete acts alleged by Plaintiff do not support a hostile work
                        environment claim ....................................................................................20

C.  Defendant is entitled to summary judgment on Plaintiff's race discrimination claims ............................................................................................22

1.  Plaintiff has not established a prima facie case that she was denied a pay raise in 2005 due to her race............................................................22

2.  Even assuming that Plaintiff is able to establish a prima facie case, Defendant has articulated legitimate, non-discriminatory reasons for why she was denied a pay raise under the Contribution-based Compensation (CBC) system applicable to all non-bargaining unit employees at the time.............................................................................25

D.  Defendant is entitled to summary judgment on Plaintiff's retaliation claims .......29

1.  Actions occurring in February-March 2006 are too remote in time to demonstrate causation...................................................................30

2.  Changes in work assignments were not adverse actions ...........................31

3.  Defendant has articulated legitimate, non-discriminatory reasons for each of the actions claimed to be retaliatory............................................32

V.  CONCLUSION.............................................................................................34

## TABLE OF EXHIBITS

1        Acceptance of EEO Claims Letter dated June 2, 2005

1-1      EEO Counselor's Report (referenced in the 2005 Acceptance Letter)

2        Acceptance of EEO Claims Letter dated April 27, 2006

3        Award Nomination for Pamela Brownfield

4        Bendler Affidavit I (August 11, 2005)

5        Bendler Affidavit II (August 22, 2006)

6        Bendler Deposition

6-1      Bendler Deposition Errata Sheet

7        Bjorklund Affidavit (August 12, 2005)

8        Brownfield Affidavit I (August 9, 2005)

9        Brownfield Affidavit II (August 4, 2006)

10       Brownfield Deposition (March 12, 2007)

11       Carmichael Deposition (March 13, 2007)

11-1     Carmichael Deposition Errata Sheet

12       E-mails in 2003 between Ms. Brownfield and Mr. Bendler

13       E-mail dated January 22, 2004 approving structured interview questions and benchmarks

14       E-mail dated January 21, 2004 requesting extension of roster and approval

15       Formal Complaint of Discrimination (May 13, 2005)

16       Formal Complaint of Discrimination (March 24, 2006)

17       Informal Counseling E-mail from Mr. Bendler to Ms. Brownfield dated January 25, 2005

18       Kea Affidavit I (July 28, 2005)

19       Kea Affidavit II (August 10, 2006)

20      Kitchens Deposition (March 14, 2007)

20-1    Kitchens Deposition Errata Sheet

21      Marlatt Deposition (March 14, 2007)

22-1    Performance Evaluation for Pamela Brownfield, 1998 (by Paul Sherman)

22-2    Performance Evaluation for Pamela Brownfield, 1999 (by Paul Sherman)

22-3    Performance Evaluation for Pamela Brownfield, 2000 (by Paul Sherman)

22-4    Performance Evaluation for Pamela Brownfield, 2001 (by Paul Sherman)

22-5    Performance Evaluation for Pamela Brownfield, 2002 (by Paul Sherman)

23      Performance Evaluation for Pamela Brownfield, 2003 (by Dan Bendler)

24      Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for
        Production of Documents

25      Sherman Affidavit I (August 2, 2005)

26      Sherman Affidavit II (August 11, 2006)

27      Sherman Deposition (March 15, 2007)

27-1    Sherman Deposition Errata Sheet

28      Steely Affidavit (August 30, 2006)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
**PAMELA A. BROWNFIELD,**                )
                                                      )
    **Plaintiff,**                               )
                                                      )
      **v.**                                        )     **Case No. 1:05-cv-02468-EGS**
                                                      )
**SHEILA M. BAIR,**                             )
**Chairman,**                                     )
**Federal Deposit Insurance Corporation,**  )
                                                      )
    **Defendant.**                            )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff Pamela A. Brownfield is currently a CG-12 Program Analyst employed by the

Federal Deposit Insurance Corporation ("FDIC" or "Agency") in its Division of Information

Technology ("DIT") in Arlington, Virginia. Prior to August 2006, and at all time relevant to this

lawsuit, she was a CG-12 Management Analyst employed by the FDIC in its Division of

Administration ("DOA"), where she worked in the Management Support Section ("MSS") of the

Management Services Branch ("MSB"). Plaintiff brings this action against Sheila M. Bair, in

her official capacity as the Chairman of the FDIC, under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq. ("Title VII"). She alleges that Arleas Upton Kea, the Director of

DOA, Paul Sherman, the Assistant Director in charge of MSB, and Dan Bendler, the Section

Chief of MSS, subjected her to a hostile work environment beginning in March 2004 based on

1

race (Amended Complaint, Count I, at ¶¶ 20-21), denied her a pay raise in 2005 based on race (id., Count II, at ¶¶ 22-23), and retaliated against after she filed an administrative complaint alleging discrimination in May 2005 (id., Count III, at ¶¶ 24-25).

After full and ample discovery, however, Plaintiff has marshaled no evidence to show: (i) that she was subjected to a hostile work environment; (ii) that any unlawful factors played a part in the performance evaluation resulting in the denial of a pay raise in 2005; or (iii) that she was subjected to retaliation for filing an EEO complaint. As demonstrated below, and as demonstrated in the Rule 7.1(h) Statement of Undisputed Facts accompanying Defendant's Motion for Summary Judgment, there is no genuine issue as to any material fact on any of Plaintiff's claims. See Fed. R. Civ. P. 56. Defendant therefore respectfully requests that judgment for Defendant be entered as a matter of law, and that this matter be dismissed with prejudice.

## II.  FACTUAL BACKGROUND

Plaintiff began her career at the FDIC in 1990 as a grade 5 secretary. Brownfield Dep. (Ex. 10) at 9. She first became acquainted with Mr. Sherman in a non-supervisory capacity in 1992, and they generally interacted on a daily basis after that. Id. at 12-14, 25. Mr. Sherman became her supervisor around 1996, at a time when she had progressed to a grade 9 Management Analyst. Id. at 13-16; Sherman Aff. II (Ex. 26) at 2. Subsequently, Mr. Sherman competitively selected her for a grade 11/12 Management Analyst position in his section. Brownfield Dep. at 16; Sherman Aff. II at 2. While he was her immediate supervisor, Mr. Sherman gave Ms. Brownfield substantial performance awards (including one for $2,000 in October 2000), as well as favorable performance evaluations. Brownfield Dep. at 20-25; Award Nomination (Ex. 3);

2

Performance Evaluations 1998-2002 (Exs. 22-1 through 22-5).  Ms. Brownfield's written comments on her performance evaluations indicate that she was an enthusiastic and engaged employee during this time period, who had a good relationship with Mr. Sherman.  See Performance Evaluations 1998-2001 (Exs. 22-1 through 22-4).

In 2003, Plaintiff was a grade 12 Management Analyst when Dan Bendler became her first-line supervisor and Mr. Sherman was elevated to her second-line supervisor as the result of a reorganization in DOA.  Brownfield Dep. at 25; Sherman Dep. (Ex. 27) at 7-9.  Ms. Brownfield had known Mr. Bendler since he had transferred into the section from the FDIC's Office of Inspector General (OIG) in 1996 or 1997.  Brownfield Aff. II (Ex. 9) at 1; Brownfield Dep. at 28.  They interacted daily on a first-name basis and had a cordial relationship.  Id.; see, e.g., E-mails in 2003 between Bendler and Brownfield (Ex. 12).  Mr. Bendler prepared Plaintiff's performance evaluation in 2003, which she characterized as "outstanding."  Brownfield Dep. at 29; Performance Evaluation 2003 (Ex. 23).

