UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PAMELA A. BROWNFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05-cv-02468-EGS |
| | ) | |
| SHEILA M. BAIR,[1] | ) | |
| Chairman, | ) | |
| Federal Deposit Insurance Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S LOCAL RULE 7.1(h) STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. 56(e) and Local Rule 7.1(h), Defendant Sheila C. Bair, in her official capacity as Chairman of the Federal Deposit Insurance Corporation ("FDIC"), hereby respectfully submits the following Statement of Material Facts Not in Dispute.[2]

**Background information**

1. Plaintiff began her career at the FDIC in 1990 as a grade 5 secretary. Brownfield Dep. (Ex. 10) at 9.[3] She first became acquainted with Mr. Sherman in a non-supervisory capacity in

---

[1] The Complaint, filed on December 20, 2005, and the Amended Complaint, filed on December 1, 2006, named as defendant Martin J. Gruenberg, in his official capacity as Acting Chairman of the FDIC. Sheila C. Bair was sworn in as Chairman of the FDIC on June 26, 2006, and in her official capacity should be substituted for Mr. Gruenberg as the defendant in this case pursuant to Fed. R. Civ. P. 25(d).

[2] Defendant also relies on Plaintiff's admissions of fact, not separately listed herein, contained in her Amended Complaint that are referenced in Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Defendant's Memorandum"). See Rann v. Chao, 209 F. Supp. 2d 75, 82 (D. D.C. 2002) (noting that "a party is generally bound by the facts it alleges in its pleadings.").

[3] The corresponding exhibit numbers for each document cited herein are set forth in the Table of

1992, and they generally interacted on a daily basis after that. Id. at 12-14, 25. Mr. Sherman became her supervisor around 1996, at a time when she had progressed to a grade 9 Management Analyst. Id. at 13-16; Sherman Aff. II (Ex. 26) at 2.

2.     Subsequently, Mr. Sherman competitively selected her for a grade 11/12 Management Analyst position in his section. Brownfield Dep. at 16; Sherman Aff. II at 2.

3.     While he was her immediate supervisor, Mr. Sherman gave Ms. Brownfield substantial performance awards (including one for $2,000 in October 2000), as well as favorable performance evaluations. Brownfield Dep. at 20-25; Award Nomination (Ex. 3); Performance Evaluations 1998-2002 (Exs. 22-1 through 22-5).

4.     Ms. Brownfield's written comments on her performance evaluations indicate that she was an enthusiastic and engaged employee during this time period, who had a good relationship with Mr. Sherman. See Performance Evaluations 1998-2001 (Exs. 22-1 through 22-4).

5.     In 2003, Plaintiff was a grade 12 Management Analyst when Dan Bendler became her first-line supervisor and Mr. Sherman was elevated to her second-line supervisor as the result of a reorganization in DOA. Brownfield Dep. at 25; Sherman Dep. (Ex. 27) at 7-9.

6.     Ms. Brownfield had known Mr. Bendler since he had transferred into the section from the FDIC's Office of Inspector General (OIG) in 1996 or 1997. Brownfield Aff. II (Ex. 9) at 1; Brownfield Dep. at 28. They interacted daily on a first-name basis and had a cordial relationship. Id.; see, e.g., E-mails in 2003 between Bendler and Brownfield (Ex. 12).

7.     Mr. Bendler prepared Plaintiff's performance evaluation in 2003, which she characterized as "outstanding." Brownfield Dep. at 29; Performance Evaluation 2003 (Ex. 23).

---

Exhibits found in Defendant's Memorandum, at iv-v.

**Non-selection in March 2004**

8.    In late 2003, multiple grade 13 Management Analyst positions were posted in MSS, and Ms. Brownfield applied for this promotion opportunity. Brownfield Dep. at 30.

9.    She qualified for the roster but in January 2003, before interviews were held for the position, Ms. Brownfield had to leave the office for about four weeks to care for her terminally ill sister in Pittsburg. Id. at 31-32. While she was away, she stayed in contact with Dan Bendler and others in the office on a daily basis. Id.

