Case No. FDICEO 050036
Pamela Brownfield EEO Complaint
Daniel Bendler, witness
Page 1 of 6

## WITNESS AFFIDAVIT

I, Daniel Bendler, am an employee of the Federal Deposit Insurance Corporation located in Washington, D.C. My telephone number during working hours is: 202-942-3586. My work address is: 1730 Pennsylvania Ave., Washington, D.C., 20429

Having been fully informed of my rights as a witness in an EEO investigation, as set forth in the attached Notice of Rights of Witnesses in EEO Investigations executed by me, I solemnly ____ swear ____ affirm that the statement, which follows, is true and complete to the best of my knowledge and belief.

**Question 1:** Describe your current position, including your duties and responsibilities in that position.

**My Response:** I am the Chief of the Management Support Section, under the Management Services Branch, in the Division of Administration ("DOA") at the FDIC. I have held this position since December 2002. My Section is responsible for supporting the Division by handling a number of analytical functions such as conducting internal control reviews; preparing, executing, and reporting on the Division's annual budget; analyzing staff and workload requirements; resolving audit findings; reporting on the Division's progress in meeting Corporate objectives and goals; analyzing corporate-wide reorganization proposals; and other management analysis type assignments. I currently supervise seven employees who operate within this Section.

**Question 2:** What is your race?

**My Response:** I am Caucasian.

**Question 3:** Describe the number and racial makeup of the non-bargaining-unit employees that you supervise.

**My Response:** There are currently seven employees in my Section: one African American (Ms. Brownfield); two who I believe are of Asian Pacific descent; and four who are Caucasian. During 2004 there was one other employee in my section who was of Asian Pacific descent.

**Question 4:** Do you supervise Complainant?

**My Response:** Yes, I am Ms. Brownfield's first line supervisor and she reports directly to me. On occasion she may also report directly to Paul Sherman, my supervisor, if she is working on a special assignment for him.

**Question 5:** What was your involvement in the administration of the CBC Program in your division for the 2004 compensation period?

**My Response:** As Section Chief, I was responsible for assessing the work related contributions of all employees in my section during the 2004 rating period. I maintained detailed records of

employees' contributions throughout the year which I supplemented with voluntary input from employees. During the first phase of the CBC process, I carefully considered everyone's contributions before ranking each of the eight employees on my staff from the highest contributor to the lowest contributor. At that time, I completed the standard CBC form for each employee where I listed everyone's contributions according to the instructions and guidance provided by the Corporation. As instructed, I did not designate a particular compensation category in which to place each employee. During the second phase of the CBC process, I met with my section head counterparts and my Assistant Director to discuss the relative contributions of all 16 non-bargaining unit employees within our Branch (MSB) and ultimately rank each employee from the highest contributor to the lowest contributor. Still, we did not assign compensation categories during this process.

**Question 6:** Were there any other African American employees who were placed in Group V of the CBC Program for the 2005 compensation period?

**My Response:** I do not recall the contribution group placement of all sixteen employees in the branch. I do know that there were other African American employees besides Ms. Brownfield in the group of sixteen but I don't recall their ranking and/or contribution group placement.

**Question 7:** Complainant has alleged that she was discriminated against and subjected to a hostile work environment because of her race when she was placed in Group V for the 2005 CBC Program. How do you respond to that allegation?

**My Response:** I strongly believe that Ms. Brownfield was not discriminated against when it was ultimately decided that her contributions during 2004 warranted her placement in CBC Group V. In addition, I do not believe that Ms. Brownfield was subjected to a hostile work environment.

Ms. Brownfield's placement in CBC Group V was the direct result of her poor contributions during the 2004 rating cycle. Ms. Brownfield was assigned three primary areas of responsibility during 2004 – all of which related to the Division's internal review program (also referred to as the Administrative Compliance Review program or risk based analysis).

First, I requested that she participate in our regional on-site visits to conduct internal control testing as a member of a review team. Ms. Brownfield declined to participate in any of the regional on-site reviews. Such participation is not mandatory and it is recognized that travel sometimes conflicts with other obligations; however, not participating significantly lessened Ms. Brownfield's opportunity to make contributions during 2004, and caused me to substitute other staff members who, in turn, rose to the occasion by delivering.

