**AFFIDAVIT**

**COMMONWEALTH OF VIRGINIA**

**COUNTY OF ARLINGTON**

I, Daniel Bendler (Caucasian, no prior EEO activity), Section Chief, CM-1, Management Support Section, Management Services Branch, Division of Administration, Federal Deposit Insurance Corporation, after first being placed under oath, make the following statement freely and voluntarily to Daniel Willard Jewell, who has identified himself to me as a Contract EEO Investigator for the Federal Deposit Insurance Corporation, investigating a complaint of employment discrimination filed by Pamela Brownfield, knowing that this statement may be used in evidence. I understand that this statement is not strictly confidential and may be shown to any interested party with a legally recognized need to know.

In response to questions from the EEO Investigator, I hereby solemnly swear or affirm:

1. I have held my current position approximately 3 years and have worked for the FDIC for approximately 15 years. My 1st and 2nd level supervisors are Paul Sherman and Glen Bjorklund respectively. My duties are to oversee the Division's budget function, internal control program, audit resolution activity, Corporate Planning function, cost management efforts, special studies and analysis, and reorganization analysis program. I supervise a staff of 7 individuals, including Pam Brownfield.

2. The Investigator has apprised me of the issues in this complaint filed by Pamela Brownfield based on race and reprisal. I have known Ms. Brownfield for approximately 9 years and have supervised her for approximately 3 years. I first learned of her EEO activity over a year ago when I received a call from FDIC's ODEO. My working relationship with Pam for the first 6 years (approximately) was generally productive and congenial. However, over the past few years, Pam's actions and conduct towards me has changed considerably. I would no longer characterize her interactions with me as congenial. A confluence of events has gradually eroded the once healthy relationship that I shared with Pam.

3. Regarding the issue of a complaint from Ann Bridges Steely, in February 2006, Paul Sherman informed me that he was approached by Ms. Steely about Ms. Brownfield's interaction with members of her staff - the Acquisition Services Branch. According to Paul, Ms. Steely stated that several members of her staff had complained about Ms. Brownfield frequently visiting their offices and holding lengthy casual (non-business related) conversations. As a result, staff members felt distracted from their work. Ms. Steely did not intend to pursue a formal course of action

in this matter but instead offered to speak with Pam personally. After a brief discussion, Ms. Steely and Mr. Sherman agreed that I would handle this situation in a low key and informal manner. All parties agreed that this situation did not warrant a formal disciplinary action and could be handled during a face-to-face discussion. Accordingly, I met with Ms. Brownfield and shared Ms. Steely's concerns and requested Pam to be mindful of her social interactions with ASB staff. I also clearly stated that I did not want to make a big deal out of this matter. Given our strained relationship and past conversations, I was purposefully gentle in my discussion to ensure that Ms. Brownfield did not feel threatened or "picked on". She said very little during our discussion but mumbled something under her breath about "that's so funny". That same evening she sent me an email about our conversation. I thought the matter was closed but she denied disturbing anyone and refuted the facts that I had discussed with her in person. I replied via email to reiterate the facts of our conversation and restate my belief that this was not a big deal. Whereas the matter should have ended at our meeting, it did not end until this email exchange was over. Under the same circumstances, I would have approached this matter in the same exact way. I have never had to do this

with anyone else on the Management Support Section staff because the issue has not come up before. I do not know whether the Corporation has a formal written policy about socializing during work hours. However, employees generally exhibit common courtesy and respect for others in the work place even without specific instructions to do so. I do not think Ms. Steely was being hateful when she approached Mr. Sherman, and I certainly had no intent to embarrass or harass Ms. Brownfield by passing along Ms. Steely's concerns. To my knowledge, this whole matter had nothing to do with a training session, as Ms. Brownfield suggested.

4. Regarding the issue of Ms. Brownfield's work assignments, much of the work in my section is shared among staff members. It is not uncommon for employees to engage in a variety of assignments from year to year. At one time, Ms. Brownfield was assigned to write most of the CFOA risk analysis summaries. However, some members of the staff suggested that the individuals who actually conducted the reviews/studies prepare their own written summaries. This combined with other factors led me to improve our process by allowing employees to take ownership of their projects from "cradle to grave". In so doing, the

responsibility for preparing written CFOA summaries shifted from Ms. Brownfield exclusively to other members of the staff including Ms. Brownfield. Sharing work among staff and creating an environment of generalists able to handle multiple responsibilities is a best practice that is embraced by organizations throughout the FDIC. For example, I recently assigned Ms. Brownfield to budget related work that she had not experienced before to expose her to new challenges and enrich her skill set. I also assigned Cost Management related work as something new and challenging to embrace. These assignments were ones that other members of the staff would have certainly enjoyed working on.

As for the Directives Review Process, DOA's Corporate Services Branch no longer requested our service in this area. The work, previously assigned to Ms. Brownfield, was not reassigned to any other member of the staff – but is instead an example of our diminished workload in certain areas. It is true that Ms. Brownfield sometimes had little work to do. Most of our work is cyclical; it is not uncommon for our staff to experience a lull in activity during certain times of the year. Moreover, as the Division's staffing and workload have declined overall – so

to has the workload of the Management Support Section declined. I gave Ms. Brownfield as much work as I could. It is true that some areas are robust at times and slow at others. Over the years, Ms. Brownfield's primary area of responsibility centered around the Division's internal review program. In this regard, Ms. Brownfield participated in the planning, execution, and reporting phases of risk and compliance based analysis. Until recently, DOA's internal review program included approximately 15 or more accountability units or functional review areas. To accommodate the large volume of reviews, our Section would assemble teams of 10-15 volunteers to conduct on-site testing and reporting. Today, because of changes to DOA's and the Corporation's staffing and workload, our internal review program includes only 8 functional review areas and our review teams have been reduced to 5 or 6 employees. Moreover, the internal review planning and reporting requirements have been considerably streamlined over the past 2-3 years. This dramatic reduction in workload has had a corresponding impact on our resource needs.

