## WITNESS AFFIDAVIT

I, Glen V. Bjorklund, am an employee of the Federal Deposit Insurance Corporation located in Washington, D.C. My telephone number during working hours is: 202-942-3440. My work address is: 1730 Pennsylvania Ave., Washington, D.C., 20429

Having been fully informed of my rights as a witness in an EEO investigation, as set forth in the attached Notice of Rights of Witnesses in EEO Investigations executed by me, I solemnly swear and affirm that the statement, which follows, is true and complete to the best of my knowledge and belief.

**Question 1:** Describe your current position, including your duties and responsibilities in that position.

**My Response:** I am the Deputy Director of the Division of Administration ("DOA") at the FDIC. I am the second highest official in the DOA organization and support the Division's Director, Arleas Upton Kea. I directly supervise the four Associate Directors (Branch Chiefs) of the Division, the Regional Managers and four members of the Director's Office and indirectly supervise all other employees in the Division. I interact with my peers across the different divisions within the FDIC and support Director Kea in reporting to the FDIC's Deputy to the Chairman and Chief Operating Officer and the Chairman of the FDIC.

**Question 2:** What is your race?

**My Response:** I am Caucasian.

**Question 3:** Describe the number and racial makeup of the non-bargaining-unit employees that you supervise.

**My Response:** I directly or indirectly supervise approximately 200 non-bargaining unit employees in the Division. The DOA, including its management staff, is the most racially diverse organizations in the FDIC.

**Question 4:** Do you supervise Complainant?

**My Response:** Ms. Brownfield is supervised directly by Daniel Bendler. Her second line supervisor is Paul Sherman, who reports to me. Although I am in Ms. Brownfield's supervisory chain of command, I do not regularly review or assign her work.

**Question 5:** Describe the FDIC's Contribution Based Compensation ("CBC") Program.

**My Response:** The FDIC is exempt from portions of Title V of the U.S Code and the compensation programs followed by other federal governmental organizations. Over the last several years it has used several pay-for-performance compensation programs. Prior to 2005, non-bargaining unit employees were compensated pursuant to the Corporate Success Award ("CSA")

Program. Under the CSA, all employees who passed their annual performance reviews received a 3.2% increase in pay. The top 1/3 of these employees received an additional 3% increase in base pay based on their relative contributions. The CBC Program was introduced for the 2005 compensation period for non-bargaining unit employees and replaced the CSA Program. Under the CBC, employees are not guaranteed a pay increase but rather are paid pursuant to their relative contributions during the contribution period. Employees under the CBC are compared with their peers and separated into one of five different performance groups: Group I (top 10% of contributors); Group II (the next 15% of contributors); Group III (the next 25% of contributors); Group IV (the next 45% of contributors) and Group V (the bottom 5% of contributors). Groups I through IV receive percentage increases in pay, with Groups I through III also receiving a bonus. Group V employees do not receive any increase in pay.

To determine employee placement in the CBC's different performance categories for the 2004 ratings period the first line supervisors of all sections in the DOA independently ranked the employees in their section numerically from highest to lowest. The supervisors also filled out nomination forms for each employee that supported their ranking. All of the DOA sections' rankings were then combined and, with the help of a mathematical tool, were statistically divided into the five different performance groups. The rankings were weighted to reflect a person's ranking in relationship to the number of employees in their section. A person who was ranked number one out of the ten employees in his or her section, for example, would not place as high in a performance group as a person who was ranked number one out of his or her section of twenty employees. Once the performance groups had been created a management team reviewed the results. Employees who were placed in Group I and Group V were given special consideration, as were employees who fell close to the cut-off mark for each performance group. The management team reviewed the nomination forms for each of these employees and moved employees up or down in the performance groups if it was determined that their original placement was not supported by the information provided in their nomination form.

**Question 6:** What was your involvement in the administration of the CBC Program in your division for the 2005 compensation period?

**My Response:** I, along with other management officials in my division, was responsible for the fair and equitable implementation of the CBC program for the 2005 compensation period. I participated in the management team that reviewed all of the employees' nomination forms for placement in the five CBC groups.

**Question 7:** What training did managers receive about the CBC Program and the manner in which they were to rate the employees they supervised?

**My Response:** Managers were given extensive training on how to implement the CBC Program and its predecessor, the CSA Program, which utilized many of the same pay-for-performance principles. Information was disseminated through power point presentations, global emails, websites and during management conferences.



**Question 8:** Were any employees moved from Group V to Group IV? If so, what was the race of those employees?

**My Response:** I believe that during the management meeting several employees were moved from Group IV to Group V and vise versa, but I don't recall the race of all the employees who were involved. I recall in particular that a white male was moved from Group IV to Group V and I believe that a couple of African American employees were moved from Group V to Group IV. None of these employees, however, were in Ms. Brownfield's section. I don't have specific recollection about any other employee who may have been moved. Each placement was carefully reviewed by the senior management team, however, and was initially recommended by that employee's direct and second line supervisors.

**Question 9:** Complainant has alleged that she was discriminated against and subjected to a hostile work environment because of her race when she was placed in Group V for the 2005 CBC Program. How do you respond to that allegation?

**My Response:** I do not believe that Complainant was discriminated against when she was placed in Group V of the CBC Program. Ms. Brownfield was ranked last in her section by Mr. Bendler because of her relatively low contributions over the 2004 rating period. That ranking was reviewed and approved by Mr. Sherman and was supported by the information provided by Mr. Bendler on Ms. Brownfield's nomination form. Ms. Brownfield's race had nothing to do with her ranking. It is my understanding that Ms. Brownfield had some personal problems that may have contributed to her job performance in 2004. Prior to that time, Ms. Brownfield had been a productive employee and had been, over several years, promoted from a lower grade administrative position to her Grade 12 analyst position. Ms. Brownfield has worked with mostly the same management staff during her tenure with the FDIC and has been recognized and promoted for her performance and accomplishments. It is unreasonable to believe that these same people would suddenly decide to discriminate against Ms. Brownfield because of her race or for that matter subject her to a hostile work environment. Everybody in that section wants to see Ms. Brownfield do well. It is my understanding that her first and second line managers were empathetic to her personal problems and have encouraged her to seek assistance from resources provided by the corporation.

To my knowledge, Ms. Brownfield has never reported to management that she believed that she was being subjected to a hostile work environment, before filing this complaint. I know that Mr. Bendler has tried to work informally with Ms. Brownfield to help her return to her earlier productivity, but has had little success. I believe that Mr. Bendler has had to counsel Ms. Brownfield on at least one occasion because of her declining performance and attitude. These actions do not constitute a hostile work environment. Mr. Bendler would be negligent in his supervisory duties if he failed to address Ms. Brownfield's performance problems and the situation would be unfair to the other employees in his section.

**Question 10:** Is there anything else you would like to add to the record about this complaint at this time?

**My Response:** No.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 7

50


Initials

I have reviewed this statement, which consists of four (4) pages, and hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____    _____
(Signature of Affiant)                                              8/12/2005
                                                                    (Date)