**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PAMELA A. BROWNFIELD,           )
    1210 Delafield Place, N.W.   )
    Apt. #2                       )
    Washington, DC 20011,         )
                           )
          Plaintiff,           ) Civil Action No.
                        )  05-2468 EGS
v.                              )
                        )
MARTIN J. GRUENBERG,            )
    ACTING CHAIRMAN,              )
    FEDERAL DEPOSIT               )
    INSURANCE CORPORATION,        )
    550 17TH Street, N.W.,       )
    Washington, D.C. 20429-9990, )
          Defendant.           )
_____)

                Washington, D.C.
                Monday, March 12, 2007

DEPOSITION OF:

        PAMELA BROWNFIELD

called for examination by counsel for the Defendant,
pursuant to notice of deposition, in the Federal
Deposit Insurance Corporation, Legal Division,
Corporate Operations Branch, 3501 Fairfax Drive,
Room E-6006, Arlington, VA 22226, when were present
on behalf of the respective parties:

APPEARANCES:

    On Behalf of the Plaintiff:

     David H. Shapiro, Esq.
     Sarah L. Riger, Esq.
     Swick & Shapiro, P.C.
     1225 Eye Street, N.W.
     Suite 1290
     Washington, D.C. 20005
     (202) 842-0300

    On Behalf of the Defendant:

     William S. Jones, Esq.
     Patricia E. Davison-Lewis, Esq.
     3501 Fairfax Drive, Room E-6006
     Arlington, VA 22226
     (703) 562-2362
     wjones@fdic.gov

Reporter: Nathan Morton

Reporter: Nathan Morton

FOR CLOSING WHEREUPON
SIGNATURE WAS NOT WAIVED

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

3

C-O-N-T-E-N-T-S

WITNESS                                      DIRECT      CROSS

Pamela Brownfield                              4          140


E-X-H-I-B-I-T-S

NO.   DESCRIPTION                                        MARK

1.    Special Act or Service Award Nomination
      for Pamela A. Brownfield, dated 10/5/00      20

2.    FDIC Performance Plan and Summary Numeric
      Score for Brownfield for period from
      9/00 to 8/01                                 21

3.    FDIC Performance Plan and Summary Numeric
      Score for Brownfield for period from
      9/99 to 8/00                                 22

4.    FDIC Performance Plan and Summary Numeric
      Score for Brownfield for period from
      9/98 to 8/99                                 23

5.    FDIC Performance Plan and Summary Numeric
      Score for Brownfield for period from
      10/97 to 8/98                                24

6.    Emails, Bendler to Brownfield re
      Follow-up to 1/18/05 discussion, dated
      1/25/05 and two dated 1/31/05,
      reply Brownfield to Bendler dated
      1/31/05, and written response
      Brownfield to Bendler dated 1/31/05          72

7.    Emails between Bendler and Brownfield
      re movies and TV shows, various dates
      in 2003                                      114

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2                                    (10:05 a.m.)

 3    Whereupon,

 4                    PAMELA BROWNFIELD

 5    was called as a witness by counsel for the Defendant

 6    and, after having been first duly sworn, was

 7    examined and testified as follows:

 8              MR. JONES: Ms. Brownfield, as I've

 9    introduced myself, my name is Bill Jones.  And I'm

10    representing the FDIC in your lawsuit.

11              This is Pat Davison-Lewis.  She is co-

12    counsel.

13              Have ever had your deposition take

14    before?

15              WITNESS: Never.

16              MR. JONES: Okay.  I'll just briefly

17    describe the process.

18              MR. Morton will be taking down the

19    questions and your answers.  We have microphones

20    here, so that helps back things up.  And because he

21    is taking it down, listening to what you say, I ask

22    that your responses be verbal.  He can't take down
```

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

5

1   nods or shrugs or shakes of the head or something

2   like that.

3           And if you don't understand one of my

4   questions or any of my questions, would you let me

5   know.  And I'll try to make it clearer.

6           If you need a break at any time, just

7   tell me and we'll take care of that.

8           And also if after you've answered a

9   question if you think of something else, if you

10  remember anything else that would make your answer

11  more complete, please go ahead and just interrupt me

12  and tell me about it, so we can put it on the

13  record.

14          This morning are you taking any

15  medications that would interfere with your ability

16  to answer the questions?

17          WITNESS: No, I'm not.

18          MR. JONES: In your discovery responses

19  you mentioned that sometimes you take Xanax; is that

20  correct?

21          WITNESS: Not recently, but I have.

22      DIRECT EXAMINATION BY COUNSEL FOR THE DEFENDANT

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

6

```
 1                    BY MR. JONES:

 2          Q     When was that first prescribed for you?

 3          A     In 2005, late 2005.

 4          Q     And what is the name of the doctor who

 5     prescribed it?

 6          A     Elliott Aleskow.

 7          Q     Aleskow.  Could you spell that?

 8          A     A-l-e-s-k-o-w.

 9          Q     Okay.  And where is his office?

10          A     K Street.  2200 block of K Street.  I'm

11     just guessing.

12          Q     Okay.  That's close enough.

13          A     I know how to get there.

14          Q     Okay, and when was the last time you

15     took that?

16          A     Probably earlier in 2006.

17          Q     Early in 2006?

18          A     Yes, maybe around March.

19          Q     Okay, and around that time how often

20     were you taking Xanax>

21

22          A     Like when he first prescribed it I might
```

1    have taken it for about four or five days in a row.

2    It made me drowsy.

3            Q     Okay.

4            A     And then I would take it when times got

5    really rough at work.

6            Q     Okay.  Do you remember any particular

7    times when you took it?

8            A     I can't remember specific dates.

9            Q     Any specific incidents at work?

10           A     One occasion might have been when I

11   would ask for work and wouldn't get any, and two

12   weeks would go by and everybody was busy and I had

13   nothing to do; that's very stressful.

14           Q     Okay.  And other than making you drowsy

15   what kind of effects did - what was the good effects

16   of the Xanax?

17           A     It took the edge off being anxious and

18   frightened; just took the edge off.

19           Q     I under anxious, but what were you

20   frightened of?

21           A     Everybody I would come in, I didn't know

22   what they were going to do to me; I didn't know how

1   they were going to treat me.

2        Q      And this was in late 2005, early 2006?

3        A      Well, actually throughout the period, I

4   didn't know they were going to treat me if you want

5   to talk about that.

6               But in particular, me taking this, when

7   you are talking about me taking this Xanax, it would

8   have been - I don't know how much detail I should go

9   into like when I come into the office.

10       Q      Well, yes, please.

11       A      And everyone would be busy, and I'd say,

12  do you have anything for me to do?  No, nothing.

13  And I'm sitting there twiddling my thumbs making my

14  own work, straightening up my files.

15       Q      And this would have been in 2005 and -

16       A      2005 and 2006.  In particular there was

17  a long period at the end of 2005 through 2006 when I

18  asked for work and it wouldn't come.

19       Q      Okay.  Let's shift gears a little bit

20  and talk about your career at the FDIC and the RTC.

21              When did you - I believe you started at

22  the RTC?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

9

1          A     I was actually March 19, 2007 an LG

2    employee at FDIC when National Bank of Washington

3    closed.

4          Q     Okay, and when was that?

5          A     I came on as a temp in August, 1990, and

6    then they picked me up as an LG employee November

7    1st, 1990.

8          Q     And what was your position at that time?

9          A     I was probably a secretary.  I don't

10   know the exact title.  It was a support position.

11         Q     And the grade level?

12         A     Five.

13         Q     Okay.  So you were an LG employee in -

14         A     The National Bank of Washington, it was

15   called the National Bank of Washington site, because

16   it was there - they were liquidating the bank.

17         Q     Okay.  And what was your next position

18   after you were a grade five secretary?

19         A     I came into - I got picked up

20   permanently at the RTC at the grade five.

21         Q     And who did you work for?

22         A     I initially worked for Dennis Geer, I

1    was in Dennis Geer's group, John Lynn.

2            Q    Okay.  And Dennis Geer at that point

3    was?

4            A    Probably he was - I can't remember his

5    title - he was one of the - similar to what Bovenzi

6    was, in the setup at RTC you had -

7            Q    Like the chief operating -

8            A    Yes, something like that, but I wouldn't

9    know the exact title.  And I worked for John Lynn,

10   who was his, I guess, his deputy.  So I was his

11   secretary.

12           Q    All right.

13                And what was your next position after

14   that?

15           A    I'm just guessing on dates here, perhaps

16   like March, `92, I became a management assistant,

17   which was a 343.

18           Q    And what grade level was that?

19           A    Six slash seven.

20           Q    Was that a competitive promotion?  Was

21   that something you had to apply for?

22           A    Yes, absolutely.

```
1          Q     And who were you working for then?

2          A     Janet Roberson.

3          Q     And you were a management assistant at

4     that point?

5          A     Yes, it was a bridge position.

6          Q     What do you mean by a bridge position?

7          A     You know they have support positions, if

8     you look at the series, then it was 344, and

9     management analyst is 343.  So it can be a bridge

10    position into the professional series.

11         Q     Okay, so it's a bridge between the

12    clerical and the professional series?

13         A     Yes, absolutely.

14         Q     Okay.  And how long did you occupy that

15    six slash seven position?

16         A     Until FDIC merged with RTC.

17         Q     And that was at the end of -

18         A     Yes, early January, well, January, 2006

19    - I mean, January 1996 we merged.

20         Q     Okay.  And it was a six slash seven

21    position.

22         A     Yes.
```

1          Q      So did you move up in the career ladder

2     fro ma six to a seven?

3          A      Yes, I did.

4          Q      So after the FDIC and RTC merged into

5     the FDIC in January, 2006 -

6          A      1996.

7          Q      Right, 1996.  You got me confused.  Who

8     were you working for at that point?

9          A      I started working for Tom Peddicord.

10         Q      All right.  And this was still the - was

11    this the division of administration?

12         A      Yes, we well under - well, he was our

13    brass direction.  Then I had a different supervisor.

14    But ultimately I worked for Tom.  So my immediate

15    supervisor eventually was Terry Zack, Z-a-c-k.

16         Q      Okay.  And when did you meet Paul

17    Sherman?

18         A      Paul, back in `92, before I came on and

19    started with Janet Roberson.

20         Q      Okay, so he worked with her too?

21         A      Yes.

22         Q      Okay, and eventually he became your

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

13

1    supervisor, did he?

2         A    Not until Terry Zack left.  I'm not sure

3    of the exact date.  It might have been late `96 or

4    early `97.

5              MR. SHAPIRO: Sorry, I didn't get the

6    name of the person that you were asking about?

7              MR. JONES: Paul Sherman.

8              WITNESS: Whenever it was that Terry

9    left, then I transferred under Paul's supervision.

10             BY MR. JONES:

11        Q    And where did Terry go?

12        A    She went to - she still is in the

13   corporation.

14        Q    I thought so.  Okay, so you had known

15   Paul Sherman since 1992, and he became your

16   supervisor sometime you think in 1996?

17        A    Late `96, or early `97.

18        Q    Okay.  What kind of - how would you

19   characterize your relationship with MR. Sherman

20   before he was your supervisor?

21        A    It was cordial, absolutely.

22        Q    Did you see him on a - how often would

```
 1    you -

 2         A     Everyday.

 3         Q     Everyday, on a daily basis?

 4         A     He worked in the same -

 5         Q     So he worked for MR. Peddicord, too?

 6         A     Absolutely.

 7         Q     And he worked for Ms. Roberson before

 8    that?

 9         A     Yes.

10         Q     And how would you characterize your

11    relationship with him after he became your

12    supervisor?

13         A    It was fine.  Everything was fine.

14              COURT REPORTER: I'm sorry, I need you to

15    speak up.

16              WITNESS: Everything was fine.

17              BY MR. JONES:

18         Q    At this point, when did you get

19    appointed to your next grade level?  I think we've

20    brought it up to where you were a seven?

21         A    Seven.  Terry Zack saw I was in college

22    working on my degree, and she saw the work I did.
```

1    And she went to Tom and said, I think we need to

2    reward her.  Because I was working hard, and I was

3    taking on a lot of responsibility.

4            Q    And you were going to college at night

5    at that point?

6            A    Yes, University of Maryland, University

7    College.

8            COURT REPORTER: I need you to pronounce

9    all the way through.

10           WITNESS: University of Maryland,

11   University College.  I guess I'm directing my

12   answers toward him.

13           MR. JONES: I'll try to be louder to.

14   Because I try to be quiet too.  I think you are

15   taking on my way, I'm sorry.

16           BY MR. JONES:

17           Q    So when you got promoted to grade nine,

18   was that a competitive promotion too?  Was that

19   something you had to apply for?

20           A    Yes, I had to apply for it.

21           Q    Okay, and Terry Zack was the selecting

22   official for that position?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

16

```
1          A     I imagine her and Tom; I don't remember.

2     It would have been her and Tom Peddicord.

3          Q     Okay, and after that what were you

4     promoted to?

5          A     Eleven slash 12.

6          Q     And was that a competitive position as

7     well?

8          A     Yes.

9          Q     And was MR. Sherman the selecting

10    official for that?

11         A     Yes.

12         Q     And Tom Peddicord was the approving

13    official, do you remember?

14         A     I guess so; I'm not sure.  He was the

15    branch director.

16         Q     Did you have to interview for that

17    position?

18         A     Yes.

19         Q     And who conducted the interview?

20         A     I believe Paul.

21         Q     Paul Sherman?

22         A     Yes.
```

```
 1          Q      And eventually you progressed in the

 2    career ladder there to a 12?

 3          A      Yes.

 4          Q      Could you tell me a little bit about

 5    your education?  You college education.

 6          A      My college education?

 7          Q      Yes.

 8          A      Well, I spent nine years on active duty

 9    in the Air Force, and that's where I started going

10    to school, when I was overseas, I was stationed

11    overseas.  I went to school part time when I was

12    overseas; stopped.  I worked night shift.

13                 Then when I came back to the United

14    States, I went again and stopped.  Once I began

15    working for Jan Roberson, she is really education

16    focused, and she suggested I go to school.

17          Q      And is that when you started going to

18    University of Maryland College?

19          A      Yes, and I stayed focused on it, and I

20    finished in four years part time.  Because I had

21    earned about 50 credits when I was in the military.

22          Q      And when did you get your degree?
```

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

18

1          A       August, 1997.

2          Q       And what's the degree in?

3          A       Major, psychology; minor, business.

4          Q       So at the end of your college education,

5      MR. Sherman was your supervisor?

6          A       Yes.

7          Q       Was he supportive, like Ms. Roberson

8      was?

9          A       Well, Ms. Roberson - supportive in what

10     way?

11         Q       Did he encourage you to -

12         A       No, it was already - I was already on

13     the path.  So it was just a matter - that's good

14     you're doing it.  Ms. Roberson paid for some of my

15     classes.  Ms. Zack paid for some of my classes.

16         Q       They paid for them personally?

17         A       No, you know through classes - yes.

18         Q       Did you ever ask MR. Sherman to do the

19     same thing?

20         A       At that point I was honor roll and I had

21     taken on a student loan so I didn't need to.

22         Q       Did you ever discuss future plans with

```
 1       MR. Sherman at that point?

 2              A      What type of future plans?

 3              Q      Future educational plans?

 4              A      Perhaps.

 5              Q      And what was that conversation?

 6              A      Going to graduate school.

 7              Q      Was he supportive of that?

 8              A      In the same way you would probably be.

 9       That's good.  That kind of support.

10              Q      Okay.  Now when he was your immediate

11       supervisor, did he give you favorable performance

12       ratings?

13              A      Yes.

14              Q      And you were satisfied with him?

15              A      Yes.

16              Q      Okay.  Did he ever give you any awards?

17              A      Two.  That was the last award I

18       received.

