IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - x
                                  :
PAMELA A. BROWNFIELD,             :
                                  :
              Plaintiff,          :
                                  :
       v.                         : Civil Action No.
                                  : 1:05-cv-02468-EGS
SHEILA C. BAIR,                   :
 Chairman,                        :
 Federal Deposit Insurance Corp., :
                                  :
              Defendant.          :
                                  :
- - - - - - - - - - - - - - - - - x


                          Washington, D.C.

                          Wednesday, March 14, 2007


Deposition of

               GERALDINE KITCHENS

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Rita M.

Hemphill, Notary Public in and for the District of

Columbia, in the offices of Swick and Shapiro, P.C.,

1225 Eye Street, Northwest, Suite 1290, Washington,

D.C., 20005, commencing at 2:15 p.m.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 2

APPEARANCES:


On Behalf of the Plaintiff:


        DAVID H. SHAPIRO, ESQ.

        SARAH L. RIGER, ESQ.

        Swick and Shapiro, P.C.

        1225 Eye Street, N.W., Suite 1290

        Washington, D.C.  20005



On Behalf of the Defendant:


        WILLIAM S. JONES, ESQ.

        Federal Deposit Insurance Corporation

        3501 Fairfax Drive

        Arlington, VA  22226



Also Present:


        Pamela Brownfield, Plaintiff

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 3

C O N T E N T S

EXAMINATION BY:                                                PAGE

        Counsel for Plaintiff                                    4

        Counsel for Defendant                                   88


FURTHER EXAMINATION BY:

        Counsel for Plaintiff                                   91



KITCHENS DEPOSITION EXHIBITS:

1 -  Packet of interview materials                              22

2 -  Interview talking points and ground rules                 27

3 -  Score sheet                                               36

4 -  Score sheet                                               57

5 -  Score sheet                                               62

6 -  Interview notes by G. Kitchens re V. Baker                67

7 -  Interview notes by G. Kitchens re H. Mattus               73

8 -  Interview notes by G. Kitchens of B. Bracely              74

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 4

1                    P R O C E E D I N G S

2    Whereupon,

3                         GERALDINE KITCHENS

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6                    REPORTER:  Please state your full name for

7    the record.

8                    THE WITNESS:  Geraldine Kitchens

9                      EXAMINATION BY COUNSEL FOR PLAINTIFF

10                   BY MR. SHAPIRO:

11       Q    Could you tell me your address, please,

12   ma'am.

13       A    14904 Ashford Place in Laurel, Maryland,

14   20707.

15                   REPORTER:  Spell the name of the street.

16                   THE WITNESS:  A-s-h-f-o-r-d.

17                   BY MR. SHAPIRO:

18       Q    And your telephone number there?

19       A    301-369-0171.

20       Q    You are African-American?

21       A    I am.

22       Q    And your age is?

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 5

1       A    62.

2       Q    I know it is a terrible question to ask a

3   woman.

4       A    I don't mind it.  I am proud of it.

5       Q    There you go.  I once heard a federal judge

6   tell Margaret Mead, the anthropologist, "Go on.  Tell

7   us your age.  You should be proud of it at your age."

8   She was the feistiest witness I ever saw in my life.  I

9   suppose if your name is going to figure prominently in

10   twentieth century history you can be feisty with

11   anybody I suppose.  This is before her fall from grace,

12   from academic grace.

13           Are you a college graduate, ma'am?

14       A    No, I am not.

15       Q    Did you go to college?

16       A    I did.

17       Q    Where did you go?

18       A    I went to University of Maryland College

19   Park.

20       Q    And about how much work did you get

21   completed?

22       A    I took several courses there and then I got a

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 6

1    paralegal certificate and that required about eight or

2    ten classes.

3        Q    At College Park?

4        A    At College Park, yes.

5        Q    And when did you get that paralegal

6    certificate?

7        A    Long ago.  In the seventies.  I think '79.

8    Somewhere like that.

9        Q    Okay.  And where did you grow up?

10       A    Lexington, Virginia.

11       Q    Lexington, Virginia?

12       A    Yes.

13       Q    Did you go to high school there?

14       A    Yes.

15       Q    Public high?

16       A    Yes.

17       Q    Which school?  What was the name of the

18   school?

19       A    Lylburn Downing High School.  And I should

20   spell that for you.

21       Q    Yes, you make me sorry I asked.

22       A    L-y-l-b-u-r-n second word is Downing,

Page 7

1    D-o-w-n-i-n-g.

2        Q    And when did you graduate from school?

3        A    1963.

4        Q    Now your employment.  You are currently

5    employed with the FDIC?

6        A    I am.

7        Q    And how long have you been employed?  Since

8    when?

9        A    I have -- I am on 43 years of government

10   service, federal government service.

11       Q    And all with the FDIC?

12       A    No.

13       Q    Okay.  Well, how long have you been with the

14   FDIC?

15       A    Since June of 1991.

16       Q    And what is your current job?

17       A    Special assistant to the director, Division

18   of Administration.

19       Q    And how long have you held that job?

20       A    Since 1999.

21       Q    Okay.  Now is that a 301 job series?  301

22   series?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 8

1      A    I don't know.

2      Q    Okay.  Do you know the job series that you

3   are in now?

4      A    I don't recall offhand.

5      Q    Okay.  What is your career field?  If you had

6   to tell me what your career field is --

7      A    Administration, human resources.

8      Q    Have you been in HR personnel work?

9      A    I haven't done personnel work, no, but the

10  Division of Administration has a human resources branch

11  so that comes under --

12     Q    Yes, I understand that, but you are not a

13  personnel management specialist.

14     A    No.

15     Q    Or labor relations specialist.

16     A    No.

17     Q    Or a position classification specialist?

18     A    No.

19     Q    Or a staffing -- any of those.

20     A    No.

21     Q    So your area would be general administration?

22     A    True.  Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 9

1      Q    And your current grade?

2      A    GS -- no, I'm sorry.  CG-14.

3      Q    How long have you been a 14?

4      A    I don't recall the exact time.

5      Q    Were you promoted in FDIC to a 14?

6      A    Yes.  Yes.

7      Q    And was it in the current job that you are in

8  now?

9      A    Yes.  Yes.

10     Q    So sometime between 1999 and now you got your

11  14.

12     A    Yes.

13     Q    Were you a CG-14 at the time you participated

14  in the interviews for the job at issue here?

15     A    Yes.

16     Q    Okay.  Now prior to '99, that is prior to

17  when you became special assistant director of DOA --

18     A    Yes.

19     Q    -- what was your job?

20     A    I was in the Office of Ombudsman and I was a

21  management analyst.

22     Q    And you were a CG-13 or a 12?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 10

1      A    Yes.  I was promoted to a -- I don't recall

2  if I was promoted to a 13 there or promoted to a 13

3  in --

4      Q    As a special assistant.

5      A    Yes.

6      Q    Well, let's think about this.  When you

7  became a special assistant, was there a pay increase

8  for you?  Was it -- because that would have been the

9  promotion, right?

10     A    But I don't recall when it was.  I have been

11 in this position so long now.  It seems that I started

12 out as a 13 and then got promoted to a 14 in that

13 position.

14     Q    Okay.  But I am asking you about your

15 previous position.  Were you a 13 in the previous job

16 at the ombudsman's office?

17     A    I am not certain whether I was a 12 or a 13.

18     Q    But in any case, you got promoted while you

19 were in the ombudsman's office?

20     A    I got promoted -- I don't know.

21     Q    How long were you in the ombudsman's office?

22     A    Maybe two or three years.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 11

1      Q     When you started at the ombudsman's office,

2    what was your grade?

3      A     A grade 12.

4      Q     So that would have been sometime in the

5    1990's, like 1996.

6      A     Yes, somewhere around there.  I don't --

7      Q     So '96 to '99.

8      A     Yes.

9      Q     Okay.  And you said you were a management

10   analyst.

11     A     Yes.

12     Q     That is not the same as general

13   administrative work, is it?  Or is it?  Was it general

14   administrative work that you were doing for the

15   ombudsman running the internal operations of the --

16   helping that along?

17     A     As a management analyst, I did do some of

18   that kind of stuff too, but I also did casework.  And

19   casework meant when clients called in with a concern, I

20   would help answer questions or make sure that they got

21   to the right place that they needed to get their

22   answer.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 12

1       Q    Which is what most of the people in the

2   ombudsman's office did.

3       A    Yes.

4       Q    That is the work of the ombudsman's office.

5       A    Yes.

6       Q    All right.  Okay.  And you did that for two

7   or three years, sometime in the late 1990's.

8       A    Yes.

9       Q    And can you tell us what you did before that?

10      A    I was in the legal division.

11      Q    At the FDIC.

12      A    At the FDIC.

13      Q    Okay.  And what was your job in the legal

14  division?

15      A    I was a paralegal.

16      Q    And for how long were you a paralegal in the

17  legal division?

18      A    From June of 1991 until the time I went to

19  the ombudsman's office.

20      Q    Which was sometime -- something like '96.

21      A    Somewhere, yes.

22      Q    Okay.  And what was your grade as a

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 13

1  paralegal?

