IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - x
                                  :
PAMELA A. BROWNFIELD,             :
                                  :
            Plaintiff,            :
                                  :
      v.                          : Civil Action No.
                                  : 1:05-cv-02468-EGS
SHEILA C. BAIR,                   :
 Chairman,                        :
 Federal Deposit Insurance Corp., :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, March 14, 2007

Deposition of

RICHARD D. MARLATT

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Rita M.

Hemphill, Notary Public in and for the District of

Columbia, in the offices of Swick and Shapiro, P.C.,

1225 Eye Street, Northwest, Suite 1290, Washington,

D.C., 20005, commencing at 10:09 a.m.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 2

APPEARANCES:


On Behalf of the Plaintiff:


        DAVID H. SHAPIRO, ESQ.

        SARAH L. RIGER, ESQ.

        Swick and Shapiro, P.C.

        1225 Eye Street, N.W., Suite 1290

        Washington, D.C.  20005



On Behalf of the Defendant:


        WILLIAM S. JONES, ESQ.

        Federal Deposit Insurance Corporation

        3501 Fairfax Drive

        Arlington, VA  22226



Also Present:


        Pamela Brownfield, Plaintiff

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 3

C O N T E N T S

EXAMINATION BY:                                          PAGE

     Counsel for Plaintiff                              4

     Counsel for Defendant                             56

MARLATT DEPOSITION EXHIBITS:

1 -  Interview talking points and ground rules        32

2 -  Packet of interview materials                     33

3 -  Score sheet, Bates ending 505                     38

4 -  Score sheet, Bates ending 597                     38

5 -  Score sheet, Bates ending 504                     38

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

```
 1                  P R O C E E D I N G S

 2   Whereupon,

 3                    RICHARD D. MARLATT

 4   was called as a witness and, having been first duly

 5   sworn, was examined and testified as follows:

 6          REPORTER:  Please state your full name for

 7   the record.

 8          THE WITNESS:  My name is Richard Douglas

 9   Marlatt.

10          EXAMINATION BY COUNSEL FOR PLAINTIFF

11          BY MS. RIGER:

12     Q    Mr. Marlatt, have you ever been deposed

13   before?

14     A    This is the first time.

15     Q    Okay.  Well, you should always answer with a

16   yes or a no instead of shaking your head or saying

17   mm-hmm or uh-huh because it is hard for the court

18   reporter to get that down and I guess we should try not

19   to talk over each other because it is also hard for the

20   court reporter to record.

21     A    Okay.

22     Q    So I am going to start with a couple of
```

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 5

1    background questions.  What is your home address?

2       A    It is 6330 Demi Place, Springfield, Virginia.

3       Q    What is your home phone number?

4       A    It is an unlisted number.  I don't give it

5    out.

6       Q    Can I have your work phone number?

7       A    Oh, gosh.  I have to get that one memorized.

8    I'm sorry.

9            MR. JONES:  May I refresh the witness'

10   recollection for his work number?

11           MS. RIGER:  Sure.

12           THE WITNESS:  Oh, yes.  703-562-2124.

13           BY MS. RIGER:

14      Q    Do you have a cell phone number?

15      A    I don't give that number out either.

16      Q    And you are a Caucasian male?

17      A    Yes.

18      Q    How old are you?

19      A    Let's see.  56, 58.

20      Q    I thought you were going to say I don't give

21   that out either.

22      A    Well, actually, I don't remember.  It is a

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 6

1    lot of computation.

2         Q    Are you a college graduate?

3         A    Yes, I am.

4         Q    Where did you go to college?

5         A    I went to college in Old Dominion University

6    in Norfolk, Virginia.

7         Q    Okay.  What did you major in?

8         A    Business administration.

9         Q    Did you get a -- what degree did you get?

10        A    I got an undergraduate degree.

11        Q    A B.A.?

12        A    Yes, a B.A.  I'm sorry, no.  It is a B.S.,

13   bachelor of science.

14        Q    B.S. in business administration?

15        A    Yes.

16        Q    What year did you graduate?

17        A    That was 1976.

18        Q    1976.  And where did you go to high school?

19        A    Mount Vernon High School in Virginia, Fairfax

20   County, Virginia.

21        Q    What year did you graduate from high school?

22        A    1967.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 7

1       Q    1967.  So what did you do between high school

2   and college?

3       A    Worked.

4       Q    Worked?  Where did you work?

5       A    Lots of different places.  Construction work,

6   warehouse work just to get money and help with paying

7   my way through college.

8       Q    So that was between 1971 and '72.  Oh,

9   actually 1967 and 1971, '72?

10      A    Yes.  Yes.

11      Q    So you were saving up for college.

12      A    Yes.  And when I was in college, I was

13  working also.

14      Q    Did you -- how long did it take you to

15  graduate from college?

16      A    Oh, about five years.

17      Q    Five years.  Well, that is still pretty good

18  working at the same time.  Where do you currently work?

19      A    I work in Virginia Square in Arlington,

20  Virginia at the FDIC, Federal Deposit Insurance

21  Corporation.

22      Q    Oh, let me go back.  Do you have any

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 8

1    post-graduate degrees?

2        A    No, I do not.

3        Q    You haven't taken any courses?

4        A    Just training courses related to, like, my

5    professional career, but no college.  No working

6    towards a post-graduate degree.

7        Q    What kind of training courses?

8        A    Some management courses, procurement training

9    courses, oversight management, a little contracting.

10        Q    Okay.  When did you take the management

11    courses?

12        A    Oh.  It has been a while back.  I really

13    don't remember the date.

14        Q    Within the last five years?

15        A    No, I think it was longer than that.

16        Q    10 years?

17        A    Within the last 10 years.

18        Q    All right.

19        A    Probably about six to ten years.

20        Q    Six to ten years?  Were they week long

21    courses or day long courses?

22        A    They were like day long courses.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 9

1      Q     When did you take the procurement classes?

2      A     Oh, gosh.  Since I first started with the

3   government, I have taken a lot of different procurement

4   and contracting classes.  So I guess from 1980 until

5   about 1995.

