## WITNESS AFFIDAVIT

I, Paul Sherman, am an employee of the Federal Deposit Insurance Corporation located in Washington, D.C. My telephone number during working hours is: 202-942-3547. My work address is: 1730 Pennsylvania Ave., Washington, D.C., 20429

Having been fully informed of my rights as a witness in an EEO investigation, as set forth in the attached Notice of Rights of Witnesses in EEO Investigations executed by me, I solemnly  X  swear ___ affirm that the statement, which follows, is true and complete to the best of my knowledge and belief.

**Question 1:** Describe your current position, including your duties and responsibilities in that position.

**My Response:** I am an Assistant Director for the Division of Administration ("DOA") at the FDIC. I have responsibility for the Management Services Branch (MSB), which is one of four branches in the Department of Administration. I have been in this position for the last three years. Prior to that time I was the head of the Management Review Staff (which has since been merged into MSB). In my capacity as Assistant Director, I directly or indirectly supervise about twenty-five employees.

**Question 2:** What is your race?

**My Response:** I am Caucasian.

**Question 3:** Describe the number and racial makeup of the non-bargaining-unit employees that you supervise.

**My Response:** Until recently, there were 25 employees in my branch. (One employee departed in May.) I am a first line supervisor to five employees and a second line supervisor to 19-20 employees. Of the employees currently in my branch, thirteen are Caucasian, six are African American and five are of Asian Pacific descent. (During the time period at issue in this complaint there was a sixth employee in my branch who was of Asian Pacific descent.)

**Question 4:** Do you supervise Complainant?

**My Response:** I do not directly supervise Ms. Brownfield. Ms. Brownfield is supervised directly by Daniel Bendler, who, in turn, is supervised by me. Over the last three years I have had limited review of Ms. Brownfield's work. I have weekly staff meetings with the section heads in my branch, however, and get regular updates on Ms. Brownfield's performance as well as the performance of all other employees in my branch. I am directly involved in projects related to the reorganization of divisions and offices within the FDIC and on occasion will directly review Ms. Brownfield's work if she is involved in such a project. In my prior capacity as head of the Management Review Staff, I regularly reviewed Ms. Brownfield's work.



**Question 5:** What was your involvement in the administration of the CBC Program in your division for the 2005 compensation period?

**My Response:** I helped administer the CBC Program on two different levels. First, I helped compile a ranking of the sixteen non-bargaining unit employees in my branch. I asked each section head to individually rank the non-bargaining unit employees in their section. Then, I met with those section heads and together we compiled a ranked list for all sixteen employees eligible for the CBC Program. All other branches and regional offices in DOA compiled similar lists for their organizations. The branch/regional lists were then sent to the Human Resources Branch where they were integrated into one master list for all 200 plus DOA non-bargaining unit employees. Through the use of a formula-driven spreadsheet tool, each employee's ranking was calculated based on two factors: the ranking that they had received from their branch/regional office and the relative number of employees in their organization. The spreadsheet tool ultimately broke the master list down on a percentage basis into five performance groups.

Once the performance groups were established, I participated in a division-wide management review of the results, which was the second phase of the process. The DOA senior management team, which consisted of the Director, the Deputy Director, the heads of the four branches and the five regional managers, reviewed all of the CBC nomination forms and conducted a comparative analysis of the narrative justifications of the employees in each of the performance groups to ensure overall consistency. We paid particular attention to employees in Groups I and V and to employees who were close to the cutoff for each group. Based on the consensus view of the managers, a few employees were moved from group to group. Once the management team agreed on the final placement of employees in the five groups, we sent the list to the Director for her final approval.

**Question 6:** Were any employees moved from Group V to Group IV for the 2004 compensation period? If so, what was the race of those employees?

**My Response:** I know that there were several employees who were moved up from Group V to Group IV. I believe that at least two of those employees were African American. None of those employees were in my group. I believe that there were also several employees who were moved from Group IV to Group V, including one male Caucasian. I do not recall any other specific racial profile information about the employees who were moved between these two groups.

