**EXHIBIT F3**

**AFFIDAVIT**

**COMMONWEALTH OF VIRGINIA**

**COUNTY OF ARLINGTON**

    I, Paul Sherman (white, no prior EEO activity), Assistant Director, CM-2, Management Services Branch, Division of Administration, Federal Deposit Insurance Corporation, after first being placed under oath, make the following statement freely and voluntarily to Daniel Willard Jewell, who has identified himself to me as a Contract EEO Investigator for the Federal Deposit Insurance Corporation, investigating a complaint of employment discrimination filed by Pamela Brownfield, knowing that this statement may be used in evidence. I understand that this statement is not strictly confidential and may be shown to any interested party with a legally recognized need to know.

    In response to questions from the EEO Investigator, I hereby solemnly swear or affirm:

1. I have held my current position for 4 years and have worked for the FDIC and RTC since 1991. My 1st and 2nd level supervisors are Glen Bjorkland and Arleas Upton Kea. My duties are to handle matters related to the budget, IT reviews, internal support, reorganization analysis, website management, and other management analysis and administrative support responsibilities. I am also a liaison between DOA and the EEO office. I currently manage 24 positions, which is down from the 31 we once had.

2.  The Investigator has apprised me of the issues in this complaint filed by Pamela Brownfield based on race and reprisal. I have known Ms. Brownfield since 1992 when she served as an Administrative Assistant for an RTC organization where I was a Section Head. I did not supervise her between 1992 and 1994 and I was assigned to the FDIC/RTC transition team until 1996. In late 1996, I began directly supervising her and did so until about 3-1/2 years ago when she started reporting directly to Dan Bendler. I first learned of her EEO activity about 2 years ago. I acquired this information through my role as ODEO liaison.

3.  Over most of the time that Ms. Brownfield and I worked together we had what I considered a good relationship. I knew she was working on her college degree and I admired her persistence. Around the time she was completing her degree, I saw it fit to promote her to grade 11 and then 12. After receiving her bachelor's degree, she was thinking of going for an advanced degree in psychology and maybe changing careers and we often discussed her plans. However, our good relationship seemed to change about two years ago. It was during a time when Ms. Brownfield was working through some difficulties in her

personal life and, in my view, was not producing to her full capability. She was placed in pay group V of the corporate Contribution-Based Compensation Program, the lowest category. She filed her first EEO complaint at that time, about 2 years ago. During this general timeframe, our division and several other FDIC organizations were planning for a downsizing of our staffs and had to carefully review each position and determine if the workload warranted keeping that position. Ms. Brownfield's position was one of five in our Branch (one of 138 in our division) that was found to be surplus because of the decrease in work across the Corporation. I was not authorized to give her advance notice of the surplus decision and, when she learned of it, she reacted strongly to the news. She stopped talking to me and began to keep her door closed - distancing herself from the rest of the staff. The other surplus positions in our branch were: Frances Childers, Administrative Officer and supervisor; 1 grade 7 web team Information Specialist; 1 Management Analyst that was vacant; and 1 Information Systems Specialist that was vacant. We later added 2 other positions when those employees took a buyout. We were heading toward a RIF in 2006 but now it seems that will not

be necessary. Ms. Brownfield has accepted a new permanent position in another work area and will transfer in 2 weeks.

4. Regarding the issue of a complaint from Ann Bridges Steely in February 2006, she came to me and advised me that Ms. Brownfield was spending a significant amount of time in her work area. A couple of supervisors had spoken to her about this and said Ms. Brownfield was spending an excessive amount of time standing around talking to people about what appeared to be non-business matters. Ms. Steely also said she had observed this to be true herself. Since relations between Ms. Brownfield and myself were already strained, I felt this matter needed to be handled in a low-key manner. However, I did not think it was appropriate to simply ignore the situation so I spoke to Glen Bjorkland and Dan Bendler about how best to handle it. We agreed someone needed to bring this matter to Ms. Brownfield's attention even though no one considered this a matter that required any type of adverse action. We decided that the best approach was to have Mr. Bendler (her immediate supervisor) speak with her alone and keep the whole matter low key. We simply just wanted to make her aware of the issue. Mr. Bendler had a meeting scheduled with her to discuss work and he mentioned it at that time. Afterward

she sent him an email suggesting he had unfairly criticized her. I believe he responded to her message reiterating that the matter was not considered a big deal – it was just something that she needed to be sensitive to. We did not keep any record of the matter since Mr. Bendler's discussion was considered informal counseling and not any kind of discipline. I did not personally speak to her about this matter because I felt that second level supervisory intervention would have inflamed the matter and given it undue import. I have not intervened on such a matter with any other employees. We have no written policy regarding socializing among employees.

