UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAMELA A. BROWNFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A.No.1:05-cv-02468-EGS |
| | ) | |
| SHEILA C. BAIR, | ) | |
| Chairman, | ) | |
| Federal Deposit Insurance Corporation | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-iii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     MSB/MSS Refuses to Promote African American
        Employees Aboce the Grade 12 Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Mr. Bendler and Mr. Sherman Select the Only Three White Employees
        For Promotion to the CG-13 Level From a List of Seven
        Eligible Candidates, And Reject All Four African American Candidates . . . . . . . . 3

IV.     In December 2004, Mr. Bendler Singles Out Ms. Brownfield, His
        Only African American Subordinate, By Targeting Her Position
        For Elimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.      Mr. Bendler Criticizes Ms. Brownfield For Not Socializing at Work. . . . . . . . . . . 7

VI.     In February 2005, Mr. Bendler Again Singles Ms. Brownfield Out By
        Depriving Her and no Other Employee of a Pay Increase by
        Discrediting and Minimizing Her 2004 Work Accomplishments. . . . . . . . . . . . . . . 8

        A.      Mr. Bendler Assumes that Ms. Brownfield Slacked Off on a
                Project Without Speaking to Her About It. . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      To Justify His Unfair Rating of Ms. Brownfield, Mr. Bendler
                Misrepresents Ms. Brownfield's Performance on the Chief
                Financial Officers Act (CFOA) Project. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Mr. Bendler Entirely Disregards Ms. Brownfield's Other Work
                so That Ms. Brownfield Receives No Pay Raise. . . . . . . . . . . . . . . . . . . . . 12

VII.    Ms. Brownfield Files a Complaint of Discrimination After Mr. Bendler
        Denies Her and None of Her White Colleagues a Pay Raise. . . . . . . . . . . . . . . . . . 13

VIII.   After Ms. Brownfield Complains of Discrimination, Mr. Bendler
        Retaliates By Reassigning Her Substantive Work Assignments and
        Withholding Work From Her. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IX.     On February 9, 2006, Mr. Bendler Invites Ms. Brownfield to a
        Branch Luncheon When It Is About to End. ................................. 15

X.      On February 23, 2006, Mr. Bendler Reprimands Ms. Brownfield For
        Socializing Too Much. ........................................................... 15

XI.     In March 2006, Mr. Bendler Omits Ms. Brownfield's Work Assignments From Her
        Evaluation So That She Will Receive the Lowest Possible Pay Raise. ........... 16

XII.    Mr. Bendler Favors Two White Employees. .................................. 17

ARGUMENT .......................................................................... 18

I.      Summary Judgment Standard ............................................. 18

II.     Principles Applicable to Motions for Summary Judgment in Title VII
        Discrimination and Retaliation Cases. ..................................... 19

III.    Ms. Brownfield Has Established a *Prima Facie* Case of
        Discrimination. ........................................................... 20

IV.     Ms. Brownfield Has Established a *Prima Facie* Case of Retaliation ........... 24

        A.      A Reasonable Jury Could Find That Mr. Bendler's
                Actions in Removing Ms. Brownfield's Job Duties Would
                Deter a Reasonable Person From Reporting Discrimination ............ 25

        B.      A Reasonable Jury Could Find that There is a Causal
                Connection Between Ms. Brownfield's EEO Complaint
                and Her Subsequent Loss of Job Duties and
                Receiving the Lowest Pay Raise Available .......................... 27

V.      A Reasonable Jury Could Infer that the FDIC Proffered False
        Reasons for Denying Ms. Brownfield a Pay Raise, Removing
        Her Job Responsibilities, and Giving Her the Lowest Raise
        Available to Cover Up its Discriminatory and/or Retaliatory
        Motives. .................................................................. 30

        A.      Mr. Bendler's Mischaracterization of Ms. Brownfield's
                Work is Evidence That He Was Covering Up a
                Discriminatory Motive. ........................................... 31

**B.**    **Mr. Bendler's Claim That He Could Not Give Ms. Brownfield Work Because the Workload Had Declined is Belied By Evidence that Ms. Brownfield's White Colleagues Had Sufficient Work.** . . . . . . . . . . 33

**CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAMELA A. BROWNFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A.No.1:05-cv-02468-EGS |
| | ) | |
| SHEILA C. BAIR, | ) | |
| Chairman, | ) | |
| Federal Deposit Insurance Corporation | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff Pamela Brownfield has sued her employer, the Federal Deposit Insurance Corporation (FDIC), claiming it discriminated against her because she is an African American employee by denying her a pay raise and then retaliating against her when she complained of race discrimination.  Plaintiff's evidence shows that she, as the only African American in her office, was singled out and denied a pay raise while her white coworkers were all given raises.  Because she complained about this discrimination, her supervisor intensified the adverse treatment against her by diminishing her job responsibilities to almost nothing, while increasing the responsibilities of non-complaining white employees, and then gave her alone the lowest possible pay raise for the following year.

In its pending motion for summary judgment, the FDIC argues that none of the treatment

1

of Ms. Brownfield was motivated by discrimination or retaliation. In so arguing, the FDIC asks

this Court to play the role of juror and ignore evidence that Ms. Brownfield's supervisor, Daniel

Bendler continually favored white employees over Ms. Brownfield, the only African American

he supervised, and decreased Ms. Brownfield's job responsibilities dramatically after she

complained of discrimination. However, it is for a jury, and not this Court, to determine whether

the FDIC's dealing blow after blow to Ms. Brownfield creates an inference of discrimination and

retaliation. Therefore, defendant's motion for summary judgment should be denied.

**Statement of Facts**

**I.      Background**

      Pamela Brownfield is a 47 year-old African-American female. She has over 25 years of

federal government service, including nine years on active duty in the U.S. Air Force.

Defendant's Exhibit (DX) 10, Brownfield Deposition (Dep.) at 17; DX 9, Brownfield 2006

Affidavit (Aff.) at 1. Ms. Brownfield started working at the FDIC as a grade 5 secretary in 1990.

She has worked her way up over the years to become a grade 12 Management Analyst. While

working at the FDIC, Ms. Brownfield obtained her Bachelor of Arts (B.A.) degree from the

University of Maryland University College.

      Ms. Brownfield began working in the Management Support Section (MSS) of the

Management Services Branch (MSB) within the Division of Administration (DOA) of the FDIC

in 1996. Plaintiff's Exhibit (PX) 1, Andrew Nickle Aff. at 2. From 2000 through 2006, Ms.

Brownfield served as a CG-12 Management Analyst in MSS. DX 8, Brownfield 2005 Affidavit

(Aff.) at 1. Ms. Brownfield's colleagues find her "very bright and competent," PX 2, Probst-

Levy Aff. at 4, and "seek her help on various work assignments because she [has] very good

2

analytical skills." PX 1, Nickle Aff. at 3; PX 19, Brownfield's 2002 and 2003 Performance

Appraisals.

## II.     MSB/MSS Refuses to Promote African American Employees Above the Grade 12 Level.

MSS was a section in MSB, which was headed by Paul Sherman, Mr. Bendler's first-

level supervisor and Ms. Brownfield's second-level supervisor.  MSB had few African-

Americans employees, none of whom were above the CG-12 level.  DX 8, Brownfield 2005 Aff.

at 2-3.

When Ms. Brownfield first complained of discrimination in 2005, CG-15 (supervisory)

Management Analyst, Daniel Bendler was the head of MSS.  Mr. Bendler supervised seven

subordinate Management Analysts.  DX 8, Brownfield 2005 Aff. at 2.  There were three CG-14

analysts (Wilma Probst-Levy, Andrew Nickle, and Gail Kennedy); three CG-13 analysts (Bill

Gately, Holly Mattus, and David Lok); and one CG-12 level analyst, Ms. Brownfield.  *Id.*  Ms.

Brownfield was the only African American in MSS and its lowest-graded employee.  *Id.*

## III.    Mr. Bendler and Mr. Sherman Select the Only Three White Employees For Promotion to the CG-13 Level From a List of Seven Eligible Candidates, And Reject All Four African American Candidates.

