# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

PAMELA A. BROWNFIELD,      )
                       )

     Plaintiff,          )
                       )

     v.                )     Case No. 1:05-cv-02468-EGS
                       )

SHEILA C. BAIR,          )
Chairman,               )
Federal Deposit Insurance Corporation,  )
                       )

     Defendant.          )
_____)

## DEFENDANT'S REPLY TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

In this race discrimination and retaliation case, Plaintiff alleges three claims arising from her employment as a Management Analyst in the Management Support Section ("MSS") in the Management Services Branch ("MSB") of the FDIC's Division of Administration ("DOA"):  a hostile work environment beginning in March 2004 based on race; denial of a pay raise in 2005 based on race; and retaliation beginning in May 2005 after Plaintiff filed an administrative complaint of discrimination concerning her lack of a pay raise.  See Amended Complaint (filed December 1, 2006) at 6-7.  Plaintiff has now abandoned her hostile work environment claim, as its underlying allegations were insufficient under the legal standards articulated by the Supreme Court and further elucidated in decisions from this Circuit.[1]  With respect to her remaining two claims, Plaintiff has not demonstrated a triable issue of pretext concerning management's non-

_____

[1] See Defendant's Motion for Summary Judgment and Memorandum in Support Thereof ("Motion for Summary Judgment") at 15-21.

discriminatory reasons for ranking her among the lowest 5% of FDIC non-bargaining unit

employees in 2005 (the "Group V" employees who received no pay raises that year), nor has she

shown that she was retaliated against after she filed an EEO complaint about her lack of a pay

raise.  As plaintiff has failed to discredit management's stated reasons for their actions with

sufficient, competent rebuttal evidence, summary judgment should be granted on all claims.  See

Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D. D.C. 2002).

## II.    UNDISPUTED FACTS SUPPORT SUMMARY JUDGMENT FOR DEFENDANT

Plaintiff has chosen not to address 28 of the 57 statements of fact set forth in Defendant's

Local Rule 7(h) Statement of Material Facts Not in Dispute ("Defendant's Statement").  See

Plaintiff's Statement of Genuine Issues ("Statement of Issues"), at 6 n.1, which states:

"Defendant's Statement No.'s 1, 5, 8-10, 12-14, 17, 22-25, 29, 36-41, 43-48, 56 and 57 are not

material to either motive, pretext, or whether a reasonable employee would be deterred from

EEO activity by Bendler's diminution of Ms. Brownfield's duties, and are therefore not

addressed herein."  Since these facts are not controverted by Plaintiff, they are deemed admitted

pursuant to this Court's Local Rule 7(h):  "In determining a motion for summary judgment, the

court may assume that facts identified by the moving party in its statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition

to the motion."  Moreover, Plaintiff's Statement of Issues does not actually controvert

Defendant's Statement Nos. 2-4, 6-7, 11, 16, 28, 34-35, 42 and 53, which are instead

characterized by Plaintiff as "not material" and/or "not disputed."  Statement of Issues at 6-16.

Accordingly, the facts that follow have been admitted by Plaintiff.

Background Information and Relationships – Plaintiff began her career at the FDIC in 1990 as a

grade 5 secretary.  Defendant's Statement ("DS") 1.[2]  She first became acquainted with Paul

Sherman in a non-supervisory capacity in 1992, and they generally interacted on a daily basis

after that.  Id.  Mr. Sherman became her supervisor around 1996, at a time when she had

progressed to a grade 9 Management Analyst.  Id.  Subsequently, Mr. Sherman competitively

selected her for promotion to a grade 11/12 Management Analyst position in his section.  DS 2.

While he was her immediate supervisor, Mr. Sherman gave Ms. Brownfield substantial

performance awards (including one for $2,000 in October 2000), as well as favorable

performance evaluations.  DS 3.  Ms. Brownfield's written comments on her performance

evaluations indicate that during this time period, she was an enthusiastic and engaged employee

who had a good relationship with Mr. Sherman.  DS 4.

In 2003, Plaintiff had been promoted to a grade 12 Management Analyst when Daniel

Bendler became her first-line supervisor and Mr. Sherman became her second-line supervisor, as

a result of a reorganization in DOA.  DS 5.[3]  Ms. Brownfield had known Mr. Bendler since he

had transferred into the section from the FDIC's Office of Inspector General (OIG) in 1996 or

1997.  DS 6.  They interacted daily on a first-name basis and had a cordial relationship.  Id.  Mr.

Bendler prepared Plaintiff's performance evaluation in 2003, which she characterized as

"outstanding."  DS 7.

Plaintiff's Non-selection for a Grade 13 Position in March 2004 – In late 2003, multiple grade 13

Management Analyst positions were posted in MSS, and Ms. Brownfield applied for this

promotion opportunity.  DS 8.  She qualified for the roster but in January 2004, before interviews

---

[2] For simplicity and because these facts have not been controverted by Plaintiff, citations here are
to the relevant statements of fact in Defendant's Statement previously filed with the Motion for
Summary Judgment.  Required citations to record evidence are found in Defendant's Statement
in accordance with LCvR 7(h).

[3] At this time, Mr. Sherman became the Assistant Director for MSB at the branch level and Mr.
Bendler became the supervisor of MSS, a section within MSB.

were held for the position, Ms. Brownfield had to leave the office for about four weeks to care for her terminally ill sister in Pittsburg.  DS 9.  While she was away, she stayed in contact with Mr. Bendler and others in the office on a daily basis.  Id.

Before Plaintiff returned to the office, the other candidates on the roster were interviewed by a panel consisting of three individuals who were not in the MSS chain of command.  DS 10. The interviewing panel (Mary Carmichael, from the OIG's office, Jerie Kitchens, the Special Assistant to DOA Division Director Arleas Upton Kea, and Rick Marlatt, an MSB employee from another section who was not in Mr. Bendler's chain of command) used a structured interview format in which all candidates were asked the same questions.  DS 11.  The interview questions and benchmark answers were approved in advance by the Human Resources Branch of DOA.  Id.  Ms. Carmichael did not know Ms. Brownfield, Mr. Marlatt was an MSB co-worker from another section, and Ms. Kitchens was a colleague with whom Ms. Brownfield had attended concerts and socialized outside the office.  DS 12.