In late 2003, multiple grade 13 Management Analyst positions were posted in MSS, and Ms. Brownfield applied for this promotion opportunity.  Brownfield Dep. at 30.  She qualified for the roster but in January 2003, before interviews were held for the position, Ms. Brownfield had to leave the office for about four weeks to care for her terminally ill sister in Pittsburg.  Id. at 31-32.  While she was away, she stayed in contact with Dan Bendler and others in the office on a daily basis.  Id.  Before she returned to the office, the other candidates on the roster were interviewed by a panel consisting of three individuals who were not in the MSS chain of command.  Bendler Aff. I (Ex. 4) at 4; Sherman Aff. I (Ex. 25) at 4.

The interviewing panel (Mary Carmichael, from the OIG's office, Jerie Kitchens, the

3

Special Assistant to DOA Division Director Arleas Upton Kea, and Rick Marlatt, an MSB

employee from another section who was not supervised by Dan Bendler) used a structured

interview format in which all candidates were asked the same questions.  Carmichael Dep. (Ex.

11) at 45, 53; Kitchens Dep. (Ex. 20) at 28; Marlatt Dep. (Ex. 21) at 41-44.  The interview

questions and benchmark answers were approved in advance by the Human Resources Branch of

DOA.  See E-mails to/from HRB (Ex. 13).  Ms. Carmichael did not know Ms. Brownfield,

Carmichael Dep. at 84, Mr. Marlatt was an MSB co-worker from another section, and Ms.

Kitchens was more than just a work colleague in that she and Ms. Brownfield had socialized

outside the office and had attended concerts together, Kitchens Dep. at 89.

In consideration of Ms. Brownfield's personal situation involving her sister's illness, Mr.

Bendler contacted the Human Resources Branch and requested that an extension of the roster for

30 days, so that the roster would not expire before Ms. Brownfield returned to the office.

Bendler Dep. (Ex. 6) at 64-65; E-mails concerning roster extension (Ex. 14).  Following her

sister's unfortunate death, Ms. Brownfield returned to work, was interviewed by the same panel

that had interviewed all the other candidates (Ms. Carmichael, Ms. Kitchens and Mr. Marlatt),

and was asked the same structured interview questions.  Bendler Aff. I at 4.

Unfortunately, as she has readily admitted, Plaintiff did not perform well during the

interview.  Brownfield Aff. I (Ex. 4) at 4, 6; Brownfield Dep. at 38.  Consequently, she was not

among the top four candidates whose names were forwarded by the initial interview panel for

further consideration by Mr. Bendler and Mr. Sherman, and therefore she was not selected for

one of the grade 13 positions.  Bendler Aff. I at 4; Sherman Aff. I at 4.

In December 2004, as part of an FDIC-wide downsizing process, Plaintiff's grade 12

4

position was listed (along with 130 other DOA positions) as a "surplus" position due for eventual elimination. Bendler Aff. I at 4-5; Sherman Aff. I at 4. Plaintiff's position was deemed "surplus" because after due consideration, it was determined that it wasn't needed to accomplish the work remaining in MSB. Sherman Dep. at 22-39. Subsequently, Ms. Brownfield became withdrawn and uncommunicative, both with other MSS staff and with management. Bendler Aff. I at 5. Finally, matters came to a head when Ms. Brownfield verbally lashed out at Mr. Bendler when he tried to meet with her concerning her performance issues in January 2005. As a result of her actions during this abortive meeting, Mr. Bendler sent her a counseling memo via e-mail on January 25, 2005. Id.; see Informal Counseling E-mail (Ex. 17). While Ms. Brownfield claims that the counseling memo constituted part of the hostile work environment she alleges, the inoffensive tone of the e-mail, which addressed expectations for her future performance and conduct, speaks for itself. Id.

As a result of her relatively poor corporate contributions during 2004, in early 2005 Ms. Brownfield was ranked in Group V (the lowest five percent of employees) under the FDIC's new Contribution-Based Compensation (CBC) program that had been implemented for all non-bargaining unit employees that year.[2] Bendler Aff. I at 2-3; Sherman Aff. I at 2-3. In accordance with the parameters of the CBC program, she did not receive a pay raise for 2005 due to her

Group V ranking, which was reviewed by senior DOA management, including Deputy Director Glen Bjorklund and Division Director Arleas Upton Kea, who is both an African American

---

[2] Although most non-management employees at the FDIC are represented by the National Treasury Employees Union (NTEU), some employees, due to the requirements of their positions, are not in the bargaining unit. The FDIC's unionized employees were not covered by the CBC

woman and head of the FDIC's diversity awareness program.  <u>Id</u>.; Bjorklund Aff. at 2-3; Kea

Aff. I at 1.  Shortly thereafter, Plaintiff contacted an EEO counselor and eventually filed a formal

complaint of discrimination in May 2005, alleging that her CBC ranking was the result of race

discrimination by Ms. Kea, Mr. Sherman and Mr. Bendler and that she had been subjected to a

hostile work environment by Mr. Bendler and Mr. Sherman.  <u>See</u> Formal Complaint of

Discrimination 2005 (Ex. 15).

The next year, in February 2006, Plaintiff was verbally counseled by Mr. Bendler after

Ann Bridges Steely, the manager of DOA's Acquisition Services Branch ("ASB"), complained

to Mr. Sherman that Ms. Brownfield had been spending an inordinate amount of time socializing

in the adjacent ASB office area and was distracting ASB employees.  Bendler Aff. II at 2-4; Kea

Aff. II at 2; Sherman Aff. II at 4-5; Steely Aff. (Ex. 28) at 2-3, 4-5.  In the interim, the FDIC had

instituted a new Pay for Performance (PFP) compensation system and Plaintiff was ranked in

PFP Group III (the lowest 25 percent of employees) for her 2005 work activities.  On March 24,

2006, Plaintiff filed a second formal complaint of discrimination based on race and reprisal,

which she alleged had occurred "[c]ontinuously since May 2005 (when I filed a formal EEO

complaint regarding my not being given a pay increase (CBC))."  Formal Complaint of

Discrimination 2006 (Ex. 16) at 2.  Plaintiff's additional claims included the verbal counseling

concerning Ms. Steely's complaint, her Group III PFP ranking, and allegations that her workload

had decreased.  <u>See</u> Acceptance Letter 2006 (Ex. 2) at 2.

Approximately five months after she filed her second EEO complaint in March

2006, Ms. Brownfield obtained a lateral transfer to an equivalent CG-12 Program Analyst

program.

position in the FDIC's Division of Information Technology in August 2006, with no loss

of pay or benefits, where she remains employed today.  Brownfield Dep. at 82.

### III.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

if the pleadings on file, together with the affidavits and other admissible evidence of record, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Material facts are those that

"might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the initial burden of

demonstrating an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  A genuine issue of material

fact is one capable of affecting the outcome of the litigation that is supported by admissible

evidence sufficient for a reasonable trier of fact to find in favor of the non-moving party.

Anderson, 477 U.S. at 247-48.

In considering whether there is a triable issue of fact, the court must draw all reasonable

inferences in favor of the non-moving party.  Id. at 255.  The party opposing a motion for

summary judgment, however, "may not rest upon the mere allegations or denials of his pleading,

but . . . must set forth specific facts showing that there is a genuine issue for trial."  Id. at 248.

The non-moving party must do more than simply "show that there is some metaphysical doubt as

to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).  Moreover, any factual assertions in the movant's affidavits will be accepted as being

true unless the opposing party submits her own affidavits or other documentary evidence

contradicting the assertion.  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

## IV.  ANALYSIS

**A.  The Court should reject Plaintiff's attempts to seek remedies for claims that were not properly exhausted and/or were not adverse employment actions.**

1.  Plaintiff failed to exhaust her administrative remedies regarding the claims that she elected to treat as "background information" only:  (i) her non-selection in March 2004; (ii) listing her CG-12 Management Analyst position as "surplus" in December 2004; and (iii) her receipt of an informal counseling e-mail in January 2005.[3]

After Ms. Brownfield was notified in February 2005 that she had been placed among the five percent of FDIC employees who had been ranked in CBC Group V, and therefore she would not be receiving a raise, she contacted an EEO counselor for the first time on March 3, 2005. See EEO Counselor's Report (Ex. 1-1) at 1.  Subsequently, on May 13, 2005, she filed a formal complaint of discrimination and designation of representative naming her current litigation counsel, Mr. Shapiro.  See Formal Complaint of Discrimination 2005 (Ex. 15).