10.   Before she returned to the office, the other candidates on the roster were interviewed by a panel consisting of three individuals who were not in the MSS chain of command. Bendler Aff. I (Ex. 4) at 4; Sherman Aff. I (Ex. 25) at 4.

11.   The interviewing panel (Mary Carmichael, from the OIG's office, Jerie Kitchens, the Special Assistant to DOA Division Director Arleas Upton Kea, and Rick Marlatt, an MSB employee from another section who was not supervised by Dan Bendler) used a structured interview format in which all candidates were asked the same questions. Carmichael Dep. (Ex. 11) at 45, 53; Kitchens Dep. (Ex. 20) at 28; Marlatt Dep. (Ex. 21) at 41-44. The interview questions and benchmark answers were approved in advance by the Human Resources Branch of DOA. See E-mails to/from HRB (Ex. 13).

12.   Ms. Carmichael did not know Ms. Brownfield, Carmichael Dep. at 84, Mr. Marlatt was an MSB co-worker from another section, and Ms. Kitchens was more than just a work colleague in that she and Ms. Brownfield had socialized outside the office and had attended concerts together, Kitchens Dep. at 89.

13.   In consideration of Ms. Brownfield's personal situation involving her sister's illness, Mr. Bendler contacted the Human Resources Branch and requested that an extension of the roster for

3

30 days, so that the roster would not expire before Ms. Brownfield returned to the office. Bendler Dep. (Ex. 6) at 64-65; E-mails concerning roster extension (Ex. 14).

14.     Following her sister's death, Ms. Brownfield returned to work, was interviewed by the same panel that had interviewed all the other candidates (Ms. Carmichael, Ms. Kitchens and Mr. Marlatt), and was asked the same structured interview questions.  Bendler Aff. I at 4.

15.     Plaintiff did not perform well during the interview.  Brownfield Aff. I (Ex. 4) at 4, 6; Brownfield Dep. at 38.

16.     She was not among the top four candidates whose names were forwarded by the initial interview panel for further consideration by Mr. Bendler and Mr. Sherman, and therefore she was not selected for one of the grade 13 positions.  Bendler Aff. I at 4; Sherman Aff. I at 4.

17.     Plaintiff became aware of her non-promotion in March 2004.  See Brownfield Aff. I at 4.

**Placement of her position on the "surplus list" in December 2004**

18.     In December 2004, as part of an FDIC-wide downsizing process, Plaintiff's grade 12 position was listed (along with 130 other DOA positions) as a "surplus" position due for eventual elimination.  Bendler Aff. I at 4-5; Sherman Aff. I at 4.

19.     Plaintiff's position was deemed "surplus" because after due consideration, it was determined that it wasn't needed to accomplish the work remaining in MSB.  Sherman Dep. at 22-39.

**Informal counseling e-mail in January 2005**

20.     Ms. Brownfield became withdrawn and uncommunicative, both with other MSS staff and with management.  Bendler Aff. I at 5.

21.     Finally, matters came to a head when Ms. Brownfield verbally lashed out at Mr. Bendler when he tried to meet with her concerning her performance issues in January 2005.  As a result

4

of her actions during this abortive meeting, Mr. Bendler sent her a counseling memo via e-mail on January 25, 2005.  Id.; see Informal Counseling E-mail (Ex. 17).

**Group V CBC Ranking in February 2005**

22.     When the FDIC implemented a compensation program for all non-bargaining unit employees called the Contribution-Based Compensation (CBC) system for pay increases starting in 2005, employees covered by the CBC, including Plaintiff, were eligible for salary increases in 2005 based on the relative contributions they made to the Corporation during the previous year, in 2004.  Bjorklund Aff. at 2.

23.     The CBC program provided for a tiered system with compensation determined by the level of individual employee contribution, in which each non-bargaining unit employee would be ranked and assigned to one of five groups, as follows:

- Group I:  the top 10% of contributors.

- Group II:  the next 15% of contributors.