Second, during the Washington portion of the internal review program, Ms. Brownfield and one of her co-workers were assigned to review the accounts of approximately 112 bank card holders to ensure that certain procurement controls were in place and functioning as intended. It was clearly explained that each participant was to review approximately half of the 112 card holder accounts in order to balance out the workload. Ms. Brownfield had successfully conducted this review during past years and was extremely familiar with the review process. Approximately one week into this

assignment, I requested a status report to ensure that the review was on track and to address any emerging concerns. At that time, I learned that Ms. Brownfield had contributed very little to this assignment. When I approached Ms. Brownfield about her progress she acted annoyed and would not engage in meaningful dialogue with me. After several more days I noted that Ms. Brownfield's performance had not improved. At that time, I decided to assign a third staff member to help complete the review. All told, Ms. Brownfield ended up reviewing approximately six cardholder accounts that represented less than ten percent of the total transactions and dollar value of transactions. I noted that the accounts that Ms. Brownfield reviewed were not substantially larger or more complicated than the accounts reviewed by the other analysts. Ms. Brownfield did not offer an explanation for her lack of performance but just kept telling me that "it would all get done." I also noted during this time frame that Ms. Brownfield spent a considerable amount of time socializing with other co-workers, talking on the phone, and spending time away from her office.

Third, Ms Brownfield was responsible for completing written summaries of 12 Accountability Unit (AU) reviews that were conducted throughout the year. In actuality, Ms. Brownfield completed only 6 of the 12 summaries assigned to her and co-authored 2 additional summaries (along with other co-workers). Three of the six summaries that Ms. Brownfield prepared had to be rewritten by other staff members because her summaries did not capture appropriate information. One of the six summaries was submitted substantially late. Two of the eight summaries were among the least demanding to prepare and should have taken approximately 2-3 hours each to complete. Instead, it took Ms. Brownfield over one week to complete both. During this time frame, I made frequent visits to Ms. Brownfield's office to inquire about the status of her assignments. During these visits, I noted that Ms. Brownfield was visibly annoyed at my inquiries about her progress. She would not engage in meaningful conversation with me or express an explanation for falling behind. Ms. Brownfield would not even look at me during these encounters. I also logged onto our shared directory to assess her progress and found that, indeed, she had fallen severely behind schedule. After several weeks, I concluded that Ms. Brownfield had fallen so much behind schedule that she would be unable to complete all of her assigned summaries by the established due date. Therefore, I reassigned 4 of the 12 summaries to other staff members. During this time period, I noted that Ms. Brownfield was not assigned any significantly time-consuming assignments that would have precluded her from successfully completing her work. Also, Ms. Brownfield never expressed concern or an explanation for not completing her assigned work.

It is noted that during 2004, Ms. Brownfield was assigned other assignments that varied in complexity. For example, she test piloted ASB's web-based training and provided feedback to ASB, participated in DOA's directive review process, and gathered data for inclusion in FDIC's Critical Infrastructure Plan. These and other ancillary assignments were relatively short in duration and not notably complex. Ms. Brownfield generally completed these assignments on schedule and in an acceptable manner. I considered her involvement in these and other assignments when evaluating and ranking her as part of the CBC process.

As previously stated, I do not believe that Ms. Brownfield was subjected to a hostile work environment. Several unfortunate events occurred during the rating cycle that were beyond anyone's control. These events impacted Ms. Brownfield in a negative way. For example, Ms. Brownfield was not selected for a higher graded position that became available within our Section.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 4**

60

Initials

Case No. FDICEO 050036
Pamela Brownfield EEO Complaint
Daniel Bendler, witness
Page 4 of 6

During September or October of 2003, I began the lengthy process of posting a job announcement to fill a CG-343-13 vacancy on my staff. That process began by me working closely with FDIC's Human Resources Branch (HRB) to complete a job analysis, evaluate the vacancy's position description, develop quality ranking factors, and finalize the job announcement. This process took close to 6 weeks to complete. The job announcement was posted on November 17, 2003, and closed on December 2, 2003. Ms. Brownfield applied for the position and her application was accepted. HRB initially required that a selection be made (referred to as a "roster due date") by February 7, 2004. To meet that deadline, I began scheduling first round interviews with candidates, including Ms. Brownfield, who were referred to me by HRB. However, towards the beginning of January 2004, Ms. Brownfield's sister passed away after a long illness. By that time, first round interviews were underway. In consideration of, and sympathy for, Ms. Brownfield's situation, Paul Sherman (my supervisor) and I mutually agreed to delay her first round interview for as long as reasonably possible and with HRB's concurrence. Accordingly, I met with HR Officer Shirley Purnell, explained Ms. Brownfield's situation, and requested a one month roster due date extension. On January 21, 2004, HRB granted my request to extend the roster due date until March 7, 2004. I notified Ms. Brownfield of the extension and scheduled her interview for February 23, 2004. At that time, she indicated that February 23, was acceptable and seemed genuinely grateful for the extra time to prepare. Approximately one week before her interview, I met with Ms. Brownfield to explain the interviewing process, offer encouragement, and answer any questions. She asked no questions and expressed no concern at that time. The first round interviewing panel consisted of three FDIC employees who were not within Ms. Brownfield's chain of command. Two of the interviewers were DOA employees and one was not. The interview panel conducted all interviews in accordance with Corporate interviewing policy and referred the top four candidates for second interviews; the Panel did not refer Ms. Brownfield for a second interview. Following her interview, Ms. Brownfield acknowledged that she did poorly while answering questions. It was not possible to know back in September 2003, when the job posting process began, that Ms. Brownfield's sister would pass away nearly 3 months later or that her passing would roughly coincide with the interviewing process. As such, Ms. Brownfield's earlier allegation that her non-selection was carefully orchestrated by her managers is completely false. In fact, Mr. Sherman and I were extremely sympathetic to Ms. Brownfield's situation and consulted frequently with HRB officials as well as our Division's Deputy Director to ensure that we offered Ms. Brownfield as much relief and consideration as reasonably possible.