Since March 2006, Ms. Brownfield has been considerably busier and even refused to help one of her co-workers claiming that she did not have the time.

5. Regarding the issue of Ms. Brownfield claiming to be restricted from contacts with other FDIC personnel, I never had any intent to chill her freedom to talk to her co-workers about non-work issues. Our talk in February 2006 regarding Ms. Steely's concerns was intended to be non-threatening and informative. Further, I never instructed Pam to cease contact with other FDIC Personnel.

6. I am unaware of any instances regarding Mr. Sherman making inquiries about Ms. Brownfield among co-workers. In a professional and supervisory capacity, Mr. Sherman and I have discussed the status of employees overall – including Ms. Brownfield -- who occupied surplus positions within DOA. I personally know that Paul was extremely concerned and compassionate about Ms. Brownfield's situation. He was genuinely interested in helping her avoid an involuntary separation and for her well-being overall. I believe that any inquiries that may have been made were done so with the most kindhearted of intentions.

7.  Regarding the issue of our employee appreciation luncheon in February 2006, we issued an email announcement inviting everyone within the Management Support Branch and the Director's Office to attend.  We ordered food from Red Hot and Blue and met in one of our new conference rooms.  This event has been a fairly long-standing tradition.  Ms. Brownfield was included in the email invitation and I was particularly alert to her attendance given her situation.  After the party was approximately 10-15 minutes underway, I quietly left the conference room to once again extend a friendly invitation to Pam to join us.  I was hopeful that she would accept my offer and join the luncheon.  She immediately became inflamed and stated "I know you are having lunch.  If I wanted to come I would have come."  I tried to be nice about the whole thing but she was hostile and clearly resented my overture.  I then returned to the conference room and rejoined the luncheon without mentioning a word about my encounter with Pam.  There were over 20 people in attendance, including Ms. Kea, and I would never dream of making an insulting comment about someone on my staff in that or any environment.

8.  Regarding the issue of the Pay for Performance Program, MSB's management team conducted a comparative analysis of the entire staff and ranked all employees. Ms. Brownfield generally met expectations and was rated accordingly. When compared to other members of MSB, Ms. Brownfield's contributions did not stand out as rising above her coworkers. I did not place Ms. Brownfield in any compensation category. That decision was made at a committee level based on the relative contributions and ranking of all eligible DOA employees. Mr. Sherman, Ms. Young, Ms. Childers, and I prepared a relative ranking of employees within MSB based on a comprehensive discussion and analysis of everyone's contributions. The work that Ms. Brownfield handled on the Customer Advisory Committee was considered when evaluating employees but overall represented a less significant contribution when compared to other accomplishments in terms of time spent and complexity of work. She was the only one of my employees who was eventually placed in group III. Her closest peers within the Management Support Section are Holly Mattus, David Lok and William Gately.

9.  I deny discriminating or retaliating against Ms. Brownfield in any way.



10. I have no additional witnesses to suggest.

11. I have nothing to add to my statement.

I have read the above statement and declare that it is truthful, accurate and complete to the best of my knowledge, information and belief, under penalty of perjury. I understand that the information I have given is not to be considered strictly confidential and may be shown to interested parties on a need to know basis pursuant to applicable EEOC regulations.

_____
Daniel Bendler

_August 22, 2006_____
Date

Subscribed before me at

_____ on this  22  day of  August  , 2006.

_____
Witness to Affiant's Signature

**Bendler, Daniel H.**
**From:** Bendler, Daniel H.
**Sent:** Friday, February 24, 2006 6:44 AM
**To:** Brownfield, Pamela A.
**Subject:** RE: office visit

Pam,

Thank you for your email. I was simply passing along to you factual information that was requested of me in a polite and non-confrontational manner. Apparently, according to members of ASB, you are indeed disturbing or distracting their work. Otherwise, I can't imagine why Ann would approach Paul on this matter. As I mentioned to you yesterday, no one is making a "big deal" out of this situation; however, I wanted to bring it to your attention for your awareness and consideration. Based on our conversation yesterday afternoon, I feel confident that you will be mindful of your social interactions with Ann's staff in the future.

Thanks,

Dan

---

**From:** Brownfield, Pamela A.
**Sent:** Thursday, February 23, 2006 5:44 PM
**To:** Bendler, Daniel H.
**Subject:** office visit

Dan,

This is in regards to your visit to my office at approximately 4:45 p.m. today. You told me that Ann Steely, ASB director, told Paul Sherman, MSB director, that managers and supervisors in her branch said I spend too much time in the ASB area socializing with staff.

I do not spend excessive amounts of time in ASB. I do socialize with staff members in ASB occasionally; many are my friends whom I've know for years. I have never disturbed or interfered with any work these employees were performing. I think this contention comes at a very peculiar time given what I sent you yesterday.

Respectfully,

Pam