19              Q      Okay.  And what two were they?

20              A      I don't remember the exact title of the

21       awards.  But they were for extensive work I did on

22       projects two years ago.
```

20

1          Q      Okay, two years in a row?

2          A      Yes, 2000 - perhaps `99 and 2000.

3          Q      Okay.  I think this is a good point to

4     show you a couple of documents here.

5                 MR. JONES: And I'll ask the court

6     reporter to mark this as Exhibit No. 1.

7                          (Whereupon the aforementioned

8                          document was marked for

9                          identification as Exhibit No.

10                         1)

11                BY MR. JONES:

12         Q      Is this one of the awards that MR.

13    Sherman gave to you?

14         A      Yes.

15         Q      And this is a Star award for $2,000?

16         A      This is not a Star award.  This is a

17    special act.  Star awards are like $500.

18         Q      Okay.  Oh, yes, I see at the top, it

19    says special act of service award nomination.

20         A      This was a big project.

21         Q      And I'm looking at the little box that

22    says, date and type of last award.  That says Star

1    award; is that correct?

2        A    It says Star award.

3        Q    Is that the other award you were

4    referring to a couple of minutes ago?  You said

5    there were two awards.

6        A    No, there was another - he gave me

7    another - I thought he gave me another big award.

8    The Star award, I don't know what that is, what

9    that's for.  He may have done that a year before,

10   because there were a lot of changes going on.

11       Q    And let's see on the next page this was

12   in October of 2000; correct?

13       A    Yes.  The other one was 2001 before the

14   terrorist attacks, I just recall.

15       Q    Okay, and that was another - dol you

16   remember how much that one was for?

17       A    Probably similar.

18       Q    Okay.  That's all the questions I have.

19   So we can give this back to the court reporter, so

20   he can keep that safe.

21            MR. JONES: We can mark this as Exhibit

22   No. 2.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

```
 1                              (Whereupon the aforementioned

 2                              document was marked for

 3                              identification as Exhibit No.

 4                              2)

 5               BY MR. JONES:

 6          Q    I'll just ask you if you recognize that

 7     document?

 8          A    Yes.

 9          Q    And what is it?

10          A    Performance summary.

11          Q    And this is the performance summary that

12     ended in August of `0-1?

13          A    Yes.

14          Q    If you'd flip over to the last page, I

15     just want to ask you whether what's written in the

16     employee's comments box is something that you wrote?

17          A    Absolutely, it is.

18               MR. JONES: This can be marked as Exhibit

19     No. 3.

20                              (Whereupon the aforementioned

21                              document was marked for

22                              identification as Exhibit No.
```

```
 1                            3)

 2                   BY MR. JONES:

 3            Q     Is this your prior year's?

 4            A     Yes, this is prior.

 5            Q     Okay.  Same question about the last

 6      page: are those your comments in the employee's

 7      comments?

 8            A     I don't remember it, but I guess it's my

 9      writing, so.   I don't remember what I wrote in

10      2000.

11            Q     But it is your handwriting?

12            A     Yes.

13                   MR. JONES:  And if we could mark this as

14      Exhibit 4.

15                            (Whereupon the aforementioned

16                            document was marked for

17                            identification as Exhibit No.

18                            4)

19                   BY MR. JONES:

20            Q     And is that the prior year's performance

21      evaluation?

22            A     Yes, `99, yes.
```

```
 1              Q     Again, on the last page, are those your

 2        comments in the employee's box?

 3              A     Yes.

 4              Q     Yes?

 5              A     Yes, sorry.

 6              Q     One more.

 7              MR. JONES: This will be Exhibit 5.

 8                          (Whereupon the aforementioned

 9                          document was marked for

10                          identification as Exhibit No.

11                          5)

12              BY MR. JONES:

13              Q     And this is the performance rating for

14        the year ending 1998, or the year ending August of

15        1998?

16              A     Yes.

17              Q     And MR. Sherman was your - was the

18        rating official for this?

19              A     Yes, like the others you showed me.

20              Q     Yes, I forgot to ask you that.  MR.

21        Sherman was the rating official for all of those

22        exhibits?
```

1          A      Yes, those ones.

2          Q      And on the last page, are those your

3     comments?

4          A      Yes.

5          Q      Now when - I can't remember when you

6     said that you interacted with MR. Sherman on a daily

7     basis?

8          A      Pretty much.  I mean we were in the same

9     office.  You know I might not have sat down with him

10    everyday.  But -

11         Q      Was that when he was your immediate

12    supervisor?

13         A      Before and after.

14         Q      Before and after.  Okay.  And did that

15    change when he became your second line supervisor?

16         A      Not immediately.

17         Q      And do you recall when he became your

18    second line supervisor?

19         A      I think when Dan Bendler was promoted, I

20    can't remember, it was early 2003 when that

21    happened.

22         Q      Okay.  And how did things change after

```
 1      that as far as the frequency?

 2            A     Well, I saw him everyday.

 3            Q     Yes.

 4                  MR. SHAPIRO: We're talking about

 5      Sherman?

 6                  MR. JONES: Sherman.

 7                  WITNESS: I saw him everyday.  And would

 8      more closely interact on specific projects, whenever

 9      I needed to get clearance from him or get his buy in

10      on something.

11                  BY MR. JONES:

12            Q     But prior to that you received your

13      assignments from MR. Sherman?

14            A     Absolutely, yes.

15            Q     And what about after that?

16            A     Some.

17            Q     Okay.

18            A     I received some after that.

19            Q     Did this change after - did this change

20      in 2004?  The frequency of your interaction with MR.

21      Sherman?

22            A     Not at all.  In 2004 it was still the
```

1   same.

2          Q      Okay, how about in 2005?

3          A      In 2005 I would say it changed.

4          Q      Yes?

5          A      Yes, it changed.

6          Q      Okay.  And how often did you interact

7   with him?

8          A      Less frequency, because my assignments

9   changed.

10         Q      Okay.  How about in 2006?

11         A      Similar to 2005.

12         Q      Okay.  Would you characterize it as - it

13  wasn't daily any more?

14         A      Well, no.  Daily, you mean the

15  interaction?

16         Q      Yes, with MR.  Sherman.

17         A      No.

18         Q      Weekly?

19         A      Probably not.

20         Q      How many times a month would you say in

21  2005 and 2006 you would actually interact with MR.

22  Sherman one on one?

```
1          A     I can't remember exactly.  I can't

2    remember exactly, but for specific projects, and

3    which dwindled.

4          Q     That would be the only time basically?

5          A     Yes.

6          Q     I'm going to ask you about MR. Bendler.

7    When did you first meet Dan Bendler?

8          A     He transferred to our office from OIG, I

9    can't remember, it was late `96 or early `97, I

10   don't remember the exact date.

11         Q     But it was after the FDIC-RTG -

12         A     Way, way after.

13         Q     And before he was your supervisor how

14   would you characterize your relationship with him?

15         A     It was cordial.

16         Q     Did you go to lunch or anything like

17   that together?

18         A     Not him and me.  We may have gone like a

19   group.  But it wasn't like time to go to lunch with

20   me.

21         Q     Would you interact with him on a daily

22   basis as well?
```

1          A     Pretty much, working in the same area.

2          Q     What about after he became your

3     supervisor in early 2003?

4          A     Pretty much the same.

5          Q     Did he do your performance evaluation in

6     2003?

7          A     Yes, he did.

8          Q     And how did that turn out?

9          A     It was outstanding.

10         Q     Sounds like you were satisfied with

11    that?

12         A     Yes.

13         Q     Now I understand that at the end of -

14    for the fall of 2003, some positions were posted in

15    your section, some grade 13 management analyst

16    positions were posted?

17         A     Yes.

18         Q     How did you find out about them?

19         A     Probably somebody mentioned it, and it

20    was on the board.

21         Q     Okay.  The board is the electronic -

22         A     I'm sorry, the career board, I don't

```
 1    know what they call it.

 2            Q     On the Internet?

 3            A     Internal to FDIC.

 4            Q     And what did you do when you saw those?

 5            A     I applied.

 6            Q     Okay.  And what happened after you

 7    applied?

 8                  What was the next thing that happened

 9    with respect to those positions?

10            A     I'm not sure what you're getting at.

11            Q     Well did you receive notification that

12    you were on the roster?

13            A     I received notification - there is so

14    much that goes on in between that point.

15            Q     Okay.  I understand at some point you

16    had to take some leave; correct?

17            A     Absolutely.

18            Q     Could you tell me about that?

19            A     My sister was -

20                  MR. SHAPIRO: Can we take a short break?

21    It's very emotional for her.  So why don't we take a

22    short break?
```

1                          (Whereupon at 10:35 a.m. the

2                          proceeding in the above-

3                          entitled matter went off the

4                          record to return on the record

5                          at 10:40 a.m.)

6              MR. JONES: Let's go back on the record.

7              BY MR. JONES:

8         Q    I understand that your sister was ill

9    and you needed to go to Pittsburgh?

10        A    Yes.

11        Q    And do you remember about when it was

12   that you had to leave the office?

13        A    Yes.  I got a call on January 12th.  So

14   I worked part of the day, January 13th.

15        Q    And how long were you up there away from

16   the job?

17        A    Approximately four weeks.

18        Q    And while you were caring for your

19   sister, did you maintain contact with anybody at the

20   office?

21        A    Yes.

22        Q    And did people call you there?

1          A     I called them very often.

2          Q     And who were the people that you did

3     call?

4          A     I called Dan, and when I couldn't reach

5     him I tried various people.  Sometimes I couldn't

6     reach people.  But I stayed in contact very often,

7     very often.

8          Q     Was he supportive of your situation?

9          A     Yes.  Yes.

10         Q     And you eventually came back to the

11    office.

12         A     Yes.

13         Q     When your sister passed on did on did

14    MR. Bendler send flowers?

15         A     Yes.

16         Q     He and his wife personally?

17         A     I can't recall.  I believe he did send

18    flowers.  I don't know if his wife did, but he did.

19         Q     Now when you returned to the office,

20    were you still upset over your sister's death?

21         A     Of course.

22         Q     And you had submitted an application for

1    the grade 13 management analyst position?

2         A    Yes.

3         Q    When you returned to the office what

4    happened with respect to that?

5         A    I returned on a Tuesday.  Her funeral

6    was Saturday.  I returned to work Tuesday, and they

7    told me they wanted to interview me Thursday.  And I

8    told them I couldn't even breathe.  There was no way

9    I could do that.

10        Q    And what was his response?

11        A    I think he said he wasn't sure if they

12   could get an extension, but that he would try.

13        Q    And did they get an extension?

14        A    Yes.

15        Q    And when you finally were interviewed,

16   how long after you had returned to the office was

17   that?

18        A    About a week and a half, two weeks.  It

19   was like the 23rd, and I returned on the 10th, so two

20   weeks.

21        Q    Did you tell them you need more time

22   before you interviewed?

34

1       A      I believe I did.

2       Q      Before the interview did you meet with

3    MR. Bendler at all concerning the interview?

4       A      Perhaps.  I believe we did meet.

5       Q      And what was discussed at that meeting?

6       A      I can't recall.

7       Q      Did MR. Bendler tell you anything about

8    the interview process?

9       A      I can't recall.

10      Q      Did you know anything about the

11   interview process before you went in for the

12   interview?

13      A      I had previous interviews.  If I could

14   remember, some might be - there were three people he

15   said, I can remember that.  But I can't recall

16   everything he said.

17      Q      And who were the three interviewers?

18      A      Jerie Kitchens, Rick Marlatt and I think

19   her name is Carmichael from OIG.

20      Q      Okay, was it Mary Carmichael?

21      A      I guess, yes.

22      Q      Did you know any of these individuals

1  before the interview?

2          A      MR. Marlatt and Ms. Kitchens.

3          Q      And how did you know MR. Marlatt?

4          A      He was in our branch.

5          Q      But not your section?

6          A      Not my section.

7          Q      Who was this supervisor?

8          A      Connie Young.

9          Q      And how long had you known MR. Marlatt?

10         A      I knew him to see him for quite awhile.

11  But I guess we talked more once he came into our

12  branch.

13         Q      And how long ago had that been?  He came

14  into the branch after you were already there?

15         A      Well, the branch was developed when Paul

16  got promoted and Dan got promoted.  When Paul got

17  promoted, it was because they created this branch.

18         Q      Okay, so MR. Marlatt would have come in

19  during or after 2003?

20         A      Yes, late 2003 to 2004.

21         Q      And how about Jerie Kitchens?

22         A      I knew her since Arleas got the position

1    as director IN DOA, which might have been `99 or

2    2000.

3         Q    And what is Jerie Kitchens' position?

4         A    I think she is one of Arleas's special

5    assistants.

6         Q    And when you say Arleas, you are

7    speaking about -

8         A    Arleas Upton Key, I'm sorry.

9         Q    And what's her position?

10        A    Director.

11        Q    Her position is director?  And she's a

12   black woman?

13        A    Yes.

14        Q    And Jeri Kitchens is a black woman too?

15        A    Yes.

16        Q    Had you worked on projects previously

17   with Jerie Kitchens?

18        A    On one occasion for compliance review,

19   yes.

20        Q    And where was that?  Was there here in

21   Washington?

22        A    No, Dallas, Texas.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

37

1          Q    Dallas?  What was the duration of that

2     project in Dallas that you worked with her?

3          A    Perhaps a couple of days.

4          Q    Any other, besides working on projects

5     with her, any other social interaction with Jerie

6     Kitchens prior to the interview?

7          A    Over the years, yes, over the years.

8          Q    Outside of work?

9          A    On one occasion.

10          Q    And what was that?

11          A    A Blue Festival.

12          Q    Here in D.C.?

13          A    Yes.

14          Q    How about in the workplace?  Did you go

15     to lunch together?

16          A    No, we didn't go to lunch together.

17          Q    How often would you speak to her?

18          A    Probably daily.

19          Q    Ms. Carmichael, you didn't have any -

20          A    Never saw her until -

21          Q    - preexisting relationship?

22          A    - until the interview, never saw her.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10
38

1          Q     What do you remember about the interview

2     process, when you had your interview?

3          A     I remember I was a little nervous.  I

4     wasn't myself, I know I wasn't, because I wasn't

5     sleeping.  I remember that I stuttered through some

6     of the questions.  And as you can tell, I'm not a

7     stutterer.  But I recall stuttering, and not being

8     able to think very clearly.

9          Q     So you didn't think you did well in the

10     interview?

11          A     I wasn't myself, so yes, I wasn't

12     myself.  I wasn't on my p's and q's.

13          Q     After the interview was over, did you

14     say to anybody else that you thought you did poorly

15     in the interview, not in those exact words, but

16     something?

17          A     Yes, I did.

18          Q     And who did you say that to?

19          A     Definitely MR. Bendler.

20          Q     And how about MR. Lok?  David Lok?

21          A     Yes, absolutely, yes.  Actually I was

22     crying when I talked to David Lok.  He also told me

1    he didn't do well at the interview.  So it was like

2    a reassurance.  I didn't do well either.

3         Q    Now had MR. Bendler told you that there

4    were going to be two rounds of interviews?

5         A    I don't recall.

6         Q    Did you find out at some point that

7    there two rounds of interviews?

8         A    Yes.

9         Q    And did you find out that you had not

10   been referred for the second round?

11        A    Yes.

12        Q    How did you find that out?

13        A    He came in my office, closed the door,

14   and sat down, and he told you.

15        Q    And that was Dan Bendler?

16        A    Yes, MR. Bendler.

17        Q    And I assume you were disappointed?

18        A    I bused out crying.  My sister had just

19   died two weeks prior, and I told him it wasn't fair.

20        Q    Did you ask him to do anything in

21   particular?

22        A    No, I just felt - there was too much

1    grief in my life at the time.  No, I didn't ask

2    anything in particular, but I told him it wasn't

3    fair.

4         Q    Did you feel that he was being unfair?

5         A    Yes.

6         Q    And why did you feel that?

7         A    Because of the things he said.

8         Q    When he came to talk to you?

9         A    Yes.

10        Q    What did he say?

11        A    I need you to be engaged.  I'm not

12   getting engaged.  My sister is dead, Dan.  So he

13   came to tell me I wasn't going to go forward on the

14   panel because I did a bad job.  And that I needed to

15   be engaged.

16        Q    And when he told you this how long had

17   you been back in the office?

18        A    Approximately two weeks.

19        Q    And how did you react to that after the

20   meeting?

21        A    All I could do was cry.

22        Q    And in the - this was in February or

1    March?

2         A    February.  My interview was the 23rd.  I

3    think he came in the next day to tell me about it.

4    So I was back exactly two weeks at that point.

5         Q    And when did you find out that the - did

6    you eventually find out who had been referred to the

7    second interview?

8         A    Yes.

9         Q    And how did you find that out?

10        A    Find it out?

11        Q    From?

12        A    Oh, find out who had been referred to

13   the second interview?

14        Q    Yes.

15        A    Oh, they all told me.

16        Q    And when you say they all, who are you

17   referring to?

18        A    David, Holly Mattus, Bill Gately, Val

19   Baker.

20        Q    Now Val Baker -

21        A    Was a black woman.

22        Q    And was she in your section?