2      A    Grade 11.

3      Q    Did you start as a grade 11?

4      A    I may have started as a grade 9 and got

5  promoted to a grade 11.

6      Q    And when you went to the ombudsman's office,

7  could you have gone as an 11 or did you get promoted to

8  a 12?

9      A    I got promoted to a 12.

10     Q    Okay.  Good.  And what -- were you assigned

11  to any particular part of the legal division?

12     A    Professional liability section first and then

13  I went to corporate affairs.

14     Q    Who did you work for?

15     A    In the professional liability section, I

16  worked for Arleas Upton Kea.  She was my first line

17  supervisor.

18     Q    She was a --

19     A    Senior counsel.

20     Q    And in corporate affairs?

21     A    I worked for Michelle Brozillo.

22     Q    All right.  Now why did you change from

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 14

1    professional liability under Ms. Upton Kea to corporate

2    affairs under Ms. Brozillo?

3        A    I went there on a detail.  I went to

4    corporate affairs on a detail.  And then I was selected

5    for a permanent position there.

6        Q    And was that a promotion?

7        A    It probably was not a promotion at that time.

8    I don't recall that it was.

9        Q    All right.  Why did you want to leave --

10       A    Well, I had done that for some time and it is

11   good to --

12       Q    Sure.  Absolutely.

13       A    -- expand your knowledge.

14       Q    Right.  Prior to that -- that was your first

15   job in the FDIC in the legal division?

16       A    It was.

17       Q    Okay.  And prior to the FDIC, I just know

18   that you had some government service.  So can you tell

19   me what your job was just before you came to the FDIC?

20       A    The U.S. Department of Labor.

21       Q    And what did you do at DOL?

22       A    I was a paralegal there.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 15

1     Q    Okay.  From when to when?

2     A    I don't recall.

3     Q    How many years did you spend there?  A

4    decade?  More?

5     A    I think I may have been -- maybe 20 years.

6     Q    And what was the grade that you had when you

7    left?

8     A    A grade 9.

9     Q    And when you started?

10    A    Probably a 5 or a 7.

11    Q    And were you a paralegal the whole time?

12    A    I was.  No, not at Labor.  I was a secretary.

13   Then I --

14    Q    Clerk typist or secretary?

15    A    It was called secretary.

16    Q    Secretary.

17    A    And then I got a paralegal.

18    Q    And did you complete your paralegal studies

19   when you were at Labor?

20    A    I did.

21    Q    Okay.  And prior to Labor?

22    A    I was at the FCC.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 16

1    Q    As a secretary?

2    A    Yes.

3    Q    How long were you at the FCC?

4    A    I don't know.

5    Q    More than five years?

6    A    Well, we can go back because I can tell you

7    the job before that, which was at a place called The

8    Foreign Claims Settlement Commission.  I started there

9    in '63 and then I went to FCC, but I do not recall how

10   long I worked at either place.

11   Q    And were you a secretary at both places?

12   A    I was.  Or clerk typist probably at The

13   Foreign Claims office.

14   Q    And you have 43 years in you say.

15   A    April 4th, 43 years.

16   Q    So you are working for less than 20 percent.

17   I tell you, I meet people like you occasionally and it

18   is amazing.  It is amazing.  My hat is off to you.  I

19   take it you are at CSRS.

20   A    I am.

21   Q    All right.  Now in your current job, you, I

22   take it, help run, help with the operation of DOA.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 17

1      A    I do.

2      Q    And you are an advisor or you are an

3  assistant to Ms. Upton Kea.

4      A    Yes.

5      Q    Okay.  Tell me about the sort of things you

6  do.  Sort of the system.

7      A    I respond to telephone calls.  I answer

8  questions that come into her.  I review incoming mail,

9  answer -- talk to people who want to talk to her and I

10  can get a feel for what they want and what they need.

11      Q    So you really are like a personal special

12  assistant.

13      A    Yes.

14      Q    And that has been your role right along?

15      A    Yes.

16      Q    Okay.  Now you served on an interview panel.

17      A    Yes.

18      Q    Now do I have the terminology right?  It is

19  an interview panel.  Not like the old selection panels,

20  right?

21      A    No, it is an interview panel.

22      Q    Right.  In the old days, you know, they used

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 18

1    to have these selection panels.  The panel would meet

2    and they would separate the people that were -- of the

3    eligibles, they would create a best qualified list.  Do

4    you recall that?

5        A    I never served on such a panel.

6        Q    Okay.  So you never did the old kind of

7    panel.

8        A    No.

9        Q    Okay.  But this is called an interview panel

10   and it comes because the people that are best qualified

11   are selected by an automated program, correct?

12       A    I don't know.

13       Q    You don't know.  All right.  How many

14   interview panels have you served on?

15       A    Three or four.

16       Q    Was this the first one?

17       A    No.

18       Q    So you had served on one before this.

19       A    I -- yes.

20       Q    Now the job of the interview panel in this

21   case, in the case of the CG-13 management analyst

22   positions in MSS, right?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 19

1      A    Is that what it was called in --

2      Q    Yes.  Management section.  It was the

3  management services section of the management services

4  branch, right?  Do you recall this at all?

5      A    Yes.

6      Q    All right.  Now in this particular selection,

7  how did you come to be on the panel?

8      A    As I recall, Dan Bendler asked me to be a

9  part of the panel.

10     Q    All right.  And did you have to check with

11  anybody before you agreed to serve?

12     A    No.

13     Q    Okay.  So it was just your call.

14     A    Yes.

15     Q    All right.  And you say you were on an

16  interview panel before this.

17     A    Yes.

18     Q    Yes.  For what kind of position?

19     A    It was either a management analyst position

20  or a secretarial position.  I don't recall which came

21  before.

22     Q    In other words, this might have been the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 20

1    first one.

2        A    No, I don't think this is the first one.

3        Q    I see.  So this would have been the third

4    one.

5        A    It could have been the second one.

6        Q    Okay.  I see.  But it wasn't the first one.

7        A    No.

8        Q    Okay.  Now Bendler asked you to serve and did

9    he give you -- at the time he asked you to serve, did

10   you agree right away?

11       A    I did.

12       Q    And did he give you any materials right then

13   and there?

14       A    No.

15       Q    Okay.  Did you get some materials?

16       A    Yes.

17       Q    Okay.  What did you get?

18       A    The interview questions.

19       Q    The interview questions.  Okay.  And who gave

20   you those?

21       A    Most likely Dan.

22       Q    Well, you don't recall who gave them to you I

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 21

1    take it.  You are just now speculating.

2        A    True.

3        Q    Okay.  I want you to think back.  If you can.

4     If you can't remember --

5        A    Okay.

6        Q    -- just say I can't remember who gave them to

7     you and then tell me that you can't -- it was most

8     likely Dan.

9        A    Okay.

10       Q    If you can't remember.

11       A    Okay.

12       Q    But I want you to take a moment and think

13    back.  Sometimes when we do that, we actually can

14    remember.  So think back to this particular selection.

15     Who handed you those questions?  Who got them to you?

16       A    I don't recall.

17       Q    Okay.  Do you recall actually getting them

18    physically or did they come electronically to you?

19       A    Physically.

20       Q    Physically.  And could it be that somebody

21    just dropped them by and left them for you in an

22    envelope.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 22

1    A    No.

2    Q    Somebody actually handed them to you.

3    A    Yes.

4    Q    And you think it might have been Dan.

5    A    Yes.

6    Q    But you don't have a recollection of it.

7    A    Yes.  True.

8    Q    Okay.  And these questions I want to show you

9    just so we can -- let's have this marked.  Let's just

10   have you look at this.

11                  (Kitchens Deposition Exhibit 1 was

12                  marked for identification.)

13              BY MR. SHAPIRO:

14   Q    What I am showing you is a blank of something

15   called structured interview documentation and it seems

16   to be for the job that we are talking about.  If you

17   look at the top, is that the job?

18   A    I don't recall these numbers.  So --

19   Q    Well, look at the job itself.  It is a

20   management analyst 13, right?

21   A    Yes.

22   Q    And it is in MSS, right?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 23

1       A    Where is MSS?

2       Q    Well, let me see the document and maybe we

3    can shortstop this.  Okay.  Let's just -- let me just

4    ask you this.  There are five questions listed here.

5    Do you see that?

6       A    Yes.

7       Q    And after each question, there is a place for

8    notes to be -- after each question that is listed,

9    there is something called benchmarks.

10      A    Yes.

11      Q    Which are the things that you are supposed to

12   judge in the answer, in the response.

13      A    Yes.

14      Q    Right?

15      A    Yes.

16      Q    And if you will look, I think you will see

17   that there is this pattern of question, then benchmark,

18   then a place to put -- a blank place to put notes for

19   the -- on your notes, the interviewer's notes of the

20   response, correct?

21      A    Yes.

22      Q    And if you go further, then there is going to

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 24

1    be a place to write in any clarifying questions, right?

2        A    Yes.

3        Q    And then a place for the clarifying -- a

4    blank for your notes for the clarifying response.

5        A    Yes.

6        Q    Right?  And then a place where there is an

7    adjustable rating of outstanding -- a place for a

8    checkmark.  Outstanding or good or inadequate, right?