6      Q     Did you take them on a yearly basis?

7      A     Well, as you go up, you know, you get more

8   experience and you take different courses.  So yes, it

9   is, yes, yearly.  I was taking a course about once a

10  year.  Sometimes two a year.  Sometimes you didn't have

11  any.

12     Q     And are these day courses again?

13     A     Yes, they were.  They would be like week long

14  with GSA and the Department of Agriculture.

15     Q     What about the oversight -- is oversight

16  management and contracting the same thing?

17     A     No.  Oversight management courses is for the

18  people who are actually the user of the service, you

19  know, receives a contract and it deals with, you know,

20  what you can and can't do and how to do change

21  requests, you know, how to approve invoices and stuff

22  like that.  It is management of the contract from the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 10

1    user's side.

2         Q    What do you mean by the user's side?

3         A    Let's say if you want a contracting service

4    for legal services, you are the user, I am the one who

5    provides that service.  I am the contracting officer.

6         Q    Oh, I see.  It is the person who is

7    benefitting from the contract.

8         A    Right.

9         Q    Any other courses?

10        A    That is -- I did have a training course in

11   structured interview.  That was an FDIC required course

12   for managers when I took it.

13        Q    When was that?

14        A    About three or four years ago.

15        Q    Okay.  So 2003 or 2004?

16        A    I do not remember the exact date.

17        Q    Do you remember if it was in preparation for

18   interviewing the CG-13 management analyst job?

19        A    Yes.  It wasn't specifically in preparation

20   for that, but I took it prior to that and that was one

21   of the reasons my supervisor, you know, volunteered me

22   to be on that panel because I had had the training and

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 11

1    FDIC was just starting out that process and not

2    everyone had been trained at that time.

3        Q    Oh, I see.  And who was your supervisor?

4        A    Ms. Constance Young.

5        Q    So you say that she recommended you for the

6    interview panel?

7        A    Yes, she did.

8        Q    Why did she recommend you?  You just said

9    that it was because you had been trained in

10   interviewing.

11       A    That was one of the reasons.  That is -- you

12   know, she told me that. I don't know all of her reasons

13   for doing that, but she intimated to me, "You have been

14   trained in this.  So you are qualified and I

15   volunteered you."

16       Q    Do you know of any other reasons?

17       A    No, I do not.

18       Q    Do you know how Ms. Young knew to get

19   volunteers for the interview panel?

20       A    I do not know.

21       Q    And you said that you volunteered for the

22   job.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 12

1      A     No, I was volunteered by my supervisor.

2      Q     Oh, okay.  Okay.  So you didn't have a

3   choice.

4      A     Well, you know, I accepted it.  I said, "Yes,

5   I will do it."

6      Q     Okay.  Was this the first time that you

7   served on an interview panel?

8      A     In a structured interview process, yes.

9      Q     Okay.  Had you done a paper process before?

10     A     No.

11     Q     What do you mean when you say it was the

12   first time you had done a structured interview process?

13     A     Because that was the structured interview

14   process and that was the first time I did it.

15     Q     Oh, I am just asking because it sounded like

16   there was some kind of other process you had done

17   before?

18     A     No.

19     Q     Oh, okay.  So the first time working on

20   hiring somebody for a job is at the FDIC.

21     A     Right.

22     Q     Okay.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 13

1        A    Yes.

2        Q    All right.  What -- so you said you work at

3    the FDIC.  What is your position?

4        A    I am the team leader for my team.

5        Q    What is your team?

6        A    We are in the corporate support services.  We

7    act as an interface between Division of Administration

8    and Division of Information Technology dealing with

9    computer systems and applications.

10       Q    So you work closely with DOA?

11       A    Oh, yes.  Yes.

12       Q    Do you know the employees in DOA?

13       A    I know quite a few, yes.

14       Q    What is your grade level?

15       A    I am a GG-14.

16       Q    A GG-14?

17       A    Right.

18       Q    That is different than the CG grade level?

19       A    CG?  Is that what they call us now, CG?  I

20    don't know.  I am a grade 14 at the FDIC.

21       Q    Oh, okay.  So it is the same thing.

22       A    Yes.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 14

1       Q    CG-14, GG-14.

2       A    Yes.

3       Q    Okay.  Did you say you were a supervisor?

4       A    No, I am a team leader.

5       Q    Oh, that is right.  How long have you worked

6    at the FDIC?

7       A    At least 10 years.  Maybe 15.  Gosh.

8       Q    Do you remember what year you started working

9    there?

10      A    It was 1986 and then in 1990, I went to the

11   Resolution Trust Corporation and in 1995, I came back

12   to the Federal Deposit Insurance Corporation.

13      Q    1995?

14      A    Right.  And I have been with the FDIC ever

15   since then.

16      Q    Okay.  So 1986, what was your job at the

17   FDIC?

18      A    I was a contract specialist.

19      Q    Contract specialist.  What was your grade

20   level?

21      A    I was a grade 13.  I'm sorry.  I was a grade

22   12.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 15

1      Q     Grade 12.

2      A     Yes.

3      Q     What did you do as a contract specialist?

4      A     Took people's requirements and put them into

5   solicitations, ran a solicitation process, did

6   negotiations and participated in the award process.

7   Would prepare award documents for the contracting

8   officer for signature.  I processed modifications to

9   awarded contracts and I also would process -- was in

10   the invoicing process to verify that yes, they are in

11   accordance with the agreement that we had with the

12   contractor.

13      Q     Okay.  And you did this from 1986 to 1990.

14      A     Yes.

15      Q     About.  Approximately.

16      A     Yes.

17      Q     And then you went to Resolution Trust

18   Corporation.

19      A     Right.

20      Q     What did you do there?

21      A     I was a contract manager there and eventually

22   ended up being a contracting officer for the Resolution

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 16

1    Trust Corporation.

2         Q    What is the Resolution Trust Corporation?

3         A    It was a temporary agency put together to

4    deal with the S&L debacle.