**Question 7:** Complainant has alleged that she was discriminated against and subjected to a hostile work environment because of her race when she was placed in Group V for the 2005 CBC Program. How do you respond to that allegation?

**My Response:** I do not believe that Ms. Brownfield was discriminated against. In the judgment of the MSB management team, she was our least productive contributor in 2004. Compared to the other employees in her section and branch, her contributions stood out as being the least significant during the rating period.

Ms. Brownfield's section has primary responsibility for CFOA internal control testing in DOA. This testing is conducted as part of the DOA Administrative Compliance Review (ACR) process.



As a member of the section, Ms. Brownfield's primary responsibilities were related to internal control testing. Specifically, she had two major areas of responsibility during the 2004 rating period: (1) To participate and report on ACR testing via on-site visitations; and (2) to prepare year-end summary reports of DOA internal control testing in twelve functional areas. Of the four on-site visitations the section conducted over the year, Ms. Brownfield declined to participate in the three ACR visitations that involved travel. Ms. Brownfield had a significant role in the fourth ACR in Washington. This assignment required her and one co-worker to review of the accounts of about 130 bank card holders. Ms. Brownfield was expected to review approximately half of these 130 cardholder accounts and the other analyst was to complete the other half. However, in actuality, Ms. Brownfield only reviewed a handful of the files. Mr. Bendler was forced to reassign another person to assume the balance of Ms. Brownfield's accounts in order to complete the project. Ms. Brownfield never provided an explanation as to why she did not complete that assignment.

Later in the year, Ms. Brownfield was assigned the responsibility of preparing twelve reports summarizing the test results of the different functional areas that were reviewed under the internal controls program. The assignment was not difficult (the summary reports were pre-structured documents that ran from one to three pages in length depending on the nature of the test results) and was the type of work that Ms. Brownfield had performed numerous times in the past. Ms. Brownfield only completed a few of the less demanding summary reports. The remainder had to be reassigned to other members in the section. Of the reports Ms. Brownfield did turn in, most had to be significantly edited or redone. Since Ms. Brownfield was out of the office a great deal of time on personal matters during 2004, these assignments represented the key sources of the work that could be taken into consideration when evaluating her contributions for the year. Because of her poor performance on these tasks, she was ranked last in contributions for her section and branch.

Race did not place a part in Ms. Brownfield's ranking in the CBC Program. Employees of various races and ethnic groups were rated at all levels of the CBC (and the companion bargaining unit Corporate Success Award program). Our Division Director, Arleas Upton Kea, is an African American female who is a leader of the Corporation's diversity awareness program. Under the leadership of Ms. Kea, our management team is committed to following the tenets of our diversity program and we regularly reflect on our management decisions to ensure that they are equitable and well-supported. Ms. Kea reviewed the nominations for the placement of employees in the different performance groups and did not express any belief that any of the placements were racially motivated. The group placement was designed to fairly and equitably reflect an employee's contribution in relation with his/her peers. I believe that Ms. Brownfield's placement in Group V was fair and accurate.

Likewise, I do not believe that Ms. Brownfield has been subjected to a hostile work environment. Ms. Brownfield's sister was terminally ill during 2003 and part of 2004 and Ms. Brownfield required a great deal of time out of the office to cope with that situation. Both Mr. Bendler and I were sympathetic to Ms. Brownfield's personal problems and tried to accommodate her needs by advancing her leave time and rearranging section work assignments.