5. Regarding the issue of Ms. Brownfield's work assignments, for a number of years we sent teams 10-14 employees to do a systematic compliance review of many DOA work areas. This was part of the CFO Act internal review process and we evaluated a comprehensive set of potential risk factors. Over the past 2-3 years we moved from a systematic to a risk based approach. The shift resulted in smaller team requirements and a less comprehensive review process. It also impacted the responsibilities of the employees who were involved in the process. The sheer volume of the program's workload decreased – enabling us to

conduct our reviews with fewer employees. This workload compression was a key factor that led us to identify Ms. Brownfield's position as underutilized and surplus to our projected future needs. The revamping of the internal control process allowed us to conduct our range of reviews with 4-5 employees rather than the 10-14 DOA employees previously required.

As for the Directives Review Process Ms. Brownfield speaks of, I do not personally know what happened to that work. In any case, this was a marginal assignment of hers and generally would not have required more than 1 hour per week. As for her workload in general, I know she asked Mr. Bendler for work and on a couple of occasions he was able to give her something additional to do. However, at other times, there was simply not enough work to give her and that is why her position was found to be surplus. I know Mr. Bendler tried to stretch the work so everyone would have enough to do but he was not always successful.

6. Regarding the issue of my making inquiries about Ms. Brownfield among her co-workers, I am not sure exactly what she is referring to since she did not identify the woman she says I talked to. I do recall having a conversation with Wilma Probst Levy, a member of our staff

who I believe maintains a cordial relationship with Ms. Brownfield.  I approached Wilma to see if she had any sense of whether Ms. Brownfield was finding opportunities to explore career possibilities because I was concerned about Ms. Brownfield's vulnerability in the (then) impending RIF scenario.  I did not feel that I could approach Ms. Brownfield directly on this matter, because in the months leading up to this conversation, she had declined to speak to me (except on questions directly related to work assignments) and made it clear through body language and silence that she did not wish to interact with me.  My intention was to get a sense of whether Ms. Brownfield was taking steps to protect herself from the threat of a RIF.  I approached Wilma out of concern and was not trying to dig up negative information.  I also briefly mentioned the subject with another staff member, Jodi Hunter, sometime later, but that conversation never materialized into a substantive discussion.

7.   Regarding the issue of the luncheon in February 2006 that Ms. Brownfield speaks of, we have an annual employee appreciation day each year.  We wanted all the employees to come of course and I attended.  I vaguely recall Mr. Bendler going to Ms. Brownfield's office to

encourage her to participate in the luncheon, but I do not recall anyone making a joke about or laughing at Ms. Brownfield. I don't believe Mr. Bendler said anything to the group about her.

8. Regarding the issue of the Pay for Performance program in 2006, I was involved in the placement process. We were tasked with placing 25% of DOA employees in group I, 50% in group II and 25% in group III. My managers and I met to discuss the contributions of each eligible employee in our branch of DOA and we ranked our employees based on a comparison of each person's total contributions over the past year. At this point we did not assign employees to any groups. We were required to give Ms. Kea our best synopsis of each employee's <u>significant</u> contributions and not expected to itemize everything each employee did. If we had applied the mandated percentages (i.e., 25%, 50%, 25%) at the branch level, Ms. Brownfield would have been in group III (the lowest 25%) but for our internal MSB purposes, we were not required to assign percentages. (That came later in the DOA process.) The MSB prioritized rankings were aggregated with the rankings of all other DOA organizations, and the senior management reviewed all of the write-ups -- especially those closest to the break

points between the three groups -- before recommending any adjustments to the aggregate rankings. There were very few adjustments to the aggregate rankings. DOA senior management collectively concurred in the final group placements for all eligible DOA employees and forwarded these recommendations to Ms. Kea for final review and approval. She reviewed the list over the course of a week and passed it to the COO's Office for final approval. I felt group III was appropriate for Ms. Brownfield and this was not a negative view of her work. We did not penalize her or look upon her contributions in a negative manner. Rather we evaluated her total contributions in comparison to those of all other DOA employees and group III was where we felt she was properly placed. She did some good work, but she just did not distinguish herself in relation to many other employees on the DOA staff.

9. As for Ms. Brownfield's Customer Advisory Committee work, it was not considered sufficiently frequent or pervasive activity such as to constitute a significant contribution to the Corporation. The committee meets every other month and has been relatively dormant over the past few years. The role of arranging the meetings and recording the minutes has value but does not rise to the

level of an ongoing substantive activity. If she had completed all of the CFOA assignments given to her by Mr. Bendler in a more proactive, engaged, results-oriented manner, she might have been placed higher but, as I understood and perceived it, her work results tended to be more in line with having met minimal requirements.

10. I deny doing anything to discriminate or retaliate against Ms. Brownfield or to create or foster a hostile work environment.

11. I suggest Glen Bjorkland as an additional witness.

12. I have nothing to add to my statement.

I have read the above statement and declare that it is truthful, accurate and complete to the best of my knowledge, information and belief, under penalty of perjury. I understand that the information I have given is not to be considered strictly confidential and may be shown

to interested parties on a need to know basis pursuant to applicable EEOC regulations.

_____
Paul Sherman

_8/11/2006_____
Date

Subscribed before me at

_4:35 p.m._____ on

this _11th_ day of _August_____, 2006.

_____
Witness to Affiant's Signature