In the fall of 2003, Mr. Bendler reviewed the CG-12 Management Analyst Position

Description (PD) because he believed that some of the CG-12 Management Analysts were

working at the CG-13 level.  DX 6, Bendler Dep. at 32; PX 3, October 2003 Memorandum from

Daniel Bendler to Human Resources.  At that time, there were four CG-12 level Management

Analysts in MSS: Ms. Brownfield, David Lok, Holly Mattus, and Bill Gately.  Of the four, Ms.

Brownfield was the only African American, and she was the only one whom Mr. Bendler

ultimately did not promote.

Because Mr. Bendler claimed that some of his CG-12 employees were already working at the CG-13 level, Human Resources could have audited the position and promoted the employees non-competitively. DX 27, Sherman Dep. at 129; PX 4, Ingra Jones Dep. at 42-44 (personnel specialist testifying that they could have conducted a desk audit and promoted the employees non-competitively if they were already working at the CG-13 level). Had this happened, Ms. Brownfield would have been objectively evaluated along with her CG-12 colleagues, and all of them would have likely been promoted. PX 5, Holly Mattus Dep. at 37 (testifying that her job has not changed since she became a CG-13); PX 6, David Lok Dep. at 131 ("We continued to do the same job."). *But see* DX 6, Bendler Dep. at 61-62 (testifying that Mr. Lok became a lead analyst after he was promoted). Instead, Mr. Bendler posted the CG-13 Management Analyst positions so that he would have control over the selections. DX 10, Brownfield Dep. at 29.

The postings were open to anyone in the Agency. DX 6, Bendler Dep. at 132. This is confounding because the workload in MSS would not justify bringing in three new people. DX 6, Bendler Dep. at 132-133; DX 27, Sherman Dep. at 127. If Mr. Bendler had selected outside candidates, he would have had three additional employees, and, therefore, would have been required to eliminate some employees in a Reduction-in-Force (RIF). *Id.* Because it would have been undesirable to RIF lower-graded employees to make room for outside employees, a jury could infer that Mr. Bendler never planned to select outside candidates, and knew he would promote Ms. Brownfield's non-black colleagues but not her. DX 6, Bendler Dep. at 132 (testifying that it was one of his "big concerns" that there would be a RIF).

All four of the MSS grade-12 Management Analysts, including Ms. Brownfield, applied

4

and were deemed qualified for the position. PX 4, Jones Dep. at 81. The grade-13 Management

Analyst position would be identical to the Grade-12 position, except for the increased pay. PX 5,

Holly Mattus Dep. at 37 (testifying that her job has not changed since she became a CG-13); PX

6, David Lok Dep. at 131 ("We continued to do the same job."). *But see* DX 6, Bendler Dep. at

61-62 (testifying that Mr. Lok became a lead analyst after he was promoted).

Mr. Bendler appointed three people from outside of MSS to conduct the first round of

interviews: Jerie Kitchens, Rick Marlatt, and Mary Carmichael. They interviewed the seven

eligible candidates: Ms. Brownfield's three white CG-12 colleagues from MSS and four other

candidates including Ms. Brownfield who were all African American. PX 7, Interview Scores;

DX 27, Sherman Dep. at 143-144 (testifying that he may have known that four of the seven

candidates were African-American when he saw the roster).[1] The interview panel referred all of

Ms. Brownfield's white CG-13 colleagues and one outside candidate, Valeria Baker, an African-

American. DX 4, Bendler Aff. I at 4; DX 10, Brownfield Dep. at 41. Mr. Bendler and Mr.

Sherman conducted second interviews of Ms. Baker, Ms. Mattus, and Mr. Lok. DX 10,

Brownfield Dep. at 41; PX 5, Mattus Dep. at 51; PX 6, Lok Dep. at 129. However, Mr. Bendler

and Mr. Sherman selected Mr. Gately without interviewing him themselves. (Mr. Gately had

been the only candidate to be interviewed by the first interview panel twice). PX 9, Bill Gately

Dep. at 26-29. Mr. Bendler could have chosen to select Ms. Brownfield for a second interview,

---

[1]The interview panel scored each candidate based on the interview answers alone and did
not consider the applications as part of the scores or compare the candidates. DX 20, Kitchens
Dep. at 39-40, 66 (testifying that the panel was just to rate the interview responses); DX 11,
Carmichael Dep. at 36 (testifying that the interview panel's job was to rank the interview and she
may not have seen the applications). *But see* DX 6, Bendler Dep. at 70, (claiming that the
interviewers "were asked to review and consider the applications.") 75 (claiming that the
candidates were to be scored based on their applications and their interview questions).

especially since he knew her work directly as her supervisor and he considered her to be just as productive as the other CG-12 level employees. DX 27, Sherman Dep. at 144 ("He [Bendler] could have decided to interview everybody."); DX 6, Bendler Dep. at 82-83.

After finishing the interviews, Mr. Sherman and Mr. Bendler promoted Ms. Brownfield's three white CG-12 colleagues, but not her. DX 27, Sherman Dep. at 141. Because the vacancy was for multiple positions, they could have promoted all four of the CG-12 MSS Management Analysts. PX 4, Ingra Jones Dep. at 68 (testifying that management could have filled as many positions as they wanted to). Mr. Bendler ultimately promoted all of the applicants who were not African American: Mr. Gately, Ms. Mattus, and Mr. Lok. PX 9, Gately Dep. at 30; DX 8, Brownfield 2005 Aff. at 4. This left Ms. Brownfield as the only CG-12 Management Analyst in MSS not to be promoted. PX 5, Mattus Dep. at 58-59.

Mr. Bendler never considered Ms. Brownfield for promotion even though he knew her as her direct supervisor, and believed that she was just as productive in 2003 (just three months before the promotion) as Mr. Gately, Ms. Mattus, and Mr. Lok. DX 6, Bendler Dep. at 82-83.

After Ms. Brownfield's peers were promoted, they continued to have the same level of assignments as she did. DX 10, Brownfield Dep. at 149; PX 5, Holly Mattus Dep. at 37 (testifying that her job has not changed since she became a CG-13); PX 6, Lok Dep. at 131 ("We continued to do the same job."). *But see* DX 6, Bendler Dep. at 61-62 (testifying that Mr. Lok became a lead analyst after he was promoted).

**IV.    In December 2004, Mr. Bendler Singles Out Ms. Brownfield, His Only African American Subordinate, By Targeting Her Position For Elimination.**

Around December 16, 2004, Ms. Brownfield received an e-mail, which listed the

positions the FDIC planned to eliminate. DX 10, Brownfield Dep. at 60. Ms. Brownfield was

shocked when she noticed that her position was scheduled to be eliminated in August 2006. *Id.*;

DX 6, Bendler Dep. at 118. Mr. Bendler had not selected any other MSS position for

elimination. DX 6, Bendler Dep. at 120 (testifying that he only eliminated one position, which

was 12 ½ percent of his section, even though he was supposed to eliminate 25 percent of his

section). The next day, Mr. Sherman confirmed to Ms. Brownfield that her position was set for

elimination. DX 10, Brownfield Dep. at 61.

      Ms. Brownfield was especially hurt that neither Mr. Bendler nor Mr. Sherman, whom she

had worked with for years, warned her that her position was going to be eliminated. DX 10,

Brownfield Dep. at 89-91. Mr. Bendler knew that Ms. Brownfield's position was going to be

eliminated as early as four months before she found out. DX 27, Sherman Dep. at 27 (testifying

that Mr. Bendler had identified Ms. Brownfield's position between August and October 2004).

      The only other employees in MSB whose positions were put on the surplus list were those

of an Asian deaf male and a woman who was ready to retire. DX 10, Brownfield Dep. at 144.

The only employee placed on the surplus list by Mr. Bendler was Ms. Brownfield, his only

African-American subordinate. DX 6, Bendler Dep. at 122.