In consideration of Ms. Brownfield's personal situation involving her sister's illness, Mr. Bendler contacted the Human Resources Branch ("HRB") and requested an extension of the roster for 30 days, so that the roster would not expire before Ms. Brownfield returned to the office.  DS 13.  Following her sister's death, Ms. Brownfield returned to work, was interviewed by the same panel that had interviewed all the other candidates (Ms. Carmichael, Ms. Kitchens and Mr. Marlatt), and was asked the same structured interview questions.  DS 14.  Ms. Brownfield was not among the top four candidates whose names were forwarded by the initial interview panel for further consideration by Mr. Bendler and Mr. Sherman, and therefore she was not selected for one of the grade 13 positions.  DS 16.  She became aware of her non-selection in March 2004.  DS 17.

Plaintiff's Group V CBC Ranking in February 2005 – When the FDIC implemented a compensation program for all non-bargaining unit employees called the Contribution-Based Compensation ("CBC") system for pay increases starting in 2005, employees covered by the CBC, including Plaintiff, were eligible for salary increases based on the relative contributions they made to the Corporation during the previous year (i.e., in 2004). DS 22. The CBC program provided for a tiered system with compensation determined by the level of individual employee contribution, in which each non-bargaining unit employee would be ranked and assigned to one of five groups, as follows:

Group I:     the top 10% of contributors.
Group II:    the next 15% of contributors.
Group III:   the next 25% of contributors.
Group IV:    the next 45% of contributors.
Group V:     the bottom 5% of contributors.

DS 23. While FDIC employees in Groups I-IV received percentage pay increases in amounts based on the group in which they were ranked, the lowest five percent of employees who were ranked in Group V received no pay increase in 2005. DS 24.

The CBC process was as follows:

To determine employee placement in the CBC's different performance categories for the 2004 ratings period the first line supervisors of all sections in the DOA independently ranked the employees in their section numerically from highest to lowest. The supervisors also filled out nomination forms for each employee that supported their ranking. All of the DOA sections' rankings were then combined and, with the help of a mathematical tool, were statistically divided into the five different performance groups. The rankings were weighted to reflect a person's ranking in relationship to the number of employees in their section. A person who was ranked number one out of the ten employees in his or her section, for example, would not place as high in a performance group as a person who was ranked number one out of his or her section of twenty employees. Once the performance groups had been created a management team reviewed the results. Employees who were placed in Group I and Group V were given special consideration, as were employees who fell close to the cut-off mark for each performance group. The management team reviewed the nomination forms for each of these employees and moved employees up or down in the performance

groups if it was determined that their original placement was not supported by the information provided in their nomination form.

DS 25. Mr. Bendler, Plaintiff's first-line supervisor, ranked the eight non-bargaining unit employees in his section by assessing their 2004 work-related contributions, but did not assign any of his employees to a CBC compensation group. DS 28. In 2004, Ms. Brownfield had been asked to participate in regional on-site internal control testing, but she declined to do so. DS 29. While participation was not mandatory, her lack of participation significantly lessened her contributions, and allowed other employees who substituted for her to make significantly greater contributions. Id.

DOA Director Arleas Upton Kea (an African-American woman) worked with the senior management team which reviewed all of the nomination forms and group placements. DS 34. Deputy DOA Director Bjorklund stated that Plaintiff's placement in Group V was not discriminatory and noted that Ms. Brownfield had "worked with mostly the same management staff during her tenure with the FDIC," and in past years, when her performance was good, she was "recognized and promoted for her performance and accomplishments." DS 35. The senior management review resulted in at least two African-American employees being moved from Group V to IV, and at least one Caucasian being moved from Group IV to V. DS 36.

During her deposition, Ms. Brownfield testified as follows:

> Q. And do you think that Ms. Kea's [the DOA Division Director's] approval of your being in group five was racially motivated?
>
> A. Yes, I do.
>
> Q. And why do you think that? She's a black woman, isn't she?
>
> A. It doesn't matter. Black people discriminate against black people.
>
> Q. Do you have any reason to – and what is the reason you think she discriminated against you?

A.  Well, I think it's easier to go along and say, oh, right, that black person didn't do that.  I think it would be, you know, because of the stereotypes that exist around black people that still exist today.  I believe she could easily say, oh, you say she didn't do it?  She didn't do it.  Instead of searching in her mind for what she knows that I've done, because we're her special staff, to know my history there in that place.

DS 37.  Another African American woman in MSB (Annette Nelson) was ranked in Group I and therefore received the highest raise possible under the CBC program.  DS 38.

Plaintiff's First EEO Complaint in May 2005 – After Ms. Brownfield was notified in February 2005 that she had been placed among the five percent of FDIC employees who had been ranked in CBC Group V, and therefore would not be receiving a raise, she contacted an EEO counselor for the first time on March 3, 2005.  DS 39.  Subsequently, on May 13, 2005, she filed a formal complaint of discrimination and designation of representative naming her current litigation counsel, Mr. Shapiro.  DS 40.  Her formal EEO complaint alleged that her CBC ranking was the result of race discrimination by Ms. Kea, Mr. Sherman and Mr. Bendler and that she had been subjected to a hostile work environment by Mr. Bendler and Mr. Sherman.  DS 41.

In her formal EEO complaint, Plaintiff elected not to pursue administratively any independent claims of discrimination for adverse actions that occurred before she was denied a pay raise in March 2005.  DS 42.  Instead, her formal complaint made allegations concerning only her lack of a pay raise and that she was subjected to a hostile work environment.  Id.  These were the only claims accepted for investigation.  DS 43.

In accordance with Plaintiff's express decision, other claims concerning a January 25, 2005, counseling memo, the designation of her position as surplus in December 2004, and Plaintiff's non-selection for the grade 13 position in 2004 were treated as background information only in connection with the administrative EEO investigation of her CBC pay raise

issue and hostile work environment claims, and the EEO investigator did not obtain affidavits from any of the interview panel members involved in the 2004 non-selection (Carmichael, Kitchens and Marlatt).  DS 44-45.

Plaintiff's Second EEO Complaint in March 2006 -- On March 24, 2006, Plaintiff filed a second formal complaint of discrimination based on race and reprisal, which she alleged had occurred "[c]ontinuously since May 2005 (when I filed a formal EEO complaint regarding my not being given a pay increase (CBC))."  DS 46.  Plaintiff's additional claims included an occasion when she was counseled verbally about a complaint by another manager (Ms. Steely), Plaintiff's ranking in Group III of the FDIC's Pay for Performance ("PFP") program, and allegations that her workload had decreased.  Id.