In her formal EEO complaint, Plaintiff elected not to pursue administratively any independent claims of discrimination for adverse actions that occurred before she was denied a pay raise in March 2005.  Instead, her formal complaint made the following allegations:

> I received notice that I would not be getting a pay increase under the CBC program.
> I was the only one eligible in my section (and I think my branch) to be passed over
> for a CBC raise.  I am the only African-American in my section.  Since I reacted
> negatively to being placed on the surplus list – the only one in my section to have
> this happen (and one of three people – an older woman and a deaf Asian male – in
> the branch) – I have been harassed by management to the point that I now suffer
> from a hostile work environment.
> . . .
> I am the only person in my section not to get a raise and I am the only Black person

---

[3] In addition, Defendant's legitimate, non-discriminatory reasons for taking each of these actions are articulated in section II above.  With respect to her non-selection, see Carter v. George Washington University, 387 F.3d 872, 879 (D.C. Cir. 2004) (candidate's poor interview performance was legitimate, nondiscriminatory reason for her non-selection).

8

in my section.  It is close to the same in my branch.

Id. at 2.

On June 2, 2005, in accordance with its standard EEO procedures, the FDIC sent an acceptance of claims letter to Plaintiff's representative, Mr. Shapiro, stating that the following claims had been accepted for investigation:

> Whether Complainant was discriminated against and subjected to a hostile work environment on the basis of race (African American), when on February 17, 2005, she was notified that based on her performance contribution during calendar year 2004, she was placed in Group V for the 2005 Contribution-Based Compensation Program, and would not receive a base pay increase for the calendar year 2005.

Acceptance Letter 2005 (Ex. 1) at 2.  The Acceptance Letter further stated:

> If the above-identified claim is incorrect, please inform Carol H. Banks, EEO Specialist, of the claim Complainant is alleging to be discriminatory, as well as the relevant date(s).  This information must be provided, in writing, within five (5) calendar days of Complainant's receipt of this letter, to Ms. Banks at the address provided below.  If this Office does not receive a written reply within five (5) calendar days of receipt of this letter, the above-identified claim will be forwarded for investigation.

Id.  In addition, the Acceptance Letter specifically noted that:

> On May 26, 2005, the Agency contacted David H. Shapiro, Complainant's representative, to ask permission to contact Complainant to clarify her formal complaint.  *In a telephone conversation, on May 31, 2005, Complainant informed the Agency that she was filing a formal complaint on the Contribution-Based Compensation Program, and that the claims listed in the EEO Counselor's Report under allegation #2 were intended as background evidence.  Complainant refused to provide written clarification to the Agency because her attorney advised her not to do so.*

Id. at 1 n.2 (emphasis added).  The referenced "claims listed in the EEO Counselor's Report under allegation #2" concerned: (i) the January 25, 2005, counseling memo; (ii) the designation of her position as surplus in December 2004; and (iii) Plaintiff's non-selection for the grade 13 position in 2004.  See EEO Counselor's Report (Ex. 1-1) at 3.  In accordance with Plaintiff's

9

express decision, these other claims were treated as background information only in connection

with the administrative EEO investigation of her CBC pay raise issue and hostile work

environment claims.[4]  See also Formal Complaint of Discrimination 2006 at 2 (alleging that she

had been retaliated against "[c]ontinuously since May 2005 (when I filed a formal EEO

complaint regarding my not being given a pay increase (CBC)).");  Plaintiff's Responses to

Defendant's First Set of Interrogatories and Requests for Production of Documents (Ex. 24) at 2

("Plaintiff filed a formal EEO complaint in May 2005 over a pay issue." (emphasis added)).

A very recent Supreme Court opinion has emphasized that when considering the prior

exhaustion of administrative remedies in actions brought under Title VII, "we have stressed the

need to identify with care the specific employment practice that is at issue." Ledbetter v.

Goodyear Tire & Rubber Co., No. 05-1074, 2007 WL 1528298, at *4 (May 29, 2007) (citing

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110-111 (2002)).  Any such

unexhausted claims are subject to dismissal.  See Camp v. District of Columbia, No. 04-234

(CKK), 2006 WL 667956 (D. D.C. March 14, 2006) (holding, in a case that included allegations

of hostile work environment, that plaintiff's termination/retaliation claim would be

subject to dismissal for failure to exhaust administrative remedies, because this claim constituted

a "discrete discriminatory act").  As the Camp decision explained:

> The Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536
> U.S. 101 (2002) . . . held that each discrete adverse employment action individually
> triggers Title VII's procedural requirements.  See Coleman-Adebayo [v. Leavitt],
> 326 F. Supp. 2d [132,] at 137 [(D. D.C. 2004)].  In Morgan, the Supreme Court held
> that that only those acts occurring within the limitations period were actionable,
> regardless of any connection between the earlier acts and the ones about which the

---

[4] Consistent with Plaintiff's election not to bring a claim of race discrimination for her non-
selection for one of the grade 13 positions in March 2004, the EEO investigator did not obtain
affidavits from any of the interview panel members (Carmichael, Kitchens and Marlatt).

10

> plaintiff had filed a timely complaint.  As the Court stated, "discrete discriminatory acts are not actionable if time barred, *even when they relate to acts alleged in timely filed charges*."  Morgan, 536 U.S. at 113 (emphasis added).  "The key to determining whether a claim must meet the procedural hurdles of the exhaustion requirement itself, or whether it can piggy-back on another claim that has satisfied those requirements, *is whether the claim is of a 'discrete' act of discrimination or retaliation or, instead, of a hostile work environment*."  Coleman-Adebayo, 326 F. Supp. 2d at 137.  "*Discrete acts such as* termination, *failure to promote*, denial of transfer, or refusal to hire" *are individual acts that "occur" at a fixed time*.  Morgan, 536 U.S. at 114.  "Accordingly, plaintiffs alleging such discriminatory action must exhaust the administrative process regardless of any relationship that may exist between those discrete acts and any others."  Coleman-Adebayo, 326 F. Supp. 2d at 138.

2006 WL 667956, at *7 (emphasis added and in original); accord Evans v. Chao, No. 04-00849 (HHK), 2006 WL 297714, at *2 n. 3 (D. D.C. Feb. 7, 2006) ("independently actionable claims of discrimination [such as denied promotions] may not also be characterized as a fragment of a hostile work environment claim in order to avoid filing requirements"); Powell v. Castaneda, 390 F. Supp. 2d 1, 8-9 (D. D.C. 2005) (noting that "[t]he court in Morgan distinguished discrete acts of discrimination [such as failure to promote] from hostile work environments" and dismissing all such discrete claims that had not been timely exhausted).

Despite this clear and binding precedent, in this case Plaintiff is seeking a remedy (her promotion to grade 13) for a discrete claim that was not exhausted when she filed her EEO complaint in May 2005, which merely alleged (i) a hostile work environment and (ii) race discrimination in connection with her lack of a pay raise under the CBC program.  Plaintiff should not be permitted to "game" the administrative process by electing in her May 2005 EEO complaint to treat claims such as her non-selection for a grade 13 position in March 2004 as merely background information for her hostile work environment claim, and then resuscitating this claim in District Court by claiming that because it was allegedly part of a hostile work

environment, she is entitled to promotion "to a CG-13 level retroactive to March 2004," Amended Complaint at 8. The Court should reject Plaintiff's attempt to evade mandated administrative exhaustion requirements (while she was represented and advised by her current counsel in this litigation) and dismiss any claims she is presently alleging for (i) non-selection, (ii) placement of her position on the surplus list, and (iii) the counseling e-mail, which were not brought as independent claims during the administrative process but were only raised as background information in connection with her hostile work environment claim.