- Group III:  the next 25% of contributors.

- Group IV:  the next 45% of contributors.

- Group V:  the bottom 5% of contributors.

Id.

24.     FDIC employees in Groups I-IV received percentage pay increases in amounts based on the group in which they were ranked, while the lowest five percent of employees ranked in Group V received no pay increase in 2005.  Id.

25.     The CBC process was as follows:

> To determine employee placement in the CBC's different performance categories for the 2004 ratings period the first line supervisors of all sections in the DOA independently ranked the employees in their section numerically from highest to lowest.  The supervisors also filled out nomination forms for each employee that

      supported their ranking. All of the DOA sections' rankings were then combined and, with the help of a mathematical tool, were statistically divided into the five different performance groups. The rankings were weighted to reflect a person's ranking in relationship to the number of employees in their section. A person who was ranked number one out of the ten employees in his or her section, for example, would not place as high in a performance group as a person who was ranked number one out of his or her section of twenty employees. Once the performance groups had been created a management team reviewed the results. Employees who were placed in Group I and Group V were given special consideration, as were employees who fell close to the cut-off mark for each performance group. The management team reviewed the nomination forms for each of these employees and moved employees up or down in the performance groups if it was determined that their original placement was not supported by the information provided in their nomination form.

Id.

26.    As a result of her relatively poor corporate contributions during 2004, in early 2005 Ms. Brownfield was ranked in Group V (the lowest five percent of employees) under the FDIC's new Contribution-Based Compensation (CBC) program that had been implemented for all non-bargaining unit employees that year. Bendler Aff. I at 2-3, 5; Sherman Aff. I at 2-3.

27.    In accordance with the parameters of the CBC program, she did not receive a pay raise for 2005 due to her Group V ranking, which was reviewed by senior DOA management, including Deputy Director Glen Bjorklund and Division Director Arleas Upton Kea, who is both an African American woman and head of the FDIC's diversity awareness program. Id.; Bjorklund Aff. at 2-3; Kea Aff. I at 1.

28.    Mr. Bendler, Plaintiff's first-line supervisor, ranked the eight non-bargaining unit employees in his section by assessing their 2004 work-related contributions, but did not assign any of his employees to a CBC compensation group. Bendler Aff. I at 2.

29.    Ms. Brownfield was asked to participate in regional on-site internal control testing, but she declined to do so. Id. While participation was not mandatory, her lack of participation significantly lessened her contributions, and allowed other employees who substituted for her to

6

make significantly greater contributions.  Id.

30.     Plaintiff was expected to review approximately half of 112 bank card holder accounts but she only reviewed 6, and other staff members completed the vast majority of the reviews.  Id. at 2-3.

31.     Plaintiff was asked to write twelve Accountability Unit Review Summaries, but she only completed eight, and the remaining four had to be reassigned.  Id. at 3.  Of the eight summaries that she completed, three had to be rewritten by other staff members.  Id.

32.     During the next phase of the CBC process, Mr. Bendler met with the other section chiefs in MSB and Mr. Sherman, the Assistant Director, to discuss the relative contributions of all 16 non-bargaining unit employees in the branch.  Id. at 2.

33.     Mr. Sherman and his section chiefs compiled a ranked list of the 16 employees, and Plaintiff was viewed as the least significant contributor due to her poor performance in 2004.  Sherman Aff. I at 2.  The ranked list of the 16 MSB employees, along with lists from other DOA branches and regional offices, were sent to the Human Resources Branch ("HRB"), where a master list of the 200 plus non-bargaining unit DOA employees was developed through the use of a formula driven spreadsheet tool, after which the five compensation groups were determined on a percentage basis.  Id.  Mr. Sherman also participated in the final stage of the CBC process, where senior DOA management consisting of the Division Director and Deputy Director, and the heads of the four branches and five regional offices, reviewed HRB's breakdown of the master list into the five compensation groups.  Id.