During 2004, the Corporation began its transition to a smaller workforce. FDIC's Chief Operating Officer mandated that all Divisions and Offices conduct a self-assessment to ensure that their organizational focus and structure were properly aligned with the evolving Corporate vision. It was made clear that the Corporation would respond to changes in the banking industry, economy, and other factors by shrinking its workforce and generally becoming more agile. Accordingly, DOA Director Kea challenged her senior management team to become more efficient by, among other things, evaluating trends in DOA's workload and staffing. The implications of this process, while sorely necessary, were painful and not taken lightly by anyone. After months of careful analysis and planning, DOA's senior management team had identified nearly 130 positions as surplus. Ms. Brownfield's position was among the 130 positions identified as surplus. The amount and type of workload handled by the Management Support Section had changed considerably over the past few years. For example, our internal review program was being overhauled to focus on considerably

fewer areas, require less widespread testing, and rely on much smaller review teams. Also, as HRB, ASB, and CSB unveiled its downsizing plans, it became very clear that – as a support organization – MSB would have to follow suit in order to remain relevant and provide value to our senior management team. Ultimately, the decision was made to eliminate our CG-343-12 position. In December 2004, Ms. Brownfield was notified that her position was deemed surplus.

Following these series of unfortunate events, Ms. Brownfield's behavior changed considerably. She kept her office door closed most of the time, would not interact with other staff members, would not interact with me, and did not look or speak to me when I was in her office other than to occasionally nod or utter something under her breath. Sympathetic to her feelings, I allowed her some space to cope with recent developments and begin interacting again with our staff. After several weeks of unchanged behavior, I met with Pam to discuss our working relationship and discuss ways to reengage her in our work. During that meeting, Ms. Brownfield became enraged and acted in an extremely unprofessional manner. Several times, she asked me to leave her office unless I had any work related issues to discuss and continued to berate me when I attempted to diffuse the situation. After several minutes, I left Ms. Brownfield's office and met with my manager, Paul Sherman, to seek advice on improving this situation. Mr. Sherman and I concluded that we should take Ms. Brownfield's reaction to our earlier "meeting" seriously and consult with an Employee Relations Specialist. Accordingly, we immediately met with an Employee Relations Specialist who advised us of various options available for responding to recent events and Ms. Brownfield's conduct. I opted to take a less formal but direct approach by sending Ms. Brownfield an E-mail on January 25, 2005, that served as a follow-up to our derailed conversation a week earlier. In my E-mail, I recounted the events of our meeting from my perspective and discussed expectations for future performance and conduct. The tone of that E-mail was intended to be direct and constructive. In actuality, I believe that Ms. Brownfield interpreted that email to be harassing and damaging to her career.

I believe that Ms. Brownfield's ultimate placement in CBC Group V was fair and appropriate. Relative to the contributions of other non-bargaining unit employees in our Branch, Ms. Brownfield's contributions during 2004 stood out as being very low. I have known and worked with Ms. Brownfield for over 8 years and know that she can be very capable and professional. Unfortunately, the 2004 rating cycle was not a good year for Ms. Brownfield and I was duty-bound to evaluate all employees on my staff based on their actual contributions; not on their ability, past performance, or potential.

**Question 8:** Complainant has alleged that she was Employee of the Month in 2004. Was any other Employee of the Month in your section placed in Group V?

**My Response:** Ms. Brownfield, along with every other employee in my section, was named Employee of the Month in 2004. The nomination was made by her peers. Ms. Brownfield was nominated in December 2004, which meant that all other employees in my section were nominated for the award before her. Ms. Brownfield was the only employee in my section who was placed in Group V.

**Question 9:** Is there anything else you would like to add to the record about this complaint at this time?

**My Response:**

N/A


I have reviewed this statement, which consists of __6__ pages, and hereby solemnly swear __✓__ affirm __✓__ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.


_____
(Signature of Affiant)

August 11, 2005
_____
(Date)