```
 1            A      No, she was in the division there.

 2            Q      Okay, she was in DOA.  And what branch

 3      was she in?

 4            A      Acquisition Services.

 5            Q      That's known as ASB?

 6            A      ASB.

 7            Q      What do they do in the acquisition

 8      services branch?

 9            A      Administer contracts in general.  It's a

10      contracting function for the corporation.

11            Q      Did you - after MR. Bendler told you

12      that you had not been referred for the second round

13      of interviews, did you talk to Jerie Kitchens at

14      all?

15            A      Yes, I probably mentioned it to her.

16            Q      And what did she say to you?

17            A      I don't remember exactly, but she did

18      mention about Baker.

19            Q      Okay.  And did she say she was sorry or

20      anything like that?

21            A      I don't remember exactly.

22            Q      Did you - besides David Lok and Dan
```

```
1      Bendler, did you tell anybody else that you hadn't

2      done well during the interview?

3           A      I probably told a few people.

4           Q      Do you remember any of them?

5           A      No, I don't.  I have a lot of friends at

6      the FDIC, people who were concerned about me.

7           Q      After you weren't selected for the

8      position did your behavior change toward other

9      employees in your section?

10          A      Not my behavior.  I would say not my

11     behavior.  I was still nice to people.  I just

12     closed in and quieted down.

13          Q      And how did that manifest itself as you

14     closed in?

15          A      I closed my door and kept to myself.  I

16     was grieving my sister.  Beyond this position I was

17     grieving my sister's death.

18          Q      And eventually were you able to go

19     through the grief process and open your door again?

20          A      I opened my door in a matter of weeks,

21     but I was still grieving my sister's death.  It's

22     not a quick process.
```

1        Q     I understand.

2              What are some of the things that you're

3    responsible for in the management services section?

4              MR. SHAPIRO: Now, you're talking?

5              MR. JONES: Not now.   At that point in

6    2004, what were some of the things that you worked

7    on?

8              WITNESS: The biggest thing I worked on

9    was the Chief Financial Officers Act.  But

10   immediately after my sister's death Paul Sherman had

11   assigned me a reorganization proposal, which got

12   pulled because they decided in March they were going

13   to work for planning.

14       Q     And what is that workforce, planning?

15       A     It's a new name for downsizing.

16       Q     So instead of a reorganization, the

17   division -

18       A     Not the division, the corporation.  This

19   was for - excuse me - the reorganizational proposal

20   was for DSC.  It was an office they were

21   reorganizing, the DSC.  And I worked on it, I think

22   the last day of the file was up through March 15th,

```
 1        then they pulled it.

 2                    One of the other things I had been

 3        assigned to do - well, actually, two days after they

 4        told me I did a bad job on the interview, I did the

 5        minutes for the Customer Advisory Committee Meeting.

 6            Q    Let me stop you right there.  Because

 7        you said two days after they told you you did a bad

 8        job on the interview.

 9            A    Yes.

10            Q    I thought you had previously said that

11        you had told Dan that you -

12            A    He told me also that I didn't do well.

13        He said I didn't do well.

14            Q    Okay, so you agreed.

15            A    I agreed, yes.

16            Q    And I'm sorry, what was the - what was

17        the task?

18            A    The Thursday on may the 25th or 26th I

19        did the Customer Advisory Committee meeting.  It's a

20        bimonthly meeting that midlevel managers attend.  I

21        did the minutes, set the agenda.  It was probably an

22        hour, hour and a half meeting.  I take the minutes.
```

1        Q      I'm always confused about bimonthly.

2    Does that mean every two months?

3        A      Every two months.  Not twice a month.

4               What else had I worked on?  Paul had

5    assigned me to be the coordinator for EEO cases in

6    February.  I was doing the directive review process,

7    coordinator for EEO.

8        Q      What are ACRs?

9        A      Administrative Compliance Reviews.

10       Q      Okay, is that something you did?

11       A      Oh, yes.  Yes.

12       Q      And can I - does it make sense to ask

13   you what does a typical ACR consist of?  What is

14   that process?

15       A      Ordinarily we target specific areas.

16   You are assigned that specific area, to go pull up

17   the policies, the related policies.  Then there is a

18   sample that is drawn that you have to test.

19               Often they would go out in the field.

20   They changed the process in the last couple of

21   years, but go to the field and test specific areas.

22       Q      And that was the type of thing you

1    worked with Jerie Kitchens on in Dallas?

2        A    In Dallas in `98 - not `98, `99,

3    somewhere in there.

4        Q    Okay.  In 2004 did you participate in

5    any ACRs?

6        A    I participated - yes, I participated.

7        Q    Okay.  Did you participate in any of the

8    - were there field office ACRs?

9        A    In field office reviews.

10       Q    Did you participate in any of those?

11       A    I did not go but I did paperwork for

12   them, yes.

13       Q    Okay.  Were you asked to go on any of

14   these field reviews?

15       A    Yes.

16       Q    And what was your response?

17       A    I think this is an explanation, this

18   requires an explanation.

19       Q    Okay.

20       A    The first one I went on, Atlanta,

21   commenced on Mother's Day.  And MR. Bendler gave me

22   permission to be on leave, because I was taking off

```
 1        that Monday, because I went to Pennsylvania to be

 2        with my mother.  So he agreed I didn't have to go.

 3             Q     Okay.

 4             A     And where the other one was concerned,

 5        he asked me if I wanted to go.

 6             Q     Okay, and what did you say?

 7             A     I said I didn't feel comfortable going.

 8             Q     Okay, and you had gone on these in the

 9        past?

10             A     Yes.

11             Q     And why didn't you feel comfortable

12        going this time?

13             A     I don't recall exactly.  Probably just

14        because I was in blues.  I don't know why I didn't

15        go to Chicago.  There were others that didn't go

16        either.  So I wasn't the only one in the office who

17        didn't participate.

18             Q     Okay.  How about were there others in

19        your section that didn't participate?

20             A     Yes.

21             Q     And who was that?

22             A     I can't recall exactly.  I think Wilma
```

```
 1    didn't go.

 2           Q     That's Wilma -

 3           A     Probst Levy.

 4           Q     P-r-o-b-s-t?

 5           A     -s-t Levy, L-e-v-y.  I can't recall if

 6    the others went or not.

 7           Q     Okay.  Did you - was there another ACR

 8    that was a headquarters ACR that involved

 9    procurement cards?

10           A     Yes.

11           Q     Were you assigned to that with MR. Lok?

12           A     Yes, I was asked to help him finish.

13           Q     Okay, you were asked to help him finish?

14           A     Finish.

15           Q     So this wasn't at the beginning of the

16    project?

17           A     No.

18           Q     What did that project consist of?

19           A     Reviewing credit card - cardholder

20    files.

21           Q     And is that a project you had done

22    previous years?
```

1          A      Absolutely.

2          Q      Now, could you be a little bit more

3     specific about how the project would be initiated,

4     or what you would actually do, how you would pick

5     the files, things of that nature?

6          A      Well, they came up with a sample list.

7     The sample list came from acquisition services.  And

8     they would request the records, and the records came

9     from the approving official.  You sit down and

10    methodically, we developed a check list of what I

11    was to look for.

12         Q      And these were procurement cards.

13    That's different from the travel cards?

14         A      Absolutely.  Yes, absolutely.  Travel

15    card is individual, and this is - people used to

16    purchase supplies.

17         Q      Now when you were assigned to this

18    project how far along was it?

19         A      Probably the end of the first week or

20    the beginning of the second week Dan came to my

21    office.

22         Q      And how long a project was it?

1           A       It was two weeks.

2           Q       A two week project?

3           A       Yes.

4           Q       So your testimony is you got involved -

5           A       Later in the process.  Absolutely.

6           Q       Do you remember how many account holders

7      there were who were being reviewed?

8           A       Not exactly.

9           Q       Okay, do you remember how many account

10     holders you completed the review of?

11          A       Not exactly.

12          Q       Do you remember MR. Bendler coming to

13     see you to check on your progress?

14          A       No.

15          Q       No?

16          A       No.

17          Q       Did you get any feedback from MR.

18     Bendler about your performance on the project?

19          A       No.

20          Q       Did you get any feedback from MR. Lok

21     about your performance on the project?

22          A       No, not that I recall.  I don't recall

1    what they said happened.

2              Q    Okay.  If I was to say that there were

3    112 account holders being sampled, was that - sound

4    about right to you?

5              A    It's what I saw, the number I saw in

6    their affidavits.  But since David was leading the

7    project, he would know the number.  I wouldn't know.

8    He assigned me certain files to review.

9              Q    He actually assigned specific files?

10             A    Yes, when I would come in his office, I

11   would say, what have you got, and he's give me a

12   folder to review.  That's how it went.

13             Q    Did you complete all the folders that he

14   assigned you?

15             A    I did all the ones he gave me.

16             Q    If I was to say that the total number of

17   account holders that you reviewed was six, does that

18   sound about right?

19             A    The only reason I can agree to it is

20   because of what they wrote in their affidavit.

21             Q    Okay, but it's your testimony that you

22   completed every folder that he gave you?

1          A       Every folder he gave me, absolutely.

2          Q       Okay.  Moving on to a different

3     responsibility, in 2004 was one of your

4     responsibilities to complete AU summaries?

5          A       Yes, accountability unit.  For the Chief

6     Financial Officers Act.

7          Q       Okay.  And were these summaries sent to

8     any different - what were done with the summaries?

9          A       Ordinarily what happens is, once I

10    complete the summaries, the senior analyst or

11    whoever is heading up the project, say for instance

12    Wilma Probst might head it up, Andrew Nickle headed

13    it up or Gail Kennedy headed it up, or Bill Gateley,

14    whoever heads it up, or the subject matter expert,

15    would initially review my draft summaries.  So that

16    was common practice that people reviewed it before

17    it went out to the management officials.

18         Q       Okay.  So this would go to the

19    management officials -

20         A       Eventually.

21         Q       - the management officials of the

22    project -

1        A    Accountability units.

2        Q    Okay.  And what would you use as the raw

3    materials to draft your summaries?

4        A    That year there were 14 accountability

5    units, procurement credit card, contract

6    administration, contract oversight - those are just

7    examples.  So there were 14 areas, and the three

8    field sites - Atlanta, Chicago, Washington - each of

9    the people who tested these areas would turn in

10   their testing documents.  So I had three for each of

11   the 14, 40 some.  So each of the three field areas,

12   field site reviews, I draw all the data into a

13   summary document one summary document for hiring and

14   placing, one for contract oversight management.

15            So I pulled all the documents together

16   into one summary report.

17       Q    And when you say hiring and placing, and

18   contract oversight -

19       A    Those are all the Aus, for instances.

20       Q    Those are two different Aus?

21       A    Yes, absolutely.

22       Q    So you didn't necessarily do the

```
 1    testing, but you did the -

 2              A    I did the testing for some areas.

 3              Q    And this year what -

 4              MR. SHAPIRO: This year meaning?

 5              WITNESS: For 2004?

 6              MR. JONES: That year, 2004, what areas

 7    did you both test and do the summary?

 8              WITNESS: I assisted David Lok and I

 9    reviewed the mailrooms in Washington,

10              BY MR. JONES:

11         Q    And when you say you assisted David Lok,

12    was the procurement card review?

13         A    Yes.

14         Q    Did MR. Bendler come and express any

15    concerns about the pace of the Aus being completed?

16         A    Not at all.  Not at all.

17         Q    Did he reassign any of the Aus to anyone

18    else?