9        A    Yes.

10       Q    And then there is another blank space to

11   presumably write down why, for the interviewer to write

12   down why.  Any explanatory notes that they want to

13   make.

14            MR. JONES:  Objection.

15            THE WITNESS:  Well, I don't know what that

16   blank space is for.

17            BY MR. SHAPIRO:

18       Q    You don't know what that blank space is, but

19   there is a blank space right under the checkmarks.

20       A    There is.

21       Q    Unexplained.  Okay.  And then go -- turn the

22   page and then there is a question number 2, right?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 25

1  A  Yes.

2  Q  With benchmarks listed.

3  A  Mm-hmm.

4  Q  In this case, there is an A, B, C and D,

5 right?

6  A  Yes.

7  Q  And then there is a blank space for the

8 response, right?

9  A  Yes.

10  Q  Then there is another blank space -- next

11 page -- which is for any clarifying questions to be

12 listed, that is, questions that the panelists -- the

13 interviewers asked.

14  A  Yes.

15  Q  A place for the response to any clarifying

16 questions.

17  A  Yes.

18  Q  And again, there is that place to put a

19 checkmark of the -- how the person did.

20  A  Yes.

21  Q  Outstanding, good or inadequate.

22  A  Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 26

1      Q     And then there is this unspecified blank

2  space.

3      A     There is.

4      Q     And if you look through that, please, you

5  will see question 3 with the same pattern as we have

6  just described.

7      A     Mm-hmm.

8      Q     And question 4 with the same pattern.  Right?

9      A     Yes.

10      Q     And question 5 with the same pattern?

11      A     Yes.

12      Q     Okay.  And that is it.  And okay.  Good.

13  Let's put this aside.  Is that what you got when you

14  said you got the question?

15      A     Yes.

16      Q     And this looks like the one for that

17  particular job, doesn't it?

18      A     It does.

19      Q     Okay.  Now did you also get interview talking

20  points, like the ground rules for the interview?

21      A     Yes.

22      Q     Okay.  I want to show you one of those.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 27

1          (Kitchens Deposition Exhibit 2 was

2          marked for identification.)

3     BY MR. SHAPIRO:

4     Q    Now this looks like something that you would

5  read or give to the person being interviewed.  Read to

6  or give to the person being interviewed.  Right?

7     A    Right.  Yes.

8     Q    And this looks like the talking points that

9  you were given --

10    A    Yes.

11    Q    -- for this interview, right?

12    A    Yes.

13    Q    Now it says "Talking Points, The Ground

14  Rules."  So it seems like somebody read these to the

15  interviewees as they -- before they were interviewed.

16    A    Yes.

17    Q    Is that what happened in this particular

18  case?

19    A    I don't remember.

20    Q    Okay.  But that is what is supposed to happen

21  in the structured interview?

22    A    It has happened in the interview.  I suppose

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 28

1   so.

2        Q    Okay.  But you don't recall what happened in

3   this particular case.

4        A    I don't.

5        Q    With regard to these interviews.

6        A    I don't.

7        Q    All right.  Okay.  Now when Dan Bendler asked

8   you to be in part of the structured interview panel,

9   right, did he tell you how many other people were going

10  to be on the panel?

11       A    I knew there would be three.

12       Q    Is that the pattern at the FDIC, the

13  structured interview, three panelists?

14       A    There may be times when it is more, but I do

15  know that it will be three.  I don't know if they

16  are --

17       Q    How did you know that there would be three on

18  this one or did he tell you there would be three?

19       A    He may have.  I recall that I knew it was

20  three, but I don't recall whether it was Dan who told

21  me.

22       Q    Did Dan tell you who the other panelists

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 29

1   would be?

2       A   At some point.  Not when he first asked me to

3   be on the panel.

4       Q   Okay.  And did you know the other panelists?

5       A   I did not know Mary Carmichael, but I knew

6   who Rick was.  I didn't know him, but I knew who he

7   was.

8       Q   Okay.  You knew who he was.

9       A   Yes.

10      Q   But you didn't know him.

11      A   Right.

12      Q   But you didn't even know who Mary Carmichael

13  was.

14      A   No.

15      Q   And did there come a time when you met with

16  the panel, your other panelists, in other words, the

17  panelists met together?

18      A   At the time of the interview, just before the

19  interview.

20      Q   So you didn't meet before that.

21      A   No.

22      Q   So when you got the interview, the interview

Page 30

1    talking points, the ground rules and the blank of the

2    structured interview documentation in blank, in other

3    words, Exhibit 1 and Exhibit 2 together, you weren't

4    with your co-panelists.  You just got them in your

5    office.

6         A    Yes.

7         Q    Okay.  And then is it your testimony, I just

8    want to make sure, that just before the first

9    interview, that is when the panelists all got together?

10        A    Yes.

11        Q    Okay.  And did you decide -- was Dan with you

12   when you got together?

13        A    I don't recall.

14        Q    Okay.  But you do recall that was the first

15   meeting.

16        A    Yes.

17        Q    Okay.  And at that first meeting, I take it

18   you decided how you were going to actually physically,

19   logistically do this.

20        A    Yes.

21        Q    Who was going to read what.

22        A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 31

1    Q    And that sort of thing.

2    A    Yes.

3    Q    All right.  And did you read the -- did you

4  do any of the reading of the ground rules?

5    A    We may have divided it.  I don't recall.

6    Q    Okay.  Now the questions.  You notice on the

7  form, Exhibit 1 that we were looking at before, there

8  is five questions and then under each question is these

9  benchmarks.  What was read to the interviewee, the

10  person being interviewed?

11    A    The question.

12    Q    Not the benchmarks.

13    A    No.

14    Q    The benchmarks were to be used -- that is

15  like what you could expect from a good answer.

16    A    Yes.

17    Q    All right.  And you, as a rater, an

18  interviewer, was supposed to use that benchmark to --

19  against which you were rating what the interviewee, the

20  person being interviewed, was saying.

21    A    Yes.

22    Q    Okay.  But you didn't disclose what the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 32

1    benchmarks were.

2        A    No.

3        Q    Okay.  Now did you actually -- were you one

4    of the people or were the person who asked the

5    questions, actually verbalized the questions to the

6    interviewees?

7        A    At some point.  We divided that also.

8        Q    All right.  Let's suppose you had question

9    number 2 to read.  All right.  Would you always read

10   question number 2 to each person being interviewed?

11       A    No.

12       Q    So you shifted it around.

13       A    Yes.

14       Q    But it was only reading the question.  You

15   wouldn't give like explanations of the questions or

16   anything.  You would just read the question, correct?

17       A    Yes.

18       Q    So ever interviewee in this selection got

19   read the same selections --

20       A    Yes.

21       Q    -- in the same order.

22       A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 33

1      Q     You would read a question and the interviewee

2    would answer it, then you would go on to the next

3    question.

4      A     Yes.

5      Q     All right.  And it may be that different

6    people read the different questions to each

7    interviewer.  It was only questions that were -- it was

8    only these questions that were read.

9      A     Yes.

10     Q     Were there any -- now I want you to think

11   back.  This is important.  Think back to this

12   particular panel.  I know that is difficult because you

13   have served on several panels.  Were there any

14   follow-up questions asked by anybody, any of the

15   interviewers?

16     A     At any of the interviews?  Not just this one?

17   Any --

18     Q     No.  In any --

19     A     Oh.

20     Q     In this selection, this interview panel, as

21   it were, were there any follow-up questions that were

22   asked that you can recall?

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 34

1      A    I don't remember.

2      Q    Okay.  And then I take it what you would do

3   is as the interviewee was answering -- giving a

4   response to a question, you would write down in the

5   note area what they said.  Your notes of what they were

6   saying.

7      A    Yes.

8      Q    And your colleagues did the same.

9      A    Yes.

10     Q    You weren't required to write notes, were

11  you?  I mean, there is a place for them, but you

12  weren't required to, were you?

13     A    I don't recall anybody saying you have to

14  take notes.

15     Q    Did anybody brief you on how you are supposed

16  to do a structured interview?

17     A    Yes.

18     Q    Who?

19     A    There had been, what was it, online training

20  or something sent out about --

21     Q    Not for this particular selection, but

22  generally when the corporation --

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 35

1      A    Yes.

2      Q    -- went to --

3      A    Went to --

4      Q    -- structured interviews.

5      A    Yes.  Yes.

6      Q    Now so you met.  All right.  The only thing

7    you had been given in advance of the first interview

8    was these two documents?

9      A    No.  We had the applications.

10     Q    You did have the applications.

11     A    Yes.

12     Q    All right.  Did you read the applications?

13     A    Yes.

14     Q    Well, okay.  And you read the applications

15   for each candidate.

16     A    Mm-hmm.

17     Q    Each candidate together before you ever got

18   to interview any of them?

19     A    No.  Wait a minute.  Now that I am thinking

20   about it because we did have applications -- maybe --

21     Q    Well, I want memory now.

22     A    Yes.  Wait a minute.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 36

1      Q    I don't want you to speculate.

2      A    Wait a minute.

3      Q    Go ahead.

4      A    Wait.  Let me think.  We must have been given

5    the application in advance.