5         Q    The S&L debacle?

6         A    Well, you know, the problem that we had when

7    we had a lot of failed institutions.  And it was a

8    corporation put together with a specific purpose to

9    deal with that to get rid of a lot of our failed assets

10   that we had and --

11        Q    So your work is in contracting primarily.

12        A    It was then, yes.

13        Q    What was your grade level?  Was there a grade

14   level?

15        A    I was -- went from a 12 -- I originally came

16   over as a 12 and I was a 13 and then ended up as a 14

17   there as a contracting officer, as a grade 14.

18        Q    When did you get the 13?

19        A    That was like in about -- no, that would have

20   been '91.

21        Q    That was at --

22        A    The RTC.

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

1      Q    Okay.  When did you get the 14?

2      A    About a year after that.

3      Q    You said you graduated from college in 1976.

4   So what did you do between 1976 and 1986?

5      A    I worked in the private sector.

6      Q    Where did you go in -- was it the same job

7   the whole time?

8      A    No.  I had -- I worked for two different

9   companies.

10     Q    What were they?

11     A    It was Tide Water Disposable Products and,

12  gosh, I forget the name of that first one.

13     Q    When did you work at that first one?

14     A    Soon after I graduated from college.  I was,

15  like, working in the warehouse there.  And actually, I

16  had started working there when I was in college and

17  working in their warehouse and running routes and

18  delivering routes for them.

19     Q    Okay.  How long were you doing that?

20     A    For about maybe a year and a half to two

21  years at the most.

22     Q    So 1978 maybe?  1977, 1978?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 18

1      A    Yes.

2      Q    And then you went to the Tide Water

3  Disposable?

4      A    Products, yes.

5      Q    Disposable Products?

6      A    TWDPCO.

7      Q    And what did you do there?

8      A    I was a sales representative for them.

9      Q    So you were in sales.

10     A    Yes.

11     Q    So you were in sales and then you worked

12  there from 1978 until 1986.

13     A    No, until 1980.

14     Q    Until 1980?

15     A    Mm-hmm.

16     Q    And where did you go in 1980?

17     A    I worked for the Department of Treasury then.

18     Q    What was your grade level?

19     A    I was a grade 5.

20     Q    What did you do?  What was your position?

21     A    I was a purchasing agent then.

22     Q    A purchasing agent?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 19

1      A     Mm-hmm.

2      Q     So it was sort of still in sales?

3      A     No, on the other side.  Purchasing.  I was

4  buying.

5      Q     Buying instead of selling.

6      A     Yes.

7      Q     Why did you decide to -- how did you -- were

8  you at the Department of Treasury until 1986?

9      A     Yes.

10     Q     Did you get any promotions while you were at

11  the Department of Treasury?

12     A     Yes, I did and they were mainly geared to --

13  I applied for a contracting specialist job there and

14  that was a latter position from -- I started out as a 5

15  and topped out as an 11 position and that is where I

16  started a lot of my training classes in contracts.

17     Q     I see.  And that is where you started

18  contracting.

19     A     Right.  Yes.

20     Q     So between 1986 and 1990, you progressed from

21  a 5 to an 11.

22     A     Yes, I did.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 20

1      Q    Did I say -- yes, 1990.  That is when you

2  left to go to --

3      A    I'm sorry.  Repeat that question again.

4      Q    So you progressed between 1986 and 1990 to

5  become a 5 to an 11.

6      A    No.  That was from 1980 to 1986 from a 5 to

7  an 11.

8      Q    Oh, right.

9      A    Yes.

10     Q    Okay.  Why did you go over to FDIC in 1990?

11     A    I was offered a job with a -- at the grade 12

12  level.  It was a promotion for me.

13     Q    I see.  And now you have been back at the

14  FDIC for 12 years.

15     A    Yes.

16     Q    And you have been a team leader the whole

17  time?

18     A    No.

19     Q    Okay.  What did you come back to the FDIC as

20  in 1995?

21     A    I came back as a contracts manager.

22     Q    Contracts manager.  What grade level was

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 21

1    that?

2        A    That was a 14.

3        Q    And then how long did you do that for?

4        A    Until about 1997.

5        Q    What did you do in 1997?

6        A    That is when I started my current

7    professional career endeavor as working with the

8    systems support section and working for Ms. Constance

9    Young.

10       Q    Okay.  Did you start as a 14?

11       A    Yes.

12       Q    And you are still a 14?

13       A    Yes, I am.

14       Q    Are you at the highest level of a grade 14?

15       A    We really don't have levels anymore.

16       Q    Okay.  The highest pay grade?

17       A    I mean, I would say no.

18       Q    How many pay grades are there in a 14?

19       A    We don't -- we did away with the steps within

20   FDIC about three or four years ago.  So there is no

21   steps like in the regular federal government.

22       Q    Okay.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 22

1      A    What they have is like a range.

2      Q    How many -- there is a range?  Okay.  When

3   did you become a team leader?

4      A    Oh, that was about two years ago.

5      Q    In 2005?

6      A    Yes.

7      Q    Have you ever worked as a management analyst?

8      A    No, I have not.

9      Q    Was it unusual to interview for a job that

10  you didn't really understand?

11     A    I really wouldn't know.

12     Q    What do you mean you wouldn't know?

13     A    I don't know if that is unusual or not.

14     Q    Oh, I see.

15     A    Yes.

16     Q    Did it strike you as unusual?

17     A    No.

18     Q    Were you, in 2003 -- what were you doing in

19  2003?  You weren't a team leader yet?

20     A    I was a -- no.  I wasn't a team leader.  I

21  was a manager then.

22     Q    What is the difference between a manager and

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 23

1    a team leader?

2        A    Team leader I manage the work.  I am

3    responsible for the work.  And as a manager, I manage

4    people and I am responsible for the people.  And

5    basically, it is down to I am signing leave slips and

6    time cards as a manager; as a team leader, I am not.

7        Q    So is a team leader higher than a manager?

8        A    I really don't know.  I don't have an opinion

9    on that.