Undeniably, it was a difficult year for Ms. Brownfield. In addition to the sorrow of her sister's death, she encountered disappointment in the workplace. First, a job advertisement for CG-13

positions on the MSB staff became open and Ms. Brownfield applied for the advertised positions. She was determined to be a qualified candidate who would participate in the interview phase of the selection process. Unfortunately, as Mr. Bendler and his interview panel were scheduling the interviews for these positions, we received word that Ms. Brownfield's sister had passed away. Mr. Bendler and I discussed the situation and decided that we would offer to postpone Ms. Brownfield's interview date as long as we could (limited by the job roster expiration date). As circumstances allowed, we were able to postpone the interview by about two weeks. The interview process followed standard corporate procedure and included two rounds of interviews. In phase one of the process, an interview panel of three officials (not Ms. Brownfield's supervisors) interviewed Ms. Brownfield and asked her the same set of questions that they had asked all the other candidates. As I understand it, Ms. Brownfield indicated that she did not perform well during the interview; in any case, the panel did not rank her as one of the top candidates, and did not send her application forward to proceed to the final level of interviews.

Later in the year, based on a workload/staffing analysis conducted at the direction of top corporate management, it was determined that the CG-12 position that Ms. Brownfield occupies was among 130 DOA positions that were identified as surplus to projected staffing requirements as part of an on-going downsizing of the corporation. These positions were posted on a surplus list that was published on the FDIC website along with hundreds of other FDIC positions.

I suspect that these events, all occurring within the span of a year, were disappointing and demoralizing to Ms. Brownfield. However, I do not believe that they were racially motivated or intended to harass Ms. Brownfield. Rather, they were unrelated occurrences that all happened within a relatively short time span, but were all precipitated by different circumstances. Some of the events that transpired involved decisions within the control of Mr. Bendler and myself. Others were not. Our recommendation to rank Ms. Brownfield in Group V was a difficult decision that we made based on a careful assessment of the contributions of the entire staff, and in my view, reflected the relatively modest contributions that Ms. Brownfield made in 2004.

After Ms. Brownfield became aware of her placement in Group V of the CBC Program she withdrew and did not interact with others in her section or with Mr. Bendler. She went from an open-door, friendly presence on the floor to not wanting to talk to anybody. She kept her door closed and did not participate in the section's working environment. Ms. Brownfield refused to discuss the issue with Mr. Bendler and was non-responsive to his inquiries about her behavior and work assignments. Mr. Bendler and I met on several occasions to discuss how to improve relations with her. Mr. Bendler tried to use non-threatening management techniques to draw her out and encourage her to participate in section activities. I met with her to discuss the placement of her position on the surplus list. Ms. Brownfield did not appear to respond to any of these overtures. Mr. Bendler and I consulted with an official in the Human Resources Branch who advised us that we should consider addressing the situation in writing. We were advised to outline the issues we were having with Ms. Brownfield's performance and behavior in an informal letter (as opposed to a formal letter of counseling that would go in her personnel file). Mr. Bendler followed HR's advice and sent Ms. Brownfield a memo that set forth the issues and outlined ways her performance could be improved. Mr. Bendler's actions were necessary and were not hostile in any way.



**Question 8:** Complainant has alleged that she was Employee of the Month in 2004. Was any other Employee of the Month placed in Group V in your branch?

**My Response:** As a supervisor, I have the capacity to annually give out small "non-monetary" awards that do not exceed $25 per employee. In the past, these awards had been used sporadically. Beginning in 2004, I initiated an Employee of the Month program, which was designed to distribute these small awards on a monthly basis. An awards committee (comprised exclusively of non-supervisory members of the staff) was formed (with membership rotating every quarter). Beginning in February 2004, the committee was empowered to chose one to three people per month to be designated as Employees of the Month. By December 2004, all but four employees in my branch had been selected to be Employee of the Month. One of those four employees was Ms. Brownfield. Prior to making the final selections, one of the committee members asked me if there was sufficient funding for all four remaining employees to be made Employees of the Month (so that no one would be left out of the program and feel excluded). Since this was a morale-building exercise and not an incentive award program, I agreed. Therefore, all employees in the branch were designated as the Employee of the Month at some period during 2004.

**Question 9:** Is there anything else you would like to add to the record about this complaint at this time?

**My Response:** Nothing further.

I have reviewed this statement, which consists of _____ pages, and hereby solemnly swear _____ affirm _____ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____   8/2/05
(Signature of Affiant)         (Date)