**V.     Mr. Bendler Criticizes Ms. Brownfield For Not Socializing at Work.**

      The month after Ms. Brownfield's job was placed on the surplus list, Mr. Bendler

confronted her and told her that she needed to socialize more with her coworkers. DX 10,

Brownfield Dep. at 64 (testifying that Mr. Bendler told her she could not "go around snubbing

[her] coworkers"). Mr. Bendler claimed that Ms. Brownfield's colleagues had complained to

him about Ms. Brownfield's behavior. DX 6, Bendler Dep. at 172. However, there is no

7

evidence of this other than Mr. Bendler's claim.  Indeed, Ms. Mattus, one of Ms. Brownfield's

colleagues testified that Ms. Brownfield was easy to work with and get along with and that Ms.

Brownfield got along well with everyone.  PX 5, Mattus Dep. at 44, 59.

**VI.    In February 2005, Mr. Bendler Again Singles Ms. Brownfield Out By Depriving Her and no Other Employee of a Pay Increase by Discrediting and Minimizing Her 2004 Work Accomplishments.**

In 2005, the FDIC instituted a new program called Contribution-Based Compensation

(CBC), where supervisors were asked to rank each employee on a scale of 1 to 5 based on their

work contributions.  DX 10, Brownfield Dep. at 94.  Employees who were ranked "5" received

no pay raise.  *Id.*  Under the CBC program, five percent of FDIC employees had to be ranked 5.

*Id.* at 95.  Mr. Bendler was in charge of ranking the MSS employees.  DX 6, Bendler Dep. at 185;

PX 10, 2005 CBC Rankings.  In order to justify his rankings, Mr. Bendler wrote a bullet-pointed

list of each employee's accomplishments for the year.  PX 10, 2005 CBC Rankings.  While Mr.

Bendler included lengthy, detailed descriptions of most employees' work, he wrote only two

brief bullet points for Ms. Brownfield.  *Id.*  ("Some CFOA related work; T & A Audit

Responsibilities.").  Mr. Bendler left out Ms. Brownfield's other accomplishments, and

minimized her CFOA and T & A responsibilities to justify ranking her the lowest in his section.

*See e.g.* DX 10, Brownfield Dep. at 45-46 (Ms. Brownfield work on Customer Advisory

Committee Meetings), 46 (Ms. Brownfield was the coordinator for MSB's EEO cases), 47 (Ms.

Brownfield helped prepare ACRs).  Ms. Brownfield's lack of pay raise was based entirely on Mr.

Bendler's report to his supervisors.  DX 27, Sherman Dep. at 105 (testifying that senior

management relied on the immediate supervisor's write-up).  Ms. Brownfield was the only black

person in MSS not to get a pay raise.  DX 8, Brownfield 2005 Aff. at 4.

8

### A.     Mr. Bendler Assumes that Ms. Brownfield Slacked Off on a Project Without Speaking to Her About It.

Mr. Bendler claims that his negative CBC recommendations of Ms. Brownfield was based on her performance on a project she worked on with Mr. Lok in 2004.   DX 6, Bendler Dep. at 93-94 (testifying that the project "was a consideration" in Ms. Brownfield's performance appraisal).   The project was a two-week Administrative Compliance Review (ACR), which entailed reviewing employees' credit card files to ensure compliance with FDIC policy.   PX 6, Lok Dep. at 65-66.  Mr. Bendler has assigned the project to Mr. Lok and a summer intern.  PX 6, Lok Dep. at 63.  *But see* DX 6, Bendler Dep. at 92 (testifying that he brought the summer intern in to "wrap it up.").  After the project commenced, Mr. Lok asked Ms. Brownfield to help him finish.  DX 10, Brownfield Dep. at 49; PX 6, Lok Dep. at 65-66.  *But see* DX 6, Bendler Dep. at 90 (testifying that he had assigned the project to Mr. Lok and Ms. Brownfield to work on equally).  Ms. Brownfield was brought in·at the end of the project.  DX 10, Brownfield Dep. at 49 (testifying that she was asked to help Mr. Lok finish).  Mr. Lok was in charge of the project, and gave Ms. Brownfield two files to review.  PX 6, Lok Dep. at 71,75.  *But see* DX 6, Bendler Dep. at 90 (testifying that he had assigned the project to Ms. Brownfield and Mr. Lok to work on equally).  Mr. Lok assigned the files to Ms. Brownfield and when she was finished reviewing them, she returned them to him to receive more.  PX 6, Lok. Dep. at 71.  Ms. Brownfield completed all the files that Mr. Lok assigned to her.  DX 10, Brownfield Dep. at 52; PX 6, Lok. Dep. at 71, 75, 158.

Ms. Brownfield did not know the project's end date or how many files that Mr. Lok expected her to review.  PX 6, Lok Dep. at 75-76 (testifying that he never told Ms. Brownfield

when the assignment was due). Neither Mr. Lok nor Mr. Bendler gave Ms. Brownfield any feedback about this project or indicated that it was time sensitive. DX 10, Brownfield Dep. at 51; PX 6, Lok Dep. at 76-78. Mr. Bendler claims he spoke to Ms. Brownfield and that she had a "stack of files on her desk." DX 6, Bendler Dep. at 91. *But see* PX 6, Lok Dep. at 71,75 (testifying that he gave Ms. Brownfield only two files at a time).

Mr. Bendler claims that Ms. Brownfield did not help work on this project. DX 6, Bendler Dep. at 90. However, Mr. Bendler had little understanding of Ms. Brownfield's duties on this project, and he never told Ms. Brownfield that he had concerns about her work on this project. In fact, Mr. Bendler did not even ask about Ms. Brownfield's work on the project until weeks later. PX 6, Lok Dep. at 140 (testifying that Mr. Bendler asked about Ms. Brownfield's contribution to the project a few weeks after it had concluded). Yet, he deprived her of a pay raise based on his limited knowledge of the project, DX 6, Bendler Dep. at 93-94 (testifying that the credit card project "was a consideration" in Ms. Brownfield's performance appraisal), without ever speaking with Ms. Brownfield about it. DX 10, Brownfield Dep. at 51.

**B.    To Justify His Unfair Rating of Ms. Brownfield, Mr. Bendler Misrepresents Ms. Brownfield's Performance on the Chief Financial Officers Act (CFOA) Project.**

In 2004, Ms. Brownfield made a considerable contribution to the CFOA project. PX 2, Wilma Probst-Levy Aff. at 3 (testifying that Ms. Brownfield had "major responsibilities" on CFOA); PX 1, Nickle Aff. at 3 ("No one had handled all the CFOA write-ups but . . . Ms. Brownfield did a significant number of them . . . "). Yet Mr. Bendler refused to give her credit for this work on her CBC rating. PX 10, 2005 CBC Rankings (Mr. Bendler claiming that Ms. Brownfield had only "[s]ome CFOA related work.").

The CFOA project was divided into three parts.  First, someone on the MSS staff would do testing.  DX 10, Brownfield Dep. at 54.  Then, Ms. Brownfield would review the testing information and draft a summary.  *Id.* at 53.  The deadline for the summaries was October 15, 2004.  *Id.* at 59.  The third part of the project was the planning phase, where MSS would decide which areas would be tested the next year.  *Id.* at 59-60.  Ms. Brownfield and Ms. Probst-Levy worked on this phase jointly.  *Id.* at 59.

Ms. Probst-Levy, a CG-14 Management Analyst in MSS, trained Ms. Brownfield to handle "all write-ups and planning documents" for the CFOA.  PX 2, Probst-Levy Aff. at 2.  Ms. Brownfield acted as Ms. Probst-Levy's "right hand person with major responsibilities" from 2000-2005.  *Id.* at 3.  Ms. Brownfield also did some of the testing for the summaries.  DX 10 Brownfield Dep. at 55.  In addition to assisting Mr. Lok with the procurement card review, Ms. Brownfield did the testing for the Washington mailroom reviews without help from any other employee, to ensure that the mailrooms were complying with FDIC policy.  DX 10, Brownfield Dep. at 55.