Alleged acts of Retaliation – In response to Defendant's discovery requests, Plaintiff identified the following alleged acts of retaliation:  (i) in February 2006, Mr. Bendler cautioned Plaintiff that Ann Bridges Steely, the Associate Director for DOA's Acquisition Services Branch ("ASB"), had complained about Plaintiff disturbing the employees in ASB's work area; (ii) her workload was lessened in 2005 when the responsibility for Chief Financial Officer Act ("CFOA") data write-ups was distributed among several employees (except for the procurement credit card area which she retained), she stopped receiving assignments to perform Directive reviews, and she was without work assignments for weeks at a time; and (iii) she was placed in Group III in the FDIC's Pay for Performance ("PFP") program (which replaced the CBC) in March of 2006.  DS 47.

In February 2006, Plaintiff was verbally counseled by Mr. Bendler after Ann Bridges Steely, the manager of DOA's Acquisition Services Branch ("ASB"), complained to Mr. Sherman that Ms. Brownfield had been spending an inordinate amount of time socializing in the

adjacent ASB office area and was distracting ASB employees.  DS 48.

In connection with the Agency's Pay for Performance ("PFP") program, Ms. Brownfield provided comments detailing the work she accomplished in 2005 which she added to her PFP form in February 2006 (and which was attached to her Formal Complaint of Discrimination filed in March 2006).  DS 53.  The PFP program replaced the CBC program in 2006.  DS 56.  The PFP program was applicable to all non-managerial FDIC employees, including those in the bargaining unit represented by NTEU as well as the non-bargaining unit employees who were previously covered by the CBC program.  Id.  Mr. Sherman explained Plaintiff's placement in PFP Group III as follows:

> Regarding the issue of the Pay for Performance program in 2006, I was involved in the placement process.  We were tasked with placing 25% of DOA employees in group I, 50% in group II and 25% in group III.  My managers and I met to discuss the contributions of each eligible employee in our branch of DOA and we ranked our employees based on a comparison of each person's total contributions over the past year.  At this point we did not assign employees to any groups.  We were required to give Ms. Kea our best synopsis of each employee's significant contributions and [were] not expected to itemize everything each employee did. If we had applied the mandated percentages (i.e., 25%, 50%, 25%) at the branch level, Ms. Brownfield would have been in Group III (the lowest 25%) but for our internal MSB purposes, we were not required to assign percentages.  (That came later in the DOA process.)  The MSB prioritized rankings were aggregated with the rankings of all other DOA organizations, and the senior management reviewed all the write-ups – especially those closest to the break points between the three groups – before recommending any adjustments to the aggregate rankings.  There were very few adjustments to the aggregate rankings.  DOA senior management collectively concurred in the final group placements for all eligible DOA employees and forwarded these recommendations to Ms. Kea for final review and approval.  She reviewed the list over the course of a week and passed it to the COO's office for final approval.  I felt group III was appropriate for Ms. Brownfield and this was not a negative view of her work.  We did not penalize her or look upon her contributions in a negative manner.  Rather we evaluated her total contributions in comparison to those of all other DOA employees and group III was where we felt she was properly placed.  She did some good work, but she just did not distinguish herself in relation to many other employees on the DOA staff.

Id.

Plaintiff's Current Employment Status – Approximately five months after she filed her second EEO complaint in March 2006, Ms. Brownfield obtained a lateral transfer to an equivalent CG-12 Program Analyst position in the FDIC's Division of Information Technology in August 2006, with no loss of pay or benefits, where she remains employed today.  DS 57.

## III.    PLAINTIFF'S STATEMENT OF ISSUES AND HER MEMORANDUM IN OPPOSITION MISSTATE AND MISCHARACTERIZE THE RECORD

### A.  Plaintiff's Statement of Genuine Issues Disputes Matters That Are Undisputable.

Plaintiff's Statement of Genuine Issues disputes a number of facts that are beyond dispute.  For example, in connection with Ms. Brownfield's non-selection for promotion in 2004, Plaintiff disputes DS 15, which reads:  "Plaintiff did not perform well during the interview."  Ms. Brownfield's own affidavit, cited by Defendant as record evidence in support of this statement, stated:  "I did not have enough time to prepare for the interview and did not perform well during the interview."  Brownfield Aff. I (DX 4[4]) at 4; see also id. at 6.  Similarly, in her deposition, which was also cited in DS 15, she said:  "I recall stuttering, and not being able to think very clearly."  Brownfield Dep. (DX 10) at 38; see also id. at 136.[5]

Plaintiff also takes issue with DS 18, which reads:  "In December 2004, as part of an FDIC-wide downsizing process, Plaintiff's grade 12 position was listed (along with 130 other DOA positions) as a "surplus" position due for eventual elimination.  Bendler Aff. I at 4-5;

---

[4] To be consistent with Plaintiff's designations, exhibits are referred to as "DX" or "PX" herein.

[5] Moreover, it is undisputed that the impartial panel conducting the initial interviews did not refer Ms. Brownfield as one of the top candidates for further consideration by Mr. Bendler and Mr. Sherman after she was interviewed.  DS 16.  The initial interviewing panel referred four diverse candidates for further consideration – a white male (Mr. Gately), an Asian male (Mr. Lok), a white female (Ms. Mattus) and a black female (Valeria Baker).  See Interview Score Sheets (PX 7-8); Gately Dep. (PX 9) at 5 (agreeing that he is a white male); Lok Dep. (PX 6) at 5 ("I am Chinese"); Mattus Dep. (PX 5) at 4 (agreeing that she is a white female); Kitchens Dep. (DX 20) at 88-92 (testifying that she socialized with both of the African-American candidates, Pam Brownfield and Valeria Baker).

Sherman Aff. I at 4." But this is certainly not in dispute (in fact, it was part of her hostile work environment allegations, see Amended Complaint at 3-4).