2. <u>Any claims involving Plaintiff's non-selection for promotion in March 2004 or listing her CG-12 Management Analyst position on the "surplus list" in December 2004 are time-barred due to her failure to contact an EEO counselor until March of 2005.</u>

Procedures for handling complaints of discrimination brought by federal government employees under Title VII are found in 29 CFR Part 1614. A complainant must first contact one of her employing agency's EEO counselors within 45 days of the alleged discriminatory act or, in the case of a personnel action, within 45 days of its effective date. 29 CFR 1614.105(a)(1). If a person fails to comply with these time limits, and fails to establish that tolling the limits is warranted, a subsequent civil action is subject to dismissal. <u>See</u> <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 426 (D.C. Cir. 2003).

Plaintiff first contacted the FDIC's EEO office on March 3, 2005. Amended Complaint at ¶ 2. Therefore, she failed to timely exhaust any claim arising more than 45 days earlier than that date, including any claim she may have had for discriminatory non-selection and/or failure to promote occurring in March 2004. <u>See</u> 29 CFR 1614.105(a)(1); <u>Camp</u>, <u>supra</u>; <u>Evans</u>, <u>supra</u>; <u>Powell</u>, <u>supra</u>. Although Plaintiff alleges in her Amended Complaint at ¶ 18 that she did not become aware of a discriminatory "scheme" until February 2005, this would not excuse her

failure to timely exhaust her administrative remedies concerning a discrete claim which arose nearly a year earlier.  See Robinson v. Chao, 403 F. Supp. 2d 24, 30 (D. D.C. 2005) (dismissing hiring and pay claims for failure to contact an EEO counselor within the requisite 45-day period, and rejecting plaintiff's argument that the discriminatory acts were not single episodes, but "were continuous, such that she could not have filed a complaint until she recognized the continuing acts of harassment as acts giving rise to a discrimination claim.").

Plaintiff became aware of her non-promotion in March 2004.  See Brownfield Aff. I at 4.  Plaintiff learned of the "surplus" designation on December 16, 2004.  Amended Complaint at ¶ 11.  Because Ms. Brownfield never contacted an EEO counselor until March 3, 2005, both of these allegedly discriminatory acts were outside the 45-day period mandated by 29 CFR 1614.105(a)(1).  Accordingly, these claims are time-barred as discrete, individual claims and should be dismissed.

3.  Listing Plaintiff's CG-12 position on the "surplus list" in December 2004 and sending her an informal counseling e-mail in January 2005 were not adverse employment actions.

Surplus List.  To the extent that Plaintiff is making a claim of discrimination based on her position being declared "surplus" (among 130 DOA positions at this time during FDIC-wide downsizing efforts), such claim must fail since this did not constitute an actionable adverse employment action.  "To establish an adverse personnel action in the absence of diminution in pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'"  Harris v. Potter, 310 F. Supp. 2d 18, 21 (D. D.C. 2004) (quoting Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)); see also Glenn v. Williams, No. 98-1278 (CKK), 2006 WL 401816, at *16 (D. D.C. Feb. 21, 2006) ("An adverse employment action has been defined by the Supreme Court, and applied by the D.C. Circuit, as

'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'") (citing <u>Taylor v. Small</u>, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting <u>Burlington Indus. Inc. v. Ellerth</u>, 524 U.S. 742, 762 (1998))).  In this case, the designation of CG-343-12 Management Analysts on the DOA "surplus list" had no effect at all on Plaintiff's pay or benefits, nor did it adversely affected any of the terms, conditions or privileges of Plaintiff's employment.  Moreover, Plaintiff subsequently was transferred laterally to an equivalent grade 12 Program Analyst position in the FDIC's Division of Information Technology, where she remains employed today with no loss of pay or benefits.

 <u>Informal Counseling E-mail</u>.  Plaintiff has also alleged that on January 25, 2005, her supervisor, Mr. Bendler, "wrote [her] up" and "subject[ed] her to discipline" as part of a "scheme to create a hostile work environment for plaintiff based on her race."  Complaint at ¶¶ 16, 18.  By its explicit terms, however, the January 25, 2005, "write-up" that Plaintiff alleges was neither a letter of admonishment nor a disciplinary notice.  It stated, <u>inter alia</u>:  "This is an informal email that will not be permanently included in any formal system of record.  Instead, this email is intended to improve communication and begin 2005 on a more positive and productive footing." Informal Counseling E-mail (Ex. 17).

 Plaintiff alleges no adverse consequences of this alleged "write-up" that affected the terms, conditions or privileges of her employment, and indeed she cannot make such allegations because there were no such adverse consequences.  Yet even if Mr. Bendler's January 25 e-mail had actually been a formal warning letter or disciplinary notice, its issuance would not be independently actionable as an adverse employment action.  As this Court has previously

observed:

> Courts in this Circuit have held that formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level do not constitute adverse employment action.  See Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999) (letters of admonishment not an adverse employment action); Walker v. Washington, 102 F. Supp. 2d 24, 29 (D. D.C. 2000) (disciplinary notice not an adverse employment action).

> To establish an adverse personnel action in the absence of diminution in pay or benefits, plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of employment."  Brown, 199 F.3d at 457.  In this case, the Letter of Warning at issue does not constitute an adverse employment action because plaintiff has failed to allege that the discipline directly affected his job title, duties, salary, benefits or work hours in any material matter.

Harris v. Potter, supra, 310 F. Supp. 2d at 21.

Accordingly, Plaintiff has not stated any actionable, discrete claims of race discrimination for either the designation of her position as "surplus" in December 2004 or her receipt of the informal counseling e-mail in January 2005, since neither constituted adverse employment actions under Title VII.

**B.  Plaintiff's hostile work environment claim is insufficient as a matter of law.**

1.  Plaintiff cannot make out a prima facie hostile work environment claim under Title VII.

In order to make out a prima facie Title VII hostile work environment claim, Plaintiff must show:  (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her membership in the protected class; (4) the charged harassment had the effect of unreasonably interfering with her work performance and creating an intimidating, hostile or offensive working environment; and (5) the existence of respondeat superior liability.  Davis v. Coastal Int'l Security, Inc., 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (quoting Yeary v. Goodwill Industries-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir.

1997)); <u>Hopps v. Washington Metropolitan Area Transit Authority</u>, No. 03-01830 (PLF), 2007

WL 944807, at *7 (D. D.C. March 30, 2007).  While it is undisputed that Ms. Brownfield is a

member of a protected class, her hostile work environment claim fails at step 2 of the prima facie

case requirements above.

 In support of her hostile work environment claim, Plaintiff alleges a litany of adverse acts

that she suffered, beginning when she was not selected for a grade 13 position in MSS:

1. In March of 2004, she was "passed over for promotion to the CG-13 level."  Amended
   Complaint at ¶¶ 8-10.[5]

2. On December 16, 2004, she learned that her CG-12 Management Analyst position, along
   with three other positions in MSB, had been placed on the FDIC's "surplus list" for
   elimination at some point in the future.  <u>Id</u>. at ¶¶ 11-12.

3. Her immediate supervisor, Daniel Bendler, "chose to become upset with plaintiff because
   she was not the same jocular subordinate he was used to having in the section before he
   and his superiors passed her over for promotion and placed her job on the surplus list,"
   and "[a]s a consequence with his annoyance with plaintiff's more somber attitude in his
   section, on January 25, 2005, Mr. Bendler wrote plaintiff up for not speaking to her
   coworkers after he had ordered her to do so again on January 18, 2005."  <u>Id</u>. at ¶¶ 15-16.