34.     DOA Director Arleas Upton Kea (an African-American woman) worked with the senior management team which reviewed all of the nomination forms and group placements.  Kea Aff. I at 1.

7

35. Deputy Director Bjorklund stated that Plaintiff's placement in Group V was not discriminatory and noted that Ms. Brownfield had "worked with mostly the same management staff during her tenure with the FDIC," and in past years, when her performance was good, she was "recognized and promoted for her performance and accomplishments." Bjorklund Aff. at 3.

36. The senior management review resulted in at least two African-American employees being moved from Group V to Group IV, and at least one Caucasian being moved from Group IV to Group V. Id.; Sherman Aff. I at 2.

37. During her deposition, Ms. Brownfield testified as follows:

> Q. And do you think that Ms. Kea's [the DOA Division Director's] approval of your being in group five was racially motivated?
>
> A. Yes, I do.
>
> Q. And why do you think that? She's a black woman, isn't she?
>
> A. It doesn't matter. Black people discriminate against black people.
>
> Q. Do you have any reason to – and what is the reason you think she discriminated against you?
>
> A. Well, I think it's easier to go along and say, oh, right, that black person didn't do that. I think it would be, you know, because of the stereotypes that exist around black people that still exist today. I believe she could easily say, oh, you say she didn't do it? She didn't do it. Instead of searching in her mind for what she knows that I've done, because we're her special staff, to know my history there in that place.

Brownfield Dep. at 103-104.

38. Another African American woman in MSB (Annette Nelson) was ranked in CBC Group I and therefore received the highest raise possible under the program. Sherman Dep. at 49, 100.

**First EEO Complaint in May 2005**

39. After Ms. Brownfield was notified in February 2005 that she had been placed among the five percent of FDIC employees who had been ranked in CBC Group V, and therefore she would

8

not be receiving a raise, she contacted an EEO counselor for the first time on March 3, 2005.
See EEO Counselor's Report (Ex. 1-1) at 1.

40. Subsequently, on May 13, 2005, she filed a formal complaint of discrimination and designation of representative naming her current litigation counsel, Mr. Shapiro. See Formal Complaint of Discrimination 2005 (Ex. 15).

41. Her formal EEO complaint alleged that her CBC ranking was the result of race discrimination by Ms. Kea, Mr. Sherman and Mr. Bendler and that she had been subjected to a hostile work environment by Mr. Bendler and Mr. Sherman. See Formal Complaint of Discrimination 2005 (Ex. 15).

42. In her formal EEO complaint, Plaintiff elected not to pursue administratively any independent claims of discrimination for adverse actions that occurred before she was denied a pay raise in March 2005. Instead, her formal complaint made the following allegations:

> I received notice that I would not be getting a pay increase under the CBC program. I was the only one eligible in my section (and I think my branch) to be passed over for a CBC raise. I am the only African-American in my section. Since I reacted negatively to being placed on the surplus list – the only one in my section to have this happen (and one of three people – an older woman and a deaf Asian male – in the branch) – I have been harassed by management to the point that I now suffer from a hostile work environment.
> . . .
> I am the only person in my section not to get a raise and I am the only Black person in my section. It is close to the same in my branch.

Id. at 2.

43. On June 2, 2005, in accordance with its standard EEO procedures, the FDIC sent an acceptance of claims letter to Plaintiff's representative, Mr. Shapiro, stating that the following claims had been accepted for investigation:

> Whether Complainant was discriminated against and subjected to a hostile work environment on the basis of race (African American), when on February 17, 2005, she was notified that based on her performance contribution during calendar year

> 2004, she was placed in Group V for the 2005 Contribution-Based Compensation Program, and would not receive a base pay increase for the calendar year 2005.

Acceptance Letter 2005 (Ex. 1) at 2. The Acceptance Letter further stated:

> If the above-identified claim is incorrect, please inform Carol H. Banks, EEO Specialist, of the claim Complainant is alleging to be discriminatory, as well as the relevant date(s). This information must be provided, in writing, within five (5) calendar days of Complainant's receipt of this letter, to Ms. Banks at the address provided below. If this Office does not receive a written reply within five (5) calendar days of receipt of this letter, the above-identified claim will be forwarded for investigation.