19         A    Yes.

20         Q    And which ones did he reassign?

21         A    I can't remember exactly.  Probably the

22    smaller ones.  I don't remember exactly.  I'd have
```

1   to have the reports and look at them.

2          Q      Had that ever happened to you before?

3          A      No.

4          Q      Did you do this in the previous years,

5   2003?

6          A      Yes.

7          Q      And you did all the summaries?

8          A      Yes.  It was a matter of timing.

9          Q      Okay, when you say it was a matter of

10  timing, what do you mean?  Was this year-end

11  summaries?

12         A      2004, if the Aus, if the summaries - if

13  the testing documents were turned in late, that

14  meant I was going to be late in my writeups.

15         Q      Okay, did that happen in 2004?

16         A      Yes.

17         Q      In 2003, they were turned in on time?

18         A      In 2003 all the testing was done by

19  June.

20         Q      Okay, when did you do your summaries in

21  2003?

22         A      I don't remember exactly, but it went

1    running up until the deadline.

2         Q    And the deadline is a year-end deadline?

3         A    It used to be the beginning of the year,

4    but it switched to year-end that year, 2004.

5             It used to be - in January, 2003, we had

6    submitted it, but they moved it, pulled it back.

7         Q    And when did you get the test data for

8    2004?

9         A    August, August, some of them, probably

10   in early September, some in August.  Because we did

11   tests up through August.  Before we did the tests up

12   through June, tried to have everything done earlier.

13        Q    So 2003 all of the data was in your

14   hands by the end of June?

15        A    No, all the tests were done - I can't

16   remember the exact day.  But there was more time

17   allowed for preparing the documents.

18        Q    And in 2004 when did you actually have

19   the data that you could use?

20        A    It came in piecemeal.  Some of it came

21   in piecemeal.

22        Q    Okay, do you recall the month that it

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

58

1    came in?

2         A    I don't recall, but I recall sending

3    Bendler an email saying, I don't have these yet.  I

4    don't have the email, but I recall sending an email

5    saying, hey, these are running late.  It's such-and-

6    such a date and I don't have these yet.

7         Q    And that's something you don't have

8    access to?

9         A    No.

10        Q    Did MR. Bendler ever express any

11   displeasure during this process?

12        A    Not at all.  Not at all.

13        Q    Not even when he reassigned some of

14   them?

15        A    Not at all.

16        Q    Did MR. Bendler recommend any training

17   for you in 2004?

18        A    Not that I'm aware of.

19        Q    Do you remember him saying anything

20   about a career renewal seminar at USDA?

21        A    No, not at all.

22        Q    Okay, in December, 2004, about the same

1    time these ACR reviews - I mean these AU summaries

2    would have been -

3        A    That would have been September.

4        Q    September?

5        A    It's not December.

6        Q    Oh, it's not the end of the calendar

7    year.

8        A    No, everything was due - those summaries

9    were due October 15th.  All that was due to OER in

10   October 15th, and then the planning phase was due

11   November 15th.

12       Q    Okay.  Who would work on the planning

13   phase?

14       A    Me and Wilma Probst.

15       Q    And this was planning for the -

16       A    The next year's testing cycle, yes.

17       Q    The ACRs?

18       A    Yes, compliance reviews, CFO testing,

19   CFOA is risk based that comes from OMB.  You have to

20   test.  You have to show that you are going to be

21   able to mitigate any kind of problems in risk areas.

22   So we do the planning.  It's a projection on what

1    we'll do, what areas we'll cover.  And that was due

2    November 15th.

3         Q    Well, let's move forward another month

4    to December of 2004.  At that point you learned that

5    your position was on the FDIC surplus list?

6         A    Maybe like December 16th.

7         Q    And how did you learn that?

8         A    An email.

9         Q    Was it an email saying that your

10   position was on the surplus list, or was it an email

11   saying there is a list, here is where you can go?

12        A    It was an email that said, this is where

13   you can go look.  And there my position was.

14        Q    Okay.  Now when you say it was your

15   position -

16        A    CG 12, management analyst, 343 12.

17        Q    So it wasn't -

18        A    It didn't put my name.

19        Q    Okay, did it put your branch or your

20   section?

21        A    Not specifically.

22        Q    And what was the - what did that mean

1    that your position was on the surplus list?

2         A    It meant that my position was going

3    away.

4         Q    And when was it going to go away?

5         A    August, 2006.

6         Q    Do you recall about how many positions

7    there were on the surplus list?

8              MR. SHAPIRO: In which organization?

9    Just the DOA?  Or the whole corporation?

10             MR. JONES: Let's start with DOA.

11             WITNESS: I don't recall the exact

12   numbers.

13             BY MR. JONES:

14        Q    Was it a lot?  Was it hundreds?

15        A    I don't recall.

16        Q    Was it under 100?

17        A    I don't recall.  I don't know.  I didn't

18   count numbers.  I saw my position was on there, and

19   MR. Sherman confirmed it was my position.

20        Q    Oh, he did?

21        A    Yes.  He said, call - why am I on the

22   surplus list?  He says, well, we need 13 to take the

1    lead.

2         Q    And when did you talk to him about it?

3         A    The next day, December 17th.  I guess

4    this came out on the 15th or the 16th.  It came out

5    on a Wednesday night, and I talked to him on a

6    Thursday night.

7         Q    And were there positions on the surplus

8    list from other divisions as well?

9         A    Of course.

10        Q    Was this part of the workforce planning

11   initiative?

12        A    Yes.  Yes.

13        Q    So it was FDIC wide?

14        A    Yes.

15        Q    Did you talk to - after the surplus list

16   was published, did you talk to MR. Bendler about it?

17        A    He called me at 4:00 o'clock that

18   afternoon.

19        Q    The same afternoon that the email came

20   out?

21        A    The email came out on a Wednesday night.

22   He was on vacation.

1          Q      And he called you the next day?

2          A      The next day around 4:00 o'clock.

3          Q      And what did he say?

4          A      It's a pookie (phonetic) way to find

5     out.  Sorry, it's a pookie way to find out.

6          Q      Did he say - and what did you say to

7     him?

8          A      I didn't say anything.  What could I

9     say?

10         Q      After your position was placed on the

11    surplus list, did your behavior toward the other

12    people in your section change?

13         A      Yes.

14         Q      How did it?

15         A      I just shut down.  I didn't socialize at

16    all.  I did my work.

17         Q      Did your door close again?

18         A      Yes, it did.

19         Q      Now the next month did MR. Bendler come

20    and meet with you?

21         A      Yes.

22         Q      And in your office?

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

64

1          A      Yes.

2          Q      What did he say to you at that meeting?

3          A      The first he said was, I cannot go

4    around snubbing my coworkers.  Was the first thing

5    he said.  And I asked him, when he came to my door,

6    did he have work?  Was this work related?  Because I

7    didn't feel like socializing.  He said it was work

8    related, that I could not go around snubbing my

9    coworkers.

10         Q      And what did you respond to him?

11         A      I told him there is no rule that says I

12   have to talk to people.  And I told him I felt

13   betrayed, I felt victimized.  I felt betrayed by him

14   and Sherman.

15         Q      Did you hold him responsible for your

16   not getting a promotion the previous year?

17         A      I don't recall saying I hold you

18   responsible for not getting a promotion.

19         Q      Well, whether you said that to him or

20   not, did you believe that?

21         A      Yes.

22         Q      And why did you believe that if he

1    wasn't involved in the initial interview?

2         A    He was involved in the second level

3    interview.

4         Q    But you hadn't been referred to the

5    second level -

6         A    No, but I worked with him.

7         Q    - so you weren't considered in that?

8         A    That's right, but I worked with him.

9         Q    So did you believe that you should be

10   considered at the second level regardless of the

11   recommendation of the panel?

12        A    Not regardless, but I think given my

13   circumstances, I think - I'm not saying, oh, just do

14   me a favor and just give it to me, but given my

15   circumstances.  Everyone knew my circumstances.

16   Everybody on that floor knew what I had experienced.

17   And some of them had just recently experienced

18   similar situations.  And I felt that I should either

19   have been given a second opportunity.  Because they

20   knew me, they knew my work, they knew how

21   professional I was.  But they knew also I had buried

22   my sister.  They knew I was at my sister's death

1    bed.  They knew I took care of her.  I told them all

2    the details.

3          Q     And when you say them, who?

4          A     The brass.  Everybody on that floor

5    knew.  You know how people talk.

6          Q     Including MR. Bendler?

7          A     Including MR. Bendler, including Ms.

8    Kitchens, including Ms. Key, everybody on that floor

9    knew that my sister had extensive surgery; everybody

10   knew.

11         Q     But at the time of the interview you

12   hadn't asked for another chance or any of that?

13         A     What do you do in those kinds of

14   situations?  All I could do was cry, because I felt

15   like the world had really fallen apart.

16               It was just one more thing.

17               MR. SHAPIRO: This might be a good time

18   for another short break.  We've been going over an

19   hour.

20               MR. JONES: Sure.  We'll take a few

21   minutes.  Go off the record.

22                       (Whereupon at 11:21 a.m. the

1                          proceeding in the above-

2                          entitled matter went off the

3                          record to return on the record

4                          at 11:43 a.m.)

5              MR. JONES: Okay, we can go back on the

6     record.

7              I wanted to jump back to the ACR

8     process.  You told us about how the ACRs worked in

9     2004, and previous.  Did that process change in

10    2005?

11             WITNESS: Yes.

12             BY MR. JONES:

13        Q    And how did it change?

14        A    They sent smaller teams out.

15        Q    Okay.  Did the scope of the reviews

16    change at all?

17        A    I don't believe so; still reviewed the

18    same thing.

19        Q    How big were the teams in the old days

20    when like for instance when you went down with Jerie

21    Kitchens to Dallas?

22        A    This is a guess: say, six to 10 people.

1          Q      Now the teams are smaller?

2          A      Yes, because they're doing a lot of

3     things in house.

4          Q      In house, you mean here in MSS?

5          A      Here in Washington, yes.

6          Q      And how do they do that?  Do they have

7     the field organizations mail things in?

8          A      Yes, for instance in2005 I reviewed all

9     the field credit cards from the three field offices.

10    And they had them shipped into me, instead of

11    sending someone out to review contracts - most of

12    the contracts, contract oversight files, all those

13    files were sent here, instead of us going to the

14    field.

15         Q      And the project you worked on, that was

16    the procurement credit cards again?

17         A      Credit cards, same thing.

18         Q      And you sampled a different sample or

19    something like that?

20         A      Well, it was a different set of offices.

21    They reviewed offices every other year, like I say,

22    bi-yearly.

1          Q      Valerie would understand what that

2     means.

3          A      Every other year.

4          Q      And in 2005 who worked on that project

5     with you?

6          A      Nobody.

7          Q      You worked on it -

8          A      By myself.

9          Q      - you did it all yourself?

10         A      By myself.

11         Q      Okay.  You had mentioned in 2004 that

12    had been project that you came in in the middle of,

13    and David Lok was working on that?

14         A      Yes.  Yes.

15         Q      Did you find that unusual that that was

16    assigned to David Lok that year?

17         A      No.

18         Q      No?

19         A      Not at all.

20         Q      Had you done - I'm going to call it the

21    P-card review.

22         A      That's fine.

1        Q     Is that what you -

2        A     Yes, I had done it, and other people

3    have done it.

4        Q     Okay, had you done it in 2003, do you

5    recall?

6        A     I think so.  I think I went to San

7    Francisco.

8        Q     That would have been a team effort,

9    though, because it was a region one?

10       A     Sometimes.  I can't recall if someone

11   worked on it with me.

12       Q     In 2003?

13       A     Yes.

14       Q     So was that a big project in 2005 to do

15   the P-card review all by yourself?

16       A     Yes, but he gave me two weeks.  Yes, it

17   was big.  Mostly keeping track of everything too,

18   from the regional offices.

19       Q     Did you do one in `06?

20       A     By the time `06 rolled around it changed

21   significantly.  What happened with P-card?

22       Q     Yes, how had it changed.

1        Q      Well, the testing methodology was

2     changed in that year.  We did what they call

3     surveys, to survey specific areas to see if they

4     warranted testing that year.  So we did test surveys

5     in the spring.  And then based on the surveys,

6     determined the testing that would go forward.

7        Q      So this was more - would you say it was

8     more targeted?

9        A      Yes, somewhat.

10       Q      Okay, when we took our break, we were at

11    the point where you had the January meet with Dan,

12    in January of 2005.  And was that a contentious

13    meeting?

14       A      There was some low level - it was

15    controlled.

16       Q      Did you raise your voice?

17       A      I was very firm.  No, I didn't scream

18    and holler as he implied.  I was firm.

19       Q      Did he raise his voice?

20       A      I don't recall.

21       Q      Okay.  Later did he send you an email

22    about the meeting?

72

1          A      Yes, he did.

2          Q      And after that did you wrote a memo?

3          A      Yes, I did.

4          Q      Okay, I'm going to show you what has

5    been premarked as Exhibit 6.

6                            (Whereupon the aforementioned

7                            document was marked for

8                            identification as Exhibit No.

9                            6)

10                  BY MR. JONES:

11         Q      And I'll ask you if that's the email

12   that Dan sent you about the meeting?

13         A      First, the context changed from the

14   print to print.  You know when I print it from my

15   computer it comes out as two pages.  So I'm sure

16   it's it.

17         Q      Well, this is two pages, but on the

18   second page there is just a Dan.

19         A      No, I'm saying the margins shifted or

20   something when he printed out, because it looked

21   like two pages.

22         Q      Well, this is actually a printout from

1    your computer.  That's why your name is at the top.

2                    Why don't you go ahead and take a look

3    at it.

4                    (Witness examines document)

5                    WITNESS: Okay.

6                    BY MR. JONES:

7        Q    Now, he says that you asked him several

8    times to leave your office.  Is that true?  That's

9    the third paragraph.

10       A    I can't recall that I asked him several

11   times.  Once I said, if you don't have work for me.

12       Q    And he told you it wasn't about work,

13   but it was work related.

14       A    I guess that's what he said, yes.

15       Q    But you don't remember?

16       A    Not his exact words; something similar.

17       Q    Did you disagree that it was work

18   related?

19       A    I can't recall that I disagreed that it

20   was work related.  I asked him if he had a project

21   for me.

22       Q    Okay.  In the fifth paragraph down he

1    talks about your work performance generally meeting

2    expectations.

3              Then he says, however, as we discussed

4    during your midyear review, an annual performance

5    appraisal last year was not a great year in terms of

6    your production and quality of your work.

7              Now do you remember any discussions to

8    this effect at your midyear review?

9         A    Not at all.  Not at all.

10        Q    And when did your midyear review take

11   place?

12        A    I can't remember.  You know midyear is

13   probably anywhere, April, May, June, I don't recall

14   the exact time frame.  But he did not discuss these

15   things.

16        Q    Okay, what about during your annual

17   performance appraisal?

18        A    He did not discuss that it wasn't a good

19   year.

20        Q    And when would the annual have been?

21        A    October, maybe, I can't remember.

22   They've shifted it.  It's changed every year in the

1    last four or five years, every year they've changed

2    the process.  So I can't tell you.

3          Q    Okay, then it goes on to say, also, as

4    we have discussed in the past, it is very important

5    to arrive at work on time.  Arriving late to work

6    almost every day is not acceptable.

7               Is this something that he had previously

8    discussed with you?

9          A    Not in this way.

10         Q    Okay, what way had he discussed it?

11         A    He told me if you are going to be late,

12   call me and let me know you are running late.   It

13   was never done in a counseling manner.

14         Q    Okay.  And what was your regular work

15   hours?  Let's talk about 2004.

16         A    Okay.  9:15 to 7:00.

17         Q    Is that a compressed day?

18         A    Yes.  Yes.

19         Q    So you have every other -

20         A    Friday off.

21         Q    - Friday off.  9:15 to 7:00.  And when

22   did you customarily arrive?

1          A      About 9:30, 9:35.  I was always about 15

2    or 20 minutes late.  But you have to take 30 minutes

3    leave.

4          Q      And is that what you would do?  You

5    would take 30 minutes of annual leave?

6          A      Yes.

7          Q      Were you surprised when you got this

8    email?

9          A      Absolutely.  I was surprised at its

10   content.

11         Q      And why was that?

12         A      I wasn't surprised that I got one.  I

13   was surprised at its content.

14         Q      And why was that?

15         A      Because it's incorrect.  He misconstrues

16   many things here.

17         Q      And which of the things does he

18   misconstrue?

19         A      Just about everything.  Did you read my

20   letter to him?

21         Q      Okay, let's take a look at your letter.

22                First of all let's just go through the

1     document page by page.  We call these little numbers

2     down at the bottom of the page Bates stamps.  So his

3     email to you is 53 and 54.  And then 55 and 56 are

4     emails - do you recognize those?

5          A     Yes.

6          Q     And what was the purpose of these

7     emails?  It looks like to set up a subsequent

8     meeting?

9          A     Yes.

10          Q     Was a subsequent meeting ever held?

11          A     No.

12          Q     Okay.  His email is January 25th.  Then

13    document number 55 is dated January 31st and talks

14    about setting up a meeting.  And then the next

15    document, number 56, talks about setting up a

16    meeting for the next day, which I guess would be

17    February 1st.

18          A     Right, yes.

19          Q     And then starting at 57 and going

20    through 59, this is your memo - your responsive memo

21    to him, and it's dated January 31st?

22          A     Yes, I was working on it when he sent me

1    that.

2            Q    Okay.  And how did he get this?

3            A    I left it in his desk chair so he can

4    get it in the morning.  When he came in.

5            Q    So you left this at the close of

6    business on the 31st?

7            A    Yes.

8            Q    You stay until 7:00?

9            A    7:00, 7:30, yes.

10           Q    In your third paragraph down at the

11   bottom it talks about, it says, also, I did not

12   resort to name calling.

13           A    Right.

14           Q    The statement implies that I used

15   derogatory terms in speaking to you.

16           A    Yes.

17           Q    Can you show me what in his memo implied

18   that?

19           A    The third paragraph, it is expected that

20   we not resort to name calling or raising our voices.

21           Q    And there was no -

22           A    I did not call any names.

1          Q     Okay.  Did you tell him, you're not a

2     man?  Did you say that to him?

3          A     I don't recall.  Under what context did

4     he say I said that?

5          Q     Well, I was going to ask you, during the

6     meeting that you had with him?

7          A     I don't recall.  If you can put it in

8     context, maybe I can recall.  You're not a man.

9          Q     Well, I was going to ask you what the

10    context was.

11         A     I don't know.

12         Q     You don't remember saying that?

13         A     I don't remember saying it.

14         Q     Okay.

15               Over on page 58, it talks about in the

16    second paragraph there, it talks about yours is the

17    only positioned identified as surplus in the MSS, in

18    the Management Support Section.

19         A     The Management Support Section.

20         Q     That's MR. Bendler's group?

21         A     Yes.

22         Q     And so there is another person in Paul

1    Sherman's branch, MSP, who also had a position on

2    the surplus list?

3         A    Yes.

4         Q    Now being on the surplus - having a

5    position on the surplus list, did you understand

6    that you would automatically lose your position in

7    August of 2006?

8         A    Yes.

9         Q    Would there have to be a reduction in

10   force?

11        A    There would have been, perhaps, if the

12   provisions the chairman made for us in the summer

13   didn't take place, there probably would have been.

14        Q    But isn't that what the surplus list

15   said, that these positions would be eliminated in a

16   formal RIF?

17        A    I can't remember exactly what it said.

18        Q    Do you have an understanding of what the

19   RIF rules are?

20        A    General understanding.

21        Q    And you have - I think I saw in the

22   documents that you have over 25 years of federal

```
 1    service?