6      Q    Okay.  Are you sure you had the applications?

7      A    Yes.

8      Q    You are?

9      A    Yes.

10     Q    All right.  The reason why I ask that is

11   oddly enough -- I want to show you another document

12   here.  Here you go, ma'am.

13             (Kitchens Deposition Exhibit 3 was

14              marked for identification.)

15        BY MR. SHAPIRO:

16     Q    Now do you recognize this?

17     A    Yes.

18     Q    Okay.  Now I take it that this is a

19   spreadsheet that gives the question by question rating

20   of the panel for each of the candidates for each of the

21   five questions and it does it with the arithmetic

22   weighting factors weighted in, utilized, and then it

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 37

1    gives a total score for each candidate.

2         A    Yes.

3         Q    Okay.  So this document was created as based

4    on what the panel did.

5         A    Yes.

6         Q    Is this the only -- is this what the panel,

7    the result of the panel produced?  In other words, this

8    is the panel's recommendation, right?  This summarizes

9    the panel's work completely, doesn't it?

10        A    I assume so.

11        Q    Well, let's not assume.  You were asked to do

12   an interview of each candidate.

13        A    Yes.

14        Q    And to rate the candidates' answers,

15   responses, to the interview questions, right?

16        A    Yes.

17        Q    Against the benchmarks that were given to

18   you.

19        A    Yes.

20        Q    All right.  And this is the result, isn't it?

21        A    Yes.

22        Q    Okay.  Do you know who produced this result,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 38

1    who actually put the panel's results into this format?

2        A    Dan Bendler.

3        Q    Dan Bendler did.

4        A    Yes.

5        Q    Okay.  And how did you give your results to

6    Dan Bendler, your -- did you give the panel's results

7    or your results?

8        A    The panel's results.

9        Q    Okay.  So the panel talked about it and came

10   up with a composite score.

11       A    Yes.

12       Q    All right.  For each candidate, for each

13   question.

14       A    I don't know that we came up with a score.

15       Q    Well, a rate, a numeric rating, correct?

16       A    Yes.

17       Q    Right?

18       A    Okay.

19       Q    You do recall that.

20       A    Yes.

21       Q    Okay.  And the only thing you were asked to

22   do was to rate each interviewee's response to each of

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 39

1    the five questions, right?

2        A    Yes.

3        Q    And you were to apply this weighted factor.

4    Like question 1 was weighted 1.5, question 2 was

5    weighted 2 and the others were just even, right?

6        A    I don't know anything about these weighted.

7        Q    Weighted.

8        A    The weighted factors.

9        Q    You don't remember that.

10       A    No, I don't.

11       Q    Okay.  All right.  But the notes on this,

12   this is all -- it looks like it is all based on -- it

13   is a rating of the responses to these -- the specific

14   questions in the interview, right?

15       A    Yes.

16       Q    Was the panel to do anything else?  Was there

17   a document where you were supposed to rate the

18   candidates on their applications?

19       A    No.

20       Q    Review their applications and rate?

21       A    No.

22       Q    You were only to do the interview.

Page 40

1      A    Yes.

2      Q    Okay.  So what you rated and then what you

3    discussed with your fellow panelists to come up with a

4    composite score, right, for each candidate for each

5    question, was based on their response to the specific

6    question asked.

7      A    Yes.

8      Q    Now all right.  Good.  Now I want to ask a

9    question about the way this was done.  I want you to

10   think back to the day of the first interview.  You met

11   with the panel to organize yourself a few minutes

12   before the first interview, correct?

13     A    Yes.

14     Q    Who was going to ask what question, who was

15   going to read that introduction.  Right?

16     A    Yes.

17     Q    All right.  And then you went right to the

18   interviews, right?

19     A    Yes.

20     Q    And the first question -- the introduction

21   was read and the first question was asked and you took

22   notes on the answer.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 41

1      A    Yes.

2      Q    All right.  And then the second question was

3  asked and you took notes on the answer.

4      A    Yes.

5      Q    And the third question and so on through the

6  five questions, correct?

7      A    Yes.

8      Q    Now did you stop to actually do a rating of

9  each question as the questions were finished -- as the

10  answers were finished for each question separately or

11  did you wait for the end of the interview to make your

12  judgments?

13      A    The way I did it --

14      Q    Yes.

15      A    -- as I recall, after the candidate finished

16  their question --

17      Q    An answer.  A single --

18      A    Finished their answer --

19      Q    To a single question.

20      A    Yes.  I provided the --

21      Q    You checked them off.

22      A    I checked it.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 42

1        Q     Okay.  And then you went on to the next

2    question.

3        A     Yes.

4        Q     All right.  And then you did the same thing

5    with that question.

6        A     Yes.

7        Q     Now at the end of a candidate's interview, in

8    other words, all five questions are answered, done.

9    The candidate leaves the room, right?

10       A     Yes.

11       Q     At that point, did the panel discuss what

12   they rated and come up with a composite --

13       A     At that point --

14       Q     -- for that candidate?  Yes.

15       A     When you say come up with a composite,

16   what --

17       Q     Well, I mean, one single rating, outstanding,

18   good, unsatisfactory or -- you see the rating factors

19   in Exhibit 1, the checkmarks.  There is inadequate,

20   good and outstanding.  You would check the mark -- as I

21   understand your answer -- let's make sure I understand.

22    You would -- as soon as the candidate finished the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

1    answer responding to a question, you would check

2    outstanding, good or inadequate.

3        A    Yes.

4        Q    Now at the close of the interview, the fifth

5    question is responded to, the candidate gets up and

6    leaves.

7        A    Mm-hmm.

8        Q    At that point, did you and the other panelist

9    discuss the candidate?

10       A    Yes.

11       Q    And is it at that point that you came up

12   with -- because if you will look at the rating sheet,

13   it is not separate ratings for each person.  It is one

14   rating by the panel for each question for each person.

15       A    Right.

16       Q    So you must have -- because sometimes, I take

17   it, you had an outstanding and somebody else had good.

18       A    Yes.  Some had good.

19       Q    Right.  Different ratings for different

20   questions.

21       A    Yes.

22       Q    For the same candidate.

Brownfield v. Bair, 05-cv-2468-EGS

Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 44

1          A    Yes.

2          Q    So you would have had to have come up with

3     what I just called the composite.  It is not really a

4     composite.  It is kind of like an agreed to score where

5     everybody agrees that it should be good or outstanding.

6          A    Yes.

7          Q    Was that done after each candidate left their

8     interview?

9          A    Yes.

10         Q    His or her interview, right?

11         A    Yes.

12         Q    Right.  And then you would come up with a

13    composite score and write it down.

14         A    Yes.

15         Q    Now you obviously didn't have this form yet

16    because this form was created later, right?

17         A    I have never had this form.

18         Q    You never saw this before.

19         A    Yes, I saw it, but I did not fill it out.

20         Q    Right.  You just -- somebody just made a note

21    of what the score would be for question 3 for candidate

22    A, right?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 45

1      A    Yes.

2      Q    And you would talk about it and you would

3  get -- come up with one score that the whole panel

4  would agree to.

5      A    Yes.

6      Q    And that was done for each interviewee after

7  their interview.

8      A    Yes.

9      Q    All right.  And you were comparing each

10  interviewee's answer to each question based on the

11  benchmarks.

12      A    Yes.

13      Q    Not with each other.

14      A    Right.

15      Q    All right.

16      A    The benchmarks.

17      Q    And you would come up with the score, the

18  panel's score, for each interviewee's answer to each

19  question after that interviewee was finished.

20      A    Yes.

21      Q    Okay.  So if you -- do you recall how many

22  interviews you had, how many days it was that you

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 46

1    interviewed?

2           MR. JONES:  Which question do you want her to

3    answer?

4           BY MR. SHAPIRO:

5       Q    How many days did it take you to do all the

6    interviews?

7       A    I don't remember.

8       Q    Okay.  Did you more in a day than one?

9       A    Yes.

10      Q    Okay.  So there was one day where you would

11   do two or three interviews.

12      A    Yes.

13      Q    And then another day where you did two or

14   three interviews.

15      A    I don't recall because I know we did at least

16   two days.

17      Q    Okay.  You did at least two days and it was

18   one interview after another?

19      A    Yes.

20      Q    Okay.

21      A    Except for the last day.  There was only one

22   interview on the last day.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 47

1      Q    So there was two days of interviews and then

2   there was a third day with one interview?

3      A    I don't know.  I know there was -- it could

4   have been the second day with one interview.

5      Q    Okay.  Were there two days in a row?

6      A    No.

7      Q    Okay.  There was a hiatus.

8      A    Yes.

9      Q    Okay.  So let's talk about the way this

10  worked.  I am just talking about the mechanics now.

11  Okay.  So you rated each candidate.  You discussed --

12  you had a discussion with your colleagues on the panel.

13     A    Yes.

14     Q    And you came up with a single score for each

15  question for the candidate.

16     A    When you say score, do you mean number?

17     Q    No.  I mean, outstanding, good, or --

18     A    Yes.

19     Q    -- insufficient or whatever that is.

20     A    Yes.

21     Q    Inadequate.

22     A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 48

1      Q    Okay.  But one for each question for each

2  candidate.