10       Q    It is just different responsibility?

11       A    It is just different.

12       Q    How long were you a manager?

13       A    Oh, let's see.  Since -- you mean all

14   together because it is off and on.  Everybody -- when I

15   was at the RTC, all my time there from a 13 until I

16   left as a contracting officer, I was a manager and had

17   people -- I was responsible for people's leave and time

18   slips.  When I came back to the RTC -- I mean, to the

19   FDIC, I was not -- I was management, but I didn't have

20   anybody -- direct reports to me.  I was working more on

21   the policy side of things --

22       Q    Okay.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

Page 24

1    A    -- dealing with contracting in general.  And

2  then when I came over to work for Connie, at first I

3  was not the manager, but then within a year, we had

4  some realignment and I became a manager.

5    Q    You said that this CG-13 management analyst

6  job was the first time you were on an interview panel.

7    A    Yes.

8    Q    Have you been on interview panels since then?

9    A    No, I have not.

10    Q    It is the only one.

11    A    Yes.

12    Q    So you should remember it like it was

13  yesterday.  You should remember it like it was

14  yesterday then.

15    A    I don't know why I should because it wasn't

16  yesterday.  It was quite a long while ago.

17    Q    Okay.  What department was the panel in?

18    A    What do you mean by what department?

19    Q    The position that you were interviewing for?

20    A    It was in -- we were in the same branch and

21  it was the other section.  You had the management

22  analyst section and system support section and we were

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 25

1    in the same branch.

2        Q    Who was the head of the branch?

3        A    That was -- oh, that was Paul Sherman.

4        Q    Is he the head of your branch?

5        A    Yes, he is.

6        Q    Okay.  So you are in the management support

7    section.  No.  No, you are not in the management --

8        A    Yes, system support.

9        Q    System support.

10        A    I work for Connie Young and the other section

11    was headed up by Dan Bendler and Dan Bendler and Connie

12    Young reported to Paul.

13        Q    Oh, I see.  So it is Paul and then Connie is

14    in charge of the systems support and Dan is in charge

15    of MSS.

16        A    Right.

17        Q    Do you know Paul, Paul Sherman?

18        A    Yes, I do.

19        Q    Are you friends with him?

20        A    I have a -- not personally, no.  We have a

21    business relationship.

22        Q    Do you eat lunch together?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 26

1      A    No.

2      Q    How often do you interact with him?

3      A    It has gotten to be a lot more now since I am

4  in an acting position.  I am filling in for Connie

5  Young while we go out for it.  So it is on a daily now.

6   Before that, I would interact with him maybe once a

7  week or every two weeks.

8      Q    Okay.  How long have you been acting in

9  Connie's position?

10     A    Since I believe it was February 28th.

11     Q    Of this year?

12     A    Yes.

13     Q    Oh.  So just a few weeks.

14     A    Yes.

15     Q    Is this the first time that you have done

16  that, acted in a position?

17     A    In this position, yes.

18     Q    Do you know Dan Bendler?

19     A    Yes, I know him.

20     Q    Are you friends with Dan Bendler?

21     A    Just a business relationship.

22     Q    So that is the same as Paul?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 27

1       A    Yes.

2       Q    Was Mr. Bendler involved in the selection?

3       A    I don't recall.  All I know is like we did

4  the structured interview and we sent our -- all of our

5  analysis to him.

6       Q    You sent all of your analysis to Dan.

7       A    Well, the analysis that we came -- you know,

8  as a group, once we did our analysis, we sent that

9  result to Dan.

10      Q    So you sent your notes to Dan.

11      A    No, I did not.  I don't think I did.

12      Q    You don't think so.

13      A    Well, the ones that I took, my personal

14  notes, no, I did not.

15      Q    I don't mean -- I mean the formal notes that

16  you took.

17      A    No, I don't believe -- I really don't

18  remember, but I don't believe I did.

19      Q    But you could have.

20      A    I don't know.

21      Q    Do you know where your notes are?

22      A    They got shredded as we were moving from

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 28

1    downtown to Virginia Square.  We had to get rid of a

2    lot of stuff and I had a lot of that, you know, the

3    notes and the 171's and no one had asked for them in a

4    couple of years so it had a lot of personal

5    information.  So we put it in the shred bin.

6        Q    When did you move to Virginia Square?

7        A    It is a little over a year ago.

8        Q    So most of your documents got shredded.

9        A    Yes.

10        Q    But you don't know that the notes got

11   shredded specifically.

12        A    Well, if I put them in the gray shred bin,

13   they got shredded.

14        Q    If you did.

15        A    Yes.

16        Q    But you might have sent them to Dan Bendler.

17        A    But I don't believe I did.

18        Q    Do you remember shredding these notes

19   specifically?

20        A    I didn't shred them to -- you know, I have

21   got a lot of things in a drawer.  Take them all out,

22   look at them.  Do I need this?  No.  Put them in the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 29

1    gray shred bin and that was the last I saw of them.

2        Q    One of the other panelists gave her notes to

3    Dan Bendler.

4        A    Okay.

5        Q    But you didn't give your notes to Dan

6    Bendler?

7        A    I don't believe I did.

8        Q    Did he ask for them?

9        A    I don't believe he did.

10       Q    Was the management analyst position a vacancy

11   in Bendler's unit?

12       A    The announcement was -- yes, I would assume

13   it was since the announcement was for his unit and we

14   were, you know, it was made for his unit.

15       Q    It wasn't in your unit.

16       A    No, no, no.

17       Q    Do you know who the selecting official was?

18       A    No, not really.

19       Q    Who do you think it was?

20       A    I have no idea.

21       Q    Was it Dan Bendler?

22       A    I don't know.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

Page 30

1      Q    Was it Paul Sherman?

2      A    I don't know.

3      Q    Did you know any of the candidates?

4      A    Yes.  I mean, they were in the same branch as

5  us so I knew of them.

6      Q    And who did you know?

7      A    Let's see.  Pam and --

8      Q    How did you know Pam?

9      A    I mean, we are on the same floor.  You pass

10  people in the hallway.