Mr. Bendler never expressed any concern to Ms. Brownfield that she would not finish the summaries for this assignment on time.  DX 10, Brownfield Dep. at 55.  Although Mr. Bendler never indicated to Ms. Brownfield that he was dissatisfied, he now claims that she was lagging behind on the CFOA project, and that was why he reassigned some of the summaries to Ms. Kennedy.  DX 6, Bendler Dep. at 95; DX 4, Bendler Aff. I at 3.  But that was not what Mr. Bendler said when he reassigned the summaries.  At that time, Mr. Bendler told Ms. Probst-Levy via e-mail that he had assigned some of Ms. Brownfield's summaries to Ms. Kennedy because "Gail had some down time and asked Pam if she wanted help with some of the HRB highlights."

11

PX 11, Sept. 1, 2004 e-mail from Bendler to Probst-Levy.  Indeed, the summaries were not due

until October 15, 2004, and Ms. Brownfield was on track to finish the summaries on time.  DX

10, Brownfield Dep. at 59, 55.  Mr. Bendler had reassigned the summaries to Ms. Kennedy at

least a month and a half before they were due from Ms. Brownfield.  PX 11, Sept. 1, 2004 e-mail

from Bendler to Probst-Levy.  As it turned out, Ms. Kennedy wrote some of the simpler

summaries that did not take more than a few hours to complete.  PX 12, Gail Kennedy Dep. at

92-96.  There was no reason for Mr. Bendler to reassign the summaries.  PX 12, Kennedy Dep. at

101 (testifying that Ms. Brownfield could have finished the summaries).[2]

### C.    Mr. Bendler Entirely Disregards Ms. Brownfield's Other Work So That Ms. Brownfield Receives No Pay Raise.

Ms. Brownfield worked on other projects in 2004 that Mr. Bendler omitted entirely from

his list of her accomplishments on the CBC nominations.  Ms. Brownfield was required to set the

agenda and take minutes at the bimonthly Customer Advisory Committee meetings for mid-level

managers.  DX 10 Brownfield Dep. at 45-46.

Ms. Brownfield was also the coordinator for EEO cases in DOA, a job previously

performed by Mr. Sherman, her second-level supervisor, a CM-2 level employee.  *Id.* at 46; DX

27, Sherman Dep. at 145 (testifying that he assigned Ms. Brownfield his EEO coordinator duties

in February 2004).  Ms. Brownfield also helped prepare for ACRs.  DX 10 Brownfield Dep. at

47.

---

[2]While Ms. Brownfield was penalized with no pay raise for her work on this assignment which was not late and was in no danger of being late, Mr. Gately, a white employee, who actually was very late on an assignment still got a higher rating than Ms. Brownfield.  PX 18, December 8, 2004 e-mail from Bendler to Gately (Bendler telling Gately that his report was "way overdue."); PX 9, Gately Dep. at 43 (testifying that he has not been ranked in the bottom 25 percent of employees).

Ms. Brownfield's colleague, Ms. Mattus, testified in her deposition that she was surprised that Ms. Brownfield did not get a raise in 2005, because Ms. Brownfield "is a performer," and that there were employees in MSB who sleep at their desks, but got raises nonetheless.  PX 5, Mattus Dep. at 64-65.

## VII.    Ms. Brownfield Files a Complaint of Discrimination After Mr. Bendler Denies Her and None of Her White Colleagues a Pay Raise.

On, March 3, 2005, after Ms. Brownfield discovered that she was the only person in MSB to receive no pay raise, she went to an EEO Counselor.  PX 13, EEO Counselor's Report at 1. On April 22, 2005, Ms. Brownfield went to Alternative Dispute Resolution (ADR) with Mr. Bendler in an attempt to resolve her complaints.  PX 17, Pamela Brownfield Declaration (Decl.). When Ms. Brownfield was unable to resolve her complaint, she filed a formal complaint of discrimination on May 13, 2005, based on Mr. Bendler's denying her a pay raise.  DX 15, 2005 EEO Complaint; DX 10, Brownfield Dep. at 97.  Ms. Brownfield was astounded that in less than one year, she was the only CG-12 to be denied a promotion, her position was targeted for elimination, and she received no pay raise.  *Id.* at 98.  It dawned on her that Mr. Bendler was singling her out as an African American, and that there had never been any other African American employees in MSS.  *Id.*[3]

## VIII.    After Ms. Brownfield Complains of Discrimination, Mr. Bendler Retaliates By Reassigning Her Substantive Work Assignments and Withholding Work From Her.

Immediately after Mr. Bendler learned that Ms. Brownfield was complaining about his

---

[3]Ms. Brownfield did not file a complain of discrimination earlier because Mr. Bendler's racial discrimination only became obvious when these events unfolded.  *Id.*  Evidence of the 2004 promotion and of her job being targeted for elimination may still be used to raise an inference of discrimination.  *See Morgan,* 536 U.S. at 102 (holding that evidence of prior discrimination may be considered as "background evidence.").

13

discrimination, he began decreasing her workload. PX 17, Brownfield Decl.; DX 10, Brownfield

Dep. at 107. Prior to filing an EEO complaint, Ms. Brownfield was the coordinator for the DOA

directives review process. *Id.* at 109. However, in 2005, this work was inexplicably taken away

from her. *Id.* at 109-110 (testifying that on e-mails she had been listed as the contact for the

review process, but in 2005, she was suddenly no longer the contact); PX 1, Nickle Aff. at 3.

In the end of 2005 and the beginning of 2006, there was a long period when Ms.

Brownfield repeatedly requested work, but Mr. Bendler did not give her anything to do. DX 10,

Brownfield Dep. at 8; DX 6, Bendler Dep. at 99 (testifying that Ms. Brownfield consistently

asked for work, and claiming that the MSS "workload started to decline considerably"). Weeks

would go by where Ms. Brownfield had absolutely no work. *See* PX 16, 2005-2006 e-mails from

Brownfield to Bendler requesting work. However, there was clearly work in MSS, because the

white, non-complaining Management Analysts were busy and working overtime. *Id.* at bate-

stamp 37; DX 10, Brownfield Dep. at 7. The fact that Ms. Brownfield's non-black colleagues

had work to do but Mr. Bendler would assign her nothing was very stressful. *Id.* (testifying that

she took Xanax when everybody was busy and she had nothing to do).

In her affidavit for the EEO investigation, Ms. Probst-Levy stated that the majority of Ms.

Brownfield's CFOA work was redistributed to other employees in 2005. PX 2, Probst-Levy Aff.

at 3 (stating that Ms. Brownfield's CFOA workload diminished while other MSS employees'

CFOA workload increased); DX 10, Brownfield Dep. at 111 (testifying that in 2005 she was only

left with a "little piece" of the CFOA responsibilities). This did not make much sense, since Ms.

Brownfield's work on the CFOA project had always been well received. PX 2, Probst-Levy Aff.

at 3.

14

When Mr. Bendler would not assign Ms. Brownfield work, Ms. Brownfield started asking her busy peers if they had anything she could help them with. *See e.g.* PX 1, Nickle Aff. at 3 ("I know Ms. Brownfield has been low on work because she asked me for something to do."); PX 5, Mattus Dep. at 38-39 (testifying that Ms. Brownfield helped her because she was overwhelmed and Ms. Brownfield had no work).

**IX.    On February 9, 2006, Mr. Bendler Invites Ms. Brownfield to a Branch Luncheon When It Is About to End.**

In February 2006, there was an MSB luncheon on Ms. Brownfield's floor. DX 10, Brownfield Dep. at 132. When the luncheon was almost over, Mr. Bendler came to Ms. Brownfield's office and asked her if she would like to join them. *Id.* at 132-133. Ms. Brownfield declined his invitation because she did not feel like socializing with him after the way he had been discriminating against her, and because the luncheon was about to end. DX 9, Brownfield 2006 Aff. at 5-6. As soon as Mr. Bendler returned to the luncheon, Ms. Brownfield heard the room erupt with laughter, so she realized that he had made a joke about her. DX 10, Brownfield Dep. at 133. *See* PX 2, Probst-Levy Aff. at 4-5 (testifying that she believes that Mr. Bendler would make a joke about Ms. Brownfield).