Plaintiff states there is a question of material fact regarding DS 20, which states that "Ms. Brownfield became withdrawn and uncommunicative, both with other MSS staff and with management," citing Bendler Aff. I at 5. While Plaintiff may quibble over semantics, it is undisputed that Ms. Brownfield isolated herself from her coworkers. See, e.g., Brownfield Aff. I (DX 8) at 5; Brownfield Dep. (DX 10) at 63-64; January 31, 2005 memo from Brownfield to Bendler (PX 15) at 1 ("You basically told me that I could not go around snubbing my coworkers and walking around not speaking to them. I responded that there were no rules established which required that employees be friends or acquaintances, that as long as I do my work, I am entitled to be quiet, alone and have my door closed."); Probst Aff. (PX 2) at ¶¶ 5, 9 ("I did hear from other staff that Ms. Brownfield kept to herself"); see also Nickle Aff. (PX 1) at ¶ 10; Bendler Aff. I (DX 4) at 5; Sherman Aff. I (DX 25) at 4 ("[S]he withdrew and did not interact with others in her section or with Mr. Bendler. She went from an open-door, friendly presence on the floor to not wanting to talk to anybody. She kept her door closed and did not participate in the section's working environment. Ms. Brownfield refused to discuss the issue with Mr. Bendler and was non-responsive to his inquiries about her behavior and work assignments."); Sherman Aff. II (DX 26) at ¶ 3 ("She stopped talking to me and began to keep her door closed – distancing herself from the rest of the staff.").

Plaintiff also disputes DS 27: "In accordance with the parameters of the CBC program, she did not receive a pay raise for 2005 due to her Group V ranking, which was reviewed by senior DOA management, including Deputy Director Glen Bjorklund and Division Director Arleas Upton Kea, who is both an African American woman and head of the FDIC's diversity

awareness program.  Id. [Sherman Aff. I at 2-3] ; Bjorklund Aff. at 2-3; Kea Aff. I at 1."  There

is no record evidence disputing that this is how the CBC review process was conducted, nor that

Plaintiff's inclusion in the 5 % of employees who were ranked in Group V resulted in her

receiving no pay raise that year.  See DS 24-25.

### B.  Plaintiff's Opposition is Replete with Mischaracterizations and Misstatements.

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment

("Opposition") is filled with mischaracterizations and misstatements of the evidentiary record

that has been adduced during discovery.  For example, Plaintiff incorrectly states that:

> Mr. Bendler and Mr. Sherman selected Mr. Gately without interviewing him themselves.
> (Mr. Gately had been the only candidate to be interviewed by the first interview panel
> twice).  PX 9, Bill Gately Dep. at 26-29.

Opposition at 5.  This assertion is then repeated twice later in the brief as well, see id. at 18 and

22.  However, these statements in the Opposition completely disregard the corrections to Mr.

Gately's deposition transcript that were previously sent to Plaintiff's counsel.  See cover letters

from William S. Jones, transmitting errata sheets for deponents Carmichael, Lok, Mattus, Gately,

Kitchens, Sherman, Bendler and Kennedy (attached hereto as DX 29).  As corrected, Mr.

Gately's responses to questions about his second interview are as follows:

Q.  Who interviewed you the second time?

A.  June DeRousse, Paul Sherman and Dan Bendler.

Q.  The same group?

A.  No.

Q.  It was Rick Marlatt, Jerie Kitchens and Mary Carmichael?

A.  No.

Q.  They interviewed you twice.

A.  No.

<u>See</u> Gately Errata (attached hereto as DX 30), at 2 (corrections to page 27, lines 1, 3, 6 and 8; <u>see also</u> correction to page 28, line 18).  Mr. Gately's corrected testimony is consistent with the testimony of both Mr. Sherman and Mr. Bendler that they interviewed all four top candidates who were referred by the initial interview panel.  Sherman Dep. (DX 27) at 137 ("I was on the second interview panel where four candidates were interviewed and three were selected."); <u>see also id</u>. at 144; Bendler Dep. (DX 6) at 53.  And it is consistent with the testimony of the two other selectees (David Lok and Holly Mattus) that they were interviewed by two different interview panels.  <u>See</u> Mattus Dep. (PX 5) at 46-53; Lok Dep. (PX 6) at 128-129.

Unfortunately, this is not an isolated incidence, and there are numerous other erroneous or misleading statements in Plaintiff's Opposition, examples of which follow.

A.  <u>Opposition at 7-8</u> – Statement: *"Mr. Bendler claimed that Ms. Brownfield's colleagues had complained to him about Ms. Brownfield's behavior.  DX 6, Bendler Dep. at 172.  However, there is no evidence of this other than Mr. Bendler's claim."*

<u>Defendant's Response</u>:  This completely misstates Mr. Bendler's deposition testimony that is cited by Plaintiff, in which Mr. Bendler responded to Plaintiff's counsel as follows:

> Q.  Who didn't feel comfortable with her?  Who told you that they didn't feel comfortable with good old Pam not behaving in a good old way?
>
> A.  Gail Kennedy, David Lok, Bill Gately all approached me.
>
> Q.  Out of concern for Pam?
>
> A.  Well, just out of concern generally.

Bendler Dep. (DX 6) at 172.  Clearly, Mr. Bendler did not say that Plaintiff's coworkers had "complained" about her; and having grossly misstated Mr. Bendler's testimony, it is not surprising that Plaintiff finds no other evidence of this misstatement.  What is clear, however, is that Ms. Brownfield had isolated herself from her MSS coworkers.  <u>See</u> discussion in section

III.A above and DS 20. This would have reasonably caused "concern" on the part of her MSS coworkers, particularly since Ms. Brownfield was previously known to be "talkative and friendly," Probst Aff. (PX 2) at ¶ 3, and she was apparently overly loquacious with non-MSS staff, to the extent that it provoked a complaint from Ms. Steely, the ASB supervisor.

B.  <u>Opposition at 8</u> – Statement:  *"In order to justify his rankings, Mr. Bendler wrote a bullet-pointed list of each employee's accomplishments for the year.  PX 10, 2005 CBC Rankings."*

<u>Defendant's Response</u>:  Contrary to Plaintiff's assertion, her exhibit PX 10 is not the "2005 CBC Rankings," but merely represents Mr. Bendler's preliminary notes for preparing the CBC forms, as he clearly testified during his deposition.  Bendler Dep. (DX 6) at 185-87.  In order to rebut Plaintiff's misleading characterization of her exhibit PX 10, copies of the actual CBC nomination forms showing the final rankings for all MSB employees are attached hereto as DX 31.