4. On February 17, 2005, she was advised via e-mail that she would be among the five
   percent of FDIC employees who would not be receiving a pay raise that year pursuant to
   the FDIC's CBC (Contribution-Based Compensation) System, and she was the only MSB

---

[5] While Plaintiff requests that the Court "order defendant to promote plaintiff to a CG-13 level
retroactive to March 2004" with back pay and interest, Amended Complaint at 8, she has not
alleged non-selection as an independent claim, nor has she exhausted this claim administratively

employee who did not receive a raise in 2005 based on her corporate contributions in 2004. Id. at ¶¶ 17-18.[6]

The Supreme Court has stated that Title VII forbids "discriminatory conduct [that is] so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin. . . ." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Id. at 21 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) (internal citations omitted)). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Id.

The required standards for an actionable hostile work environment have been more recently articulated in a D.C. case as follows:

> The workplace environment becomes "hostile" only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) [parallel and additional citations omitted].

> The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment. Under Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998) [parallel citations omitted], in order to determine whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the

---

so as to permit a recovery for her non-promotion. See discussion above at IV.A.1-2.

[6] This denial of a pay raise in February 2005 is also the sole basis for the race discrimination claim set forth in Count II of her amended complaint.

discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance. . . . Moreover, it must be clear that the hostile work environment was the result of discrimination based on protected status. . . .

Silver v. Leavitt, No. 05-0968 (JDB), 2006 WL 626928, at *11 (D. D.C. March 13, 2006).

In this case, Plaintiff has alleged a number of workplace disappointments, occurring months apart, that do not constitute harassment, let alone "severe," "pervasive," and "abusive" conduct. She was not selected for promotion in March 2004; her position was listed among 130 others in DOA as "surplus" in December 2004; she received an informal counseling e-mail in January 2005 that was inoffensive in tone and subject-matter; and she was ranked in Group V of the CBC program in February 2005 and as a result, was denied a raise along with five percent of all FDIC non-bargaining unit employees covered by the CBC. Considering the totality of the circumstances alleged by Ms. Brownfield, she has not shown harassment, or harassment based on her race, or that the charged harassment had the effect of unreasonably interfering with her work performance or which created an intimidating, hostile or offensive working environment, as required under the standards set forth by the D.C. Court of Appeals in Davis. Since she has failed to establish a prima facie case, judgment should be entered for Defendant on her hostile work environment claim.[7]

---

[7] Compare Silver v. Leavitt, 2006 WL 626928, at *12 (holding that plaintiff had not alleged facts sufficient to support a hostile work environment claim because, inter alia, "[t]here is no allegation that defendant ever threatened plaintiff, or intimidated, degraded, subordinated, or abused plaintiff. . . . Hence, the facts of this case, even viewed in the light most favorable to plaintiff, do not establish a pattern of 'severe and pervasive' conduct that has affected the terms, conditions, or privileges of plaintiff's employment."), with Powell v. Castaneda, 390 F. Supp. 2d at 4-5 (denying motion to dismiss hostile work environment claim where plaintiff alleged, inter alia, that her supervisor "subjected her to offensive treatment" and "abusive behavior," "made the plaintiff's work environment 'punishing . . . by demeaning her daily with derogatory

18

2.  Plaintiff's non-recognition of her hostile work environment is fatal to her claim.

Plaintiff also states that she was unaware that she was in a hostile work environment until February 2005, when she learned she would not be receiving a pay raise:

> While she did not recognize the incidents as part of this scheme when they happened, the acts of passing her over for promotion while promoting all of her non-Black CG-12 Management Analysts [sic] colleagues in her section, thereafter declaring her position alone in her section surplus, expecting her to continue to be jovial after being mistreated, ordering her to do so, and then subjecting her to discipline when she failed to do so, are all part of this scheme to create a hostile work environment for plaintiff based on her race.  This scheme culminated – and became recognizable as a hostile work environment scheme based on race – when FDIC management denied plaintiff a pay raise in 2005, while giving raises to her non-African American colleagues based in part on her own work.  This denial of a pay raise is, in any case, separately actionable as a blatant act of race-based discrimination.

Amended Complaint, ¶ 18.  Plaintiff's statement in her Amended Complaint that she "did not recognize" that she was subjected to a hostile work environment for nearly a year, from March 2004 until February 2005, negates any reasonable inference that she was subjected to conduct during this time period that was "offensive" or "abusive," let alone sufficiently "severe and pervasive" to be actionable under Title VII.

The Supreme Court has clearly and unequivocally stated that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  Harris, supra, 510 U.S. at 21-22.  That is precisely the case here.  Accordingly, her hostile work environment claim under Title VII should be dismissed.

---

language . . . and his incessant, inappropriate anger,' and by insulting or chastising her on various occasions," and that he "physically threatened her on a number of occasions.").  See also Ginger v. District of Columbia, No. 03-2512 (EGS), 2007 WL 646249 (D. D.C. March 5, 2007) (whether considered in isolation or taken together, incidents complained of did not provide sufficiently severe or pervasive conduct to support a hostile work environment claim; conduct

3.  <u>The discrete acts alleged by Plaintiff do not support a hostile work environment claim</u>.

As previously explained in more detail above, Plaintiff claims that she endured a hostile work environment beginning in March 2004 (but was not aware of it until February 2005) based on the following four actions: (i) she was not promoted to a CG-13 Management Analyst in March 2004; (ii) her position was placed on the "surplus list" in December 2004; (iii) she was "written up" by Mr. Bendler in January 2005; and (iv) she was denied a pay raise in February 2005.  However, these discrete, individualized types of actions do not even support a hostile work environment claim under Title VII.  As the court in <u>Silver v. Leavitt</u> explained:

> The hostile work environment theory of discrimination is not applicable to discrete, identifiable, isolated actions.  <u>See</u> [<u>Nat'l R.R. Passenger Corp. v.</u>] <u>Morgan</u>, 536 U.S. [101,] 114-115 [(2002)].  Failures to promote and failures to hire . . . are discrete actions that are easy to identify and thus distinguishable from cognizable hostile work environment claims.  <u>See id</u>.

2006 WL 626928, at *12.  <u>See also</u> <u>Camp v. District of Columbia</u>, 2006 WL 667956, at *7 (holding, in a case that included allegations of hostile work environment, that plaintiff's termination/retaliation claim would be subject to dismissal for failure to exhaust administrative remedies, because this claim constituted a "discrete discriminatory act"); <u>Powell v. Castaneda</u>, 390 F. Supp. 2d at 8-9 (noting that "[t]he court in <u>Morgan</u> distinguished discrete acts of discrimination [such as failure to promote] from hostile work environments").

In its very recent opinion, the Supreme Court has again emphasized that

> <u>Morgan</u> distinguished between "discrete" acts of discrimination and a hostile work environment.  A discrete act of discrimination is an act that in itself "constitutes a separate actionable 'unlawful employment practice' and that is temporally distinct.  <u>Morgan</u>, 536 U.S., at 114, 117.  As examples we identified "termination, failure to promote, denial of transfer, or refusal to hire.  <u>Id</u>., at 114.  A hostile work environment, on the other hand, typically comprises a succession of harassing acts,

was not so extreme that it constituted a change in the conditions or terms of employment.).

> each of which "may not be actionable on its own." In addition, a hostile work environment claim "cannot be said to occur on any particular day." Id., at 115-116. In other words, the actionable wrong is the environment, not the individual acts that, taken together, create the environment.

Ledbetter v. Goodyear Tire & Rubber Co., 2007 WL 1528298, at *12.

Plaintiff's non-selection for a competitive promotion opportunity, the designation of her Management Analyst position as surplus as one of 130 DOA surplus positions, her receipt of an informal counseling e-mail, and her failure to receive a raise due to her placement in Group V of the FDIC's CBC program because she was ranked by management in the lowest CBC group, do not individually or collectively support a hostile work environment claim. Each was "[a] discrete . . . act [that] 'occurred' on the day that it 'happened,'" Morgan, supra, 536 U.S. at 110, and the Court should reject Plaintiff's attempt to cobble together a hostile environment claim on the basis of these discrete actions.