Id.

> In addition, the Acceptance Letter specifically noted that:

> On May 26, 2005, the Agency contacted David H. Shapiro, Complainant's representative, to ask permission to contact Complainant to clarify her formal complaint. In a telephone conversation, on May 31, 2005, Complainant informed the Agency that she was filing a formal complaint on the Contribution-Based Compensation Program, and that the claims listed in the EEO Counselor's Report under allegation #2 were intended as background evidence. Complainant refused to provide written clarification to the Agency because her attorney advised her not to do so.

Id. at 1 n.2.

44.     The referenced "claims listed in the EEO Counselor's Report under allegation #2" concerned: (i) the January 25, 2005, counseling memo; (ii) the designation of her position as surplus in December 2004; and (iii) Plaintiff's non-selection for the grade 13 position in 2004. See EEO Counselor's Report (Ex. 1-1) at 3.

45.     In accordance with Plaintiff's express decision, these other claims were treated as background information only in connection with the administrative EEO investigation of her CBC pay raise issue and hostile work environment claims, and the EEO investigator did not obtain affidavits from any of the interview panel members (Carmichael, Kitchens and Marlatt).

**Second EEO Complaint in March 2006**

46.     On March 24, 2006, Plaintiff filed a second formal complaint of discrimination based on race and reprisal, which she alleged had occurred "[c]ontinuously since May 2005 (when I filed a formal EEO complaint regarding my not being given a pay increase (CBC))."  Formal Complaint of Discrimination 2006 (Ex. 16) at 2.  Plaintiff's additional claims included the verbal counseling concerning Ms. Steely's complaint, her Group III PFP ranking, and allegations that her workload had decreased.  See Acceptance Letter 2006 (Ex. 2) at 2.

**Alleged acts of retaliation**

47.     In response to Defendant's discovery requests, Plaintiff identified the following alleged acts of retaliation:  (i) in February 2006, Mr. Bendler cautioned Plaintiff that Ann Bridges Steely, the Associate Director for DOA's Acquisition Services Branch ("ASB"), had complained about Plaintiff disturbing the employees in ASB's work area; (ii) her workload was lessened in 2005 when the responsibility for Chief Financial Officer Act ("CFOA") data write-ups was distributed among several employees (except for the procurement credit card area which she retained), she stopped receiving assignments to perform Directive reviews, and she was without work assignments for weeks at a time; and (iii) she was placed in Group III in the FDIC's Pay for Performance ("PFP") program (which replaced the CBC) in March of 2006.  See Plaintiff's Discovery Responses (Ex. 24) at 1-5.

**Complaint by ASB manager Steely in February 2006**

48.     In February 2006, Plaintiff was verbally counseled by Mr. Bendler after Ann Bridges Steely, the manager of DOA's Acquisition Services Branch ("ASB"), complained to Mr. Sherman that Ms. Brownfield had been spending an inordinate amount of time socializing in the adjacent ASB office area and was distracting ASB employees.  Bendler Aff. II at 2-4; Kea Aff. II

11

at 2; Sherman Aff. II at 4-5; Steely Aff. (Ex. 28) at 2-3, 4-5.

49.     Mr. Bendler, Mr. Sherman and Ms. Steely have explained that in February 2006, Assistant Director Steely of ASB (who was completely unaware of Plaintiff's prior EEO complaint at the time, see Steely Aff. at 2) became concerned that Plaintiff was spending too much time in ASB's work area and was distracting Ms. Steely's employees as a result of her excessive socializing. Bendler Aff. II at 2-4; Sherman Aff. II at 4-5; Steely Aff. at 2-3, 4-5.

50.     Ms. Steely brought her concerns to Assistant Director Sherman, as the head of MSB, who then instructed Mr. Bendler, as Plaintiff's immediate supervisor, to caution Ms. Brownfield that a complaint had been made. Id.; Bendler Aff. II at 2-4; Sherman Aff. II at 4-5.