 2         A      Yes, I have 25 August, 2006.

 3         Q      So in a reduction in force, you

 4    understand that bump and retreat (phonetic) rights?

 5         A      Yes, but.

 6         Q      What do you mean by that "yes, but"?

 7         A      Things change around her quickly.

 8    Sometimes people have bump and retreat rights, and

 9    it's still -

10         Q      So there are no guarantees?

11         A      No guarantees.

12         Q      But there was also no guarantee that you

13    would lose your position?

14         A      Well, I would say there was.

15         Q      And why would you say that?

16         A      Because the day after that email comes

17    out, MR. Sherman says to me, we don't need any 12s.

18    We need people at the 13 level who can take the

19    lead.  So clearly he said this position was going

20    away period.

21         Q      Okay.

22         A      Absolutely.
```

1       Q      So your position -

2       A      Absolutely, because they didn't need any

3   grade 12s.

4       Q      But you might have bumped or retreated -

5       A      I don't know my -- to lookout to that

6   end.

7       Q      I understand.  And as it turned out, you

8   are still here.

9       A      Yes, I am.

10      Q      And what is your current position?

11      A      Still in analysis, program analysis.

12  Same series, 343, in DIT, Digital Information

13  Technology.

14      Q      And how long have you - when did you

15  start in that position?

16      A      August 21st, 2006.

17      Q      How did that come about, that you got

18  that position?

19      A      Some gracious person at the top - nobody

20  in DOA, someone gracious at the very top said, let's

21  allow surplus people to apply for vacancies.  So.

22      Q      And do you know who that person was?

1          A     I don't know.  People seem to think it

2     was the chairman, either acting Gruenberg or Sheila

3     Bair.  It happened at a high level.

4          Q     So you applied for a vacant position in

5     DIT?

6          A     A couple.  They had a specific set of

7     positions available to only CTOP people.

8          Q     And I can never remember what CTOP

9     stands for.  Do you remember?

10         A     I can't remember.

11         Q     Well, what is CTOP?

12         A     People who were surplus positions could

13    apply.  Only people who were in surplus positions

14    could apply for these vacancies.

15         Q     Is CTOP a special hiring preference for

16    people that are being downsized?

17         A     It's a governmentwise used term; it's

18    not just at DOC.

19         Q     So you and the other employees occupying

20    surplus positions were able to apply for these

21    vacancies?

22         A     Only DOA, and there were a few people in

1  DOF.  It was limited to those people.

2        Q    Okay.  What did you have to do to apply

3  for it?

4        A    Fill out an - I had to do a 171, and

5  address KSAs, just like you would outside.  But they

6  limited the scope -

7        Q    Of who could apply?

8        A    - of who could apply, absolutely.

9        Q    And as far as you know, MR. Bendler and

10  MR. Sherman had nothing to do with it?

11        A    Not that I'm aware of at all, not at

12  all.

13        Q    In the middle or - the fourth paragraph

14  you talk about the project that you worked on to

15  review an ASB computer-based training course?

16        A    Yes, that was a very short term project.

17        Q    Yes, how short term was that?

18        A    It probably took a day.

19        Q    Could you tell me about the corporate

20  critical infrastructure in the project that you talk

21  about?

22              MR. SHAPIRO: If you ask a better

1    question than can you tell me about.

2                BY MR. JONES:

3        Q    Well, let's see, you talk about

4    research.

5        A    Yes.

6        Q    What research did you produce?

7        A    The vendor came to me with a document

8    that said, you need to answer question number one,

9    two, three, and I want you to do so and so, draw -

10   summarize what each division in the corporation

11   does.  They wanted me to find out the assets that

12   the corporation held, and owned property too.

13               So the research required, I had to

14   contact the different people to find out if there

15   was a summary document or some simplified way of

16   getting information about each division.  Because

17   when I went on each division's website, it was very

18   extensive.  And I had like - he wanted it probably

19   the next week.

20               And I contacted Rex Anderson in

21   Corporate Services to find out about owned

22   buildings.  I contacted people in DOF to find out

1   about other assets that FDIC held, and was sent to

2   someone in DIT.  So I came up with this document

3   that was submitted to the bigger report.  So this is

4   DOA's portion of it.

5        Q    Oh, it's DOA, not just MSB's, but it was

6   actually DOA's portion?

7        A    I'm assuming it was the portion that

8   related to DOA.  Of a larger document.

9        Q    And what did you - what was the

10  Washington - what did you do for the Washington mail

11  room project?

12       A    That was one of the compliance reviews.

13  I reviewed the four main mail centers.  In the past

14  it had always been a team of two.  Previous ACRs had

15  been a team of two.  And Dan came to me and said, I

16  know we don't have two people, but I'll give you two

17  weeks to do it instead of one week.  You can do that

18  by yourself.  And I said, sure.  So we have a big

19  mail center - well, it's bigger now that we are

20  here, but we had a big mail center in Virginia

21  Square.  A big mail center in the main building,

22  550.  A medium sized center in A01 and a very small

1    center in the 1730 building.

2              So I went to those facilities, I looked

3    through their records.  The records they retained on

4    checks, incoming checks; the account law, so they do

5    an account of how many stats were put out each day.

6         Q    When you say that previous ACRs had two

7    people assigned to them?

8         A    Yes, there was always a team of two.

9         Q    Are you talking about the previous mail

10   room ACRs?

11        A    Yes.  Well, in the field there is

12   normally one person, because they just had one

13   little mail center.  But DC is huge, the mail

14   operations are really big there.

15        Q    But we are talking about the mail room

16   ACRs here.

17        A    Right.  There was one in 2002 that I did

18   along with a 14, he and I reviewed it.  But this

19   year he asked me to do it on my own.

20        Q    Okay.  Now when he met with you, it was

21   January - well, the email date is January 25th.  So

22   he met with you briefly on the 18th.

```
 1              Did he say anything to you about the

 2      procurement card project -

 3          A     Not at all.

 4          Q     - that you worked on with David Lok?

 5          A     Not at all.

 6          Q     Did he say anything about the

 7      accountability -

 8          A     Not at all.

 9          Q     - summaries?

10          A     Not at all.

11          Q     Did he say anything about the - not

12      going on the site visitation?

13          A     Not at all.

14          Q     Did he say anything to explain where he

15      said, last year was not a great year in terms of

16      your production and the quality of your work?

17          A     No, he did not.  He did not say

18      anything.

19          Q     So is it fair to say that when he met

20      with you what he was talking about was not talking

21      to the other employees?

22          A     Specifically, specifically, yes.  It
```

1    became a topic of the employees - it really boiled

2    down to that, it really did, and about my position

3    being surplus.  That's basically all that

4    conversation.

5         Q    And what did he say about your position

6    being surplus?

7         A    That he could tell me - he said I wasn't

8    allowed to tell you that you were going to be

9    surplus.  Management wouldn't let me.  And that's

10   when I said I've worked with you and Paul for years.

11   They tell everyone else secrets like that.  And I

12   felt the way it was done - you know.

13        Q    But you don't have any reason to believe

14   that he wasn't telling you the truth that they

15   weren't supposed to tell in advance?

16        A    Well, in my experience they told a lot

17   of things in advance of things happening, my

18   experience in that office, there is a lot of

19   conversation like that.

20        Q    Telling things that aren't supposed to

21   be told?

22        A    Hold this under your hat, but management

1    is planning on doing so and so.

2         Q    What's a - can you name a for instance

3    when that happened?

4         A    Not off the top of my head.  If I think

5    about it for awhile.

6         Q    And I think you said the only thing he

7    had previously discussed with you about coming in

8    late was -

9         A    Call me.

10         Q    Calling you?

11         A    Yes, if you're running late call me.

12         Q    Any time limits on that?  If you are

13    going to be a half hour late, if you are going to be

14    an hour late?

15         A    There was one time I called and he said,

16    it's less than 15 minutes, don't worry about it.

17         Q    At this point in time, in 2005 -

18              MR. SHAPIRO: January 31st?

19              MR. JONES: Well, let's say beginning in

20    January of 2005, how often were you interacting with

21    MR. Bendler?

22              WITNESS: Not at all.  He didn't have an

```
 1      assignment for me.  I felt burnt.

 2                 BY MR. JONES:

 3           Q     You felt burnt?

 4           A     Yes.

 5           Q     What do you mean by that?  Burnt out?

 6           A     Not burnt out, I felt hurt by these

 7      things that had occurred.

 8           Q     So you wouldn't go to see him; is that

 9      right?

10           A     If there was something work related, I'd

11      go see him.  If I need to get so and so, yes.

12      Mostly I would do it in writing, so I could have a

13      record, because of this.  I'd send him an email, so

14      I can have a record.  That's how I started making

15      records.

16           Q     And this was a lot different than it was

17      back in 2003?

18           A     Absolutely.  Absolutely.  I didn't feel

19      like I needed to protect myself on everything.

20           Q     Was the same true with regard to MR.

21      Sherman?

22           A     Absolutely.
```

1          Q      Didn't see him either?

2          A      No.  If there was something related I

3     needed to talk to him about, I would have talked to

4     him.

5          Q      Now, did MR. Sherman come and - he came

6     and talked to you about the surplus list?

7          A      Yes, because I saw him in the elevator

8     lobby, and I said, what's with the surplus?  And he

9     said he'd come talk to me.

10         Q      And he was the one who said they needed

11    13s -

12         A      Who could take the lead, yes, he told me

13    that.

14         Q      Did MR. Bendler say anything about the

15    surplus list?

16         A      No, he didn't.  He didn't.  He didn't

17    say anything about it to me specifically until we

18    went to the counselor.

19              COURT REPORTER: I'm sorry, I don't hear

20    that last .

21              WITNESS: I said until we went and had

22    that counseling.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

93

```
1              MR. JONES: You're referring to this

2      meeting as a counseling?

3              WITNESS: Oh, I need to correct myself.

4      He did say something in an email about it.

5              BY MR. JONES:

6         Q    And what was that?

7         A    I know you are upset by Arleas's email,

8      something like that.  I can't recall exactly.

9         Q    And Arleas's email was the notification

10     of the surplus?

11        A    The surplus notification, yes.

12        Q    The list that was published?

13        A    Yes.  Yes.

14        Q    Okay.

15        A    And that was the next week that he sent

16     me that email.

17        Q    And that's Dan?

18        A    Dan.

19        Q    Now in March of 2005 you had

20     notification about the CBC program?

21        A    It was February.

22        Q    February, okay.  And what si the CBC
```

1   program?

2         A      That year it was new, it was called the

3   Contributions-Based Compensation.

4         Q      And that was applicable to nonbargaining

5   unit -

6         A      Nonbargaining unit employees.

7         Q      Nonbargaining unit employees?

8         A      Yes.

9         Q      And can you describe the program, what

10  your understanding of it was?

11        A      They came up with a scale of five, one

12  of five, one being the highest contribution and five

13  being the lowest contribution.  And they had

14  specific pay increases for each level five, four,

15  three, two, one.  And level five was zero, nothing,

16  you didn't contribute anything.

17        Q      So level five was a zero pay raise?

18        A      Zero pay raise, nothing.

19        Q      The five different levels, did they have

20  specific percentages of employees -

21        A      Yes.

22        Q      To be assigned to each?

1          A      Yes.

2          Q      And do you know how many were in the

3     level five?

4          A      Yes, that's all I know is level five;

5     five percent.  I can't tell you what the other

6     percentages were, because that's the one that

7     affected me.

8          Q      So five percent of the DOA employees

9     that were nonbargaining unit had to be assigned to

10    level five?

11         A      The way I understand it, five percent of

12    the corporation.

13         Q      The corporation, nonbargaining unit?

14         A      Right.

15         Q      So this year you've got zero?

16                MR. SHAPIRO: This year being 2005?

17                MR. JONES: 2005.

18                WITNESS: Nothing, nothing ready.

19                BY MR. JONES:

20         Q      So your paying benefits stayed the same

21    as 2004?

22         A      Exactly.

1          Q      And you understand that it was a

2      comparative process?

3                 MR. SHAPIRO: What do you mean, do you

4      understand?

5                 BY MR. JONES:

6          Q      Was it a comparative process?

7          A      That's what they said it was.

8          Q      And was it your understanding that you

9      weren't the only DOA employee who was in group five?

10         A      My understanding was, I was the only one

11     at MSD.  I don't know about the rest of DOA.

12         Q      And MSD is Paul Sherman's -

13         A      Paul Sherman's branch.  They didn't give

14     me the numbers for the rest of DOA.  That wasn't

15     shared.

16         Q      Did they share the numbers for MSB about

17     what the breakdown was?

18         A      No.  I learned I was the only one,

19     because everybody else - general people talking.

20         Q      And the results that were sent out in

21     March of 2005, that was for performance - was it

22     March of 2005 when you got your -

1          A      No, February 18th.

2          Q      February?  That was for things you did

3     in 2004?

4          A      In 2004, yes.

5          Q      And that was the year when MR. Bendler

6     didn't say anything about it?

7          A      Absolutely, yet.

8          Q      Did he say anything negative during 2004

9     about your performance?

10          A      Not that I recall.  Not that I recall.

11          Q      And after you got - after you found out

12     you were in group five, what did you do then?

13          A      I cried like a baby.

14          Q      Did you take any action?

15          A      Oh, yes.  I filed a complaint.

16          Q      An EEO complaint?

17          A      Yes.  The grievance process was

18     available, but the grievance process went back to

19     the same people who put me in that category, MR.

20     Sherman and Arleas Key, it was going right back to

21     them.

22          Q      So you could elect either -

```
 1              A     But I felt it was discrimination.  I

 2       felt it was discrimination.

 3              Q     And why did you feel that?  Why did you

 4       think it was discrimination?

 5                    When you say discrimination, you mean

 6       race discrimination?

 7              A     Absolutely.

 8              Q     And why did you think that at the time?

 9              A     First off, historically, I'm the only

10       black person in that office.  And in the short

11       amount of time, these three things happened to me.

12       How can they do this?  How can they say I didn't

13       contribute when I know I did.  Except I believe they

14       can say anything about a black person and have it

15       believed.

16              Q     When you say these three things, what

17       three things are you talking about?

18              A     The promotions of 13, my position on the

19       list of being abolished, and then not rewarding me

20       and lying about my contributions and not rewarding

21       me.