3      A    Yes.

4      Q    And you did that after each candidate was

5  done.

6      A    Yes.

7      Q    For that candidate.

8      A    Yes.

9      Q    Okay.  Good.  Sometimes you changed the score

10  you would have given --

11      A    Yes.

12      Q    -- after the discussion with your colleagues.

13      A    No.  I did not change the score that I had

14  given.  As I recall, sometimes like -- if I had an

15  outstanding and the other two had good, then that

16  became a good.

17      Q    I see.  So you wouldn't have changed your

18  opinion.  It was just that they -- you harmonized by

19  taking the majority view.

20      A    Yes.

21      Q    Now was it -- I take it there was never a

22  time when one had outstanding, one had good and one had

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 49

1    inadequate.  One each.  You can't recall that.

2        A    I don't recall that.

3        Q    So it was always two to one.  If there was a

4    dispute at all, it was two to one and you just went

5    with -- the panel just went with whatever the majority

6    was.

7        A    Yes.

8        Q    Okay.  Good.  So it wasn't really a question

9    of a discussion so much as just seeing where the

10   majority lie.

11       A    I don't think that is true.

12       Q    Okay.  Well, you said they just -- it wasn't

13   so much that you gave up your view, a panelist would

14   have to give up their view.  It is just that you went

15   with the majority.  There were two goods and one

16   outstanding.

17       A    I mean, we would ask questions.

18       Q    Ask questions of?

19       A    Of the panel.  You know --

20       Q    Of each other.

21       A    -- of each other, yes.

22       Q    "Well, why did you say outstanding?  I mean,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 50

1    what was outstanding about that."

2        A    Yes.

3        Q    But in the end, it was a simple majority

4    thing.  If two people had good and one person had

5    outstanding, it was good.

6            MR. JONES:  Objection.

7            BY MR. SHAPIRO:

8        Q    Is that what you are saying or not?

9            MR. JONES:  Misstates what she just said.

10           BY MR. SHAPIRO:

11       Q    I am asking.  I wasn't there.  You were.  I

12   am just trying to get an understanding.  I don't care

13   which one it was.  I just want to know which one it was

14   if it was -- if you can recall.

15       A    What is your question?

16       Q    My question is, if two people were -- I know

17   there was a discussion.  You said you discussed well,

18   how can you put down outstanding and what was it that

19   made it outstanding in your mind like that.  But in the

20   end, if there were two goods and one outstanding, then

21   the panel would agree that it would be good.

22       A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 51

1      Q    Okay.  No matter what the discussion was or

2    the reasons.

3      A    Yes.

4      Q    Okay.  Good.  All right.  Now how did you,

5    meaning the panel, not you personally -- maybe you

6    personally too, but I am talking -- how did you deliver

7    the scores to Dan, the scores of the whole, all the

8    candidates and all the questions?  How did you deliver

9    your -- the panel's view?

10     A    I don't remember.

11     Q    You don't remember.  Okay.  Now looking at

12    the names on the score sheet on Exhibit 3, those are

13    all the candidates that you interviewed, correct, for

14    this particular vacancy.

15     A    Yes.

16     Q    Now did you know any of them before, before

17    you met them at the interview?

18     A    Yes.

19     Q    Who did you know?

20     A    I knew Valeria Baker, Brent Bracely, William

21    Gately, David Lok and Pamela Brownfield.

22     Q    Okay.  Did you know Ms. Mattus?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 52

1    A    Oh, Holly.

2    Q    Holly Mattus.  You knew her too.  Yes?

3    A    I am trying to think.  Yes, I knew Holly.

4    Q    So you just didn't know Almalita Robertson?

5    A    I didn't know her.

6    Q    Yes, but you knew everybody else.

7    A    Yes.

8    Q    Okay.  You knew them from your work in DOA.

9    A    Yes.

10   Q    Okay.  Now you see the scoring, the little

11   box right in the middle of the thing?  It says O-3,

12   G-2, I-0.

13   A    Yes.

14   Q    Do you know what those stand for, O, G and I?

15   A    Yes.

16   Q    What are they?

17   A    Outstanding, good, inadequate.

18   Q    Okay.  And these are -- is it your

19   understanding that these numbers next to each one is

20   the numeric score for the purposes of translating the

21   scores?  Do you see the column for question one?  There

22   is two columns on question one.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 53

1      A    Okay.  What are we looking at?

2      Q    On 3.  The score sheet.  Yes.  Look at the

3   columns.  The first says, "Order of interview."

4      A    Okay.

5      Q    And the next column is "Name."

6      A    Yes.

7      Q    Then there is two columns for each question.

8    See, question 1 has two columns.  One column has a

9   letter in it.

10     A    Yes.

11     Q    A G, an O or in some -- maybe in some cases

12   an I.  All right.  And the next column has a number.

13     A    Yes.

14     Q    Okay.  But it is all under question 1.

15     A    Yes.

16     Q    And then question 2 has the similar two

17   columns.  Right?  You see that?

18     A    Yes, I see that.

19     Q    Now at the top, before we get into the

20   columns, there is a line that says, "Weighted factors."

21    Do you see that?

22     A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 54

1    Q    And then on top of each -- of the question

2    columns there is a number, 1.5 under 1, 2 under 2 and

3    then 1, 1, 1, under 3, 4, and 5.

4    A    Yes.

5    Q    This is the weighted factors for each

6    question.

7    A    Yes.

8    Q    For each answer, correct?

9    A    Yes.

10    Q    Okay.  Now so look at Holly Mattus, the first

11    person.  Does this mean she was the first person

12    interviewed?

13    A    Yes.

14    Q    Okay.  So Holly Mattus, the first person

15    interviewed, she received an O, outstanding for

16    question number 1, and because an O equals 3 on the

17    chart, then if you multiply 3 times the weighted factor

18    of 1.5, you get a 4.5, correct?

19    A    Okay.

20    Q    Do you see that?

21    A    Yes, I see that.

22    Q    And you see how it goes the same way.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 55

1    Ms. Mattus, for example, got an O, outstanding, in

2    question 2.  The weighted factor for question 2 is 2.

3    So you multiply 3, which is for O, for outstanding --

4         A    Yes.

5         Q    -- by 2 and you get 6 and that is exactly the

6    number that is in there.  Do you see that?

7         A    I do.

8         Q    Okay.  Did you deal with these weighted

9    factors?

10        A    I did not.

11        Q    You did not.  Somebody else did that.

12        A    Yes.

13        Q    Did you see this chart before you finished

14   your work as a panelist?

15        A    No.

16        Q    Okay.  Now did you, as a panel, not as a

17   panelist, but as a panel, recommend how many people be

18   interviewed further, move on to the next step?

19        A    I don't recall.

20        Q    You don't recall.  How many positions -- did

21   you know how many positions were actually going to be

22   filled, how many vacant positions were going to be

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

1    filled through this process at the time you sat on the

2    panel?

3         A    I don't recall.

4         Q    Well, could it have been one position?

5         A    I don't remember.

6         Q    You don't remember.  You don't remember or

7    you didn't know how many positions?  Different

8    question.  You understand?  Remember says -- not

9    remembering is, you know, I am sure I knew at the time,

10   but I don't remember now and now knowing means, you

11   know, I don't know how many vacancies there were going

12   to be.

13        A    I don't remember.

14        Q    Okay.  So you think you knew how many

15   vacancies --

16        A    I could have known.

17        Q    So you don't recall whether you knew or not.

18        A    Right.

19        Q    Okay.  Good.  Good.  I am just looking for

20   information, not trying to confuse.

21        A    That is okay.

22        Q    In fact, I am trying to not confuse, to get

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 57

1    an adequate -- an accurate picture as best I can.  All

2    right.  So all right.  Now I want to show you a couple

3    of other documents.

4                (Kitchens Deposition Exhibit 4 was

5                marked for identification.)

6            BY MR. SHAPIRO:

7        Q    Now here is Number 4.  Now this looks like a

8    lot like the chart that we looked at above except that

9    it has a couple of things not there.  Okay.  It had a

10   couple of things there that are not there in the first

11   chart.  You see that last box, the lowest one on the

12   page.  It says, "Recommendation."

13       A    Yes.

14       Q    Now in the first chart, Exhibit 3, there is

15   no such box, is there?

16       A    No.

17       Q    All right.  But -- so this is new in 4,

18   correct?  It is different.

19       A    Yes.

20       Q    It is different from 3.

21       A    Yes.

22       Q    Okay.  But the other three boxes that are in

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 58

1    Exhibit 3 are also in 4, correct, at least by title.

2         A    Yes.

3         Q    However, there is a difference here, isn't

4    there, in the boxes.  Can you see a difference?

5         A    In this box --

6         Q    Exhibit 4.

7         A    Yes.  Exhibit 4, Pam is not on this sheet.

8         Q    Okay.  So in Exhibit 3, there are all the

9    candidates.

10        A    Yes.

11        Q    In Exhibit 4, there is only six, not seven,

12   and the one that is not there is the last interview,

13   Pam Brownfield, correct?

14        A    Yes.

15        Q    But everything else is here.  All the

16   ratings, all the composite scores for the six

17   candidates are identical in Exhibit 4 as in Exhibit 3,

18   correct?