11      Q    Were you friendly with Pam?

12      A    I am always friendly to everybody.

13      Q    So you said hello?

14      A    If I met her in the hallway, I would say

15  hello, yes.

16      Q    But you didn't necessarily have lunch

17  together?

18      A    No-no.  It wasn't -- with any of the people

19  that I was interviewing, it wasn't like that.  No.

20      Q    Did you have about the same relationship with

21  all the candidates?

22      A    Yes.

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 31

1    Q    With Pam and Bill Gately too?

2    A    Yes.

3    Q    Did you know Bill Gately as well as you knew

4    Pam?

5    A    I hardly knew any of them back then.

6    Q    Okay.

7    A    We had just, like, gotten formed as a new

8    unit so just -- as a new branch and we were just

9    freshly together.

10    Q    But you knew them because you worked closely

11    with them.

12    A    No.  I knew them because they were on the

13    same floor as us.  Our jobs are -- what we do is

14    completely different and we don't -- the two sections

15    do not have a working relationship.

16    Q    I see.  Did Bendler talk to you before the

17    interviews?

18    A    I do not recall him talking to me.

19    Q    Do you remember if he told you anything about

20    the selection process?

21    A    No, I don't recall that.

22    Q    How did you prepare for the interviews?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 32

1    A    We had some questions that we were supposed

2    to ask and before the interview, the interviewing team

3    would get together and would decide who was going to go

4    first or explain the process and we were kind of

5    like -- and which questions we would ask and we kind of

6    mixed it up so it wouldn't get too boring and have a

7    little bit, you know, difference for everything, but

8    and then we had our questions and note sheets, you

9    know, for that particular person, for the person that

10   we were interviewing at that time.

11       Q    Okay.  I am going to show you a document.

12                (Marlatt Deposition Exhibit 1 was marked

13                for identification.)

14           BY MS. RIGER:

15       Q    What is this document?  Okay.  What is this

16   document, Exhibit 1?

17       A    Well, it is titled, "Interview Talking Points

18   and Ground Rules."  So I guess that is what the

19   document is.

20       Q    Does it look familiar to you?  You can look

21   at it for a few minutes.

22       A    Yes.  I am going over it.  It is not jumping

Page 33

1    out at me.

2        Q    Have you seen it before?

3        A    I can't say with certainty that I have.  I

4    would -- yes, I am not sure if I have or not.

5        Q    It looks like it was a script for an

6    interview, for the CG-13 management analyst job.

7        A    I don't know if it is a script per se.  It

8    just says it is ground rules.  It looks like something

9    we would give out to the candidate to let them know

10   what the process is.

11       Q    Okay.

12       A    Just as a preamble and then we would go into

13   our questions.

14       Q    It is funny -- well, so one of -- do you

15   think someone read it to the candidates?  Anyway the

16   candidates have this information.

17       A    Okay.

18       Q    You don't remember?

19       A    No, I don't.

20             (Marlatt Deposition Exhibit 2 was marked

21             for identification.)

22             BY MS. RIGER:

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 34

1    Q    Okay.  Do you remember -- do you know what

2    this document is?

3    A    This looks like the interview questions that

4    we were -- yes.  This is the structured interview

5    questions.

6    Q    Do you remember this one?  Have you seen this

7    before?

8    A    It looks like the questions that we asked

9    them.  We had a form like this.

10    Q    Did you fill out a form like this?

11    A    Yes, we did.

12    Q    What did you do with the form?

13    A    It got shredded.

14    Q    This is the form that you were talking about

15    earlier?

16    A    Yes.

17    Q    Are you positive it got shredded?

18    A    It went into the gray shred bin.  If it goes

19    in there, it is the policy of the FDIC to shred it.

20    Q    Did you give a copy of it to anyone?

21    A    No, I did not.

22    Q    They didn't ask for a copy of the interview

Diversified Reporting Services
202-467-9200

5138adf0-6929-4b64-996d-9beac75a297e

Page 35

1    notes?

2        A    No, they did not.

3        Q    So they didn't really care what your notes

4    were?

5             MR. JONES:  Objection.  Object to form.

6             BY MS. RIGER:

7        Q    You can answer.

8             MR. JONES:  Who is the "they."

9             BY MS. RIGER:

10       Q    Dan Bendler.  Dan Bendler didn't care what

11   you had to say about the candidates.

12            MR. JONES:  Objection.

13            BY MS. RIGER:

14       Q    You can answer.

15       A    No, I will not answer.

16            MR. JONES:  Oh, you can answer.  You can go

17   ahead.

18            THE WITNESS:  I don't know.

19            BY MS. RIGER:

20       Q    And Paul Sherman wasn't interested in what

21   you wrote about the candidates?

22            MR. JONES:  Objection.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 36

1          BY MS. RIGER:

2      Q    You can answer.

3      A    I don't know.

4      Q    Well, they obviously weren't interested if

5  they didn't want to see your written notes.

6          MR. JONES:  Object to form.

7          BY MS. RIGER:

8      Q    You can answer.

9          MR. JONES:  Is that a question or a

10  statement?

11          BY MS. RIGER:

12      Q    It is a question.  There was a question mark

13  at the end.  My voice went up.

14      A    All right.  Repeat the question again.

15      Q    Isn't it obvious that they weren't interested

16  in what you wrote about the candidates because they did

17  not ask to see what you wrote about them?

18      A    No, it is not obvious to me.

19      Q    It is not?

20      A    No.

21      Q    Why wouldn't they ask for your notes?

22          MR. JONES:  Objection.  It calls for

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 37

1    speculation.

2            BY MS. RIGER:

3        Q    You can answer.

4        A    I have no idea.

5        Q    What did you write down about the candidates?

6        A    I do not recall.

7        Q    Do you remember the interviews?

8        A    I remember that -- yes, some of the

9    interviews that we gave and that we gave them, but

10   exact details, that was a while back and I don't have a

11   detailed recollection of them.

12       Q    Do you remember which of the candidates did a

13   good job?

14       A    Not -- well, I mean, not really.  We rated

15   them and how we rated them.  We have got a record of

16   that and that is -- that was it.  It is a structured

17   process and we went by the process.