**X.    On February 23, 2006, Mr. Bendler Reprimands Ms. Brownfield For Socializing Too Much.**

In February of 2006, Mr. Bendler counseled Ms. Brownfield based on an allegation by Ann Bridges Steely, that Ms. Brownfield was distracting and disturbing her staff in the Acquisition Services Branch (ASB).[4] DX 10, Brownfield Dep. at 121. While he had previously

---

[4]Before Mr. Bendler warned Ms. Brownfield not to socialize too much, he never even spoke to Ms. Bridges Steely, the person who had allegedly complained. DX 6, Bendler Dep. at 176. Indeed, Mr. Bendler knew that Ms. Bridges Steely was not very popular with her staff,

warned Ms. Brownfield that she needed to be social with her coworkers, this time Mr. Bendler

chastised her for spending too much time socializing with ASB employees.   DX 9, Brownfield

2006 Aff. at 3.  He also indicated that in his view Ms. Brownfield was causing trouble with ASB

employees.  *Id.*  While Ms. Brownfield does have friends in ASB, she was not "disturbing"

anyone or spending too much time with them.  DX 10, Brownfield Dep. at 121; PX 2, Probst-

Levy Aff. (testifying that she never heard any ASB employees complain that Ms. Brownfield was

"disturbing" them).

XI.     **In March 2006, Mr. Bendler Omits Ms. Brownfield's Work Assignments From Her
        Evaluation So That She Would Receive the Lowest Possible Pay Raise.**

        In 2006, the FDIC retooled the CBC program and created a program called "Pay for

Performance" (PFP), to compensate employees for their 2005 contributions.  DX 10, Brownfield

Dep. at 116.  PFP required the supervisors to divide their subordinates into three groups.  *Id.*

Like the previous year with the CBC nominations, Mr. Bendler placed Ms. Brownfield in the

lowest group.  *Id.* at 117.  Although she did receive a pay raise, she received the lowest possible

raise.  *Id.* at 118.  Just as Mr. Bendler had done with CBC in 2005, Mr. Bendler discredited,

omitted, and minimized Ms. Brownfield's contributions.  PX 14, Brownfield PFP Evaluation.

        Mr. Bendler omitted from his PFP nomination form that Ms. Brownfield reviewed all of

the procurement credits cards without help from anyone.  DX 10, Brownfield Dep. at 68-70; PX

14, Brownfield PFP Evaluation (Bendler stating that Ms. Brownfield "helped" with the

procurement card program).  This project included rewriting test documents and getting approval

from ASB subject matter experts.  PX 14, Brownfield PFP Evaluation at 3 (Brownfield

_____

particularly her African American staff.  *Id.* at 177.

16

supplementing Mr. Bendler's narrative).

Ms. Probst-Levy, who worked closely with Ms. Brownfield on the CFOA project, questioned the basis for Mr. Bendler assigning Ms. Brownfield the lowest rating in their section for PFP, because Ms. Brownfield "does very good work." PX 2, Probst-Levy Aff. at 5. Ms. Probst-Levy further noted that the PFP rating process is an "enigma." *Id.*

In addition, Ms. Brownfield had been consistently seeking work in 2005, but to no avail. DX 6, Bendler Dep. at 169. Ms. Brownfield did all the work assigned to her, but because Mr. Bendler assigned her very little work after she complained of discrimination, her accomplishments could not mirror those of her colleagues. *Id.* (testifying that Ms. Brownfield did the work assigned to her and asked for more assignments when she was done).

After she found out Mr. Bendler ranked her in the lowest group for PFP, Ms. Brownfield filed an EEO complaint based on race discrimination and retaliation for protected activity. DX 10, Brownfield Dep. at 118.[5]

## XII.    Mr. Bendler Favors Two White Employees.

While Mr. Bendler dealt blow after blow to Ms. Brownfield, an African-American employee, he noticeably favored two Caucasian employees: Bill Gately and Gail Kennedy. PX 1, Nickle Aff. at 5 (testifying that Mr. Bendler favors Ms. Kennedy and Mr. Gately); PX 5, Mattus Dep. at 60 (testifying that Mr. Gately was the "perceived favorite" in MSS). Indeed, Mr. Bendler is very friendly to Ms. Kennedy. PX 12, Kennedy Dep. at 74. They sometimes have lunch

---

[5]Mr. Bendler continued to discredit Ms. Brownfield's work after the PFP awards came out. Mr. Bendler testified that it would be a "huge stretch" to say that Ms. Brownfield assisted Ms. Mattus on budget matters. DX 6, Bendler Dep. at 129. However, Ms. Mattus testified that Ms. Brownfield was a big help with her budget work. PX 5, Mattus Dep. at 38.

together, and they commute home together after work. *Id.* at 75. When Ms. Kennedy was

eligible for promotion in 2003, he promoted her to a CG-14 level Management Analyst position

without competition or interview. DX 6, Bendler Dep. at 24-25. And, when Ms. Kennedy was

low on work, Mr. Bendler reassigned work from Ms. Brownfield to her. PX 11 Sept. 1, 2004 e-

mail from Bendler to Probst-Levy.

Similarly, Mr. Bendler had a friendly relationship with Mr. Gately. PX 9, Gately Dep. at

44. They socialize a couple of times a year outside of work and sometimes eat lunch together.

*Id.* at 45-46. Mr. Gately was the only candidate that Mr. Bendler did not interview, and he was

promoted, nonetheless. PX 9, Gately Dep. at 27-28.

## ARGUMENT

### I.      Summary Judgment Standard.

Summary judgment is proper only against "a party who fails to make a showing sufficient

to establish the existence of any element essential to that party's case, and on which that party

will bear the burden of proof at trial." Fed. R. Civ. P. 56©); *Celotex Corp. v. Catrett*, 477 U.S.

317, 321 (1986). Accordingly, to make the determination on a motion for summary judgment,

the court must evaluate all of the evidence before it. *Celotex*, 477 U.S. at 323. In *Anderson v.*

*Liberty Lobby, Inc.*, the Supreme Court made clear that disputes over facts, which might affect

the outcome of the suit under the governing law, will preclude the entry of summary judgment.

477 U.S. 242, 248 (1986). The evidence presented must always be construed in favor of the

party opposing the motion for summary judgment, and it is that party who is also to be accorded

the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. United States Dep't*

*of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 747 (1998) ("[W]e must take the facts alleged by the employee [the nonmovant] to be true."). Thus, the moving party must demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 323. If, and only if, the moving party meets this burden, the burden passes to the nonmoving party to establish the existence of a disputed factual element essential to her case with respect to which she bears the burden of proof. *Id.* Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    Principles Applicable to Motions for Summary Judgment in Title VII Discrimination and Retaliation Cases.

Because the central issue in employment discrimination cases are motive and intent, the trial court "should apply an added measure of rigor" when evaluating motions for summary judgment in these cases. *Lucero-Nelson v. Washington Metro. Transit Auth.*, 1 F.Supp.2d 1, 3 (D.D.C. 1998) *(citing Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997)). *See also Albritton v. Kantor*, 944 F. Supp. 966, 970 (D.D.C. 1996); *Ross v. Runyon*, 859 F. Supp. 15, 21-22 (D.D.C. 1994); *Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005) (citing 42 U.S.C. § 2000e-2(a)(1)); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2408 (2006). Title VII also makes it unlawful for an employer to retaliate against an employee for filing a charge of

discrimination. *Id.* "The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington Northern*, 126 S.Ct. at 2412.

In discrimination and retaliation cases, the Court evaluates the case using the *McDonnell Douglas* burden shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] This requires a plaintiff to first establish a *prima facie* case with evidence that her employer took an adverse action against her, which raises an inference of discrimination/retaliation. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 and n.44 (1977).

Then, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse action. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If defendant meets this burden, plaintiff must show that the proffered reason was pretextual in order to prevail. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000). The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *Id.* ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose ").