C.  <u>Opposition at 8</u> – Statement:  *"Ms. Brownfield's lack of a pay raise [in 2005] was based entirely on Mr. Bendler's report to his supervisors.  DX 27, Sherman Dep. at105 (testifying that senior management relied on the immediate supervisor's write-up)."*

D.  <u>Opposition at 23</u> – Statement:  *"Upper management was entirely at [Mr. Bendler's] mercy when they were determining Ms. Brownfield's pay raise [in 2005], because they only knew what Mr. Bendler told them.  DX 27, Sherman Dep. at 105 (testifying that senior management relied on the immediate supervisor's write-up)."*

E.  <u>Opposition at 24</u> – Statement:  *"In fact, Mr. Sherman merely relied on Mr. Bendler's CBC nomination form in denying Ms. Brownfield a pay raise.  DX 27, Sherman Dep. at 105 (testifying that senior management relied on the immediate supervisor's write-up).  He approved Mr. Bendler's discriminatory act without independently assessing Ms. Brownfield's performance.  Mr. Sherman did not, as the Defendant claims, evaluate Ms. Brownfield's performance and agree with Mr. Bendler's assessment."*

<u>Defendant's Response</u>:  All of these statements disregard Mr. Sherman's errata sheet (DX 27-1), which was filed as an exhibit to the Motion for Summary Judgment.  As corrected, his testimony is as follows:

> Q.  All right.  Now you will agree with me that if Mr. Bendler had gotten it wrong and there was a lot to more to say about Pam's contribution nobody up there would have known about it?  Nobody among the senior management would have known enough

to challenge that, correct?

A. Not necessarily so.  If there were more significant contributions, I would have known and other Seniors [sic] Managers may have as well.

Q. They were stuck with what Bendler said as they were with all of the immediate supervisor's saying.

A. Not necessarily.  As Senior Managers, we had some interaction with the employees as well and had some basis for understanding their contributions.

Q. So if an immediate supervisor – I'm talking theoretically now – if an immediate supervisor wanted to stick it to one of his people, all he'd have to do is write a short, small, de minimus, minimizing write-up and that would do it, wouldn't it?

A. It could, but it's very conceivable that someone else would have recognized that and clarified the reward.

DX 27 at 105 and DX 27-1 at 3-4.  See also Sherman Dep. (DX 27) at 88-89 (discussing the initial CBC ranking process for the 16 employees in MSB).  Mr. Sherman's testimony that he would have known if Plaintiff had made more significant contributions in 2004 is consistent with Ms. Brownfield's testimony that she generally interacted with Mr. Sherman on a daily basis during this time period.  See Brownfield Dep. (DX 10) at 25-27.  Moreover, Deputy Director Bjorklund, who participated in the senior management reviews, stated that "[e]mployees who were placed in Group I and Group V were given special consideration . . . ."  Bjorklund Aff. (DX 7) at 2; DS 25 (which was "not addressed" in Plaintiff's Statement of Issues).  It is a gross mischaracterization of the record evidence concerning the CBC program to say that Ms. Brownfield was ranked in Group V solely on Mr. Bendler's say so.

F.    *Opposition at 13-14* – *Statement:  "Immediately after Mr. Bendler learned that Ms. Brownfield was complaining about his discrimination, he began decreasing her workload.  PX 17, Brownfield Decl.; DX 10, Brownfield Dep. at 107.  Prior to filing an EEO complaint, Ms. Brownfield was the coordinator for the DOA directives review process.  Id. at 109.  However, in 2005, this work was inexplicably taken away from her.  Id. at 109-110 (testifying that on e-mails she had been listed as the contact for the review process, but in 2005, she was suddenly no longer the contact); PX 1, Nickle Aff. at 3."*

G. <u>Opposition at 26</u> – Statement: *"Her position as coordinator for the DOA review process directives was taken away without explanation in 2005 immediately after she complained of discrimination. DX 10, Brownfield Dep. at 109-110."*

H. <u>Opposition at 28</u> – Statement: *Ms. Brownfield's work on the DOA review process directives disappeared right after she complained of race discrimination. Id. [PX 17, Brownfield Decl.] at ¶ 3.*

<u>Defendant's Response</u>: Ms. Brownfield's July 12, 2007, declaration does not support the statement that her role as DOA contact for the review of directives changed after she filed her administrative complaint of discrimination in May 2005. To the contrary, she states that "[t]he last directive I received for processing was in February 2005 . . . ," PX 17 at ¶ 3, months <u>before</u> she filed her complaint. Mr. Bendler explained that this work was <u>not</u> given to others in MSS:

> As for the Directives Review Process, DOA's Corporate Services Branch no longer required our services in this area. The work, previously assigned to Ms. Brownfield, was not reassigned to any other member of the staff – but is instead an example of our diminished workload in certain areas.

Bendler Aff. II (DX 5) at 5; <u>see also</u> Probst Aff. (PX 2) at 3 ("I do not know who does it now . . . ."). Moreover, Mr. Sherman stated that the directives review process "was a marginal assignment of hers and generally would not have required more than 1 hour per week." Sherman Aff. II (DX 26) at ¶ 5. Plaintiff is attempting to manufacture a material issue where none exists.

I. <u>Opposition at 14</u> – Statement: *"[T]he majority of Ms. Brownfield's CFOA work was redistributed to other employees in 2005. . . . This did not make much sense, since Ms. Brownfield's work on the CFOA project had always been well received. PX 2, Probst-Levy Aff. at 3."*

<u>Defendants' Response</u>: Ms. Probst (now Probst-Levy) did not in any way testify that the change in the way the CFOA program was administered "did not make sense." As explained by Mr. Bendler, the change in CFOA procedures was made for valid business reasons:

> At one time, Ms. Brownfield was assigned to write most of the CFOA risk analysis summaries. However, some members of the staff suggested that the individuals who actually conducted the reviews/studies prepare their own written summaries. This combined with other factors led me to improve our practice by allowing employees to take ownership of their projects "from cradle to grave." In so doing, the responsibility

for preparing written CFOA summaries shifted from Ms. Brownfield exclusively to other members of the staff including Ms. Brownfield.