**C. Defendant is entitled to summary judgment on Plaintiff's race discrimination claims.**

As here, absent direct evidence of racial discrimination, it is necessary to analyze the plaintiff's claims in accordance with the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In so doing, "[i]t is the district court's responsibility to closely adhere to this analysis and to go no further, as it does not sit as a 'super-personnel department that reexamines an entity's business decisions.'" Glenn v. Williams, 2006 WL 401816, at *13 (quoting Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

1. Plaintiff has not established a prima facie case that she was denied a pay raise in 2005 due to her race.

Under the McDonnell Douglas paradigm, Plaintiff has the initial burden in a Title VII

21

action to establish a prima facie case by a preponderance of the evidence.  See McDonnell

Douglas, 411 U.S. at 802; Stella v. Mineta, 284 F.3d 135, 144 (D.C. Cir. 2002).  "[T]o state a

prima facie claim of disparate treatment discrimination, the plaintiff must establish that (1) she is

a member of a protected class; (2) she suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  Brown v. Brody, 199 F.3d at

452.

    Plaintiff has alleged that "as a separate act of race-based discrimination, defendant,

through plaintiff's immediate supervisors at the FDIC, and through higher management there as

well, denied Ms. Brownfield a pay raise – a share in the CBC pool – in 2005 in violation of Title

VII of the Civil Rights Act of 1964, as amended."  Amended Complaint at ¶ 22.  It is undisputed

that Plaintiff is a member of a protected class (African-American).  Moreover, under analogous

precedent in this Circuit, Plaintiff suffered an adverse employment action when she did not

receive a raise for 2005 as a result of being ranked in CBC Group V for her corporate

contributions in 2004.  See Russell v. Principi, 257 F.3d 815 (D.C. Cir. 2001) (employee's

receipt of smaller bonus based on performance rating constituted adverse employment action).

However, Plaintiff's ranking in CBC Group V does not give rise to an inference of

discrimination.

    When the FDIC implemented a compensation program for all non-bargaining unit

employees called the Contribution-Based Compensation (CBC) system for pay increases starting

in 2005, employees covered by the CBC, including Plaintiff, were eligible for salary increases in

2005 based on the relative contributions they made to the Corporation during the previous year,

in 2004.  Bjorklund Aff. at 2.  The CBC program provided for a tiered system with compensation

determined by the level of individual employee contribution, in which each non-bargaining unit employee would be ranked and assigned to one of five groups, as follows:

> - Group I:  the top 10% of contributors.
>
> - Group II:  the next 15% of contributors.
>
> - Group III:  the next 25% of contributors.
>
> - Group IV:  the next 45% of contributors.
>
> - Group V:  the bottom 5% of contributors.

Id.  FDIC employees in Groups I-IV received percentage pay increases in amounts based on the group in which they were ranked, while the lowest five percent of employees ranked in Group V received no pay increase in 2005.  Id.  DOA Deputy Director Bjorklund explained the CBC process as follows:

> To determine employee placement in the CBC's different performance categories for the 2004 ratings period the first line supervisors of all sections in the DOA independently ranked the employees in their section numerically from highest to lowest.  The supervisors also filled out nomination forms for each employee that supported their ranking.  All of the DOA sections' rankings were then combined and, with the help of a mathematical tool, were statistically divided into the five different performance groups.  The rankings were weighted to reflect a person's ranking in relationship to the number of employees in their section.  A person who was ranked number one out of the ten employees in his or her section, for example, would not place as high in a performance group as a person who was ranked number one out of his or her section of twenty employees.  Once the performance groups had been created a management team reviewed the results.  Employees who were placed in Group I and Group V were given special consideration, as were employees who fell close to the cut-off mark for each performance group.  The management team reviewed the nomination forms for each of these employees and moved employees up or down in the performance groups if it was determined that their original placement was not supported by the information provided in their nomination form.

Id.

Although Plaintiff was the only African-American in Mr. Bendler's section (MSS), she

was not the only African-American in Mr. Sherman's branch (MSB). In February 2005, Mr.
Sherman could have changed Plaintiff's ranking had he thought that Mr. Bendler's ranking was
unfair or unjustified, and he could have advocated on her behalf in the senior management
discussions. Having been Plaintiff's first-line supervisor from 1996-2002, and having conferred
with Mr. Bendler on a regular basis about Plaintiff's performance issues during 2004, see
Sherman Aff. I at 1, Mr. Sherman was familiar enough with Plaintiff's situation to make such a
determination. Instead, Mr. Sherman agreed that Plaintiff was the lowest contributor in MSB
during 2004.

Given the cordial relationship that previously existed among Mr. Sherman, Mr. Bendler
and Ms. Brownfield, her history of favorable performance evaluations (at least before her
disappointment at not being selected for promotion in March 2004 caused a deterioration in her
performance that year), and the senior management checks and balances built into the CBC
program, the record evidence raises no inference that race discrimination played any part in Ms.
Brownfield's CBC evaluation. Moreover, while Ms. Brownfield has identified a number of
higher-ranked MSS employees who she alleges were similarly situated to her, see Plaintiff's
Discovery Responses at 6, she has failed to demonstrate that all of the relevant aspects of their
employment situations were "nearly identical" to hers, as required by precedent in this Circuit.
See, e.g., Barbour v. Browner, 181 F.3d 1342, 1345 (D.C. Cir. 1999). On the other hand, it is
undisputed that another African American woman in MSB (Annette Nelson) was ranked in CBC
Group I and therefore received the highest raise possible under the program. Sherman Dep. at
49, 100. Plaintiff's prima facie case fails because she has not established that her placement in
CBC Group V gives rise to an inference of discrimination.

2.  <u>Even assuming that Plaintiff is able to establish a prima facie case, Defendant has articulated legitimate, non-discriminatory reasons for why she was denied a pay raise under the Contribution-Based Compensation (CBC) system applicable to all non-bargaining unit employees at the time</u>.

Even assuming that Plaintiff is able to establish a prima facie case, Defendant has articulated legitimate, nondiscriminatory reasons for Plaintiff's ranking in CBC Group V, as required by the <u>McDonnell Douglas</u> framework, 411 U.S. at 802:  Ms. Brownfield's perceived relative lack of corporate contributions in 2004 as compared to other employees in MSB.  <u>See</u> Bendler Aff. I at 5; Sherman Aff. I at 2.  Mr. Bendler, Plaintiff's first-line supervisor, stated that he ranked the eight non-bargaining unit employees in his section by assessing their 2004 work-related contributions; he noted, however, that he did not assign any of his employees to a CBC compensation group.  Bendler Aff. I at 2.  Mr. Bendler explained that Ms. Brownfield was asked to participate in regional on-site internal control testing, but she declined to do so.  <u>Id</u>.  While participation was not mandatory, her lack of participation significantly lessened her contributions, and allowed other employees who substituted for her to make significantly greater contributions.  <u>Id</u>.  In addition, Plaintiff was expected to review approximately half of 112 bank card holder accounts but she only reviewed 6, and other staff members completed the vast majority of the reviews.  <u>Id</u>.  at 2-3. Moreover, Plaintiff was asked to write twelve Accountability Unit Review Summaries, but she only completed eight, and the remaining four had to be reassigned.  <u>Id</u>. at 3.  Of the eight summaries that she completed, three had to be rewritten by other staff members.  <u>Id</u>.

During the next phase of the CBC process, Mr. Bendler stated that he met with the other section chiefs in MSB and Mr. Sherman, the Assistant Director, to discuss the relative contributions of all 16 non-bargaining unit employees in the branch.  <u>Id</u>. at 2.  Mr. Sherman

indicated that he and his section chiefs compiled a ranked list of the 16 employees, and Plaintiff

was viewed as the least significant contributor due to her poor performance in 2004.  Sherman

Aff. I at 2.  Mr. Sherman explained that the ranked list of the 16 employees, along with lists from

other DOA branches and regional offices, were sent to the Human Resources Branch ("HRB"),

where a master list of the 200 plus non-bargaining unit DOA employees was developed through

the use of a formula driven spreadsheet tool, after which the five compensation groups were

determined on a percentage basis.  Id.  Mr. Sherman indicated that he also participated in the

final stage of the CBC process, where senior DOA management consisting of the Division

Director and Deputy Director, and the heads of the four branches and five regional offices,

reviewed HRB's breakdown of the master list into the five compensation groups.  Id.