51.     Mr. Bendler relayed Ms. Steely's concerns to Plaintiff in a low key and non-threatening manner. Bendler Aff. II at 3-4.

**Work assignments**

52.     Mr. Bendler has explained that the variations in Plaintiff's work assignments resulted from changes in the way that business was conducted in MSS, due in part to a decline in overall MSS work. Bendler Aff. II at 4-7; see also Sherman Aff. II at 5-6.

53.     Ms. Brownfield provided comments detailing the work she accomplished in 2005 which she added to her PFP form in February 2006 (and which is attached to her Formal Complaint of Discrimination filed in March 2006). See Formal Complaint 2006 (Ex. 16), Plaintiff's attached PFP form at Section V – Employee Acknowledgment/Comments.

54.     Mr. Bendler has explained that work in MSS is cyclical, and that variations in Plaintiff's work assignments resulted from changes in the way that business was conducted in MSS, due in part to a decline in overall MSS work. Bendler Aff. II at 4-7.

55.     Mr. Sherman also confirmed that there was a reduced need for staff based on changes in

the review process, and that this was consistent with Ms. Brownfield's position being designated as surplus. Sherman Aff. II at 5-6.

**Group III PFP Ranking in March 2006**

56.     Plaintiff's claims of retaliation include her ranking in Group III of the Agency's Pay for Performance (PFP) program, which replaced the CBC in 2006. The PFP program was applicable to all non-managerial FDIC employees, including those in the bargaining unit represented by NTEU as well as the non-bargaining unit employees who were previously covered by the CBC program. Mr. Sherman explained Plaintiff's placement in PFP Group III as follows:

> Regarding the issue of the Pay for Performance program in 2006, I was involved in the placement process. We were tasked with placing 25% of DOA employees in group I, 50% in group II and 25% in group III. My managers and I met to discuss the contributions of each eligible employee in our branch of DOA and we ranked our employees based on a comparison of each person's total contributions over the past year. At this point we did not assign employees to any groups. We were required to give Ms. Kea our best synopsis of each employee's <u>significant</u> contributions and [were] not expected to itemize everything each employee did. If we had applied the mandated percentages (i.e., 25%, 50%, 25%) at the branch level, Ms. Brownfield would have been in Group III (the lowest 25%) but for our internal MSB purposes, we were not required to assign percentages. (That came later in the DOA process.) The MSB prioritized rankings were aggregated with the rankings of all other DOA organizations, and the senior management reviewed all the write-ups – especially those closest to the break points between the three groups – before recommending any adjustments to the aggregate rankings. There were very few adjustments to the aggregate rankings. DOA senior management collectively concurred in the final group placements for all eligible DOA employees and forwarded these recommendations to Ms. Kea for final review and approval. She reviewed the list over the course of a week and passed it to the COO's office for final approval. I felt group III was appropriate for Ms. Brownfield and this was not a negative view of her work. We did not penalize her or look upon her contributions in a negative manner. Rather we evaluated her total contributions in comparison to those of all other DOA employees and group III was where we felt she was properly placed. She did some good work, but she just did not distinguish herself in relation to many other employees on the DOA staff.

Sherman Aff. II at 8-9; <u>see also</u> Bendler Aff. II at 9; Kea Aff. II at 3-4.

13

**Plaintiff's Current Employment Status**

57.     Approximately five months after she filed her second EEO complaint in March 2006, Ms. Brownfield obtained a lateral transfer to an equivalent CG-12 Program Analyst position in the FDIC's Division of Information Technology in August 2006, with no loss of pay or benefits, where she remains employed today.  Brownfield Dep. at 82.

Respectfully submitted,

/s/ *William S. Jones*
_____
William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Patricia Davison-Lewis
D.C. Bar No. 414378
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6010)
Arlington, VA 22226
(703) 562-2315
(703) 562-2482 (Fax)

Attorneys for Defendant

Dated: May 31, 2007