22              Q     This CBC?
```

1          A      Yes.  What else could it be?

2          Q      So the email and the meeting, that

3     didn't really have any effect on you?

4          A      Yes, it did; did it have an effect on

5     me.

6          Q      Okay, but did it have an effect on your

7     paying benefits or anything like that?

8          A      It shouldn't have.  It shouldn't have,

9     because that was 2005, and pay was based on the work

10    I performed in 2004; not a counseling session that

11    occurred in 2005.

12         Q      Do you think it had an effect on your

13    CBC rating?

14         A      I believe it did.

15         Q      Was that reflected in the writeup, the

16    CBC rating?

17         A      Not at all.

18         Q      Now was this your - when you sought EEO

19    counseling, was that in March?

20         A      Yes, March.

21         Q      Was this the first time you had sought

22    EEO counseling for something that happened to you?

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

1          A    In DOS/FDIC?  I mean, when?  When are

2     you talking about?

3          Q    At RTC or FDIC?

4          A    No, I had sought at RTC.

5          Q    When?

6          A    In 1993.

7          Q    In 1993?  So was this the first time you

8     had sought counseling while you were in DOA?

9          A    Yes.

10         Q    And did you later file a complaint, a

11    formal complaint?

12         A    Yes.

13         Q    And what did you allege?

14         A    That I had been discriminated against.

15         Q    And did you claim that you had been

16    harassed?

17         A    Yes, I did.

18         Q    And what was - what do you claim was

19    done to harass you?

20         A    That -

21         Q    Or had been done to harass you?

22         A    That my work was diminished, that all

1    the work I did was diminished.

2         Q      When you say -

3         A      That I was targeted by them.  The work I

4    did was diminished.  Everything was wiped out as if

5    I never did a thing, and it - if that like - you are

6    in another zone, it's like - I mean I did work.  But

7    nobody told me I did work.  So it felt like another

8    place.

9         Q      So when you say diminished, is that the

10   same thing as saying it was disregarded by -

11        A      Disregarded, minimized.

12        Q      Your achievements were minimized.

13        A      Not only my achievements, my work

14   contributions, the work I actually did.  That's

15   something separate from achievements.

16        Q      Okay, and that happened with the CBC - I

17   mean, at the - during the year did you get feedback

18   that your work was being disregarded?

19        A      Not at all.  I had no idea this was even

20   coming.  No one said to me, you are not working.

21   You are risking something here.

22        Q      So your work was diminished or

1    disregarded.

2         A    Yes.

3         Q    What else was done, what else did you

4    claim was done to harass you?

5         A    During what period?

6         Q    During the 2004 year.

7         A    There were a number of things.  I can't

8    recall exactly.

9              MR. SHAPIRO: Maybe if you show her the

10   complaint.

11             MR. JONES: I'll have to do that after

12   lunch.

13             WITNESS: In 2004 - because in 2004-2005

14   there were a series of things that went on.

15             BY MR. JONES:

16        Q    And now the CBC program was signed off

17   on - or your rating in the CBC program was signed

18   off on by the division director?

19        A    Yes, MR. Sherman, MR. Bendler and Arleas

20   (inaudible).

21

22             COURT REPORTER: I didn't get that last

1    one.

2                WITNESS: I'm sorry.  MR. Bendler, MR.

3    Sherman and Ms. Kea, I believe, signed my documents.

4                MR. JONES: That's K-e-a.  And the name

5    is Arleas Upton Kea, A-r-l-e-a-s U-p-t-o-n K-e-a,

6    three names.

7                BY MR. JONES:

8         Q    And do you think that Ms. Kea's approval

9    of your being in group five was racially motivated?

10        A    Yes, I do.

11        Q    And why do you think that?  She's a

12   black woman, isn't she?

13        A    It doesn't matter.  Black people

14   discriminate against black people.

15        Q    Do you have any reason to - and what is

16   the reason you think she discriminated against you?

17        A    Well, I think it's easier to go along

18   and say, oh, right, that black person didn't do

19   that.  I think it would be, you know, because of the

20   stereotypes that exist around black people that

21   still exist today.  I believe she could easily say,

22   oh, you say she didn't do it?  She didn't do it.

1    Instead of searching in her mind for what she knows

2    that I've done, because we're her special staff, to

3    know my history there in that place.

4         Q    After you were put in group five, did

5    you talk with Jerie Kitchens about it at all?

6         A    Probably mentioned it to her.  I don't

7    know specifically what I said.

8         Q    Other than the fact that you stated

9    about you thought it was easy for them to get away

10   with it because you were a black woman -

11        A    Yes.  Yes.

12        Q    - do you have any personal knowledge of

13   any racial comments that either Dan Bendler or Paul

14   Sherman made at any time?

15        A    Not that I can recall.  Not in my

16   presence.

17        Q    Did they ever treat you in a racially

18   derogatory manner?

19        A    Not racially derogatory.  Just little

20   things over time.  You know.  There are some things

21   you just let go.

22        Q    Can you give us some for instances?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

105

1        A    It's really simple and small.

2        Q    It's okay.

3        A    When I had my hair in braids?  Oh, you

4   look like Whoopi.  It's an assumption every black

5   woman in braids looks like Whoopi Goldberg.

6        Q    And who said that?

7        A    Dan.

8        Q    Do you think he - was he being mean

9   spirited?

10       A    No, no, that's not it again, he wasn't

11  being mean spirited, just not having knowledge.

12       Q    Okay.  Was that when you and he still

13  had a good relationship?

14       A    Yes, we still had a good relationship.

15       Q    I wanted to ask you about something

16  because I saw some emails about the Katrina

17  hurricane hotline that the FDIC set up.  Were you

18  asked to volunteer for that hotline at some point

19  after the hurricane?

20       A    Yes, I was asked to volunteer.

21       Q    And what was your response?

22       A    That I was supporting the Katrina relief

1    at the very outside, through giving money at church.

2    I had my own way of supporting it.  I didn't need

3    FDIC to show me how to support the -

4         Q    Okay, at some point did the request for

5    volunteers turn into a mandatory assignment for MSB

6    employees?

7         A    I don't know that it was for MSB

8    employees.  But Dan came and told it was mandatory.

9    He came and told me it was mandatory now.

10        Q    Okay.

11        A    But there were other people in MSB that

12   did not take part in it.  I don't believe everybody

13   else did.

14        Q    How about in MSS?

15        A    I don't know.

16        Q    The Dan Bendler unit?

17        A    I don't know.

18        Q    Do you know anybody who didn't take

19   part?

20             Do you know anybody who did take part?

21        A    Yes, I know a few people that did take

22   part.

1        Q     And who was that?

2        A     There were a few people on my staff and

3    a few people on the branch.  Just in general you

4    hear people talking, oh I did it, and some people

5    say, oh, I couldn't do it.

6        Q     And did you do it?

7        A     No, I did not.

8        Q     And why not?  Just because -

9        A     Because it said, voluntary.  And I know

10   how to support people.  I do.  I pay - I gave money

11   outside.  I bought things.  So I was doing my part

12   to support Katrina outside of the FDIC.

13       Q     Okay.  So after you filed your EEO

14   complaint in March of 2005, did your working

15   conditions change after that?

16       A     Yes, I believe they did.

17       Q     And how did they change?

18       A     Such a broad question.  Some of my work

19   disappeared, diminished.

20       Q     Did you feel like you were being

21   retaliated against?

22       A     Absolutely.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

108

```
1          Q     For filing the EEO complaint?

2          A     Absolutely.

3          Q     And what things happened to you that

4    made you feel like you were being retaliated

5    against?

6          A     Let's go back to the Katrina thing.

7    Let's go back to Katrina.  The emails went out under

8    Arleas' name, since we're seeking volunteers.  And

9    that happened the week of - Labor Day weekend.

10               I was out of town.  Labor Day was a

11   Monday.  I was off Tuesday.  I come in Wednesday.

12   He comes and tells me, we need you to work a

13   hotline.  And I said, I don't choose to do that

14   because I'm supporting it outside of here.

15               And he said okay.  Then the next morning

16   he comes and says, well, it's now mandatory, and I

17   want you to go to the hotline.  I said, who said

18   it's mandatory?

19         Q     And what did he say?

20         A     And he said, Glen Bjorkman says it's

21   mandatory.  And I said, well, I think you need to

22   give it to me in writing.  Because at that point we
```

1    had communication problems about whether I was doing

2    work or not.  And I said, if you give it to me in

3    writing I'll go do it.  If it's mandatory, if Glen

4    Bjorkman wants us all of us to do it, I wanted to

5    see it in writing, because we've had those issues.

6    And that's what I told him.  And that's what I wrote

7    in an email to him.  That was one thing.

8        Q    And what did he do?

9        A    He responded that he didn't have to give

10    me all my assignments in writing.  And he got some

11    other people to do it.

12        Q    What else did he do?  What else did

13    either Paul or Dan do?

14        A    Saw my work diminish.  My work went

15    away.  Some of the things I was responsible -

16    disappeared.  One of the things just disappeared

17    completely.  I wasn't told it was gone anywhere.  It

18    just -

19        Q    And what was that?

20        A    I was the coordinator for the DOA review

21    process directives.  Every division has someone that

22    does it, and that was assigned to me in 2003, and in

1    2005 it just disappeared.  In 2003 when they gave it

2    to me, it was a series of emails.  Pam Brownfield is

3    the contact.  And then it just disappeared.  There

4    was nothing that said, Pam Brownfield is no longer

5    the contact.  But the process was still going on.

6    Somebody was doing it.

7        Q    And what would you do for those

8    directives?

9        A    Oh, generally, there was a list of

10   people that you farm it out to.  There was an email

11   I sent out.  And I tracked it to make sure

12   everything was timely.  And I might on occasion have

13   to send out a reminder, look, you've got one more

14   day to review this.  If you have any comments give

15   it to me; if not, the window is closing.  That kind

16   of thing.  And I forwarded all comments to whoever

17   the originating office was.

18       Q    So this was before a directive would be

19   published?

20       A    Right, before it went through the final

21   process of going through - what do they call it,

22   ODEO and the legal division, final process.  So it

1   was the internal review process.

2         Q      Were you ever told -

3         A      Not at all.

4         Q      - where that work went?

5         A      Not at all.

6         Q      Do you know where it went today?

7         A      Somebody is doing it; I don't know.

8         Q      Okay.  Any other work that was taken

9   away from you besides the directorate review at any

10  time after -

11              MR. SHAPIRO: March of 2005?

12              MR. JONES: Yes, after March of 2005 when

13  you filed your EEO complaint?

14              WITNESS: The CFOA testing and reporting

15  process, it changed, a lot of my responsibilities

16  went away.  Prior to that point Wilma Probst and I

17  were totally doing the project.  After that, it was

18  like, we can do this little piece.

19              BY MR. JONES:

20        Q      And what little piece were you left

21  with?

22        A      Reviewing and writing highlights for

1    contract - for the procurement credit conference.

2    That little piece.

3         Q    Were you doing the AU summaries after

4    that?

5         A    All I did was review them for content,

6    and correct - where prior, before, I used to write

7    them up.

8         Q    And who wrote them up after the process

9    changed?

10        A    Each of the people who oversaw - the

11   subject matter experts.

12        Q    The people who actually did the testing

13   would write up the summaries too, is that a fair

14   thing to say?

15        A    Yes, sometimes they did the testing.

16   Sometimes they didn't, may have gotten the testing

17   from other people.

18        Q    Did you do both the testing and the

19   summary for the P-card subjects?

20        A    Yes, that's the year I did it by myself.

21            MR. JONES: Why don't we take a break.

22            MR. SHAPIRO: If this is a convenient

1  place.  I'd rather have you come to the end of a

2  subject, but if you'd rather come to an end now.

3          MR. JONES: Well, let's finish the

4  enumeration the things that were done that were

5  retaliatory.

6          WITNESS: Okay.

7          BY MR. JONES:

8      Q    You've talked about the Katrina.  We've

9  talked about the AU summaries.  We've talked about

10  diminishing work in general.  Anything else outside

11  the diminishment of work?

12     A    You talking about in 2005?

13     Q    In 2005.

14     A    I can't recall everything right now.

15     Q    Did you think your CBC rating - not CBC,

16  PFP -

17     A    For the next year.

18     Q    - grade three, group three, was

19  retaliatory?

20     A    Yes, I did.

21     Q    Well, we'll get into that after lunch.

22          MR. SHAPIRO: Say in 45 minutes?

```
 1                    MR. JONES: Yes, that sounds fine.

 2                    MR. SHAPIRO: How close are you to

 3        finishing?  Another hour?

 4                    MR. JONES: Yes, probably.  Don't hold me

 5        to it.

 6                                (Whereupon at 12:34 p.m. the

 7                                proceeding in the above-

 8                                entitled matter went off the

 9                                record to return on the record

10                                at 1:29 p.m.)

11                    MR. JONES: Okay, we're ready to go back

12        on the record.

13                    Let me show you what has been marked as

14        Exhibit No. 7.

15                                (Whereupon the aforementioned

16                                document was marked for

17                                identification as Exhibit No.

18                                7)

19                    BY MR. JONES:

20             Q      I would ask if you can identify those as

21        emails exchanged between you and Dan Bendler in

22        2003?
```

1          A     I probably got some from him myself.

2          Q     Well, the top one on page 578 is from

3    you, and I believe the next one is from him to you.

4          A     Yes.

5          Q     Are these an example of the cordial

6    relationship that you had back in 2003?

7          A     Yes, probably.

8          Q     You can take a look at them.

9                (Witness examines documents)

10               WITNESS: Good.  Thank you.

11               BY MR. JONES:

12         Q     My question is, do these emails

13   exemplify the kind of -

14         A     Absolutely.

15         Q     - cordial relationship you had with MR.

16   Bendler in 2003?

17         A     And everybody on the staff, yes.

18         Q     And at this time he was your personal

19   supervisor?

20         A     Yes.

21         Q     Okay.  We can hand those to the court

22   reporter.

1              Let's jump ahead to March of 2006.  Now

2       for the performance year 2005 the FDIC instituted a

3       new program called the PFP, correct?

4              A      Right.

5              Q      And what does that stand for?

6              A      Pay for performance, but I think that

7       stuff is February.  It was effective February, the

8       actual documents were returned to us I believe in

9       March.

10             Q      Okay.  And I asked you a similar

11      question with regard to the CBC program.  But what's

12      your understanding of how the PFP program worked?

13             A      It's similar to CBC, based on

14      contributions.

15             Q      Okay.  Is it a comparative program

16      throughout?

17             A      I guess.  Yes, yes it is.

18             Q      And do they break the employees into

19      groupings?

20             A      Yes.

21             Q      How many groups are there?

22             A      Three now instead of five.  There is the

1   ‖   fourth one, but the fourth one you are only put in

2   ‖   if you don't receive a fully successful.  For the

3   ‖   CBC you could receive fully successful and still not

4   ‖   get paid.

5   ‖          Q     I understand.

6   ‖                Now for the people who did get the fully

7   ‖   successful on their PMP, do you know what the

8   ‖   breakdown in the percentages were between group one,

9   ‖   two and three under the PFP program?

10  ‖          A     I think 25-50-25.

11  ‖          Q     And what group did you - were you put

12  ‖   in?

13  ‖          A     Number three.

14  ‖          Q     And when did you find that out?

15  ‖          A     I think when those emails came out.  We

16  ‖   had - I don't know the exact date it came out.  It

17  ‖   was like different steps.  In February, this year,

18  ‖   we could comment on what they wrote.  And then I

19  ‖   can't remember exactly when they made the decision.

20  ‖          Q     And you did that, you commented on it?

21  ‖          A     Oh, yes.

22  ‖          Q     So it was around February or March -

1          A     Yes, February or March.

2          Q     2006?

3          A     Yes.

4          Q     And what effect did the group three have

5     on your pay and benefits?

6          A     Oh, I got a pay raise.  It was the

7     minimum, but I got one.

8          Q     Okay.  So it was less than the group

9     two?

10          A     Yes.

11          Q     And did they - do you know what groups

12     the other MSB employees were put in?

13          A     A few might have mentioned, but not

14     really.

15          Q     Did FDIC publish it at all?

16          A     No.

17          Q     And what did you do when you found out

18     you had been placed in group three under the PFP

19     program?

20          A     Well, I filed a complaint.  Actually I

21     filed a complaint when they wrote it up, because I

22     had given them more information I had failed to

1    include.

2         Q    Failed to include?

3         A    Yes.

4         Q    And when you say a complaint, an EEO

5    complaint?

6         A    Well, yes.  I actually had one, and I

7    just made a change to it.

8         Q    Oh you already had an EEO complaint

9    pending?

10        A    Yes.

11        Q    And what was the subject of your pending

12   complaint?

13        A    It was the pay for performance, the way

14   he wrote me up and failed to include my - I had

15   given him a list of things, he failed to include it

16   in there.  He had - that's when he came to me and

17   told me that I was spending too much in opposition

18   services, and I wad disturbing and distracting Ann

19   Steely's staff.  That was February.

20        Q    February of 2006?

21        A    2006.

22        Q    And when you say, he, that was MR.

120

1    Bendler?

2         A     MR. Bendler.

3         Q     Okay.  And did he tell you how he found

4    out about this?

5         A     Again, he said Paul came to him, Ann

6    came to Paul, something like that.

7         Q     And did you talk to anybody in Ann's -

8    what section is Ann?

9         A     Acquisition Services Branch.

10        Q     ASB?

11        A     ASB.

12        Q     Did you talk to anybody in ASB about

13   this after -

14        A     Yes.

15        Q     - MR. Bendler came to you?

16        A     Yes.

17        Q     And who did you talk to?

18        A     I don't know specifically.

19        Q     Did you talk to Ann Bridges Steely?

20        A     No, I did not talk to her.

21        Q     Did you talk to any of the managers over

22   there?

1           A      No, I didn't talk to any of the

2      managers.

3           Q      Do you have any reason to believe that

4      Ann Bridges Steely didn't complain?

5           A      Yes.

6           Q      And why is that?

7           A      Because I wasn't doing what they said I

8      was doing.

9           Q      And what did they say?

10          A      They said I was disturbing and

11     distracting the staff and spending too much time in

12     that office.

13          Q      Okay.

14          A      And that wasn't my behavior.

15          Q      Okay.  Did you spend any time over

16     there?

17          A      Yes.  It was right around the corner

18     from me, yes.  On the way to the bathroom sometimes.

19          Q      It's on the same floor?

20          A      It's on the same floor.

21          Q      And do you have friends in ASB who you

22     would talk to?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

122

1          A      Absolutely.  Absolutely.  I've known all

2     these people for 10 - 15 years.

3          Q      Anyone in particular stand out that you

4     would -

5          A      Vonda Bailey I've known since RTC days.

6     Julie Rothermel, Kelly Budd, Mary Bess.  I've known

7     Marisha Price, I've known these people for 10 - 15

8     years.

9          Q      Who was the last one?

10         A      Marisha Price.

11         Q      Marisha?

12         A      Price, people I've known for years.  One

13    of the managers, Deena Weatherly, we're very

14    friendly because our birthdays are on the same date,

15    same year.

16         Q      Okay.  Did you include that in your EEO

17    complaint, Dan Bendler coming to you?

18         A      Yes, I did.

19         Q      And in your EEO complaint did you allege

20    both race discrimination and retaliation?

21         A      Yes, I did.

22         Q      And that was based on the PFP group

1    three placement, and the - yes?

2         A    I believe it was on when I, what do you

3    call, amended it later I put the placement.  But

4    earlier it was -

5         Q    The PFP writeup?

6         A    The writeup and what I thought was

7    retaliatory behavior when he came to me about the

8    Ann Sterling business.

9         Q    Okay.  Anything else that was

10   retaliatory or discriminatory?

11        A    Not off the top of my head, not off the

12   top of my head.  There may have been a few other

13   things.  I don't know exactly.  I have it written

14   down.  But those two things stand out specifically.

15        Q    But you don't -

16        A    Well, there was an incident that did

17   occur.  But I ended up not including it.

18        Q    Well, why don't you tell me about it.

19        A    It's where I felt they were asking

20   questions about me - not I felt like - allegedly

21   were asking questions about me from other people.

22        Q    And when you say, they, who?