19        A    Yes.

20        Q    Okay.  But Pam Brownfield is simply not

21   mentioned at all.  She is not rated, she is not

22   mentioned as an interviewee at all in Exhibit 4,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 59

1    correct?

2        A    Correct.

3        Q    Okay.  Now who -- was Pam the last interview?

4        A    Yes.

5        Q    Was she interviewed right after the fifth

6    interview?

7        A    No.

8        Q    The next day after the -- I'm sorry, the

9    sixth interview?

10       A    No.

11       Q    The next day after the sixth interview?

12       A    No.

13       Q    There was a hiatus.

14       A    Yes.

15       Q    And she was interviewed on a different date

16   separately.

17       A    Yes.

18       Q    A couple of weeks later?

19       A    I don't think it was a couple of weeks.  I

20   don't recall.  I don't know.

21       Q    You don't know.

22       A    I don't remember.

Page 60

1     Q     Okay.  You don't remember.

2     A     I know it was later.

3     Q     It could have been a couple of weeks.

4     A     It may have been.

5     Q     Okay.  Good.  But the same panel interviewed

6  Pam as interviewed everybody else.

7     A     Yes.

8     Q     All right.  It was just at a later time.

9     A     Yes.

10    Q     Now you think -- you told me before that Dan

11 made these things up, made these documents up, made

12 these spreadsheets up.

13    A     Prepared these spreadsheets.

14    Q     Yes, prepared the spreadsheets.

15    A     Yes.

16    Q     But he used the panel scores.

17    A     Yes.

18    Q     Okay.  You never saw these spreadsheets

19 before you concluded your work on the panel.

20    A     No.

21    Q     I am correct?

22    A     Correct.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 61

1    Q    Okay.  Now the first spread -- Exhibit

2    Number 4 that doesn't have Pam in it has a

3    recommendation.  It says, "The interview members

4    recommend that the first and second ranked individuals

5    be advanced to the second round of interviews."  Did

6    you ever recommend that?

7    A    I don't recall.

8    Q    You don't recall the recommendation.

9    Certainly the last sheet, the one that is later in

10   time, number 3, which has Pam included, doesn't have

11   that recommendation on it, does it?

12   A    No, it doesn't.

13   Q    Okay.  And the -- in the Exhibit Number 3,

14   which has all the candidates rated, the first and

15   second rankings, the first and second lines, right,

16   they include just three people, correct?

17   A    Yes.

18   Q    Right.  And in Exhibit 4, the first and

19   second include four people, correct?

20   A    Yes.

21   Q    Okay.  Good.  Now I just have one more

22   document I would like to look at that is a chart.  I am

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 62

1    getting tired of charts myself.  They give me a

2    headache.  So let me -- let's get on with it and get to

3    this chart.  Okay.

4                    (Kitchens Deposition Exhibit 5 was

5                    marked for identification.)

6            BY MR. SHAPIRO:

7        Q    Now let's look at 5 and let's keep it -- keep

8    all three of these charts out so we can look at them

9    together.  Now this chart has everyone on it, right,

10   all the interviewees?

11       A    Number 5.

12       Q    All seven.  Number 5, yes.  It has all seven,

13   right?

14       A    Yes.

15       Q    Including Ms. Brownfield.  And it has the

16   same second box, the box below it, you see what the

17   candidates ranked?

18       A    Yes.

19       Q    It appears to have the same exact -- it

20   appears to have a different ranking.  You see?  In

21   other words, in one, number 3, there are four -- or

22   sorry, five rank orders and the one we are looking at

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 63

1    now there are only four rank orders.  Do you see that?

2     In the second box, the box below.

3        A    The box.

4        Q    Here we have four ranks, right?

5        A    Yes.

6        Q    Some of them have more than one person, but

7    there is only four.

8        A    Yes.

9        Q    But in 3, which also has all the candidates,

10   there were five ranks.

11       A    Yes.

12       Q    Correct?

13       A    Yes.

14       Q    Five separate rankings.

15       A    Yes.

16       Q    The little box with what O and G equate to

17   numerically is the same in both, right?

18       A    Yes.

19       Q    But in 3, where we didn't have a

20   recommendation box, now we have a recommendation box in

21   5 and that recommendation box says, "The interview

22   members recommend that the first and second ranked

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 64

1    individuals be advanced to the second round of

2    interviews."  It is the same words, but it relates to a

3    box that is separate and different, right?  They are

4    broken down differently in the two.

5         A    Yes.

6         Q    But it is the same words in the

7    recommendation.

8         A    Yes.

9         Q    You don't recall making any such

10   recommendation, do you?

11        A    I don't recall whether I did or not.

12        Q    Right.  You don't recall that the panel did

13   or not.

14        A    I don't recall.

15        Q    Okay.  I understand.  All right.  Now in

16   Exhibit 5, there is also handwriting, an annotation,

17   what I call marginalia.  It is marginal notations.  Do

18   you see it?

19        A    Yes.

20        Q    Now do you recognize the handwriting by any

21   chance?

22        A    No.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 65

1      Q    Okay.  Somebody has written out O equals

2   outstanding, G equals good and I equals inadequate,

3   correct?

4      A    Yes.

5      Q    And somebody has also put, in each line for

6   each candidate, how many O's, how many G's, right?

7      A    Yes.

8      Q    And how many I's somebody got.

9      A    Yes.

10     Q    All right.  But you don't recognize who said

11  that.  Who wrote that.

12     A    No.

13     Q    Now let me ask you a question.  By the time

14  you finished your work as a panelist, had you seen any

15  of these charts?  You had not seen any of these.  I'm

16  correct?

17     A    No.  I did not see any of these charts.

18     Q    And your belief is that Dan made up these

19  charts.

20     A    Yes.

21     Q    From the information, which is just the raw

22  scores that the panel gave.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 66

1       A    Yes.

2       Q    Now this structured interview process, this

3   was fairly new to the FDIC at the time, wasn't it?

4       A    Yes.

5       Q    Previously interviews would be done by the

6   selecting official and maybe some people to help the

7   selecting official, correct?

8       A    Yes.

9       Q    And when you had selection panels, they would

10  be doing something else.

11      A    Yes.

12      Q    They would be rating the candidates to

13  separate the best qualified.

14      A    Yes.

15      Q    Okay.  But that is not what your panel did

16  here.

17      A    No.

18      Q    You were just to rate the interview

19  responses.

20      A    Yes.

21      Q    To the questions asked.

22      A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 67

1      Q    Correct?

2      A    Yes.

3      Q    Now I have a bunch of documents.  I hope I

4  don't burden you with them, but I am going to show them

5  to you, just at least some of them, to see if you

6  remember them and maybe we can talk a little bit about

7  them.  Okay?

8      A    Okay.

9      Q    This is going to be more familiar to you I

10 promise you.

11              (Kitchens Deposition Exhibit 6 was

12              marked for identification.)

13          BY MR. SHAPIRO:

14     Q    Now the first one I am showing you,

15 Exhibit 6, says it is the structured form, the same as

16 Exhibit Number 1, but this one is filled in.  Do you

17 see it?

18     A    Yes.

19     Q    And this one says the job and everything

20 typed in, but then in handwriting, it says, 2/4/04.  I

21 take that to mean February 4th.

22     A    Yes.

Page 68

1    Q    2004.

2    A    Yes.

3    Q    Is this your handwriting?

4    A    It is.

5    Q    Okay.  So is that the date you write dates,

6    February 4, 2/4?

7    A    I have written them like that.

8    Q    Okay.  And then it says Jerie Kitchens, which

9    is your name.

10    A    Yes.

11    Q    It says as the name of the interviewer and

12    then it says name of candidate Valeria?

13    A    Valeria.

14    Q    Valeria Baker.

15    A    Yes.

16    Q    Okay.  Now if you will look and compare, it

17    is the exact same questions and the same benchmarks.

18    The typewritten portion is the same.

19    A    Okay.

20    Q    Right?

21    A    Yes.

22    Q    Okay.  Now in the candidates' response place,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 69

1    you took -- this is your handwriting of notes that you

2    took while Ms. Baker was responding to question

3    number 1.

4         A    Yes.

5         Q    And your notes was what she said and then you

6    would -- at the end of her answer, you would look at

7    those and you would say and you would check off, good,

8    outstanding or inadequate, right?

9         A    Yes.

10        Q    And if you turn the page, you will see that

11   you checked good.  That is your checkmark, isn't it?

12        A    Yes.

13        Q    Now let's look at the next one.  Here is

14   question number 2.  You will agree it is the same

15   question as on the blank form, Exhibit Number 1, right?

16    Right?

17        A    Yes.

18        Q    Okay.  And here again, your notes of what

19   Ms. Baker must have said in the interview.  And in

20   fact, you have even A, B and C, which is the same as

21   the benchmarks that are broken down, right?

22        A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 70

1      Q    Okay.  And here you check outstanding.  And

2   you would have done that right after she finished her

3   answer.

4      A    Yes.

5      Q    Now in both question 1 and question 2, you

6   will note in the form there is a place for you to

7   indicate if there were clarifying questions and there

8   is nothing indicated, right?