18       Q    Do you remember if anybody did a bad job?

19       A    No, I do not.

20       Q    Okay.  I am going to show you the scores that

21   you are talking about.

22       A    Okay.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 38

1    Q    There is actually three different documents

2    with the scores.  So I am going to mark them as

3    Exhibits 3, 4 and 5.  3 is the one that is 505.  4 is

4    597.  5 is 504.

5              (Marlatt Deposition Exhibits 3 through 5

6              were marked for identification.)

7              BY MS. RIGER:

8    Q    Can you tell me about Exhibit 3, the document

9    that ends in 505?

10             MR. JONES:  Objection.  Vague.

11             BY MS. RIGER:

12   Q    What is number 3, Exhibit 3?

13   A    Number 3 looks like our overall summary

14   evaluations that we came to a consensus to, as the

15   interview panel, of our summary weighting and that we

16   gave the people.

17   Q    Were all the candidates that you interviewed

18   on this -- are they all on this document?

19   A    Yes, they are.

20   Q    They are?

21   A    All the -- well, all the ones that we

22   interviewed when this document was done I would say

Page 39

1   because we have -- all the ones that we -- I mean, why

2   would we leave someone off?

3       Q    Did you consider anyone else?

4       A    We only considered those that we interviewed.

5       Q    What about Pam Brownfield?

6       A    We interviewed her.

7       Q    Why isn't she on this list?

8       A    Well, she may be -- she is on list number 4

9   it looks like.

10      Q    Why isn't she on 3?

11      A    Maybe we didn't interview her at that time.

12      Q    Do you remember if you had interviewed her at

13  the time you made this form?

14      A    I don't recall, but whenever we did these, we

15  put everyone on there.  I mean, we interviewed her and

16  everyone that we interviewed at the time that we came

17  to our consensus was on the, you know, we gave our

18  summary opinions of.

19      Q    So why is Pam on 4 and 5, but not on 3?

20      A    I do not know.

21      Q    What do you think?

22      A    Logically, on 4 and 5, we had interviewed her

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 40

1    and on 3, we had not interviewed her.

2        Q    So you think 3 was made before 4 and 5?

3        A    Logically you can come to that conclusion,

4    yes.

5        Q    Do you remember how long of a -- how long

6    there was between the first interview and the last

7    interview?

8        A    No, I do not recall.

9        Q    Do you remember if you went on vacation

10   during the interview process?

11       A    I don't recall.

12       Q    Do you recall anything?

13       A    No.

14       Q    When was the -- when were these interviews

15   done?

16       A    Exact dates I don't recall.

17       Q    Do you remember that Pam Brownfield

18   interviewed later than the other candidates?  Does that

19   sound familiar?

20       A    I can't recall with certainty on that.

21       Q    Do you remember there was a death in Pam

22   Brownfield's family?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

Page 41

1      A    I didn't know her well enough to know what

2   was happening within her family.

3      Q    Okay.  So on these sheets, there are

4   rankings, correct?

5      A    Yes, there are rankings.

6      Q    And do you remember what -- what do the

7   rankings mean?

8      A    Well, I -- it is how they ranked out in

9   accordance to their total score with the weighted

10  factors is what it should be.

11     Q    So is each candidate ranked as a whole?

12     A    I'm sorry.  I don't quite understand that.

13     Q    Is each candidate assigned an overall

14  ranking?

15     A    Well, if you mean that, yes, William Gately

16  got the most points and he was number one and then,

17  let's see, Holly Mattus, Valerie and David Lok were --

18  they had pretty much the same it looks like.

19     Q    What is that score based on?

20     A    The total score?

21     Q    Right.

22     A    Is based on the structured interview, how we

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 42

1    rank -- there is a ranking here: outstanding, good and

2    inadequate and we had an OG and that was the answer

3    score, which is a 3, a 2 or inadequate was a zero and

4    then taking each one of these and putting a weight to

5    them, i.e., and question 2 had a weight of 2.  So if

6    you got an outstanding, you got a total of 6 points on

7    those.  And then the total score is a summation of all

8    the questions with the answer scores multiplied by

9    their weight.

10        Q    So were the candidates ranked on each

11   question?

12        A    They were scored on each question and no,

13   they were ranked with their total score.

14        Q    Okay.  So they were scored on each question

15   they received a score.

16        A    Right.

17        Q    Did you give a score to each candidate on

18   each question?

19        A    Everyone within the -- that was on the

20   interview panel did that and then after, we came to a

21   consensus of what the consensus of the group's score

22   that we felt should be of that particular discussion.

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

1    Q    How did you come to a consensus?

2    A    Through discussions.

3    Q    So you could say, "I think this person

4    deserves an outstanding."  And someone said, "No, it is

5    a good."  And then you would come to an understanding?

6    A    Usually what would happen is -- we were

7    pretty much all in agreement, but where we were not in

8    agreement, we would then discuss it, the pros and cons

9    of why we thought that and based on their answers and

10   we would come to an agreement through group dynamics.

11   Q    Did you tend to give the person a higher

12   score or would you give them a lower score?

13        MR. JONES:  Objection.  Vague.  When you say

14   you --

15        BY MS. RIGER:

16   Q    When the group was discussing the scores, if

17   someone gave the person -- the candidate a 3 and

18   another person gave the candidate a 2, was there a

19   tendency to go with the 3 or to go with the lower

20   score?

21   A    It would vary.  It could go either way

22   depending on how we discussed it and what we felt and

Diversified Reporting Services
202-467-9200

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 44

1    how, you know, the consensus we came to.  Sometimes it

2    would be higher; sometimes it would be lower.

3              MS. RIGER:  Okay.  Can we take a short break,

4    please, five minutes.

5              (A brief recess was taken.)

6              BY MS. RIGER:

7         Q    Okay.  So let's look at the score sheets

8    again.

9         A    Which one?

10        Q    Let's look at 4.  So for Holly Mattus.  Is

11   4.5 her score for question 1?