## III.   Ms. Brownfield Has Established a *Prima Facie* Case of Discrimination.

A plaintiff establishes a *prima facie* case of discrimination by showing that: 1) she is a member of a protected class; 2) she was subjected to an adverse employment action; and 3) the adverse action gives rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*,

---

[6] The Supreme Court has held that this "flexible evidentiary standard" should not be imported as a pleading standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

411 U.S. 792, 802 (1973); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).

Here, Defendant does not dispute that Ms. Brownfield is a member of a protected class

based on her race (African American) or that she was subjected to adverse employment actions

when she was denied a pay raise in 2005, when she received the lowest possible pay raise in

2006, and when Mr. Bendler reduced her duties to nothing.[7]  Defendant challenges only the third

element, arguing that Plaintiff cannot raise an inference of discrimination because Mr. Sherman

agreed with Mr. Bendler's determination that Ms. Brownfield was the lowest contributor in MSS

and because one of Mr. Sherman's African American subordinates received the highest possible

pay raise.  Defendant's Motion for Summary Judgment (MSJ) at 24.  However, there is sufficient

evidence for a reasonable jury to conclude that Mr. Bendler had a racial motive for his treatment

of Ms. Brownfield.  Moreover, Mr. Sherman's opinion of Mr. Bendler's motive is just one piece

of evidence that must be weighed by the jury against the evidence that Mr. Bendler consistently

treated his white employees more favorably than Ms. Brownfield.  Under these circumstances,

summary judgment cannot be granted.

A reasonable jury could find that Mr. Bendler had a pattern of favoring employees who

were not African American and infer discrimination.  *See, e.g., Morris v. WMATA*, 702 F.2d

1037, 1045-46 (D.C. Cir.1983) (finding that evidence of a pattern of retaliation against other

employees was probative of retaliation against plaintiff); *Webb v. Hyman*, 861 F.Supp. 1094,

1111-12 (D.D.C. 1994) (holding that evidence of employer's harassment of other employees was

---

[7]Although Defendant challenges whether the diminution in duties is an adverse action for
purposes of Ms. Brownfield's retaliation claim, it does not move for summary judgment on
whether it was an adverse employment action for purposes of her race discrimination claim. MSJ
at 21-25 (challenging only whether Ms. Brownfield raised an inference of discrimination on the
race discrimination claims).

probative of discriminatory motive).  First, in 2004, Mr. Bendler promoted all three of his white

Management Analysts to the Grade 13 level, singling Ms. Brownfield out as the only Grade 12

not to be promoted.  When he made those selections, he chose from a pool of seven applications,

four of whom were African American, and Mr. Bendler ended up selecting only the three white

applicants.  Morever, Mr. Nickle, a CG-14 Management Analyst, testified that Mr. Bendler

favored two white employees.  PX 1, Nickle Aff. at 5.  *See also*, PX 5, Mattus Dep. at 60

(testifying that Mr. Gately was the "perceived favorite" in MSS).  Indeed, Ms. Kennedy was

promoted without competition in 2003, and Mr. Gately was selected without being interviewed

by Mr. Bendler at the same time Ms. Brownfield and three other African Americans were denied

promotions.  DX 6, Bendler Dep. at 24-25; PX 9, Gately Dep. at 27-28; PX 5, Mattus Dep. at 60.

Mr. Bendler also favored white employees in work assignments.  He diminished Ms.

Brownfield's responsibilities to the point that she had almost nothing to do and had to repeatedly

ask Mr. Bendler for work.  DX 10, Brownfield Dep. at 8; DX 6, Bendler Dep. at 99 (testifying

that Ms. Brownfield consistently asked for work); PX 1, Nickle Aff. at 3 ("I know Ms.

Brownfield has been low on work because she asked me for something to do."); PX 5, Mattus

Dep. at 38-39 (testifying that Ms. Brownfield helped her because she was overwhelmed and Ms.

Brownfield had no work).  However, he saw to it that his white employees were fully employed.

DX 9, Brownfield 2006 Aff. at 5 ("all my white co-workers were busy").  Moreover, when Ms.

Kennedy, a white employee, requested work, he shifted work away from Ms. Brownfield, the

only African American in MSS.  PX 11, Sept. 1, 2004 e-mail from Bendler to Probst-Levy.

In addition, Ms. Brownfield was the only African American in Mr. Bendler's section and

also the person he ranked lowest in 2005 and 2006, and the only Management Analyst that Mr.

Bendler targeted for elimination.  DX 8, Brownfield 2005 Aff. at 2.  In all of MSB, there were no

African Americans above the CG-12 grade level.  *Id.* at 2-3.  The D.C. Circuit has held that such

an imbalance may be used to establish a *prima facie* case of discrimination.  *Davis v. Califano*,

613 F.2d 957, 962 (D.C. Cir. 1979) (holding that statistical proof alone may establish a *prima*

*facie* case and create an inference of discrimination).

   Mr. Bendler's racial animus may be inferred by his readiness to assume that Ms.

Brownfield has done something wrong without any justification.  Mr. Bendler assumed that Ms.

Brownfield shirked her duties when Mr. Lok requested her help on the procurement card project.

However, if Mr. Bendler had spoken with her or with Mr. Lok, he would have discovered that

Ms. Brownfield had other work to do and that she was never informed of the project's urgency,

PX 6, Lok Dep. at 75-76, and that she had reviewed all of the files that Mr. Lok had assigned to

her.  PX 6, Lok Dep. at 71, 75, 158.

   The FDIC claims that Ms. Brownfield was denied a pay raise in 2005, because she had a

"perceived relative lack of corporate contribution in 2004."  MSJ at 25.  However, a reasonable

jury could infer that this perception is attributed to Mr. Bendler's mischaracterization of Ms.

Brownfield's work on her CBC nomination form.  PX 10, 2005 CBC Rankings.  For Ms.

Brownfield's non-black coworkers, Mr. Bendler wrote detailed descriptions of their work

contributions that were half a page or more in length, but Mr. Bendler only wrote two brief bullet

points for Ms. Brownfield.  *Id.*; DX 6, Bendler Dep. at 185.  Upper management was entirely at

his mercy when they were determining Ms. Brownfield's pay raise, because they only knew what

Mr. Bendler told them.  DX 27, Sherman Dep. at 105 (testifying that senior management relied

on the immediate supervisor's write-up).

The Defendant attempts to escape liability by asserting that Mr. Sherman agreed with Mr. Bendler's assessments of Ms. Brownfield, and therefore, the FDIC's actions against Ms. Brownfield cannot raise an inference of discrimination. However, it is for the jury to decide whether to credit Mr. Sherman's alleged consensus with Mr. Bendler's evaluation of Ms. Brownfield or the other evidence that Mr. Bendler has distorted Ms. Brownfield's achievements. *See e.g.* PX 10, 2005 CBC Rankings ("Some CFOA related work."); PX 2, Probst-Levy Aff. at 3. (testifying that Ms. Brownfield had "major responsibilities" on CFOA); PX 1, Nickle Aff. at 3 ("No one had handled all the CFOA write-ups but . . . Ms. Brownfield did a significant number of them . . . "). In fact, Mr. Sherman merely relied on Mr. Bendler's CBC nomination form in denying Ms. Brownfield a pay raise. DX 27, Sherman Dep. at 105 (testifying that senior management relied on the immediate supervisor's write-up). He approved Mr. Bendler's discriminatory act without independently assessing Ms. Brownfield's performance. Mr. Sherman did not, as the Defendant claims, evaluate Ms. Brownfield's performance and agree with Mr. Bendler's assessment.[8]

## IV.    Ms. Brownfield Has Established a *Prima Facie* Case of Retaliation.

The standard for demonstrating a *prima facie* case of retaliation parallels the three-part