Bendler Aff. II (DX 5) at 5.  While Plaintiff asserts that she should have retained her prior responsibility for writing CFOA summaries for projects she was not otherwise involved in, such micromanagement of management decisions concerning business processes is not within Title VII's purview.  As the D.C. Circuit has cautioned, Title VII "does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions."  Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation marks omitted).

*J.  Opposition at 14 – Statement:  "[T]he white, non-complaining Management Analysts were busy and working overtime.  [PX 16] at bate-stamp 37; DX 10, Brownfield Dep. at 7."*

Defendant's Response:   The statement that others were working overtime is based entirely on Ms. Brownfield's speculation.  Mr. Bendler, who as a supervisor would have known about his employees' schedules, informed Plaintiff that others in the section were not working overtime. See PX 16 at Bates-stamp 00038.  Even Mr. Nickle, who as a project leader would have been in a better position than Ms. Brownfield to know what others were doing, stated that "it is hard for me to determine exactly what my co-workers are doing at any one time since we do not have much communication among Branch members or the office management. . . . Communication in the Branch is poor . . . ."  Nickle Aff. (PX 1) at ¶ 4.

*K.  Opposition at 15 – Statement:  "[S]he realized that [Mr. Bendler] had made a joke about her [during an MSB luncheon in February 2006].  DX 10, Brownfield Dep. at 133.  See PX 2, Probst-Levy Aff. at 4-5 (testifying that she believes that Mr. Bendler would make a joke about Ms. Brownfield)."*

Defendant's Response:  At her deposition, Ms. Brownfield readily admitted that her supposition that Mr. Bendler made a joke about her at an official luncheon which she had declined to attend (but which was attended by Ms. Kea, the Division Director who is African-American, Mr. Bjorklund, the Deputy Division Director, as well as Mr. Sherman and other MSB staff), was

based wholly on her own speculation and that she had no personal knowledge of what occurred

at the luncheon.  Brownfield Dep. (DX 10) at 132-134.  But in the Opposition, this has magically

been transformed into a "realization" that Mr. Bendler had made a joke about her.  Not

surprisingly, no one observed Mr. Bendler making a joke about Ms. Brownfield.  See, e.g.,

Nickle Aff. (PX 1) at ¶ 7; Bendler Aff. II (DX 5) at ¶ 7; Kea Aff. II (DX 19) at ¶ 6; Sherman Aff.

II (DX 26) at ¶ 7.  The Probst affidavit cited by Plaintiff stated "I was not there" but went on to

speculate "it was possible that Mr. Bendler would make a joke about Ms. Brownfield . . . ."

     While this wholly unsupported character assassination of Mr. Bendler would ordinarily

not be worthy of further discussion, it is important here for two reasons.  One, it illustrates the

extent to which Plaintiff is willing to misrepresent the record evidence in this case in order to

avoid summary judgment.  But perhaps as important, it shows Ms. Brownfield's distorted and

paranoid view of her employment situation at the FDIC that began in March 2004, after she

interviewed poorly for the grade 13 Management Analyst position, which caused her not to be

referred by the impartial initial interview panel for further consideration.  As a result, she chose

to isolate herself from management and her co-workers, minimize her participation in work

assignments, and her performance declined.  In sum, the "bad things" that happened to Ms.

Brownfield were caused by her own actions, and were not the result of some latent racism on the

part of her supervisors with whom she had worked for years in a friendly environment.

## IV.   PLAINTIFF HAS ABANDONED HER CLAIMS THAT WERE NOT PROPERLY EXHAUSTED AND/OR WERE NOT ADVERSE EMPLOYMENT ACTIONS

     In the Motion for Summary Judgment, Defendant noted that Plaintiff was improperly seeking

remedies (such as a promotion to grade 13, see Amended Complaint at 8[6]) for claims that were not

---

[6] See also Plaintiff's discovery responses (DX 24) at 7-8 (stating that relief sought includes "back pay from March 2004 when she was denied promotion . . . .").

administratively exhausted and/or were not adverse employment actions, such as (i) her non-selection for promotion in March 2004, (ii) placement of her position on the "surplus" list in December 2004, and (iii) her receipt of an informal counseling e-mail from Mr. Bendler in January 2005. See Motion for Summary Judgment at 8-15; DS 42 (stating, inter alia, that "Plaintiff elected not to pursue administratively any independent claims of discrimination for adverse actions that occurred before she was denied a pay raise in March 2005."). Plaintiff's Opposition does not address Defendant's contentions concerning these claims except in a footnote. See Opposition at 13 n. 3 ("Evidence of the 2004 promotion and of her job being targeted for elimination may still be used to raise an inference of discrimination. *See Morgan*, 536 U.S. at 102 (holding that evidence of prior discrimination may be considered as 'background evidence.').") Similarly, they are addressed in Plaintiff's response to DS 42: "Not disputed or material. However, these earlier acts of discrimination, <u>although not before the court independently</u>, do support here timely discrimination and retaliation claims. *See National Ry. Corp. v. Morgan*, 536 U.S. 101, 102 (2002) (holding that evidence of prior discrimination may be considered as 'background evidence' of discrimination)." Statement of Issues at 14 (emphasis added). Inasmuch as Plaintiff has admitted that these earlier alleged acts of discrimination are raised as background evidence only and are not independent claims in this action, prayer for relief (d) (seeking a remedy for her non-promotion in 2004) should be denied and/or struck from the Amended Complaint, or otherwise eliminated as an issue in this case.

## V.    PLAINTIFF HAS ABANDONED HER HOSTILE WORK ENVIRONMENT CLAIM

In the Motion for Summary Judgment, Defendant demonstrated that Plaintiff's hostile work environment claim was insufficient as a matter of law, because: (i) Plaintiff cannot make out a prima facie hostile work environment claim under Title VII; (ii) Plaintiff's non-recognition of her hostile work environment is fatal to her claim; and (iii) the discrete acts alleged by Plaintiff do not

support a hostile work environment claim. <u>See</u> Motion for Summary Judgment at 15-21. Plaintiff

has not addressed any of these arguments in her Opposition. In fact, the phrase "hostile work

environment" does not appear anywhere in either Plaintiff's Opposition or in her Statement of

Issues. Accordingly, Plaintiff has abandoned her hostile work environment claim and judgment

should be entered for Defendant on Count I of the Amended Complaint.