DOA Director Arleas Upton Kea (an African-American woman) stated that she worked

with the senior management team which reviewed all of the nomination forms and group

placements.  Kea Aff. I at 1.  Deputy Director Bjorklund stated that Plaintiff's placement in

Group V was not discriminatory and noted that Ms. Brownfield had "worked with mostly the

same management staff during her tenure with the FDIC," and in past years, when her

performance was good, she was "recognized and promoted for her performance and

accomplishments."  Bjorklund Aff. at 3.  Moreover, Mr. Bjorklund and Mr. Sherman recalled

that the senior management review resulted in at least two African-American employees being

moved from Group V to Group IV, and at least one Caucasian being moved from Group IV to

Group V.  Id.; Sherman Aff. I at 2.

In sum, management has articulated a legitimate and non-discriminatory explanation for

Plaintiff's placement in Group V:  her low ranking in her section and branch due to her relative

lack of contributions in 2004; her subsequent low ranking on the DOA master list; HRB's

division of the master list into the five compensation groups; and senior management's

agreement with the determination to place Plaintiff in the lowest group.  Because Defendant's

burden is merely one of production, the explanations contained in management's affidavits are

sufficient "admissible evidence that, if believed, would establish that the employer's action was

motivated by a legitimate, nondiscriminatory reason."  Tenyck v. Omni Shoreham Hotel, 365

F.3d 1139, 1151 (D.C. Cir. 2004).

 In order to preclude summary judgment, Plaintiff must show that "a reasonable jury

could conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason."  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  Plaintiff,

however, has adduced no evidence which would support a claim that Defendant's stated reasons

for ranking her in CBC Group V were pretextual.  See Tenyck, 365 F.3d at 1151.  Instead, the

discovery process has shown that the basis for Ms. Brownfield's belief that she was

discriminated against is purely speculative and based on her own negative stereotyping:

> Q.  And do you think that Ms. Kea's [the DOA Division Director's]
> approval of your being in group five was racially motivated?
>
> A.  Yes, I do.
>
> Q.  And why do you think that?  She's a black woman, isn't she?
>
> A.  It doesn't matter.  Black people discriminate against black people.
>
> Q.  Do you have any reason to – and what is the reason you think she
> discriminated against you?
>
> A.  Well, I think it's easier to go along and say, oh, right, that black person
> didn't do that.  I think it would be, you know, because of the stereotypes
> that exist around black people that still exist today.  I believe she could
> easily say, oh, you say she didn't do it?  She didn't do it.  Instead of

27

> searching in her mind for what she knows that I've done, because we're
> her special staff, to know my history there in that place.

Brownfield Dep. at 103-104.

Critically, plaintiff's personal speculation and belief, no matter how sincerely held, is not a sufficient basis for opposing a motion for summary judgment. See McGill v. Munoz, 203 F.3d 843, 846 (D.C. Cir. 2000) (speculation insufficient to avoid summary judgment); Brown v. Brody, 199 F.3d at 459 ("'As courts are not free to second-guess an employer's business judgment,' a plaintiff's mere speculations are 'insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment.'") (quoting Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)); Griffin v. Acacia Life Insurance Co., 151 F. Supp.2d 78, 81 (D.D.C. 2001).

Plaintiff has failed to meet her burden to adduce evidence that Defendant's legitimate, non-discriminatory reasons for her ranking in CBC Group V were a pretext for discrimination. Accordingly, Defendant's request for summary judgment as to Plaintiff's race discrimination claim stated in Count II of the Amended Complaint should be granted.

**D. Defendant is entitled to summary judgment on Plaintiff's retaliation claims.**

In her Amended Complaint, Plaintiff makes the following allegations regarding retaliation: "Since plaintiff filed her formal EEO complaint regarding her not being given a pay raise in May 2005, plaintiff's managers Paul Sherman, the Chief of the Management Services Branch and Dan Bendler the head of the Management Support Section have retaliated by substantially changing plaintiff's job responsibilities and intensifying the hostile work environment." Amended Complaint at ¶ 19; see also id. at ¶ 24. In response to Defendant's discovery requests, Plaintiff identified the following alleged acts of retaliation: (i) in February

28

2006, Mr. Bendler cautioned Plaintiff that Ann Bridges Steely, the Associate Director for DOA's Acquisition Services Branch ("ASB"), had complained about Plaintiff disturbing the employees in ASB's work area; (ii) her workload was lessened in 2005 when the responsibility for Chief Financial Officer Act ("CFOA") data write-ups was distributed among several employees (except for the procurement credit card area which she retained), she stopped receiving assignments to perform Directive reviews, and she was without work assignments for weeks at a time; and (iii) she was placed in Group III in the FDIC's Pay for Performance ("PFP") program (which replaced the CBC) in March of 2006.  See Plaintiff's Discovery Responses (Ex. 24) at 1-5.

To establish a prima facie case of retaliation, a plaintiff must show that:  (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists.  Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007); Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999).  To demonstrate a causal connection between the protected activity and the adverse action, the plaintiff must show that defendant "had knowledge of [her] protected activity, and that the adverse personnel action took place shortly after that activity."  Id. (quoting Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985).

1.  Actions occurring in February-March 2006 are too remote in time to demonstrate causation.

Plaintiff alleges that after she filed an EEO complaint in May 2005, two retaliatory actions occurred nine and ten months later, when Mr. Bendler cautioned Plaintiff in February 2006 that the Assistant Director for ASB had complained about excessive socializing in her employees' work area, and when in March 2006 Plaintiff was rated in Group III in the FDIC's

29

PFP program.  In this regard, a recent decision from this Circuit affirming a grant of summary

judgment is dispositive as to lack of causation in this case:

> Although causation can sometimes be inferred by temporal proximity, see, e.g.,
> Singletary [v. District of Columbia], 351 F.3d at 525 [(D.C. Cir. 2003)] ("[T]his
> circuit has held that a close temporal relationship may alone establish the required
> causal connection."), the eight- or nine-month gap between the final protected
> activity – either the physician's March 2000 letter or Mayers's April 2000
> conversation with the Assistant Executive Director – and the early January 2001
> project is far too long, see Clark County School Dist. v. Breeden, 532 U.S. 268, 273-
> 74, 121 S. Ct. 1508, 149 L. Ed.2d 509 (2001) (per curiam) (citing with approval
> circuit cases rejecting temporal proximity of three and four months as evidence of
> causation).

Mayers v. Laborers' Health & Safety Fund of North America, 478 F.3d 364, 369 (D.C. Cir.

2007).  Similarly, the nine- and ten-month gaps between Plaintiff's EEO complaint in May 2005

on the one hand, and the caution given her about too much socializing with ASB employees in

February 2006 and the PFP rating in March 2006 on the other, are "far too long" to demonstrate

causation.  Accordingly, Plaintiff cannot establish a prima facie case of retaliation based on these

actions.  Cf. Woodruff, 482 F.3d at 529 (less than a month between protected activity and

alleged retaliatory acts was sufficiently short so that a reasonable finder of fact could infer

causation).

2.  Changes in work assignments were not adverse actions.

An employee suffers an adverse employment action if she experiences "materially

adverse consequences affecting the terms, conditions or privileges of employment or future

employment opportunities such that a reasonable trier of fact could find objectively tangible

harm."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing Brown v. Brody, 199

F.3d at 457).  "Changes in assignments and work-related duties do not ordinarily constitute

adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."

Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997). "Mere

inconveniences and alteration of job responsibilities will not rise to the level of adverse action."

Childers v. Slater, 44 F. Supp. 2d 8, 19 (D. D.C. 1999).