```
 1            A      Management, manage - supervision.  Dan

 2       Bendler, Paul Sherman, it's in my complaint.

 3            Q      They were asking - Dan Bendler was -

 4            A      Well, Paul Sherman specifically.

 5            Q      Paul Sherman specifically?

 6            A      Yes.

 7            Q      Was asking other employees --?

 8            A      What they thought about me.

 9            Q      And you thought that was retaliatory too

10       but you didn't put it in your complaint?

11            A      Well, it was originally it the

12       complaint, but I pulled it out.

13            Q      Okay.  So you amended your complaint and

14       took that out?

15            A      When they did the investigation.  When

16       they did a report of investigation.

17            Q      Anything else subsequent to that that

18       you felt was retaliatory?

19            A      There are so many little things I can't

20       name them all right now.

21            Q      This is in March of 2006 that you filed

22       your EEO complaint and alleged retaliation.
```

1      A      I'd have to look at the complaint to

2   see.  I can't remember exactly what those items

3   were.  I think there might have been four things.  I

4   just remember those three.

5      Q      But they all would have been in the

6   complaint?

7      A      In the complaint I filed in March,

8   February-March.

9           MR. SHAPIRO: As amended.

10          MR. JONES: Right.

11          BY MR. JONES:

12     Q      Now why do you think the things that you

13  alleged in your complaint, why do you think that

14  they were racially motivated?

15     A      As I said earlier, I believe they can do

16  and say anything about me and it will automatically

17  be believed because of the assumptions people make

18  about black people.

19     Q      Okay.

20     A      Yes.

21     Q      And again, the PFP rankings were signed

22  off on by Arleas Upton Key?

1          A     Yes.

2          Q     So when you say, they -

3          A     She's included, yes, management, yes.

4          Q     And when you say management in this

5     context, are you talking about Arleas Upton Kea,

6     Paul Sherman -

7          A     And Bendler would be officially

8     considered a supervisor, but Sherman would be

9     considered a manager.

10         Q     We'll include him as a manager.  So it's

11    those three?

12         A     Those three.

13         Q     They were all retaliatory - they all

14    participated in the retaliation, and they all

15    participated in race discrimination in your view?

16         A     I wouldn't say they were all

17    retaliatory.  In some ways, yes.  You know.

18    Specifically say - they were all retaliatory.  They

19    were all - I believe they were all discriminatory.

20    Retaliatory, definitely MR. Bendler and MR. Sherman,

21    and in some ways Ms. Kea.

22         Q     Okay.  Moving on a little bit in 2006

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

127

1    were you assigned to do another procurement card

2    review with David Lok in June of 2006?

3        A    It wasn't done that way.

4        Q    Okay, how was it done?

5        A    We did this - I spoke earlier to us

6    doing surveys, to see if these things would be

7    legitimate.  And the survey was conducted by Andrew

8    Nickel and myself, where we looked at policy; we

9    looked at various issues; and we wrote up this

10   document.

11             Then they said they were going to assign

12   specific people, groups to do certain things.  So he

13   put out a table that showed this analyst and that

14   analyst reviewing this, that and the other.

15             And David Lok and a student intern were

16   assigned to do credit cards for 2006 with me.

17       Q    Okay.  And -

18       A    We were assigned to do - there was a

19   step that went beyond the survey.  It wasn't the

20   actual review of the credit cards.  It was the fully

21   - more fleshed out - it's in between.

22             We were going to review credit cards.

1    We had to flesh out a lot of policy changes.  So we

2    would have to had to change the test documentation;

3    NFE, you know, the new financial guideline that came

4    in.  There were a lot of policy changes, federal

5    policy changes that were taking place between 2005

6    and 2006, the test period, major changes.

7         Q    So did David Lok participate in that

8    project?

9         A    Not at all.  2006 you are talking about?

10        Q    Yes, 2006.

11        A    Not at all.

12        Q    He - what happened?

13        A    He sent an email saying, I'm down and

14   out.  I'm just saying, I don't know the language

15   exactly, but basically Dan gave him permission to

16   drop out of the project.

17        Q    Okay, and what did you do when that

18   happened?

19        A    In his email he said that Dan said he

20   can get out and he will assign someone else.  Well,

21   a week went by and Dan didn't assign anyone else.

22   And I wrote MR. Bendler an email saying, we've got

Brownfield v. Bair, 05-cv-2468-EGS<br>Exhibit 10

129

```
1  || all these teams.  The teams are in motion, but no
2  || one as yet has been assigned to this very important
3  || area.
4  ||      Q    Did the project move forward at all
5  || while you were there?
6  ||      A    Not at all.  It just got taken off -
7  ||      Q    Do you know what happened after you left
8  || the section and went over to DIT?
9  ||      A    No, I don't know.
10 ||      Q    Now talk about the CDC rankings.  Do you
11 || believe - do you think -
12 ||           MR. SHAPIRO: You mean 2005?
13 ||           BY MR. JONES:
14 ||      Q    Yes, the CDC put out in March of 2005,
15 || for the 2004 year.  Is it your belief that MR.
16 || Bendler assigned you the group five ranking?
17 ||      A    I don't know who did it. Between
18 || Bendler, Sherman, Bjorkland and Keas.  Somebody made
19 || the decision to put me there.  I know it's within
20 || that chain of command that someone made that
21 || decision.
22 ||      Q    But you didn't - not being in
```

**NEAL R. GROSS**<br>COURT REPORTERS AND TRANSCRIBERS<br>1323 RHODE ISLAND AVE., N.W.<br>(202) 234-4433     WASHINGTON, D.C.  20005-3701     www.nealrgross.com

| | |
|---|---|
| 1 | management, you didn't participate in the actual |
| 2 | ranking? |
| 3 | A    No. |
| 4 | Q    Or the grouping? |
| 5 | A    No. |
| 6 | Q    After your position was put on the |
| 7 | surplus list in December of 2004, did you believe |
| 8 | that it was part of a plan to get rid of you? |
| 9 | A    Yes. |
| 10 | Q    And did you believe it was a plan that |
| 11 | went back to when you weren't selected for the |
| 12 | position? |
| 13 | A    Yes. |
| 14 | Q    Did you believe it went back to when the |
| 15 | position was posted? |
| 16 | A    I don't know.  I can't say that far |
| 17 | back.  But I know, I do believe it went back to when |
| 18 | I wasn't selected. |
| 19 | Q    Okay, at the time you weren't selected, |
| 20 | it was early 2004. |
| 21 | A    Three weeks after my sister's funeral. |
| 22 | Q    Yes, in February. |

1          A      Yes, February.

2          Q      And you had had good reviews in 2003.

3          A      Yes.

4          Q      So why do you think they would want to

5     get rid of you?

6          A      Nobody knows how people think.  I didn't

7     know.  I couldn't understand.  It's like, what is

8     going on?  What in the world happened?

9          Q      Do you think MR. Bendler is a bigot?

10         A      I wouldn't say he's a bigot.  I believe

11    he may have behaviors.

12         Q      Behaviors that are what?  That are

13    consistent with bigotry?

14         A      It's not a consistent thing.  It's just

15    like the hair pulling thing.  Things that come up

16    and just like you let stuff fall off your shoulders.

17    But it's just - I believe there were behaviors that

18    exist.  And I believe there are still types that

19    exist.  And I believe he believes he can say

20    anything about me and automatically FDIC will come

21    down, yes, you're right, black people do that, blow

22    their eyes, suck their teeth, these are the things

132

1    he said.

2            Q      Who said?

3            A      Well, it's not quite that - when he

4    talks about my behavior in his affidavit.

5            Q      You are referring to what he's actually

6    written down.

7            A      What he has written, yes, yes.

8            Q      You take that as showing signs of

9    racism?

10           A      Yes, absolutely.  And the knowledge that

11   he can just say anything about me and it will

12   automatically be believed, as I stated before.

13           Q      At some point in February of 2006, MR.

14   Bendler came to your office to invite you to go to a

15   branch lunch; is that correct?

16           A      No, I got a written invitation that

17   everyone else got.

18           Q      And did MR. Bendler come to your office

19   while the luncheon was in progress?

20           A      While the luncheon - the luncheon had

21   been in progress.  It was approximately 1:00

22   o'clock.  I was about to go out on my own that he

1    came, when it was almost over, is when he came by.

2        Q    And when he came by, did he invite you?

3        A    He said, would you like to join us?  And

4    I said no thank you.  That was it.

5        Q    Did you feel that by him doing that,

6    that treated you in a hostile and exclusionary

7    manner?

8        A    Not exclusionary; and the hostility came

9    when he went back next door and everybody started

10   laughing within seconds.

11       Q    And you surmised that he said something

12   -

13       A    Yes.

14       Q    - about you?

15       A    Yes.

16       Q    Do you have any personal knowledge -

17       A    Not at all.

18       Q    - that he said anything.

19       A    I don't have any personal knowledge that

20   he said - but it was moments.

21       Q    Did anybody ever tell you that he said

22   anything about you?

1          A     No.

2          Q     Did you ever ask anybody?

3          A     No.

4          Q     And that was a luncheon that Ms. Keas

5     was at?

6          A     Absolutely.

7          Q     Can you tell me what compensation you

8     are seeking in this?

9          A     I didn't read everything, so I can't

10     tell you off the top of my head.

11          Q     Well, no, not necessarily what was set

12     down.  But as we sit here today, what compensation

13     are you seeking?

14          A     Well, I want to be treated fairly and

15     properly.  I think they need to go correct the

16     records and give me what I earned.

17               I think -

18          Q     When you say that, you are talking about

19     the CBC and the -

20          A     The CBC, the whole thing, all the way

21     back, from the way they treated me, how they tried

22     to - they said I didn't do things.  They lied about

```
1    my contribution to the corporation.

2         Q    That would all be in the CBC and the -

3         A    The CBC, the PFT, my unfair treatment so

4    soon after my sister's death, when they promoted

5    three people in the office; all of that.

6         Q    So you think you should be promoted as

7    well?

8         A    Absolutely.

9         Q    How are you being treated now in your

10   new job?

11        A    I like where I'm working.

12        Q    No complaints?

13        A    Not against her.  I work with a good

14   staff.  That was a good staff - for awhile it was a

15   good staff.  When those things were happening.

16        Q    At MSB?

17        A    MSB.

18        Q    Do you think that MR. Bendler cheated

19   you out of a Grade 13 position?

20        A    I would say management, so collective,

21   yes.

22        Q    How did they cheat you out of that?
```

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

136

1          A      Well, I stated earlier that it was so

2     soon after my sister's death.  And most people in

3     general would say, hm, I think most people would

4     say, let's try this one more time, give her a second

5     opportunity.  Because of the fact I've had people

6     say that to me.

7          Q      People in management?

8          A      No, just in general, people - quite a

9     few people knew that this had occurred within DOA,

10    quite a few people knew it was happening; quite a

11    few people.

12         Q      And when they say, a second chance, when

13    you say a second chance -

14         A      Yes.

15         Q      Do you mean another interview?

16         A      Not at the - not at the - oh, we've

17    achieved this, and so we put these people at a

18    higher level.  But understanding my situation, and

19    knowing that I behaved more professionally than I

20    did at that time, knowing that I don't go around

21    stuttering and trying to gather my thoughts.  That

22    wasn't common behavior at all.

1          Q      It wasn't you?

2          A      It wasn't me.

3          Q      Now after your position was placed on

4    the surplus list at the end of 2004, did MR. Bendler

5    ever forward emails about job opportunities outside

6    the FDIC?

7          A      Sure, he did.

8          Q      And did you find that offensive?

9          A      Yes.

10         Q      Why?

11         A      Because I didn't ask him.  I can look

12   for my own work.

13         Q      Did you ever tell him to stop?

14         A      No.

15         Q      Why not?

16         A      I just didn't.

17         Q      Do you remember MR. Lok asking you to

18   take over a project of his just before he was about

19   to go on vacation for a week?

20         A      Yes.

21         Q      And what was that project?

22         A      I don't really know.  It was 10 minutes

138

```
 1    before he was leaving.  I don't know what it was.

 2          Q    Did you tell MR. Lok you needed to call

 3    your lawyer right away?

 4          A    I don't recall that.  I don't recall

 5    telling him that.  I don't recall it.

 6          Q    If he recalled that, would you say he

 7    was not telling the truth?

 8          A    I don't want to accuse anybody of not

 9    telling the truth.  But -

10          Q    You just don't recall it?

11          A    I just don't recall it.

12          Q    You mentioned something - did you

13    mention Dan Jewel?  Who did -

14          A    I didn't mention him, but you mentioned

15    him.  I didn't mention him.

16          Q    Who is Dan Jewel?

17          A    He is the investigator on the second -

18          Q    Did you have any complaints or problems

19    with the way MR. Jewel did the investigation?

20          A    First off, I didn't mention him; you

21    mentioned him.