9      A    No.

10     Q    You would have indicated if there was a

11  clarifying questions.

12     A    Yes.

13     Q    Asked by anybody.

14     A    Yes.

15     Q    Any of the interviewers, right?

16     A    Yes.

17     Q    That is what you were supposed to do.

18     A    Yes.

19     Q    You understood that from that course.

20     A    Yes.

21     Q    That online course.

22     A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 71

1      Q    Okay.  And there is also no explanation as to

2  why you wrote outstanding.  This is just to check

3  outstanding, correct?

4      A    Correct.

5      Q    Okay.  And so with 3, you gave her a good.

6      A    Okay.

7      Q    You took notes.  4.  Now 4 is interesting.

8  Turn to 4.  Again, you have notes, right, taken during

9  her answer to question 4, right?

10     A    Yes.

11     Q    And then if you turn, you have this

12  checkmark, but then there is this double arrow, an

13  arrow in each direction.  I take it that is your

14  handwriting?

15     A    It is.

16     Q    Can you tell us what that indicates?

17     A    That her answer was between outstanding and

18  good, but --

19     Q    I see.  You gave her an outstanding.

20     A    But I gave her an outstanding.

21     Q    And -- good.  And we look at 5.  It is the

22  same.  There is a good checkmark and there is brief

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 72

1    notes.  Right?

2        A    Yes.

3        Q    How long were these interviews?  About how

4    long did the interviews run, each interview run?  Were

5    they the same length or --

6        A    They weren't the same length, as I recall, as

7    it all depended on how detailed of an answer the

8    candidate gave.

9        Q    And sometimes they gave -- some candidates

10   gave concise answers.

11       A    Yes.

12       Q    Where they weren't lacking in detail, but

13   they were concise.

14       A    Yes.

15       Q    Others more verbose.

16       A    Yes.

17       Q    So who was the longest of the interviews?

18       A    I don't remember.

19       Q    Who was the shortest?

20       A    I don't remember.

21       Q    Okay.  Was there a particular time that you

22   were going for?  Was it a timed interview?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 73

1      A    No.

2      Q    It was not.  Okay.  Now I want to look at the

3   next one, which is your interview, I believe, of

4   Ms. Mattus.

5                 (Kitchens Deposition Exhibit 7 was

6                  marked for identification.)

7            BY MR. SHAPIRO:

8      Q    Now again, you will recognize that this is

9   the same thing, but this date, the date of this

10  interview, was also 4, 2/4, right?

11     A    Yes.

12     Q    But it is -- now the candidate is Holly

13  Mattus, but it is the same job, isn't it?

14     A    Yes.

15     Q    Okay.  Now I want to look over at question

16  number 3.  There it is.  Again, you took notes, right?

17     A    Yes.

18     Q    And then look at the next page where you give

19  the assessment.  Now here we have a scribbled up in the

20  outstanding box and an arrow pointing to good and then

21  sort of a star or a checkmark is good.  Do you see

22  that?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 74

1        A    Yes.

2        Q    Now can you tell us what that might mean?  It

3   is your writing, isn't it?

4        A    It is.

5        Q    Okay.

6        A    Most likely it meant I was rating her

7   outstanding.  After discussion and everything with the

8   other panel members, they had good.  So her answer

9   became a good answer, not an outstanding.

10       Q    Got you.  Okay.  And that would have been --

11   that discussion would have been held right after

12   Ms. Mattus' interview concluded.

13       A    Yes.

14       Q    Before you started the next interview?

15       A    Yes.

16       Q    Okay.  All right.  Now I have one more that I

17   want to show you.

18                 (Kitchens Deposition Exhibit 8 was

19                  marked for identification.)

20            BY MR. SHAPIRO:

21       Q    Now this one is, again, the same vacancy,

22   right?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

1      A    Yes.

2      Q    The same vacancy announcement, that is, and

3  now it is also you doing the interview and it is Brent

4  Bracely.

5      A    Yes.

6      Q    Another candidate.

7      A    Yes.

8      Q    Now look at the date.

9      A    Yes.

10     Q    February 5th.

11     A    Yes.

12     Q    The next day.

13     A    Yes.

14     Q    So there were at least two days of interviews

15  of other candidates other than Ms. Brownfield, right?

16     A    Yes.

17     Q    She was separate from it.

18     A    Yes.

19     Q    Okay.  Good.  Now in this one, look at 3.

20  Now in 3, we have, again, your notes, right, under the

21  candidates' response, and then we have your checkoff.

22  Now here there is no arrow indicating a change, but

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 76

1    there is a scribble.  It looks like an X over

2    outstanding and scribbled and now an X over good.  So

3    can you tell us what this might mean?

4        A    Most likely it meant I rated him outstanding

5    on this question.  The other two panel members rated

6    him a good.  So he became a good.

7        Q    Okay.  And that would have been done right

8    after Mr. Bracely's interview.

9        A    Yes.

10       Q    That discussion and the change.

11       A    Yes.

12       Q    Now was it your understanding that all three

13   of these GS-13 jobs were going to be the same job, that

14   as many as they filled of it it was all going to be the

15   same job?

16       A    I don't recall how many jobs there --

17       Q    Well, if there were more than one, then it

18   would all be the same job, the same job description for

19   each of these if there was more than one filled.

20       A    I don't recall how many there would be and I

21   don't recall whether it was going to be one or five.

22       Q    Okay.  But -- okay.  Fair enough, but if

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

1    there were going to be more than one selected for this

2    position, then the positions would be the same 13's,

3    right?

4         A    Yes.

5         Q    The same jobs.

6         A    Yes.

7         Q    Okay.  Because it was in the same job

8    vacancy.

9         A    Yes.

10         Q    Same duties and responsibilities, right?

11         A    Yes.

12         Q    Okay.  Now have you -- when you were finished

13    with the role, where did you deliver your materials,

14    your rating sheets and anything else that you had.

15    Where did you -- who did you bring them to?

16         A    As I recall, Dan Bendler.

17         Q    Okay.  Was there a personnel specialist or an

18    HR specialist who was working this selection?

19         A    I don't know.

20         Q    You never dealt with one.

21         A    No.

22         Q    You just dealt with Dan.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 78

1       A    Yes.

2       Q    He came and asked you to do this.  He

3  presumably gave you the materials.

4       A    Yes.

5       Q    You met with the panel at the appointed time,

6  your other panel members?

7       A    Yes.

8       Q    Conducted the interviews?

9       A    Yes.

10      Q    Filled in the sheets?

11      A    Yes.

12      Q    And turned them in.

13      A    Yes.

14      Q    And as for the charts that we have seen, you

15  never saw them before you -- the panel was finished.

16      A    I never saw them before the panel was

17  finished.

18      Q    When was the first time you saw a chart like

19  this for this selection?  Do you recall?

20      A    Sometime after.  I don't recall.

21      Q    You don't recall.  But it wasn't within the

22  confines of this selection.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 79

1     A    No.

2     Q    That was done and finished.

3     A    Yes.

4     Q    And the selection made by the time you saw

5   the charts.

6     A    Yes.

7     Q    Okay.  And you have been a member of an

8   interview, structured interview panel after this?

9   Since this one?

10    A    Yes, I have had three, at least three, and I

11  don't know whether this was -- if I had two after or

12  one after or what, but I know that this was not the

13  first.

14    Q    This was not the first.

15    A    No.

16    Q    And could it have been the last?

17    A    I don't think so.

18    Q    Okay.  So you think it was in the middle.

19    A    Yes.

20    Q    You think it was in the middle.

21    A    I think so.

22    Q    When was the last one that you did?  How long

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 80

1    ago?

2        A    Probably 2005.

3        Q    2005.  And this one was in 2004.

4        A    Mm-hmm.

5        Q    And when did they start doing structured

6    interviews, this process?

7        A    I don't know.

8        Q    You don't recall.

9        A    No.

10       Q    Are they still doing them?

11       A    Yes.

12       Q    Okay.  And it is the same system.

13       A    Yes.

14       Q    So the panel is not a selection panel.  It is

15   an interview panel.

16       A    Yes.

17       Q    Good.  The other jobs that you did.  You said

18   you did a secretarial job.

19       A    Yes.

20       Q    You were a member of the panel for

21   secretarial jobs.

22       A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 81

1        Q    An interview panel.  And you were also a

2    member of an interview panel for another management

3    analyst.

4        A    I think it was a management analyst.

5        Q    And where was that vacancy?  In DOA?

6        A    I don't recall.

7        Q    You don't recall.  Okay.  Now your job that

8    you currently have, were you asked to apply for that

9    job?

10       A    No.

11       Q    No.  You just saw it as a vacancy come up and

12   you applied?

13       A    No, that is not how it worked.

14       Q    How did it work?  Because you had worked for

15   Ms. Kea before --

16       A    Right.

17       Q    -- when she was in the counsel's office and

18   so were you.

19       A    Right.  Right.  And I worked for her.  She

20   was my second line supervisor in legal division when I

21   worked for Michelle Brozillo.