12        A    That would be the weighted score for that

13   question.

14        Q    That was the score, the consensus that the

15   group agreed to.

16        A    Oh, yes, yes, yes.  We came to a consensus.

17        Q    And that was her score on the interview

18   question.

19        A    Times the 1.5 weight.

20        Q    Okay.  Right.

21        A    Yes.

22        Q    Right.  So but this score was from -- the

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

Page 45

1    group came to this score based on all of their score,

2    the individual scores of the interviewers.

3         A    Yes.  We would go back to the questions and

4    say okay, why are we not -- why are we out of consensus

5    on each one of these and we would come to a consensus

6    on that.

7         Q    Okay.

8         A    On that, on the score or the question.

9         Q    And you asked each applicant the questions on

10   Exhibit Number 2, the five questions on Exhibit

11   Number 2.

12        A    Yes.  Yes, we did.

13        Q    Did you read the questions?

14        A    Yes, they were read to them.

15        Q    Did you read the questions to each -- do you

16   read all the questions to all the people you

17   interviewed?

18        A    Yes, we do.  We read the same questions and

19   we give them all the same information.  So they all get

20   the same questions.

21        Q    Were all -- how long were the interviews?

22        A    Oh, I don't recall.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

1    Q    Were they an hour?

2    A    I really don't recall.

3    Q    Were they approximately the same time?

4    A    Everybody is different.  Some people, you

5    know, talk a lot, some don't, some are concise.  And so

6    it varied.

7    Q    Okay.  But for each number that is on this

8    score sheet, the group agreed on the score to the

9    interviewee's answer to each question.

10    A    Yes, I believe so.

11    Q    And then you came to a total score based on

12    the agreed upon score for each question, for each

13    interviewee.

14    A    Yes.

15    Q    Okay.  What did you give to Mr. Bendler?

16    A    I don't have my records so I don't know.

17    Q    Did you give him a score sheet?

18    A    No, he doesn't get the score -- oh, I see, to

19    Mr. Bendler?  Yes, we gave him our consistent score.

20    Q    And which exhibit is that?

21    A    I don't know.  I don't know where you got

22    these from.  If they came from Mr. Bendler, then this

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 47

1     is what we gave him.

2         Q     You said that you gave him just your scores

3     to the -- just your overall consensus scores.

4         A     Right.

5         Q     And it looks to me like --

6         A     Yes, I'm sorry.

7         Q     Yes.  So did you give Mr. Bendler Number 5,

8     the one without any handwriting?

9         A     I believe what we gave Mr. Bendler was this

10    in electronic format.

11            MR. JONES:  "This."  Which one is "this?"

12            THE WITNESS:  Well, I mean, any one of these,

13    when we did the evaluation, it was summarized in

14    electronic -- it was on a spreadsheet and that was

15    transmitted to him in an e-mail as an attachment, our

16    consensus, is my belief.

17            BY MS. RIGER:

18        Q     But was it Number 5, was it Number 4, was it

19    Number 3?  It had to be one of them.

20            MR. JONES:  Objection.

21            THE WITNESS:  I don't recall.

22            BY MS. RIGER:

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

Page 48

1    Q    Okay.  Did you give Mr. Bendler the score

2  sheet without Pamela Brownfield's name on it, Number 3?

3    A    If it was attached to the e-mail, the summary

4  e-mail we gave him, then yes, it was, but --

5    Q    Who e-mailed Mr. Bendler the scores?

6    A    I don't remember on that.  It may have been

7  me, but I -- this was so long ago.

8    Q    Well, just think back.  You can look at

9  these.  Remember just think logically which one you

10  would have sent to Mr. Bendler.

11    A    I cannot recall with certainty which one.

12    Q    Okay.  But you did send Mr. Bendler the

13  composite scores on the interviews.

14    A    Yes, we did.

15    Q    On each interview question.

16    A    No.  We sent it -- well, in this format

17  where -- because this was an electronic spreadsheet so

18  yes, we sent it in this format.

19    Q    So Mr. Bendler would see the composite scores

20  on each interview question and the overall score, the

21  overall consensus score.

22    A    Well, wait a minute.  What was the question

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 49

1    again?  I'm sorry.

2         Q    Mr. Bendler saw what each candidate scored on

3    each question, the group's consensus.

4         A    Right, right, right.  Yes.

5         Q    And he saw the overall scores.

6         A    Yes, because that is on this whole sheet

7    right here.  So he would have gotten it --

8         Q    So he would have gotten it in this format.

9         A    Yes.  Yes.  In this format.

10        Q    Okay.  When did the panel meet?  When did you

11   meet with the other panelists?

12        A    The exact date?

13        Q    No.  Was it before the interviews?  Was it

14   after the interviews?

15        A    Well, we -- right after each interview, we

16   would discuss what we thought and then after everything

17   was over, we discussed some more and came to our

18   consensus.

19        Q    Okay.  Did you -- each time that you met, did

20   you compare the candidates to one another?

21        A    No.  We compared their scores that we gave

22   them.

Page 50

1    Q    So you compared -- did you tally their scores

2  each time you met after each interview?

3    A    I don't recall with certainty on that.

4    Q    Was each candidate -- were you comparing each

5  candidate to the ideal candidate?

6    A    No.

7    Q    Well, in other words, were you comparing each

8  candidate to the benchmark on Exhibit 2?  There was --

9  that is an ideal answer, isn't it, the benchmark?

10    A    It is a benchmark and we would go down those

11  and say, like, yes, how much of this did they provide,

12  you know.  As more explained more and you would write

13  down if they talked about this.  Yes, they sought

14  advice from their supervisor.  And you would say, oh,

15  yes, you did that and then add some other stuff, but

16  yes, you would tick off.  If noone said any of this,

17  then of course they were the lowest score.  If they got

18  all of it, they would be the highest score.

19    Q    So but you were comparing -- after each

20  interview, you would meet with the panelists, correct?

21    A    I mean, we were there.  I mean, right after

22  the interview, we were there.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 51

1     Q    Right after the interview, you discussed with

2   the panelists the interview.