---

[8]The Defendant attempts to remove itself from Mr. Bendler's decision by arguing that two layers of supervisors would be required to discriminate against Ms. Brownfield to make her claims viable. However, a jury could reject this assertion based on evidence that Mr. Sherman accepted Mr. Bendler's assessments of Ms. Brownfield without forming an independent judgment and therefore the entire process was tainted by Mr. Bendler's discrimination and retaliation against Ms. Brownfield. *See e.g. George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (To the extent a non-decisionmaker "participated in and influenced . . .[a challenged] decision, her good-faith belief in the proffered reasons also becomes relevant), *citing Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence").

discrimination standard: "the plaintiff must show: (1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Boyd*, 335 F.Supp.2d at 36.  "As in a case of disparate treatment, this initial burden is not great.  Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). The FDIC challenges the second and third elements, asserting that Ms. Brownfield cannot establish a causal connection between her supervisor's negative actions against her immediately following her complaint of discrimination and the complaint itself, and that Mr. Bendler's diminishing Ms. Brownfield's work assignments to nothing was not an adverse action.[9]

**A.    A Reasonable Jury Could Find That Mr. Bendler's Actions in Removing Ms. Brownfield's Job Duties Would Deter a Reasonable Person From Reporting Discrimination.**

The U.S. Supreme Court has established that a material adverse action for purposes of retaliation is an action that would dissuade a reasonable employee from filing a charge of discrimination. *Burlington*, 126 S.Ct. at 2409.  The Supreme Court has also held that a reassignment of duties may constitute an adverse action for Title VII purposes. *Id.* at 2417.  The D.C. Circuit Court of Appeals has further established that reassignment of duties is actionable "if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities." *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007); *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[A]ctions such as demotion, reassignment with significantly

---

[9]The fact that Mr. Bendler's diminishing Ms. Brownfield's job responsibilities constitutes an adverse action is discussed in Section IV. A. below.

25

different responsibilities, or the loss of economic benefits can also count as adverse.").[10]  More

specifically, the D.C. Circuit Court has held that a formal reassignment is not necessary to

establish an adverse employment action, so long as a reasonable jury could find that the

plaintiff's duties "dramatically declined in both quality and quantity."  *Holcomb v. Powell*, 433

F.3d 889, 902 (D.C. Cir. 2006).

      In this case, Mr. Bendler reduced both the quality and quantity of Ms. Brownfield's job

duties to the point that she had practically nothing to do.  PX 16, E-mails from Brownfield to

Bendler Regarding Work Requests; PX 17, Brownfield Decl. (testifying that her assignments

were less meaningful).  Her position as coordinator for the DOA review process directives was

taken away without explanation in 2005 immediately after she complained of discrimination.

DX 10, Brownfield Dep. at 109-110.  Ms. Brownfield's CFOA work was also redistributed to

other MSS employees in 2005.  PX 2, Probst-Levy Aff. at 3 (stating that Ms. Brownfield's

CFOA work diminished while other employees' CFOA work increased).  Because Mr. Bendler

refused to assign Ms. Brownfield any new work, Ms. Brownfield was left with nothing to do,

DX 10, Brownfield Dep. at 7, and resorted to asking for work from her colleagues because her

supervisor would not give her anything to do.  *See e.g.* PX 1, Nickle Aff. at 3 ("I know Ms.

Brownfield has been low on work because she asked me for something to do."); PX 5, Mattus

---

[10]Most courts addressing the issue agree that a diminution in duties constitutes an adverse action. *See, e.g., Green v. Admin. of the Tulane Educ. Fund*, 284 F.3d 642, 651, 654-55 (5th Cir. 2002) (holding that removal of duties constituted an adverse action and noting that "the Supreme Court did not state that loss of economic benefit was required in all cases"); *Dahm v. Glynn*, 60 F.3d 253, 257 (7th Cir. 1994) ("[A] dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action"); *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (If an employee "is required to utilize a lesser degree of skill than his previous assignment," then he has suffered a demotion) *abrogated on other grounds, Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995).

Dep. at 38-39 (testifying that Ms. Brownfield helped her because she was overwhelmed and Ms. Brownfield had no work). Mr. Bendler admits that Ms. Brownfield frequently asked for work since 2005. Bendler Dep. at 99. As such, a reasonable jury could conclude that Mr. Bendler's actions in removing Ms. Brownfield's duties left Ms. Brownfield "with significantly diminished responsibilities," and therefore she suffered an actionable adverse personnel action. *Czekalski*, 475 F.3d at 365.

      **B.**    **A Reasonable Jury Could Find that There is a Causal Connection Between Ms. Brownfield's EEO Complaint and Her Subsequent Loss of Job Duties and Receiving the Lowest Pay Raise Available.**

To establish causal connection in a retaliation claim, a plaintiff may produce evidence sufficient to show that the adverse action closely followed the protected activity. *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) ("Temporal proximity is often found sufficient to establish the requisite causal connection for [retaliation] claims."). Temporal proximity may be established by showing that the employer's adverse action against the plaintiff was simultaneous with an EEO investigation. *Cones v. Shalala,* 199 F.3d 512, 515, 521-522 (D.C. Cir. 2000). A plaintiff may also show causal connection by demonstrating a change in the workplace following her protected activity. *Moses v. Howard Univ. Hosp.*, 474 F.Supp.2d 117, 124 (D.D.C. 2007) (inferring causation based on "a change in the atmosphere of the workplace" after his supervisors found out about complaint of discrimination).

Ms. Brownfield has demonstrated close temporal proximity between her protected activity and the FDIC's diminishing her work responsibilities. FDIC management knew that Ms. Brownfield had filed a complaint of discrimination because Ms. Brownfield's supervisors all

27

provided affidavits for the investigation. *See* PX 13, 2005 EEO Counselor's Report. Prior to

that, Mr. Bendler had also engaged in ADR with Ms. Brownfield in April 2005. PX 17,

Brownfield Declaration (Decl.) at ¶ 2.

Ms. Brownfield's work on the DOA review process directives disappeared right after she

complained of race discrimination. *Id.* at ¶ 3. After she complained of discrimination and

engaged in EEO activity with Mr. Bendler, Ms. Brownfield never received another DOA

directive. *Id.*

After Ms. Brownfield filed her formal complaint on May 13, 2005, she continued to lose

work. *Id.* at ¶ 2-4. Less than two months after she filed a complaint against Mr. Bendler, he

substantially diminished her work on the CFOA project. *Id.* (stating that by July 2005, Mr.

Bendler had diminished her CFOA responsibilities significantly). This short time span is more

than sufficient for a reasonable jury to conclude that there was a causal connection between Ms.

Brownfield's formal complaint and her diminished workload. *Buggs v. Powell*, 293 F.Supp.2d

135, 148 (D.C. Cir. 2000) (finding that a time span of three months or less between protected

activity and adverse action establishes causation). In addition, the fact that Mr. Bendler

diminished her workload *while* he was being investigated regarding her complaint against him

raises an inference of causation. *Cones*, 199 F.3d at 515, 521-522; *Buggs*, 293 F.Supp.2d at 149

("Thus, the Court finds it noteworthy that at the same time Mr. Rubino was reviewing the

plaintiff's application . . . he was a target of an investigation initiated by the plaintiff alleging that

he had discriminated against the plaintiff.").

In *Moses*, the plaintiff established causation by describing "a change in the atmosphere of

the workplace" after his supervisors found out he had complained of discrimination. *Moses*, 474

F.Supp.2d at 126.  Then, the plaintiff showed that an adverse action was taken against him five months after his managers found out about his complaint -- they decreased his performance appraisal by five points.  *Id.*  Four months later, the plaintiff was terminated.  *Id.*

Similarly, within a month of when Ms. Brownfield informally complained of discrimination and participated in ADR with Mr. Bendler, Mr. Bendler began to change her work atmosphere by diminishing her workload.  PX 17, Brownfield Decl. ¶¶ 2-3.  Then after Ms. Brownfield formally complained of discrimination, her work loss spiraled further downward.  *Id.* at ¶¶ 2-4.  By November 2005, Ms. Brownfield had almost no work.  *Id.* at ¶ 4; DX 10, Brownfield Dep. at 109-110 (testifying that the DOA review process directives assignments were taken away in 2005); PX 2, Probst-Levy Aff. at 3 (stating that Ms. Brownfield's CFOA workload diminished in 2005 while other MSS employees' CFOA workload increased).