**VI.    PLAINTIFF HAS FAILED TO ADDUCE SUFFICIENT, COMPETENT EVIDENCE SHOWING THAT MANAGEMENT'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR HER GROUP V CBC RANKING IN MARCH 2005 (WHICH RESULTED IN THE DENIAL OF A PAY RAISE, THE BASIS FOR HER RACE DISCRIMINATION CLAIM) WERE PRETEXTUAL**

In Count II of her Amended Complaint, Plaintiff alleges that she was denied a pay raise

based on her race. Amended Complaint at ¶ 22. As Plaintiff has abandoned her allegations that

she was subjected to a hostile work environment due to her race (as discussed above in section

V), her sole remaining claim of race discrimination in the Amended Complaint is based on this

allegation that she was denied a pay raise under the FDIC's CBC program in 2005.

The record evidence, however, shows that Ms. Brownfield was placed in CBC Group V

(the lowest 5 % of non-bargaining unit employees who consequently received no pay raises) for

legitimate, non-discriminatory reasons that were consistent with Mr. Sherman's conclusion that

her contributions were the least of all the employees in his Management Services Branch. See

discussion and evidentiary citations in the Motion for Summary Judgment at 23-27; Sherman

Aff. I (DX 25) at 2 ("In the judgment of the MSB management team, she was our least

productive contributor in 2004."). Her immediate supervisor, Mr. Bendler, did not assign her to

Group V at either the section or branch level phases of the CBC process in which he participated.

Bendler Aff. I (DX 4) at 2; Sherman Dep. (DX 27) at 87-90 (describing the MSB management

team's CBC deliberations at the branch level, which resulted in the ranking of the 16 non-

bargaining unit employees from highest to lowest, but no assignments to any of the five CBC groups). Her Group V ranking was only determined at a later phase of the CBC process, in which Mr. Sherman participated as a senior DOA manager, when all 200 plus non-bargaining unit DOA employees were considered. Sherman Aff. I (DX 25) at 2. The material facts summarized below which led to her placement in Group V are not disputed.

It is beyond dispute that subsequent to Ms. Brownfield's non-promotion in March 2004 (after her non-referral by a fair and impartial initial interviewing panel for further consideration by Mr. Sherman and Mr. Bendler), she became uncommunicative with both MSB management and staff. See discussion above in section III.A. It is also undisputed that in 2004, unlike in other years, she declined to participate in any out of town field-work, thereby losing the opportunity to contribute to the success of these projects. DS 29 (not controverted by Plaintiff). When given the opportunity to participate in the headquarters procurement card review, she only completed reviews of four cardholders, while Mr. Lok completed 71. Lok Dep. (PX 6) at 137-39.[7] Ms. Brownfield's continued non-responsiveness to Mr. Bendler's concerns about completing the 2004 CFOA summaries in a timely manner caused him to re-assign half of them to other MSS personnel, despite her demonstrated ability to perform these tasks successfully in prior years when she had a better attitude. Bendler Aff. I (DX 4) at 3. In short, the record shows that due to her resentment at not being promoted in March 2004, Ms. Brownfield made only minimal and begrudging contributions to MSS efforts for the remainder of the year.[8]

---

[7] Mr. Bendler gave her credit for reviewing "around six." Bendler Aff. I (DX 4) at 3. While Plaintiff has noted that Mr. Bendler and Mr. Lok have differing recollections as to how Ms. Brownfield was assigned to the procurement card review project (perhaps illustrating Mr. Nickle's comment in his affidavit that "[c]ommunication in the Branch is poor," PX 1 at ¶ 4), the absolutely minimal contribution that she made to the project is undisputed.

[8] Ms. Brownfield did not even respond to Mr. Bendler's request for employee input as to their contributions to be considered in the CBC evaluations. See Bendler Dep. (DX 6) at 185-86.

Plaintiff has failed to raise a material issue of fact that would cast management's reasons for her Group V ranking into the realm of pretext. The CBC process was structured with multiple levels of management review up to and including the Division Director, Ms. Kea, who is African-American. Both Mr. Bendler (or "Danny," as Plaintiff used to call him in happier times, see e-mails filed with the Motion for Summary Judgment as DX 12) and Mr. Sherman had friendly relationships with Plaintiff for many years and both had given her very favorable performance reviews prior to 2004, when her performance plummeted after her non-promotion. See, e.g., PX 19, Plaintiff's 2003 performance evaluation (prepared by Mr. Bendler) and Plaintiff's 2002 performance evaluation (prepared by Mr. Sherman). Mr. Sherman was an active participant in the CBC process, both at his branch's level and during the more senior management review sessions. Sherman Aff. I (DX 25) at 2. He was familiar with Plaintiff's job responsibilities and performance. See id. at 2-4. Moreover, at the time Ms. Brownfield was ranked in CBC Group V due to her lack of corporate contributions, another African-American female employee in MSB, Annette Nelson, was ranked in CBC Group I, the highest group. See DX 31 at Bates no. 00752. (Meanwhile, Mr. Gately, the white male employee supposedly favored by Mr. Bendler, see Opposition at 17-18, fared hardly better than Plaintiff, since he was ranked in CBC Group IV. See DX 31 at Bates no. 00741.) Considering all of the evidence found in the record before the Court, Plaintiff has failed to raise a material issue of fact that would preclude summary judgment for Defendant as to Plaintiff's race discrimination claim, Count II of the Amended Complaint.[9]

---

[9] Although not found anywhere in the Amended Complaint, an additional allegation was raised in Plaintiff's interrogatory responses: "Plaintiff also alleges she was discriminated and retaliated against when she was placed in Group III in Pay for Performance in March 2006." See DX 24 at 4-5. To the extent that this allegation is properly an issue in this case, while absent from the Amended Complaint, management's legitimate, non-discriminatory reasons for her placement in

## VII.   PLAINTIFF HAS FAILED TO ADDUCE SUFFICIENT, COMPETENT EVIDENCE THAT SHE WAS SUBJECTED TO UNLAWFUL RETALIATION

In Count III of her Amended Complaint, Plaintiff alleges that "[b]y substantially changing plaintiff's work responsibilities and intensifying the hostility of the work environment, defendant unlawfully retaliated against plaintiff because she filed a complaint of discrimination regarding her not being given a pay raise in May 2005."  Amended Complaint at ¶ 24.  As Plaintiff has abandoned her allegations concerning a hostile work environment, see discussion above in section V, her sole remaining claim of retaliation is based on her changed work responsibilities after she filed an EEO complaint on May 13, 2005.[10]

The record evidence shows that the first time Plaintiff raised the subject of her work assignments was on November 21, 2005 (over six months after she filed her EEO complaint), when she sent an e-mail to Mr. Bendler which stated:  "I know it's the end of the year and all the CFOA requirements have been met and things have slowed down.  Just wondering if you have anything for me to work on.  It's very quiet on my end."  PX 16, at 00032.[11]  In response, Mr.