Mr. Bendler has explained that the variations in Plaintiff's work assignments resulted

from changes in the way that business was conducted in MSS, due in part to a decline in overall

MSS work.  Bendler Aff. II at 4-7; see also Sherman Aff. II at 5-6.  Moreover, Ms. Brownfield's

comments detailing the work she accomplished in 2005 which she added to her PFP form in

February 2006 (and which is attached to her Formal Complaint of Discrimination filed in March

2006) belies any assertion that changes in her work assignments which may have occurred rose

to a level where they could be considered retaliatory.  See Formal Complaint 2006 (Ex. 16),

Plaintiff's attached PFP form at Section V – Employee Acknowledgment/Comments.

3.   Defendant has articulated legitimate, non-discriminatory reasons for each of the actions
      alleged to be retaliatory.

Mr. Bendler, Mr. Sherman and Ms. Steely have explained that in February 2006,

Assistant Director Steely of ASB (who was completely unaware of Plaintiff's prior EEO

complaint at the time, see Steely Aff. at 2) became concerned that Plaintiff was spending too

much time in ASB's work area and was distracting Ms. Steely's employees as a result of her

excessive socializing.  Bendler Aff. II at 2-4; Sherman Aff. II at 4-5; Steely Aff. at 2-3, 4-5.  Ms.

Steely brought her concerns to Assistant Director Sherman, as the head of MSB, who then

instructed Mr. Bendler, as Plaintiff's immediate supervisor, to caution Ms. Brownfield that a

complaint had been made.  Id.; Bendler Aff. II at 2-4; Sherman Aff. II at 4-5.  Mr. Bendler

relayed Ms. Steely's concerns to Plaintiff in a low key and non-threatening manner.  Bendler

Aff. II at 3-4.  Under these circumstances, no reasonable jury could find that Mr. Bendler's

31

actions were retaliatory.

As to work assignments, Mr. Bendler has explained that work in MSS is cyclical, and that variations in Plaintiff's work assignments resulted from changes in the way that business was conducted in MSS, due in part to a decline in overall MSS work. Bendler Aff. II at 4-7. Mr. Sherman also confirmed that there was a reduced need for staff based on changes in the review process, and that this was consistent with Ms. Brownfield's position being designated as surplus. Sherman Aff. II at 5-6.

Plaintiff's remaining claim of retaliation concerns her ranking in Group III of the Agency's Pay for Performance (PFP) program, which replaced the CBC in 2006.[8] Mr. Sherman explained Plaintiff's placement in PFP Group III as follows:

> Regarding the issue of the Pay for Performance program in 2006, I was involved in the placement process. We were tasked with placing 25% of DOA employees in group I, 50% in group II and 25% in group III. My managers and I met to discuss the contributions of each eligible employee in our branch of DOA and we ranked our employees based on a comparison of each person's total contributions over the past year. At this point we did not assign employees to any groups. We were required to give Ms. Kea our best synopsis of each employee's <u>significant</u> contributions and [were] not expected to itemize everything each employee did. If we had applied the mandated percentages (i.e., 25%, 50%, 25%) at the branch level, Ms. Brownfield would have been in Group III (the lowest 25%) but for our internal MSB purposes, we were not required to assign percentages. (That came later in the DOA process.) The MSB prioritized rankings were aggregated with the rankings of all other DOA organizations, and the senior management reviewed all the write-ups – especially those closest to the break points between the three groups – before recommending any adjustments to the aggregate rankings. There were very few adjustments to the aggregate rankings. DOA senior management collectively concurred in the final group placements for all eligible DOA employees and forwarded these recommendations to Ms. Kea for final review and approval. She reviewed the list over the course of a week and passed it to the COO's office for final approval. I felt group III was appropriate for Ms. Brownfield and this was not a negative view of her

---

[8] The PFP program was applicable to all non-managerial FDIC employees, including those in the bargaining unit represented by NTEU as well as the non-bargaining unit employees who were previously covered by the CBC program.

work. We did not penalize her or look upon her contributions in a negative manner. Rather we evaluated her total contributions in comparison to those of all other DOA employees and group III was where we felt she was properly placed. She did some good work, but she just did not distinguish herself in relation to many other employees on the DOA staff.

Sherman Aff. II at 8-9; see also Bendler Aff. II at 9; Kea Aff. II at 3-4.

Plaintiff has been unable to muster any evidence that these actions were in any way in retaliation for her prior EEO activities, except for her own conclusory assertions. See Plaintiff's Discovery Responses at 5 ("In addition, she has been subjected to continuous retaliation ever since she went to the agency's EEO office. Mr. Bendler and Mr. Sherman strongly resent her challenge to their actions by filing an EEO complaint.").

## IV. CONCLUSION

In the beginning of 2004, Plaintiff suffered a personal tragedy when her sister died after an extended illness. Despite FDIC management's efforts to accommodate Plaintiff's needs at this difficult time, Ms. Brownfield interviewed poorly in March 2004 for a position that would have meant a promotion for her and was not referred to the final selection panel as a result. In December 2004, she was further disappointed when she learned that the position she occupied had been designated surplus as part of a general FDIC-wide downsizing. Due to her self-imposed isolation from other staff and management, in January 2005 she received an informal counseling e-mail from her supervisor that expressed valid concerns about her conduct and which tried to encourage improvement during the coming year. Because of her limited corporate contributions compared with other MSB employees in 2004, she was notified in February 2005 that she would be among the five percent of FDIC non-bargaining unit employees who would not be receiving a raise under the FDIC's new Contribution-Based Compensation (CBC) system

that had been implemented that year.

      After Ms. Brownfield filed an EEO complaint in May 2005, she began to see every difficulty at work as further illegal conduct by management.  Another supervisor's complaint about Ms. Brownfield spending too much time socializing with employees in another branch in February 2006 was interpreted by her as evidence of a conspiracy against her, as was the ebb and flow of her work assignments in a declining workload environment.  Finally, her 2006 ranking in PFP Group III (although she was among 25 percent of all FDIC employees) was seen by her to be yet another illegally motivated action.

      However, after full and ample discovery, Plaintiff has been unable to show that unlawful factors played any part in the matters she complains of.  Accordingly, for the reasons set forth above, defendant Sheila M. Bair respectfully requests that the Court grant this Motion for Summary Judgment in its entirety, and dismiss this matter with prejudice.  A proposed order granting the relief requested is attached.

                                Respectfully submitted,

                                /s/ *William S. Jones*
                                _____
                                William S. Jones
                                Georgia Bar No. 404288
                                Counsel, Legal Division
                                Federal Deposit Insurance Corporation
                                3501 N. Fairfax Drive (VS-E6006)
                                Arlington, VA 22226
                                (703) 562-2362
                                (703) 562-2482 (Fax)

                                Patricia Davison-Lewis
                                D.C. Bar No. 414378
                                Counsel, Legal Division
                                Federal Deposit Insurance Corporation
                                3501 N. Fairfax Drive (VS-E6010)

Arlington, VA 22226
(703) 562-2315
(703) 562-2482 (Fax)


Attorneys for Defendant


Dated: May 31, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **PAMELA A. BROWNFIELD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:05-cv-02468-EGS** |
| | ) | |
| **SHEILA M. BAIR,** | ) | |
| **Chairman,** | ) | |
| **Federal Deposit Insurance Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## <u>ORDER</u>

UPON CONSIDERATION of Defendant's Motion for Summary Judgment, the opposition thereto, the reply, and the entire record herein, it is this _____ day of _____, 2007

ORDERED that Defendant's Motion is hereby GRANTED, and it is further

ORDERED that this matter is DISMISSED WITH PREJUDICE.  This is a final and appealable order.

SO ORDERED.


_____
United States District Judge


Copies to:

1

David Shapiro
Swick & Shapiro, P.C.
1225 Eye Street, Suite 1290
Washington, D.C. 20005

Attorney for Plaintiff


William S. Jones
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, Virginia 22226

Attorney for Defendant