22          Q    Okay.
```

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

139

1          A        Yes, I had some complaints.

2          Q        And what was that?  What were they?

3          A        Well, as I wrote in the report, when I

4    was with my attorney in, what was that, taking an

5    affidavit with MR. Jewel, he had disclosed the fact

6    that he had worked for FDIC previously, and he told

7    me, don't worry, he works for a higher authority.  I

8    said I know you do.

9              And then one of the things I had put in

10   the original retaliation complaint that I had

11   mentioned to you a few minutes ago was the fact that

12   MR. Sherman was trying to get information about me,

13   fishing for information from people.  And the person

14   that had told me this told me she did not want to be

15   involved.

16              And so when MR. Jewel was taking the

17   affidavit, I said - and I counseled my counsel - I

18   said to strike it.  However, they still wanted to

19   find out who that person was.

20         Q        And that was Wilma Probst?

21         A        No.

22         Q        No?  Somebody else?

140

1          A      Yes.

2          Q      So that unnamed somebody is not somebody

3     who you recommended to be interviewed as a witness?

4          A      Absolutely.  I pulled the form because

5     she did not want to be involved.  And MR. Jewel, I

6     made it clear to him.

7          Q      Is that the only complaint you had about

8     the way he handled the investigation?

9          A      I can't recall. I have to look at my -

10    look at this thing and see if I said anything else.

11         Q      That's really all I have.

12              MR. SHAPIRO: All right, let me ask a few

13    questions here.

14      CROSS EXAMINATION BY COUNSEL FOR THE PLAINTIFF

15              BY MR. SHAPIRO:

16         Q      Now you said in answer to questions that

17    you, when you got the - when you were put on - when

18    you found out your position was to be surplused, you

19    started to think or you concluded that this was part

20    of a pattern.

21         A      Yes.

22         Q      The nonpromotion and the surplus.

1          A     Yes.

2          Q     But you didn't conclude it was race

3     discrimination until later?

4          A     Until I got the pay, the pay for

5     performance.

6          Q     So you started to see a pattern -

7          A     Absolutely.

8          Q     - but then you concluded it was race

9     discrimination, when you didn't get any pay - when

10    you got zero from CBC?

11         A     Absolutely.  I think there may have been

12    little hints of it when that position, and I was

13    like - it's my tendency to look for the good first,

14    it really is.  I was thinking - but when that pay

15    thing came, I thought, it has to be.  Because what

16    happened to all the work I did?  I even said that to

17    Bendler.

18         Q     All right.

19               So I wanted to ask you a question about

20    this three - the four CG-12s that were all working

21    for Bendler?

22         A     Yes.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

142

1        Q      And were there lower graded people in

2    that job category, or just all 12s?

3        A      Just all 12s were the lowest.

4        Q      And then they decided to have three 13s

5    in addition to the 12s?

6        A      No.

7        Q      So what would have happened if the three

8    people who got the 13s were from outside?  There

9    were outside candidates, right?

10       A      Yes.

11       Q      So what would have happened if the three

12   people who got - would there be four 12s and three

13   13s then?

14       A      No, I doubt it.

15       Q      Yes.  And how many people as you

16   understand it applied for this job?

17       A      Seven or eight.

18       Q      And were qualified.

19       A      Seven or eight, it was less than eight.

20       Q      And the four people who were qualified

21   were the four 12s who were there plus three or four

22   people from outside who weren't doing those jobs?

143

1          A     Right.

2          Q     And you were the only 12 who was not

3     promoted in the unit, who was not promoted to 13?

4          A     Right.

5          Q     And the other 12s were not African-

6     American; is that right?

7          A     That's true.

8          Q     You were the only African-American?

9          A     Yes, that's true.

10         Q     In fact you were the only African-

11    American on Bendler's team?

12         A     Yes.

13         Q     And you were also the only person to be

14    surplused on Bendler's team; is that right?

15         A     Yes.

16         Q     And the other people who got surplused

17    from Sherman's section?

18         A     The branch.

19         Q     Or the branch, I guess, it's Bendler's

20    section, Sherman's branch, the other people who got

21    surplused, the other positions that were surplused,

22    they were held by a -

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

144

1                    MR. JONES: Objection, leading.

2                    WITNESS: I can answer it without him

3       even leading me.

4                    BY MR. SHAPIRO:

5            Q    So who held those positions, or if they

6       were held at all?

7            A    One was a vacancy.  One was an Asian

8       deaf male.  And one was a woman about to retire.

9            Q    So the woman about to retire, did she

10      retire on schedule?

11           A    She retired earlier this year, January.

12           Q    So she retired when she wanted to

13      retire?

14           A    Yes.

15           Q    And the Asian deaf male, he was a

16      handicapped person?  When you say deaf, you mean

17      handicapped?

18           A    Yes, he's deaf, yes.

19           Q    His position was eliminated?

20           A    No, it wasn't.

21           Q    It wasn't?

22           A    No, he's still there.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

145

1          Q        Oh, he didn't get fired?

2          A        Right, he didn't lose his position.

3          Q        Ah, they didn't surplus that job?

4          A        No, they changed it.

5          Q        They did surplus the job of the person

6     who retired?

7          A        Yes.

8          Q        That was eliminated?

9          A        Yes.

10         Q        And job that was vacant, that was

11    eliminated?

12         A        Yes.

13         Q        And was your job eliminated when you

14    left and got the other job?

15         A        I can only guess that it was.

16         Q        But you don't know it?

17         A        I don't know it.

18         Q        So the Asian male stayed?

19         A        He stayed.

20         Q        And what grade was he?

21         A        Probably a seven or an eight.

22         Q        And the person who was retiring?

146

1      A      Thirteen.

2      Q      And the job that was vacated?

3      A      I'm guessing it was a 12 or 13.

4      Q      Okay.  Good.

5             Now as part of the relief that you are

6      seeking here, you say you want back pay, to be

7      treated right, and so forth and so on.

8      A      Yes.

9      Q      Let me ask you this, you gave some

10     testimony about being placed on Xanax, was it?

11     A      Yes, I took what they used to call it

12     tranquillizers.  But anti-anxiety drugs they call it

13     now.

14     Q      And why were you anxious?

15     A      Well, I'm generally not a person who is

16     afraid of things.  But coming to work everyday,

17     doing what I'm supposed to do, and not knowing

18     what's going to happen to me led me to be anxious.

19     I wasn't sleeping.  I was worried about what would

20     happen to me.

21     Q      When you didn't get promoted, you were

22     the only 12, and you then later got surplused?

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

147

```
1          A     Yes.

2          Q     And later didn't get a dime in - and you

3     were the only one who didn't get any?

4          A     Right.

5          Q     In Bendler's section.

6          A     In the entire branch.

7          Q     In Sherman's branch, right?

8          A     Yes.

9          Q     How did that make you feel?

10         A     I felt that something was against me.  I

11    felt like I was fighting up against something, like

12    there was something - like what is this thing here

13    that's doing this?  Something is happening to me.

14    Everything is trying to fall apart here.  First I

15    didn't get this, and I didn't get that.  And it was

16    like, hey, right around the anniversary of my

17    sister's death these crazy things happened.  It was

18    like, the only inkling I got was an email from

19    Arleas Upton Keas, your compensation remains the

20    same.

21               I felt like my world was falling apart.

22         Q     Were you embarrassed?
```

148

1          A     I was embarrassed.  I was ashamed.  I

2     was angry.  I was ashamed, because I felt it was

3     within my power to do something.  If there is

4     something you can do, and it took me awhile it

5     wasn't in my power, that somebody did this to me,

6     and it wasn't an invisible thing.  Somebody did this

7     thing to me, and I didn't understand where it come

8     from, and why me.

9          Q     Is there any difference - taking you

10     back to the time period where you and your three CG-

11     12 colleagues in Bendler's section, any difference

12     in the kind of work you did, in the assignments?

13          A     No.  Actually a lot of the work that the

14     13s are doing, other than the budget work, is work I

15     did before they even showed up, before they even

16     arrived in the office.

17          Q     Would there be any difference, like were

18     some of the 12s doing higher level work than you

19     were doing?

20          A     Not really.  The budget analysts, she

21     was assisting the major budget person.  But other

22     than the budget, that's the only thing -

1           Q      Well, what's the kind of work?  Is it

2      harder?  More difficult than the work you were

3      doing?

4           A      The budget work?

5           Q      Yes.

6           A      No, I probably could have learned it.

7           Q      But that was one 12?

8           A      That was one 12.

9           Q      But the three of you who were not doing

10     that kind of work, were you doing interchangeable

11     work?

12          A      Yes.

13          Q      Interchangeable assignments?

14          A      Yes.

15          Q      One year you would get an assignment,

16     the next year one of your other colleagues would get

17     the assignment?

18          A      Yes.

19          Q      Interchangeably?

20          A      Interchangeably.  In fact, I did some of

21     that work as a grade nine.

22          Q      Some of what work?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

150

1          A      The work that one of the 13s is doing.

2          Q      That one of the 13st was doing?

3          A      Yes, 12 slash 13.

4          Q      In other words, your colleagues?

5          A      Yes.

6          Q      And the people above.  How many 13s were

7     there in the office before the promotions of the

8     three?

9          A      Well there was one that was promoted to

10    the 14.

11         Q      Who was that?

12         A      Gail Kennedy, she was promoted to a 14.

13         Q      Any other 13s?

14         A      No.

15         Q      Okay.  And were there other

16    professionals below your grade level?

17         A      No.

18         Q      Okay, so how much prior to the promotion

19    of the three 12s and the 13 was Ms. Kennedy moved to

20    a 14?

21         A      Probably like, say, May, or June of

22    2003, six months, to eight months.

1          Q      So 10 months before the promotion of the

2     three 12s, to 13s, there was one 13 and four 12s?

3          A      Right.

4          Q      Then six months before there was one 14

5     and four 12s?

6          A      Not one 14, four 14s.

7          Q      Four 14s -

8          A      Let me see.

9          Q      Oh, I see, so there were other 14s as

10    well?

11         A      Oh, yes.

12         Q      I see.  So when your position was

13    surplused, they replaced four 12s with three 13s and

14    one 12?

15         A      When they promoted those people, that's

16    how they did it.  But when my position surplused -

17         Q      Wait, let's take it a step at a time.  I

18    just want to get a snapshot of this.

19                So before Ms. Kennedy was promoted to

20    14, this section headed by MR. Bendler had three 14s

21    -

22         A      Three 14s -

| | | |
|---|---|---|
| 1 | Q | - a 13 - |
| 2 | A | - one 13 - |
| 3 | Q | - and four 12s? |
| 4 | A | - and four 12s. |
| 5 | Q | And that was the professional core? |
| 6 | A | That was the professional core. |
| 7 | Q | Everybody else was support? |
| 8 | A | Well, that was it.  Our group was a |

small team of professionals.

| | | |
|---|---|---|
| 10 | Q | Okay.  So there was Bendler, a 15? |
| 11 | A | Right, equivalent. |
| 12 | Q | Equivalent to a 15?  So then you had |

three 14s, one 13 and four 12s?

| | | |
|---|---|---|
| 14 | A | Yes, sir. |
| 15 | Q | Then the next thing that happened was, |

you had four 13s and four 12 - four 14s and four

12s?

| | | |
|---|---|---|
| 18 | A | Yes. |
| 19 | Q | Then it went to four 14s, three 13s, and |

a 12?

| | | |
|---|---|---|
| 21 | A | Yes. |
| 22 | Q | And then - |

1          A     One of the 14s left.

2          Q     Then a 14 left?

3          A     Then a 14 left.

4          Q     So you had three 14s, three 13s, and a

5     12 that was set for elimination?

6          A     Yes.

7          Q     And then you became the only person in

8     that group not to get a raise?

9          A     Yes.

10         Q     And then you were the person that got

11    the lowest possible raise the next year?

12         A     Absolutely.

13         Q     The only person in the group?

14         A     Yes, the only person in the group.

15         Q     And then you left DOA entirely on a

16    competitive selection?

17         A     Yes, it was a limited -

18         Q     Yes, limited, but it was still

19    competitive, you had to apply?

20         A     I had to apply.

21         Q     And all this time I was the only

22    African-American in the group?

1          A     Yes, I was the only African-American.

2                MR. JONES: Objection, vague.  What

3     group?

4                MR. SHAPIRO: The section.

5                WITNESS: Management support section.

6                BY MR. SHAPIRO:

7          Q     And how about in MR. Sherman's group,

8     the branch?  How many African-Americans were there?

9          A     Maybe six.

10         Q     And any above the 12 level?

11         A     No.

12         Q     So all African-Americans, the ceiling

13    was 12?  Twelve was the highest an African-American

14    was in MR. Sherman's branch?

15         A     Yes.

16         Q     Ever?  So far as you knew?

17         A     Ever.  I was in that office from `96.

18    Ever ever.

19         Q     Now this question you were asked near

20    the end of the examination by counsel for the FDIC

21    about somebody trying to get you to take over his

22    assignment 10 minutes before he left on vacation.

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**

```
1                    Who was the person who tried to get -

2         A      David Lok.

3         Q      He was - at the time he was a 13?

4         A      Yes.

5         Q      And you never did figure out what that

6    assignment was fully, correct?

7         A      It was something related to credit

8    cards.

9         Q      And it was never assigned to you by the

10   management?

11        A      No.

12        Q      By your superior?

13        A      No.

14        Q      Right. Now this question, where you said

15   to David Lok, counsel said, MR. Lok says you said, I

16   need to call my lawyer?

17        A      I don't -

18        Q      Was MR. Lok your supervisor?

19        A      No.

20        Q      All right.

21               Now this question about MR. Jewel,

22   Daniel Jewel the investigator, you told him you
```

1    didn't want this witness looked into because she was

2    uncomfortable?

3        A    I didn't want - not just the witness,

4    that little section that I had written in my

5    complaint where it said, they were fishing for

6    information.  I decided to pull that.

7            He said, well, if you don't name the

8    person we can't go forward.  And I said, I'm not

9    going to name her, so you need to pull it.

10       Q    So then what did he do?  He looked

11   anyway?

12       A    In the draft - after my draft affidavit,

13   he wrote it down, and I asked him not to.  I can't

14   think word for word what he said, but it was

15   something like I said this woman, so and so and so.

16   But I thought that was most unprofessional of him,

17   when I said, just scrap it.  He shouldn't have

18   brought it up from that point forward, and certainly

19   MR. Bendler and MR. Sherman shouldn't have been out

20   looking to see who it was.

21       Q    And they were?

22       A    They responded to that question in their

```
 1    affidavits, when I had scrapped it.

 2          Q    So they must have gotten it from

 3    somebody other than your statement, because you

 4    didn't sign that statement?

 5          A    Right.

 6          Q    And the only person who would have known

 7    that would have been MR. Jewel?

 8          A    MR. Jewel.

 9          Q    MR. Jewel had once been a lawyer for the

10    FDIC?

11          A    Yes, and used to work for Ms. Keas.

12          Q    Um -

13          A    Who was named in my complaint.

14          Q    Just wanted to final get the line of

15    authority.  Your management, that is, people over

16    you when you were at DOA when this complaint arose,

17    Bendler was your immediate -

18          A    First line.

19          Q    It was his section?

20          A    His section.

21          Q    Then the branch was Sherman -

22          A    Paul Sherman.
```

**Brownfield v. Bair, 05-cv-2468-EGS**
**Exhibit 10**                                         158

1          Q      Then the division was -

2          A      Arleas Keas.  Because Sherman reported

3     to Bjorkland.

4          Q      Glen Bjorkland was the deputy to Arleas

5     Keas?

6          A      Deputy, yes.

7          Q      Okay.

8                 MR. SHAPIRO: Okay.   We're done.

9                 MR. JONES: Good.

10                MR. SHAPIRO: We'll read and sign.  We'd

11    like copies of the exhibits that follow the

12    transcript.

13                MR. JONES: Okay.

14                MR. SHAPIRO: And we also want a

15    miniscript.

16                (Signature not waived)

17                        (Whereupon at 2:20 p.m. the

18                        proceeding in the above-

19                        entitled matter was adjourned)

20

21

22

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 10

159

1

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com