22       Q    I see.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 82

1        A     And she went to the ombudsman's office.

2        Q     Who did?

3        A     Ms. Upton Kea.

4        Q     Ms. Kea.

5        A     Yes.

6        Q     Yes.

7        A     And a position became available there.  I

8    applied for it and I got it.

9        Q     Okay.  Was she the selecting official?

10       A     I don't know.  I didn't work directly for her

11   there.

12       Q     Okay.

13       A     But she was, like, my second line.

14       Q     Did she interview you for that ombudsman's

15   job?

16       A     I don't recall.  This might have been -- I

17   don't recall.

18       Q     Okay.  And what about moving over from

19   ombudsman to DOA?

20       A     When she went to -- I was working for her in

21   the ombudsman's office and when she was selected for

22   the DOA job, I went on a detail with her.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 83

1       Q    So you came over with her on a detail.

2       A    Not right away.  She had been there.

3       Q    But did she ask for you to come over as a

4  detail?

5       A    I don't know that she asked specifically

6  for -- she -- most likely she did.

7       Q    Okay.

8       A    I would say most likely.

9       Q    So you were on loan --

10      A    Yes.

11      Q    -- from legal to --

12      A    Not legal.

13      Q    From ombudsman to DOA.

14      A    Yes.

15      Q    As a special assistant.

16      A    I was not a special assistant in ombudsman.

17      Q    No-no.  But you were detailed to the special

18  assistant DOA director position.  In other words, when

19  you went on the detail, the detail was to a detail of

20  the special assistant to the director of DOA, right?

21      A    That must have been that position.

22      Q    Sure.  And then they announced that job --

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 84

1    A    Yes.

2    Q    -- while you were on the detail.

3    A    And I applied for it.

4    Q    And you got it, yes.  And the -- yes?

5    A    Yes.

6    Q    And the selecting official was Ms. Kea.

7    A    Apparently so.

8    Q    It was her special assistant.

9    A    Yes.

10   Q    Who better to select it?

11   A    Right.

12   Q    All right.  So good.  Now I wonder if you

13   could tell me if you looked at any documents in

14   preparation for this deposition.

15   A    Yes.

16   Q    And what did you look at?

17   A    The complaint and the answer.

18   Q    The complaint that was filed by

19   Ms. Brownfield?

20   A    Yes.

21   Q    And the answer filed by FDIC?

22   A    Yes.

Diversified Reporting Services

202-467-9200

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 85

1       Q     All right.  Did you -- had you ever seen them

2   before?

3       A     No.

4       Q     Had you heard of them before?

5       A     I knew that Pam had a case, yes.

6       Q     Right.  So you knew there was a suit.

7       A     Yes.

8       Q     But you had never seen a complaint.

9       A     No.

10      Q     What did you get from that?  What did you

11  understand?  Why did you understand you were shown that

12  complaint?

13      A     Just for background so I would know what was

14  going on.

15      Q     So you would know who is taking what

16  position.

17      A     Yes.

18      Q     What the complaint is about.

19      A     Yes.

20      Q     What the suit is about.

21      A     Yes.

22      Q     Were you shown any other documents at all?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 86

1       A    No.

2       Q    Did you view any other documents on your own?

3       A    No.

4       Q    Did you have any meetings with anybody,

5    Ms. Upton Kea?

6       A    No.

7       Q    Mr. Bendler?

8       A    I met with him.

9       Q    With the lawyer.

10      A    Yes.

11      Q    Did you meet with -- that is the lawyers that

12   are sitting to your left, right?

13      A    Yes.

14      Q    The FDIC's lawyers.

15      A    Yes.

16      Q    Did you meet with anybody else from

17   management --

18      A    No.

19      Q    -- or any of the other witnesses to discuss

20   this?

21      A    No.

22      Q    Just with Bill Jones and his colleague,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 87

1   correct?

2        A    Yes.  Yes.

3        Q    So when did you meet with them?  How many

4   times?

5        A    Once.

6        Q    And when was that?

7        A    Maybe two weeks ago.

8        Q    Maybe two weeks ago.  How long was that

9   meeting for?

10       A    Half an hour.

11       Q    Half an hour.

12       A    At the most.

13       Q    What did you talk about?

14            MR. JONES:  Objection.  Invasion of

15   attorney-client privilege.  She is my client; I am her

16   lawyer for the purposes of this proceeding.

17            And I direct you not to answer the question.

18            MR. SHAPIRO:  As the lawyer for the FDIC.

19            MR. JONES:  Yes.

20            MR. SHAPIRO:  I see.  Okay.  All right.  I

21   don't have anything further.

22            MR. JONES:  Why don't we take a five minute

Page 88

1    break.  Then I have got a couple.

2           MR. SHAPIRO:  You know that if you talk to

3    your client during the course of this meeting, I am

4    going to be able to find out what you talked about.

5    You are aware of that.

6           MR. JONES:  Do you know if I talk to my

7    client during this five minute break, that will mean

8    she will have gone into the men's room.

9           MR. SHAPIRO:  I got you.

10          (Laughter.)

11          (A brief recess was taken.)

12          MR. SHAPIRO:  Questions, sir?

13          MR. JONES:  I do.

14            EXAMINATION BY COUNSEL FOR DEFENDANT

15          BY MR. JONES:

16     Q    Now Ms. Kitchens, you testified that of the

17    people that were interviewed, you knew Val Baker, Brent

18    Bracely, Bill Gately, Holly Mattus, David Lok and Pam

19    Brownfield.  Of all those people, have you ever gone to

20    lunch with any of these, the people that you know?

21     A    Yes.

22     Q    And which of the people?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

Page 89

1      A    I have gone to lunch with Valeria Baker and I

2   guess you could say Pam and I have been to lunch.  We

3   have been to the post office during lunch.

4      Q    Okay.

5      A    And, you know, we are always planning a lunch

6   or planning to get together.

7      Q    How about anybody on this list?  Did you ever

8   get together with any of these individuals outside of

9   work?

10      A    Yes.

11      Q    And who would that be?

12      A    Valeria Baker and Pam Brownfield.

13      Q    Okay.  And what kind of occasions -- what

14   occasions did you get together with Val Baker outside

15   of work?

16      A    Dinner.  We have been to -- I have been to

17   her home and social gatherings.

18      Q    Okay.  How about Ms. Brownfield?

19      A    Pam and I have been to one or two concerts

20   together.  What else have we done.  I can recall a

21   couple of concerts.

22      Q    Okay.  Was that before or after when she was

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 90

1    interviewed?  Do you recall?

2         A    Maybe both.  Maybe both.

3         Q    Okay.  Now you also testified that Dan

4    Bendler was the one who prepared the spreadsheet or one

5    or more of these spreadsheets, the Exhibits I think it

6    is 3, 4 and 5, which are the spreadsheets here.

7         A    Yes.

8         Q    How do you know that, that it was Dan

9    Bendler?

10        A    Maybe I shouldn't say Dan Bendler prepared

11   them.  I recall getting them from Dan.

12        Q    Okay.  And how would you have gotten -- what

13   do you recall -- how do you recall getting them?  Would

14   that be by e-mail or physically or --

15        A    No.  I remember a hard copy.

16        Q    A hard copy.

17        A    I think at least seeing a hard copy or being

18   handed a hard copy.  I remember seeing it from Dan.

19        Q    Okay.  And if you had been handed the hard

20   copy, do you remember Dan handing it to you?

21        A    I remember that I saw this somehow with Dan,

22   whether he handed it to me or showed it to me.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 91

1       Q    Okay.  And that was the first time you saw

2   it?

3       A    Yes.

4            MR. JONES:  Okay.  That is all I have.

5            FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

6            BY MR. SHAPIRO:

7       Q    The other people on the panel -- is there

8   somebody that acted like chairman of the panel?

9       A    No, not that I recall.

10      Q    Well, who decided who would go first and who

11  would do the first question and that sort of thing?

12      A    I don't recall.  I think we just decided as a

13  group, "I will take this one.  You take that one."

14      Q    Okay.  And you say that you -- the people

15  that you knew on the panel, of the people that you

16  knew, of the interviewees, the candidates, you knew the

17  black people, but not the -- you socialized with the

18  blank people and not the white people; is that right?

19      A    I socialized with two of the black people on

20  the panel.

21      Q    Right.  Well, of the ones you knew --

22      A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b

Page 92

1    Q    Of the interviewees that you knew -- you knew

2    six of them.

3    A    Yes.

4    Q    All right.  Of the six that you knew, two

5    were black and four were white.  Or four were not

6    black, right?

7    A    Okay.

8    Q    And you socialized with the two that you knew

9    who were African-American, right?

10    A    Yes.

11        MR. SHAPIRO:  Okay.  Nothing further.

12        MR. JONES:  Okay.  Thank you.

13        THE WITNESS:  Thank you.

14        MR. SHAPIRO:  Thank you.

15        (Whereupon, at 3:45 p.m., the deposition of

16    GERALDINE KITCHENS was concluded.)

17                            * * * * *

18        I have read the foregoing pages, which are a

19    correct transcript of the answers given by me to the

20    questions therein recorded.

21    Deponent_____

22        Date_____

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 20

6d93dc81-a3a2-4d84-b776-ab8f7c65af0b