3     A    I don't recall.  We may have -- I believe --

4   no, we would rate these independently.  Then we came

5   together.

6     Q    So you rate them based on how well each

7   person did.  You would rate them against the

8   benchmarks.

9     A    Yes, that is was the purpose of the

10  structured interview.

11    Q    Okay.

12    A    But these were the factors we would rate them

13  on and it would take any other factor out of the

14  process.

15    Q    So you weren't comparing candidates to each

16  other.  You just did that numerically.

17    A    Yes.

18    Q    Based on their individual scores.

19    A    Yes.  Yes.

20    Q    So approximately, how many times did you meet

21  with the interview panelists?

22    A    I don't recall the exact number.  I would say

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 52

1    at least two times.

2        Q    At least two times, but you said you met

3    after all the interviews.

4        A    That is when we came to our consensus.  We

5    discussed everything as a consensus.

6        Q    So you would --

7        A    We would -- what we would do, after each

8    interview, we would individually write, you know, give

9    them our rating right here and then we came -- I

10   believe we had a meeting afterwards where we got

11   together and we would go down each individual and go

12   over how we scored them and why and then that is when

13   we came to the consensus score if that makes sense.

14       Q    After the interviews?

15       A    After all the interviews were completed, yes.

16       Q    Oh, at the end of the process.

17       A    Yes.  Yes.  I'm sorry.  Yes.

18       Q    Okay.

19       A    At the end of each interview, we were rating

20   the individual individually, but we didn't come to our

21   consensus until after the interview process.

22       Q    Okay.  I don't have anymore questions.  Oh,

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 53

1    that is right.  Sorry.  Did you review any documents

2    before this deposition?

3              MR. JONES:  You can answer.

4              THE WITNESS:  Yes, I did.

5              BY MS. RIGER:

6        Q    What did you review?

7        A    I believe I was shown these right here.

8              MR. JONES:  "These" being.

9              THE WITNESS:  Oh, I'm sorry.  The exhibits

10   that I have here on the --

11             BY MS. RIGER:

12       Q    Oh, you saw all of these.  You saw all these

13   exhibits or you saw just the score sheets?

14       A    I saw the score sheets or I saw a score

15   sheet.

16       Q    Which score sheet did you see?

17       A    I'm sorry.

18       Q    Well, there is one that Pam Brownfield was

19   not on.

20       A    Yes.  I -- that may have been shown to me

21   because I just looked at it and said yes, that is --

22   just glanced over it yes, I have seen this before, but

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 54

1    I didn't go into detail.  It was just a cursory review

2    of it, but I did recognize the format and also their

3    names on there.  I believe I was shown most of these.

4         Q    Okay.  So you were shown most?  You were

5    shown two of these score sheets?

6         A    I don't recall.

7         Q    Who showed them to you?

8              MR. JONES:  You can say.

9              THE WITNESS:  Bill did.

10             BY MS. RIGER:

11        Q    When did he show them to you?

12        A    I would say it was about a week ago.

13        Q    A week ago?

14        A    Yes.

15        Q    Did you review anything else?

16        A    No.

17        Q    Nothing else?

18        A    Well, I saw the, what do you call it, the

19   thing that you guys write up.

20        Q    The complaint?

21        A    Yes.

22        Q    And the answer?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 55

1       A    Yes, I did.

2       Q    Have you ever seen a complaint before?

3       A    No.

4       Q    And you said you met with Bill a week ago?

5       A    It was approximately a week ago.

6       Q    Is that the only time you met with him?

7       A    Yes, it was.

8       Q    How long did you meet for?

9       A    About 45 minutes.

10      Q    What did you discuss?

11           MR. JONES:  Objection.  Attorney-client

12  privilege.  Direct the witness not to answer.

13           MS. RIGER:  He is your client?

14           MR. JONES:  Yes.

15           MS. RIGER:  Is everyone at the FDIC your

16  client?

17           MR. JONES:  Only people who were involved in

18  this transaction, this case in an official capacity.

19           MS. RIGER:  Okay.  So he is your client then.

20           MR. JONES:  Correct.

21           MS. RIGER:  So you are directing him not to

22  answer that.

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 56

1              MR. JONES:  I am.

2              BY MS. RIGER:

3        Q    Okay.  Did you do anything else to prepare

4    for this deposition?

5        A    No.

6              MS. RIGER:  That is it.  Okay.

7              MR. JONES:  You have to make a verbal

8    response.

9              THE WITNESS:  Oh, yes.  I'm sorry.

10             BY MS. RIGER:

11       Q    You didn't do anything else.

12       A    No, I did not.

13             MS. RIGER:  Okay.  I don't have anymore

14   questions.

15             EXAMINATION BY COUNSEL FOR DEFENDANT

16             BY MR. JONES:

17       Q    Okay.  Let me ask a clarifying question about

18   the consensus, coming to a consensus.  I know you said

19   you didn't remember -- well, if one day you had

20   interviewed four people in a row, would you have come

21   to your consensus at the end of the four interviews or

22   after each individual interview?

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e

Page 57

1      A    We came to our consensus after all the

2   interviews.

3      Q    Okay.  So if you did four interviews --

4      A    And that is all we had was four people.

5      Q    Yes, that day.  You would actually -- the

6   discussion would not -- your discussion of coming to

7   the consensus and working out the differences was after

8   all four interviews were over not after each individual

9   interview.

10      A    Yes.  Yes.

11           MS. RIGER:  Would you repeat that.  I'm

12   sorry.  Okay.  All right.  That is it then.  No more

13   questions.

14           THE WITNESS:  Okay.

15           MR. JONES:  Okay.

16           (Whereupon, at 11:28 a..m., the deposition of

17   RICHARD D. MARLATT was concluded.)

18           I have read the foregoing pages, which are a

19   correct transcript of the answers given by me to the

20   questions therein recorded.

21      Deponent_____

22        Date_____

Brownfield v. Bair, 05-cv-2468-EGS
Exhibit 21

5138adf0-6929-4b64-996d-9beac75a297e