Just as in *Moses*, the change in Ms. Brownfield's work atmosphere was followed within months by an adverse action -- the lowest possible pay raise.  *Moses*, 474 F.Supp.2d at 126 (finding sufficient evidence of a causal connection where protected activity was followed by a change in work atmosphere and termination nine months later).  Moreover, a reasonable jury could find that Mr. Bendler's antagonism immediately following Ms. Brownfield's complaint against him establishes causation.  *See Buggs*, 293 F. Supp.2d at 149 ("[C]ircumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference [of retaliation].").

29

V.     **A Reasonable Jury Could Infer that the FDIC Proffered False Reasons for Denying Ms. Brownfield a Pay Raise, Removing Her Job Responsibilities, and Giving Her the Lowest Raise Available to Cover Up its Discriminatory and/or Retaliatory Motives.**

Because the defendant has articulated its non-discriminatory reasons for actions against

Ms. Brownfield, the Court should address the ultimate questions of retaliation and discrimination

rather than concerning itself with whether there is a *prima facie* case.  As the Supreme Court

stated in *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983):

> Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.  The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated [retaliated] against the plaintiff." (quoting *Texas Dept. Of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

*See also Moses,* 474 F.Supp.2d at 124 ("The Court must assess whether a reasonable jury could

infer intentional discrimination from the plaintiff's *prima facie* case and any other evidence the

plaintiff offers to show that the actions were discriminatory or that the non-discriminatory

justification was pretextual.").

Ms. Brownfield may establish the FDIC's discriminatory and retaliatory motives by

attacking its justifications for its actions and showing that they are unworthy of credence.  In *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the Supreme Court provided specific

guidance about how a jury can find discrimination when it rejects the employer's explanation for

its actions:

> The fact finders' disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional

30

> discrimination, and the Court of Appeals was correct when it noted that,
> upon such rejection, "[n]o additional proof of discrimination is required."

509 U.S. at 511-512.  Ms. Brownfield therefore may meet her burden of establishing

discrimination and/or retaliation by showing that the FDIC's proffered reasons were not the real

reason for its actions.  *Reeves v. Sanderson Plumbing Prod., Inc,* 530 U.S. 133, 147 (2000); *Aka*

*v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) *(en banc)*.  In this case, the FDIC's

proffered reasons for taking actions against Ms. Brownfield are belied by other evidence.  There

is evidence from which a reasonable jury could conclude that FDIC managers are dissembling to

cover up a discriminatory purpose.  *Reeves*, 530 U.S. at 147-48 (2000).

### A.     Mr. Bendler's Mischaracterization of Ms. Brownfield's Work is Evidence that He Was Covering Up a Discriminatory Motive.

A reasonable jury could infer from the fact that Mr. Bendler repeatedly mischaracterized

Ms. Brownfield's work contributions that he is covering up a discriminatory motive.  For

example, Mr. Bendler claimed that he told Ms. Brownfield that he was dissatisfied with her

progress on the credit card project that Mr. Lok asked him to help her with, DX 6, Bendler Dep.

at 91, but Mr. Lok testified that Mr. Bendler never asked about Ms. Brownfield's work until

weeks after the project was finished.  PX 6, Lok Dep. at 140.

Mr. Bendler also discredited Ms. Brownfield's job responsibilities by ignoring her budget

work.  He claimed it would be a "huge stretch" to say that Ms. Brownfield helped Ms. Mattus

with budget work.  DX 6, Bendler Dep. at 129.  However, Ms. Mattus's testimony that Ms.

Brownfield was a big help to her on budget work directly contradicts Mr. Bendler's minimizing

of Ms. Brownfield's work.  PX 5, Mattus Dep. at 38.

A reasonable jury could conclude that Mr. Bendler's characterization of Ms. Brownfield's

work on the CFOA project is mendacious. Mr. Bendler told Ms. Probst-Levy that he had assigned some of Ms. Brownfield's work to Ms. Kennedy because "Gail had some down time and asked Pam if she wanted help with some of the HRB highlights." PX 11, Sept. 1, 2004 e-mail from Bendler to Probst-Levy. Now Mr. Bendler uses this reassignment to justify Ms. Brownfield's low rating. MSJ at 25 ("Plaintiff was asked to write twelve Accountability Unit Review Summaries, but she only completed eight, and the remaining four had to be reassigned.") (citing DX 4, Bendler Aff. I).

Although Mr. Bendler claims that the summaries "had to be reassigned," the summaries were not due until October 15, 2004. DX 10, Brownfield Dep. at 59. Mr. Bendler had reassigned the summaries to Ms. Kennedy at least a month and a half before they were due from Ms. Brownfield. PX 11, Sept. 1, 2004 e-mail from Bendler to Probst-Levy. Ms. Brownfield was on track to finish the summaries on time. DX 10, Brownfield Dep. at 55. Moreover, the summaries that were assigned to Ms. Kennedy were simple and did not take more than a few hours to complete. PX 12, Gail Kennedy Dep. at 92-96.

In fact, there is plenty of evidence disputing Mr. Bendler's claim that Ms. Brownfield was a poor performer. *See* PX 5, Mattus Dep. at 64-65 (testifying that Ms. Brownfield is a "performer."); PX 2, Probst-Levy Aff. at 5 (testifying that Ms. Brownfield "does very good work."); PX 1, Nickle Aff. at 3 (testifying that Ms. Brownfield "[has] very good analytical skills" and that he sometimes seeks her out to help him on projects). As such, a reasonable jury could find that Mr. Bendler mischaracterized and misstated Ms. Brownfield's accomplishments because of his race-based bias against her.

32

**B.    Mr. Bendler's Claim That He Could Not Give Ms. Brownfield Work Because the Workload Had Declined is Belied By Evidence that Ms. Brownfield's White Colleagues Had Sufficient Work.**

Because of the overwhelming evidence that Ms. Brownfield's workload declined to almost nothing, Mr. Bendler has been forced to concede that he did not assign her any work despite her persistent requests. DX 10, Brownfield Dep. at 8; PX 16, e-mails from Brownfield to Bendler Regarding Work Requests; DX 6, Bendler Dep. at 99 (testifying that Ms. Brownfield consistently asked for work, and claiming that the MSS "workload started to decline considerably"). To justify this diminution of duties, Mr. Bendler claims that there was "a decline in overall MSS work." MSJ at 32. Yet, other employees had sufficient work. DX 9, Brownfield 2006 Aff. at 5 ("[A]ll my white co-workers were busy"). Indeed, while Ms. Brownfield had nothing to work on, Ms. Mattus was "overwhelmed" with her workload. PX 5, Mattus Dep. at 38-39. Ms. Probst-Levy noticed that Ms. Brownfield's CFOA responsibilities in 2005 decreased, while other staff members' responsibilities increased. PX 2, Probst-Levy Aff. at 3. Mr. Nickle also had a constant flow of work assignments. PX 1, Nickle Aff. at 3.

From this evidence, a reasonable jury could conclude that the real reason that Mr. Bendler would not assign available work to Ms. Brownfield (and claimed that there was none) was that he was discriminating and/or retaliating against her for her prior protected activity.

## CONCLUSION

As demonstrated above, there are numerous issues of material fact and inferences from the undisputed facts, which, when viewed in the light most favorable to Ms. Brownfield, would readily support jury findings that Mr. Bendler discriminated against her based on her race, and retaliated against her when she reported this discrimination. Therefore, the FDIC's Motion for

Summary Judgment must be denied.

Respectfully submitted,

_____/s/_____
David H. Shapiro
D.C. Bar No. 961326
Sarah L. Riger
D.C. Bar No. 486591
Swick & Shapiro, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, DC  20005
Tel. (202) 842-0300
Fax (202) 842-1418
dhshapiro@swickandshapiro.com
slriger@swickandshapiro.com
Attorneys for Plaintiff

34