_____

PFP Group III (the lowest 25 % of all FDIC employees) were stated in detail in the Motion for Summary Judgment at 32-33.  Both Mr. Bendler and Mr. Sherman participated in Plaintiff's PFP ranking, as her supervisor and as the reviewing official, respectively.  See PX 14, Brownfield PFP evaluation form dated 2/22/06, at 3.  Notably, PX 14 indicates she received a "1" ("Consistently performs below expectations") for "Oral Communication," reflecting management's concerns with her lack of interaction with other MSS employees in 2005, as documented in Mr. Bendler's informal counseling e-mail, see DX 17, and as tacitly admitted by Ms. Brownfield in her PFP comments, see PX 14 at 3 (where she wrote "The rating of '1' did not take into consideration my communication with FDIC employees outside of MSS . . . .").  As with her CBC ranking, Plaintiff has not brought forth any competent evidence that would raise the inference that her supervisors, with whom she had a long history of friendly relations and from whom she had received laudatory performance evaluations prior to 2004 (and in the case of Mr. Sherman, substantial cash awards), would make up pretextual reasons to hide a racial animus for placing her with the 25 % of all FDIC employees ranked in PFP Group III.

[10] To the extent that her discovery responses alleged that her placement in PFP Group III was also retaliatory (although not alleged in the Amended Complaint), see the discussion above in section VI n. 9, which is applicable equally to her claims of race discrimination and retaliation.

[11] While Plaintiff never complained about a lack of work before the end of November 2005, she

Bendler agreed there was an "end of year lull in the action" at that time, id. at 00034, and he

gave her two assignments on or about December 5, 2005. See id. at 00036. Subsequently, at

various times from January 31, 2006 through April 4, 2006, Ms. Brownfield sought additional

assignments when she was underutilized. See id. at 00037-00047. As Ms. Probst stated in her

affidavit, much of the MSS workload "ebbs and flows," PX 2 at ¶ 4, so this was not necessarily

unusual. See also Bendler Aff. II (DX 5) at ¶ 4 (work in MSS is cyclical). Moreover, Ms.

Brownfield's assertions that other MSS employees were always busy are only based on her

speculation. See discussion above at 17.

     Contrary to Ms. Brownfield's claims that her workload declined significantly, her PFP

evaluation, covering the period through December 31, 2005 (see PX 14 at 1), describes

significant projects to which she was assigned, including the FDIC's procurement credit card

program, activities in support of the CFOA program, analyses of reorganization proposals from

the FDIC's Office of Diversity and Economic Opportunity as well as the Legal Division, a

project involving NFE (New Financial Environment) procurement reports for multiple FDIC

divisions, participation in a review of ASB's electronic contract filing system, and auditing time

and attendance records of DOA employees. See id. at 2. Moreover, in her own PFP comments,

Ms. Brownfield contended (and continues to contend in this lawsuit) that management's PFP

write-up understated her accomplishments during the assessment period. See id. at 3; see also

---

now contends, in a newly minted declaration dated July 12, 2007, that by "July 2005" her CFOA
responsibilities had been "diminished significantly." See PX 17 at ¶ 4. Plaintiff does not
indicate just how she determined that she had "significantly diminished" CFOA responsibilities
by July, and her statement is inconsistent with the assertion that the CFOA summaries which she
formerly prepared were due in mid-October, see Opposition at 32. Moreover, reassignment of
the CFOA summaries to those employees responsible for the field-work did not cause a
significant decrease in Plaintiff's overall workload, as they were "not difficult (the summary
reports were pre-structured documents that ran from one to three pages in length depending on
the test results)," Sherman Aff. I (DX 25) at 3 (which made it even more troubling that she had
performed this task poorly and was unresponsive to management's concerns about it in 2004).

Brownfield Aff. II (DX 9) at ¶ 8 ("Mr. Bendler completely left out some important work I did. In an email addressed to him, I pointed out that I prepared the schedule, agenda and minutes for the Customer Advisory Committee bi-monthly meetings.  I am the only person in the Corporation who does this yet he said nothing of it in my evaluation.  He also stated in my PFP form that I 'helped' with revisions to CFOA documents when in fact I did all the revisions myself.").

The record evidence (including Plaintiff's own statements) does not support her contention that she was left with significantly diminished responsibilities following her EEO complaint or that any changes in her work assignments occurred sufficiently close in time after her EEO complaint to support an inference of retaliation, as required by applicable case law.[12] Accordingly, Plaintiff has failed to raise a material issue of fact that would preclude summary judgment for Defendant as to Plaintiff's retaliation claim, Count III of the Amended Complaint.

## VI.    CONCLUSION

For the foregoing reasons in this reply brief (which due to LCvR 7(e)'s page limitations does not address each and every point raised in the Opposition with which Defendant disagrees), and for the reasons set forth in the Motion for Summary Judgment, Defendant respectfully requests that its motion be granted, and that this matter be dismissed with prejudice.

Respectfully submitted,

/s/ *William S. Jones*

_____
William S. Jones
Georgia Bar No. 404288
Counsel, Legal Division
Federal Deposit Insurance Corporation

_____

[12] See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval circuit cases rejecting temporal proximity of three and four months as evidence of causation).

3501 N. Fairfax Drive (VS-E6006)
Arlington, VA 22226
(703) 562-2362
(703) 562-2482 (Fax)

Patricia Davison-Lewis
D.C. Bar No. 414378
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive (VS-E6010)
Arlington, VA 22226
(703) 562-2315
(703) 562-2482 (Fax)

Attorneys for Defendant

Dated: August 1, 2007